IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LI SHAOMING, et al,<br><br>Defendants. | Criminal No. 4:13-cr-147<br><br>**DECLARATION OF PETER J. SHAKOW IN SUPPORT OF DEFENDANT MO YUN'S MOTION *IN LIMINE* TO EXCLUDE "CUT-AND-PASTE EXCERPTS" OF PURPORTED INSTANT MESSAGE CONVERSATIONS** |

I, Peter J. Shakow, declare as follows:

1.     I am a partner at the law firm Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C., and represent defendant Mo Yun in the above-entitled action.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2.     I have reviewed the hundreds of documents that the government purports to be cut-and-paste excerpts of instant message communications between defendant Mo Hailong and other individuals, including his sister Mo Yun and Dr. Li Shaoming (the "excerpts"), and which it represents were obtained via a search of Mo Hailong's computers and other electronic devices following his arrest in December 2013.

3.     Out of the hundreds of excerpts produced in discovery, approximately seventy purport to be between Mo Hailong and Mo Yun.  A handful of other excerpts where Mo Yun is not purported to be a sender or recipient appear to reference her in the body of the message.

1

4.      Many of the seventy or so messages purportedly involving Mo Yun are written in English, though a substantial number of them either contain or are comprised completely of Mandarin characters.  While my client has some limited abilities in English, Mandarin Chinese is her native language.

5.      The vast majority of these purported communications appear to relate to issues that have nothing to do with the allegations of trade secret theft presented in the Superseding Indictment in this case.  They purport to discuss, for example, Mo Hailong's efforts to raise DBN's profile in the United States, to identify potential recipients of DBN's "Award for Science and Technology," and to develop prospective partnerships with other companies or attend industry conferences.

6.      The government concedes that these excerpts are not the original instant messages themselves, but instead appear to be "cut and paste portions of instant messaging communications" that had been separately saved "into Word documents and things of that nature."  *See* Reporter's Transcript of Detention Hearing dated July 17, 2014 ("RT"), a true and correct copy of which is attached as Exhibit A hereto, at 43:4 – 44:9.  Indeed, no original versions of the instant message communications at issue here have been produced to the defense in this case.  Instead, the excerpts were produced by the government in electronic format as "rich text files," or ".rtfs," compatible with Microsoft Word, WordPerfect, or some other word processing program, or as .pdfs.  The government has averred that the excerpts were produced in a format consistent with the way they were allegedly found on one or more of Mo Hailong's computers or other electronic devices.

7.      Because the original messages do not exist, or at least have not been provided to the defense, I have been unable to compare the excerpts to any originals to determine the extent

to which they differ from one another.  Indeed, it would appear to be impossible for anyone to perform such a comparison without access to the original messages.

8.      Nevertheless, in reviewing the purported excerpts, I have been able to identify numerous inconsistencies, abnormalities, and what appear to be changes and alterations from the original text message itself.  These include the following:

(a)      **Date and file names have been created and added to the cut-and-pasted documents.**  Even assuming the information that was purportedly copied over from an internet messaging service to a Word document is accurate, that information did not contain date and time data.  There are no dates within the documents themselves.  Instead, dates appear to have been embedded into the file names given to the .rtf or .pdf files by whomever saved the file. Even this is not always true.  A number of files contain only month and year (*e.g.*, "Moyun072007.rtf" and "Myun012007.rtf"); others contain only month and day, but not year (*e.g.*, "moyun1204.rtf").   Not only are such file names an alteration of the original instant message, but because the excerpts were saved as new documents and the original messages are not available, there is no metadata associated with the original messages that could establish their actual creation date with any level of certainty.   Moreover, a number of files contain no date information at all, and instead are named simply, for example, "moyun.rtf," "$\overline{z}$ says.docx," or "Lecture.rtf."

(b)      **Several excerpts are merely partial versions of longer excerpts saved under different file names.**  In a number of instances, there are two versions of the same instant message conversation, identical in content except that one version contains additional lines of text inexplicably missing from the other.  For example, two different documents were saved with the file name "Myun02252007.rtf."  True and correct copies of both versions of these documents

as they were produced to the defense have been filed under seal as Exh. B to this declaration. The text of each is identical to the other, except that one version contains an additional 19 lines of communication not included in the other.  Because the original messages are not available, it is impossible to identify how many other excerpts are similarly truncated, or what the excluded data might have contained.

(c)     **Hyperlinks to outside websites are broken, and many are unavailable or dead even when typed directly into an internet browser.**  Numerous excerpts – including two cited in the Superseding Indictment at ¶¶ 28 and 30 – contain links to outside websites.  Not only do the links themselves not work from within the documents produced, but they also are no longer available even when re-typed directly into an active browser.  It is impossible, then, to determine the content or import of the reference.  Attached as Exh. C hereto is a list of additional examples where the links referenced in various excerpts are no longer available.

(d)     **Attachments that appear to have been embedded within the original instant message are similarly unavailable.**  A number of excerpts appear to contain links to documents sent from one user to another via the instant messenger system, but those links are broken in the cut-and-paste excerpt.  Unlike an email, for instance, attachments are not preserved by these excerpts.  For example, an excerpt with the file name "Moyun_10302007.rtf" notes that "Transfer of 'Summary102007.doc' is complete."  True and correct copies of these documents as they were produced to the defense have been filed under seal as Exh. D to this declaration. There is no document with that name in the database of documents produced by the government. Even when a document with a similar name can be found elsewhere in the database, however, it is impossible to determine whether that is the same version included in the original instant message.

(e)      **There are blank areas and unusual spacing in numerous excerpts.**  A number of excerpts contain blank spaces that suggest intervening communications might have been removed, or that only portions of a longer message were copied over into Word format. Excerpts with examples of this characteristic include "Moyun072007.rtf," and "MoYun_01-18-2007.rtf," each of which show unusual spacing following a number of comments attributed to Hailong Mo.  True and correct copies of these documents as they were produced to the defense have been filed under seal as Exh. E to this declaration.

(f)      **Numerous excerpts appear to start in the middle of a discussion.** The excerpts almost always fail to include opening or closing salutations, and often begin and/or end abruptly, suggesting either at least in some cases the excerpts consist of selections from the original message, or that the surrounding context of the message can only be found elsewhere. For example, the excerpt named "moyun01282007.rtf" begins, abruptly and nonsensically: "veterinary preparations for pets and livestock for treatment of intestinal bacteria, parasite or virus, respiratory bacteria , parasite or virus, blood bacteria , parasit [sic] or virus and other organic bacteria, parasite or virus."  The "Lecture.rtf" excerpt begins, "it is for hard copy materials, not for a lecture."  The context of the opening lines is not made any clearer by reading the entire excerpt. True and correct copies of these documents as they were produced to the defense have been filed under seal as Exh. F to this declaration.

(g)      **Offline communications referenced in a number of the excerpts are not available.**  There are a number of excerpts in which off-line communications are referenced. In "Moyun.rtf," for example, Hailong says "let me call you," at which point the excerpt ends.  In "moyun 10142007.rtf," Hailong writes "I will call you now," and the conversation again ends. True and correct copies of these documents as they were produced to the defense have been filed

under seal as Exh. G to this declaration.  None of those off-line communications appear to have been preserved.  Certainly, none, to my knowledge, have been produced to the defense.

9.      Again, because there are no original messages, only cut-and-paste excerpts of what purport to be instant message communications, it is impossible to identify with certainty the extent to which these excerpts have been manipulated, truncated, selectively copied, or edited, or even to verify that they are indeed excerpts from real conversations at all.  The above concerns, therefore, are not meant to and cannot be an exhaustive list of potential problems, but rather are simply examples of observable inconsistencies and other indications of untrustworthiness.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on March 27, 2014, in Los Angeles, California.

/s/ Peter J. Shakow
Peter J. Shakow

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2015, I electronically filed the foregoing with the Clerk of Court using the CM EFC system.  I hereby certify that a copy of this document was served on the parties or attorneys of record and the United States Probation Officer by ECF/Electronic filing.

Executed on March 27, 2015, at Los Angeles, California.

/s/ Alicia Eastman
_____
Alicia Eastman
Legal Assistant
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
telephone 310-201-2100

# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :        Criminal No. 4:13-147
                            :
     vs.                    :
                            :
MO YUN,                     :        TRANSCRIPT OF DETENTION HEARING
                            :
          Defendant.        :
- - - - - - - - - - - - - -X

Second Floor Courtroom
United States Courthouse
123 East Walnut Street
Des Moines, Iowa  50309
Thursday, July 17, 2014
10:00 a.m.

BEFORE:  THE HONORABLE ROBERT W. PRATT, Senior Judge.

Terri L. Martin, CSR, RPR, CRR
United States Court Reporter
Room 189, U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa  50309

2

APPEARANCES:

For the Plaintiff:                      JASON T. GRIESS, ESQ.
                                        Assistant U.S. Attorney
                                        U.S. Courthouse Annex, Suite 286
                                        110 East Court Avenue
                                        Des Moines, Iowa  50309-3899


For the Defendant:                      LEON F. SPIES, ESQ.
                                        Mellon & Spies
                                        312 East College Street
                                        Suite 216
                                        Iowa City, Iowa  52240

                                        TERRY W. BIRD, ESQ.
                                        KARIS A. CHI, ESQ.
                                        ARIEL A. NEUMAN, ESQ.
                                        Bird, Marella, Boxer, Wolpert,
                                         Nessim, Drooks, Lincenberg &
                                         Rhow
                                        1875 Century Park East
                                        23rd Floor
                                        Los Angeles, California  90067


ALSO PRESENT:                           Chak Lau, Interpreter

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Mark Betten | 10 | 33 | 58 | 61 |

4

1                   P R O C E E D I N G S

2           (In open court, with defendant present.)

3           THE COURT:  Please be seated.

4           THE CLERK:  Your Honor, the case before the court this

5    morning is United States of America versus Mo Yun.

6           Counsel, please enter your appearances for the record.

7           MR. BIRD:  Good morning, Your Honor.  Terry Bird,

8    representing the defendant who is in court and with an

9    interpreter, Your Honor.

10          THE COURT:  All right.

11          MR. BIRD:  Also representing the defendant is Ariel

12   Neuman.

13          MR. NEUMAN:  Good morning, Your Honor.

14          MR. BIRD:  And Leon Spies.

15          MR. SPIES:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MR. GRIESS:  Your Honor, Jason Griess for the

18   government.

19          THE COURT:  All right.  Mr. Griess, I think it's your

20   burden.  Do you want to proceed?

21          MR. GRIESS:  Indeed, Your Honor.  It's my

22   understanding that --

23          THE COURT:  Oh, my law clerk just told me I have to

24   swear the interpreter.  Excuse me for interrupting.

25          THE CLERK:  Mr. Lau, raise your right hand.

1          (The interpreter, Chak Lau, was sworn by the clerk.)

2          THE COURT:  Mr. Griess, I apologize.

3          Please proceed.

4          MR. GRIESS:  Thank you, Your Honor.

5          Just to clarify a couple of things for the record

6  here.  It's my understanding that we have filed a motion which

7  indicates that we are seeking detention, with the exception --

8  or I guess with the addition of the fact that if the defendant

9  would be willing to agree to the same terms and conditions or

10  very, very similar terms and conditions as the co-defendant in

11  this case that the hearing wouldn't be necessary, that we could

12  explore the imposition of those conditions.  The difficulty --

13  one of the difficulties I see, Your Honor, with a straight order

14  of that is that there is a private security company involved,

15  and I think they would need to be consulted as far as exactly

16  the logistics of putting them into place.  We do have a

17  short-term plan in place that's working right now; but beyond

18  today's date I think there would need to be additional

19  arrangements, potential manpower, and so on and so forth.  I'm

20  not entirely sure if, given some of the filings I've seen,

21  whether the defense is in agreement with that or whether they're

22  still seeking her release to go home to China.

23          THE COURT:  Mr. Interpreter, are you hearing that all

24  right?  I note that you're straining some.

25          THE INTERPRETER:  I heard some all right, but the

1 voice volume is kind of low.

2          THE COURT:  For the lawyers, why don't you stay at

3 microphone.  You don't have to worry about the local rule about

4 standing.  If you stay by the microphone, the interpreter and

5 defendant will hear you better.

6          Mr. Bird, do you want to answer counsel?  One

7 additional thing, on page 17 of your submissions, you tell me

8 that the defendant wants to stay in the United States and prove

9 her innocence, words to that effect.  On 18 you tell me she

10 wants to return to Beijing.  So perhaps you can clarify that for

11 me as well.

12          MR. BIRD:  I will, Your Honor.

13          THE COURT:  And you can remain seated.

14          Mr. Interpreter, you tell me if you're picking up all

15 right.  If you're not, just interrupt them.

16          THE INTERPRETER:  All right.

17          MR. BIRD:  Sounds like the microphones just came on.

18          THE COURT:  Yes, it did.

19          MR. BIRD:  Old habits, Your Honor, I apologize.  If

20 the court would prefer, I will sit.

21          THE COURT:  No, no.  That's fine.

22          MR. BIRD:  First of all, the court obviously has seen

23 our brief, and I'm not sure whether the court had an opportunity

24 to read the government's brief this morning.

25          THE COURT:  I did.

1          MR. BIRD:  I read that this morning as well.  Let me

2     answer the court's question directly and then I'll respond to

3     Mr. Griess's comments with the court's permission.

4          We are seeking leave as one of the bail conditions.

5     We have a number of bail conditions, all of which we think

6     reasonably assure our client's presence at the time of trial.

7     Our client is a 41-year-old mother of two.

8          One of her children, the 12-year-old, is going through

9     a critical stage of education at home.  He is actually moving

10    from middle school up into, in the Chinese education system, a

11    critical move for him.  He needs his mother who has been a

12    stay-at-home mom for the last seven or eight years.

13         She also has a five-year-old daughter who also is

14    going through a critical stage, although not in education,

15    simply in maturation and also needs her mother.

16         We understand the circumstances of this case are that

17    the government will -- because of discovery and because of the

18    complexity of the case, that this case will not be tried for

19    several months at the earliest and perhaps even as long as a

20    year.  We think under the circumstances, particularly given the

21    paucity of evidence -- and I will address that in much more

22    detail as we have to some extent in our brief, but we now are

23    armed with information which we received late yesterday, and I

24    want to address some of that information with the court's

25    permission in much more detail.  But given the paucity of

1   allegations and evidence and considering the case law as it

2   relates to these circumstances, bail conditions, we think that

3   there are conditions which can be imposed which will assure the

4   defendant's presence at trial.

5           Under those circumstances we are asking in the first

6   instance that the defendant be allowed to return to spend time

7   with her children, to help them through the process that they're

8   going through in terms of education.  We believe that under the

9   circumstances she will return.  She wants very much to vindicate

10  herself.  She wants these false charges to be cleared up.  We

11  sincerely and genuinely believe that the evidence will show that

12  she is innocent.  If she were to depart and not return, we

13  understand the consequences of that, she understands the

14  consequences of that, not only for her brother who may suffer

15  for that, but also for the company that is inferentially

16  involved in this.  This is a matter which involves not only

17  publicity in this country but some publicity in China.

18          So, for all of those reasons and under all of those

19  circumstances, she wants to come back and seek vindication,

20  which we believe she will have at the end of this trial, and I

21  can get into some of the more details now to show you why I

22  believe that.

23          THE COURT:  Okay.  Mr. Bird, why don't we -- so I

24  don't forget Judge Lay's reminder that the burden here is on the

25  government --

1          MR. BIRD:  It is, Your Honor.

2          THE COURT:  -- why don't we let the government go

3   first with their presentation, or perhaps they were resting on

4   their -- the way I get their claim is she's a flight risk,

5   period and --

6          MR. BIRD:  That's the way I read their brief, Your

7   Honor.

8          THE COURT:  So why don't we, so I don't get who

9   shoulders the burden confused because sometimes -- I came here

10  after 25 years of practicing law, and I hadn't tried a criminal

11  case for about 15 years, and I learned that the Bail Reform Act

12  of 1984 had changed things significantly; but I still want to

13  proceed with the idea that the government has the burden.  So

14  I'll let Mr. Griess put on evidence or make any additional

15  argument and then we'll proceed with your argument about the

16  thinness of the evidence.

17         MR. BIRD:  I appreciate that, Your Honor.

18         THE COURT:  Does that make sense?

19         MR. BIRD:  Absolutely.  I started off in Mr. Griess's

20  chair a long, long time ago, and I must prefer to let him have

21  the burden at this point.

22         THE COURT:  All right.  Thank you.

23         Mr. Griess, do you have any evidence you want to put

24  on?

25         MR. BIRD:  I do.  The government calls Special Agent

1  Mark Betten.

2            THE CLERK:  Raise your right hand.

3         MARK BETTEN, GOVERNMENT'S WITNESS, SWORN

4                    DIRECT EXAMINATION

5  BY MR. GRIESS:

6  Q.  Please state your full name and spell your last name for the

7  record.

8  A.  It's Mark Betten, B-E-T-T-E-N.

9  Q.  Are you employed?

10 A.  Yes.

11 Q.  How so?

12 A.  Special agent with the FBI.

13 Q.  How long have you been with the FBI as a special agent?

14 A.  Next month will be 17 years.

15 Q.  I want to direct your attention back to June of 2011.  About

16 that time were you assigned to begin an investigation that

17 involved the theft or the potential theft of intellectual

18 property?

19 A.  Yes.

20 Q.  Can you generally describe what the circumstances were that

21 existed at that time?

22 A.  Yes.  We went out and visited Pioneer Hybrid, which is a

23 seed company in Johnston, Iowa, and during that visit they told

24 us about a suspicious incident the previous month in one of

25 their grower fields.  And a grower field is growing proprietary

1  test seed.

2  Q.  Is this proprietary test seed that contains the intellectual

3  property?

4  A.  Yes.

5  Q.  And this is property that has not yet been patented and

6  constitutes trade secrets?

7  A.  Correct.

8  Q.  From that point forward, just to talk generally about the

9  background of your investigation, did you conduct an ongoing

10  investigation that basically spanned from that time, many months

11  into the future?

12  A.  Yes.

13  Q.  Let's jump ahead then to December of 2013.  Did you, armed

14  with a criminal complaint, execute an arrest warrant in Florida?

15  A.  Yes.

16  Q.  Can you describe what happened on that date?

17  A.  Yes.  On December 11, 2013, we arrested the defendant's

18  brother.  His name is Mo Hailong.  It's H-A-I-L-O-N-G.  We

19  arrested Hailong at his house in Boca Raton, Florida, and along

20  with that we executed search warrants at his residence and

21  business.

22  Q.  What type of material were the search warrants seeking?

23  A.  Mostly digital type devices, computers, any kind of digital

24  storage devices, things of that nature.

25  Q.  Did you or were you able to seize different types of

1   electronic evidence that constituted or included communications

2   between Mr. Hailong and other potential individuals involved in

3   this conspiracy?

4   A.   Yes.

5   Q.   Shortly after that seizure and that arrest, was Mr. Hailong,

6   along with five other Chinese National individuals, indicted by

7   grand jury in the Southern District of Iowa?

8   A.   Yes.

9   Q.   December 17, 2013 was the date of the original indictment?

10   A.   Correct.

11   Q.   From that point forward, was the FBI involved in a review of

12   all of the evidence that was seized as a part of that search

13   warrant and seized over the course of the case?

14   A.   Yes.

15   Q.   Is that something that took some time?

16   A.   Yes.

17   Q.   Generally would you describe the volume of the evidence that

18   was seized?

19   A.   There was multiple devices, over 20.  When I say "devices,"

20   it could be a jump drive, could be a removable hard drive, could

21   be a computer.  There was close to a total of three terabytes of

22   data, not quite three terabytes of data, and much of it was in

23   Mandarin Chinese, so it took a considerable amount of time to

24   translate it as well.

25   Q.   As that information was developed, did it become clear that

1   there were other individuals not indicted that were involved in

2   the conspiracy?

3   A.   Yes.

4   Q.   One of those individuals was a female by the name of Mo Yun,

5   correct?

6   A.   Correct.

7   Q.   What was her relationship to Mo Hailong?

8   A.   She is the sister of Mo Hailong, and she is the spouse of

9   the DBN founder and chairman, Dr. Shao Genhuo, G-E-N-H-U-O.

10  Q.   Based upon that discovery, did you take steps to try and --

11  not only with Mo Yun, but with other individuals who you

12  discovered to be involved, did you take steps to learn of any

13  potential travel they might have to the United States?

14  A.   Yes.

15  Q.   Ultimately, were you advised that Mo Yun was going to be

16  arriving in the United States on or about June 25, 2014?

17  A.   Yes.

18  Q.   And based upon that, did you begin to compile information

19  that you had seized from Mo Hailong as part of the search

20  warrant?

21  A.   Yes.

22  Q.   And that information is contained in -- some of that

23  information is contained in the superseding indictment, is that

24  correct?

25  A.   That's correct.

BETTEN - DIRECT

14

1   Q.   And you have reviewed all of that information?

2   A.   Yes.

3   Q.   On July 1 Ms. Yun was arrested based upon a criminal

4   complaint that was issued here in Iowa.   She was arrested in the

5   Central District of California, correct?

6   A.   Yes.

7   Q.   Where was she at when she was arrested?

8   A.   In the Los Angeles International Airport.

9   Q.   Do you know why she was there?

10  A.   She was preparing to fly back to Beijing out of the country.

11  Q.   Did she have anyone with her?

12  A.   Yes; her two children.

13  Q.   Roughly ages 12 and 5?

14  A.   Correct.

15  Q.   Were you aware of the fact that she would likely have her

16  children with her when you approached her?

17  A.   Yes.

18  Q.   At any point in time, was she handcuffed or restrained in

19  any way in the presence of her children?

20  A.   No.

21  Q.   Did you allow her to remain in the gate area of the airport

22  pending her children boarding the flight and leaving?

23  A.   Yes.

24  Q.   Did you restrict her movement in any way during that time?

25  A.   No.

1   Q.   Did you allow Ms. Yun to be involved in a decision as to

2   what would happen with the children once you advised her that

3   she was under arrest?

4   A.   Yes.

5   Q.   What were the choices you gave her in that regard?

6   A.   That she could allow her two children to fly unaccompanied

7   on the plane back to Beijing and we would contact family members

8   in Beijing to pick them up at the airport or they would be

9   placed in some type of custodial arrangement in the United

10  States under the Department of Health and Human Services or

11  Family Services until we could arrange for relatives to come

12  pick them up in the United States.

13  Q.   And she chose the prior of the two choices?

14  A.   Correct, to put them on the plane.

15  Q.   When was the first time that she was handcuffed or

16  restrained in any way?

17  A.   It was sometime later, approximately an hour later when we

18  were down at the CVP processing center in the basement of the

19  airport.  Again, that was probably about an hour later.

20  Q.   Now, you participated in her basically being escorted or

21  you're aware of the FBI participating in her being escorted from

22  California to Iowa pursuant to order of the California

23  magistrate, correct?

24  A.   Yes.

25  Q.   Based upon your investigation in this case, do you have --

1  or have you developed information as to the amount of the

2  potential loss that the victims have sustained as a result of

3  the theft of intellectual property that is set forth in detail

4  in the superseding indictment?

5            MR. BIRD:  Objection, Your Honor; calls for a

6  conclusion of the witness.  There's no foundation.

7            THE COURT:  Do you want to lay some foundation,

8  Counsel?

9            MR. GRIESS:  Your Honor, my understanding is the rules

10 do not apply to detention hearings; that the court can accept

11 the evidence.

12           THE COURT:  It still might help me evaluate what he

13 says a little better.

14           MR. GRIESS:  I will.

15           THE COURT:  Okay.

16 BY MR. GRIESS:

17 Q.  Agent Betten, can you answer the question?

18 A.  I'm sorry, could you repeat it?

19 Q.  Certainly.  Are you aware of what the potential loss is to

20 the victim seed companies in this case?

21 A.  Yes.

22 Q.  Conservatively speaking, what is that?

23           MR. BIRD:  Objection; foundation, Your Honor.

24           THE COURT:  Okay.  Well, it's already in his brief, so

25 go ahead.  The objection is overruled.

1 A.  Conservatively, we've estimated it to be 500 million

2 dollars.

3 BY MR. GRIESS:

4 Q.  Can you describe to the court how you arrived at that

5 conclusion?

6 A.  Yes.  During the course of reviewing the evidence that we

7 talked about earlier seized from the digital devices, there's

8 very compelling evidence that these individuals and the

9 conspirators were stealing and obtaining various products of the

10 corn companies over a period of from 2007 all the way up until

11 2012, and there are far in excess of over a hundred product IDs

12 that we can establish that they've likely stolen.  One of our

13 victim companies estimated that the loss of one product ID, the

14 inbred line from that product ID would be anywhere from five to

15 eight years of work and research and a minimum of 30 million

16 dollars.

17           So just to get to 500 million, you only need, what,

18 12, 13 products, and we have likely well over 100.

19 Q.  Can you describe further the evidence which leads you to the

20 conclusion that there were well over 100 lines of corn seed that

21 actually left the United States as part of this conspiracy by

22 these conspirators?

23 A.  Yes.  There's a series of spreadsheets that Mo Hailong had

24 on his computer, and those spreadsheets documented the product

25 IDs that were acquired.

1          In addition, on September 30, 2012, when we stopped

2    the subjects at the O'Hare Airport, the Canadian border, there's

3    evidence from listening device evidence that they were dividing

4    the seeds that they had acquired up into three separate

5    packages.  We intercepted over a thousand envelopes, but we also

6    have evidence that a third of those, there were probably three

7    separate thousand envelope packages, one of those likely left

8    the country, so you have that seed as well that was lost.  So

9    you have a tremendous amount of seed over the time period from

10   2007 to 2012 that has actually left the country.

11   Q.  The thousand seed parcel, one of three packages that you

12   just referred to, was that included in your 500 million dollar

13   estimate?

14   A.  No.

15   Q.  So this is -- the 500 million dollar estimate is a

16   conservative estimate based upon what you know left the country?

17   A.  Correct.

18   Q.  With regard to those facts, the facts that you intercepted

19   these individuals who were charged in the indictment, attempted

20   to leave the country, did that give meaning to some of the

21   electronic evidence and communications you saw between the

22   defendant Mo Yun and Mo Hailong?

23   A.  Yes.

24   Q.  Specifically I want to talk about the overt act contained in

25   paragraph No. 27.  This was actually between Dr. Li Shaoming and

BETTEN - DIRECT

19

1   Mo Hailong.

2          Who is Dr. Li Shaoming as part of this conspiracy?

3   A.   He is the CEO of Kings Nower Seed, and Kings Nower Seed is

4   the seed subsidiary of DBN.

5   Q.   And Dr. Li Shaoming has been indicted, correct?

6   A.   Correct.

7   Q.   Was it very common not only in the evidence that you seized

8   as part of the search warrant but in other evidence derived

9   throughout the course of this case that there were

10  communications between Mo Hailong and Dr. Li Shaoming?

11  A.   Yes.

12  Q.   And, in fact, was Dr. Li Shaoming one of the individuals who

13  attempted to leave the United States in possession of a very

14  large quantity of corn seed?

15  A.   That's correct.

16  Q.   Dr. Shaoming indicated to Mo Hailong that Mo Yun is in

17  charge of the specifics from the home country side, correct?

18  A.   Yes.

19  Q.   She will contact you and work with you?

20  A.   That's correct.

21  Q.   I hope you can gather 1,000 pieces of the top notch corn

22  hybrids or inbred lines currently available in the United

23  States?

24  A.   Yes.

25  Q.   It's even better if we can collect the elite breeds that are

1  being tested, correct?

2  A.  Correct.

3  Q.  What did that mean to you based upon your entire

4  investigation?

5          MR. BIRD:  Objection, Your Honor.  It's irrelevant.

6          THE COURT:  Overruled.

7  A.  That they were attempting to collect the best hybrid

8  products, the best performing hybrid products from the various

9  seed manufacturers.  During the course of that, they seemed to

10  focus primarily on Pioneer and Monsanto companies.

11  BY MR. GRIESS:

12  Q.  Two days later, on January 18, 2007, was there communication

13  as indicated by Dr. Shaoming between Mo Hailong and Mo Yun?

14  A.  Yes.

15  Q.  Can you describe what took place as part of that

16  communication?

17  A.  I don't have it here in front of me.  You would have to show

18  it to me to refresh my recollection.

19  Q.  Let me read to you what the indictment says.

20          Defendant Mo Hailong and defendant Mo Yun discussed

21  what seeds to collect?

22  A.  Correct.

23  Q.  Defendant Mo Yun instructed the defendant Mo Hailong to send

24  them to Dr. Li so he can check which is better?

25  A.  Yes, I now remember that conversation.  That is correct.

BETTEN - DIRECT

1  Q.  How does that fit into your understanding of what was being

2  done as far as part of the conspiracy?

3  A.  Dr. Li was, as I mentioned, the CEO of the seed division of

4  Kings Nower, and he was essentially in charge of the seed

5  collection effort.  And when I say "collection," I mean the

6  conspiracy to steal U.S. manufactured elite hybrids.

7          And I should also add, on the estimate of loss, that

8  the seed companies said at a minimum the loss would be 30

9  million dollars, and if it's a successful hybrid line or inbred

10 line, it can exceed 100 million dollars in loss seed elite, so

11 that's why the 500 million is conservative as well.

12 Q.  Was there evidence that some of the seeds being targeted by

13 the members of this conspiracy were the elite or successful

14 breeds of seed being manufactured by these companies?

15 A.  Yes.

16 Q.  What evidence?

17 A.  For example, on the September 30th -- or excuse me, the

18 May 11, 2012, we intercepted 250 pounds that Mo Hailong and two

19 of his co-conspirators were trying to mail from the Chicago

20 area, a Fed Ex to Hong Kong.  We intercepted that shipment.  We

21 have since developed very compelling evidence that at least one

22 of those products in that package was Pioneer's most successful

23 product ever as far as yield.  So that would certainly be

24 characterized as an elite hybrid.

25 Q.  Referring to overt act No. 29, the defendant and Mo Hailong,

BETTEN - DIRECT

22

1   the defendant Mo Yun and Mo Hailong are again discussing, and

2   this time they're discussing the advantages of purchasing

3   farmland to facilitate their plans, indicate that the defendant

4   Mo Hailong advised Iowa farmland is affordable and that the

5   purchase of land would be good for business as they could hire

6   two to three individuals from DBN and plant to get the parent of

7   germplasm.

8           Does that have meaning based upon your entire

9   investigation?

10  A.   Yes.

11  Q.   Can you describe that to the court?

12  A.   It gets a little complex, but essentially you can purchase

13  hybrid seed from a local seed dealer, and there are a number of

14  ways you can extract the underlying parent seed that was used to

15  create that hybrid.  One of the ways to do that is to plant that

16  at a local farm, and there are ways to isolate the inbred plant

17  because, for example, in every 80,000 kernel bag of corn seed,

18  approximately one-half of one percent of that seed is going to

19  be an inbred parent seed.  Individuals knowledgeable about seed

20  breeding can plant out that 80,000 kernel bag.  They can then

21  physically identify that inbred plant as it grows because the

22  inbred plant is smaller than the surrounding hybrid.  They can

23  isolate that inbred and collect the seed from that, and then

24  they have the inbred seed that was used to get that elite hybrid

25  seed.  That's just one method of doing that.  So that could be a

BETTEN - DIRECT

23

1   use for that farmland.

2   Q.   Were there other indications developed during the course of

3   your investigation as to other potential reasons why the members

4   of the conspiracy would want to obtain farmland?

5   A.   Yes.

6   Q.   Describe what you mean.

7   A.   The other -- there's discussions that we've since recovered

8   off search warrant material where they're discussing the

9   logistics of how best to collect the inbred, whether it's easier

10  to ship large quantities of seed back to China or whether to

11  grow it here in the U.S. to extract the inbred seed and then you

12  only have to transport a much fewer number of seeds back to

13  China.

14          Well, part of the difficulty with that is seed sellers

15  for the U.S. based manufacturers are very stringent on who they

16  sell these elite hybrids to.   There's a number of requirements

17  that must be in place.   They have to have a grower agreement

18  that the seller signs and they have to agree to abide by certain

19  restrictions to be able to purchase that seed.

20          So, in order to have cover to make purchases and claim

21  that you're a legitimate farmer, there's evidence, compelling

22  evidence that they were purchasing a farm to provide them that

23  cover so that when they went in to purchase these seeds, they

24  could say that they were using the farmland to grow crop corn.

25  Q.   And the evidence in that regard are, in fact, statements

1  attributable to Mo Hailong?

2  A.  That's correct.

3  Q.  As part of, again, overt act 29, does Mo Yun appear to give

4  the go ahead instructing Mo Hailong to contact the farm owners

5  to learn more about the purchase?

6  A.  Yes.

7          THE COURT:  Mr. Griess, can I interrupt?  Agent, I

8  didn't understand the part about this was cover to them when

9  they were purchasing farmland.  Can you explain that to me

10  better?

11          THE WITNESS:  Sure, Judge.  There's a lot -- there's a

12  fair number of conversations where Mo Hailong, the defendant's

13  brother, would go into the farm store, to the ag stores to

14  purchase these elite hybrids, to purchase a bag of 80,000

15  kernels.  These seed dealers for these companies, the seed

16  dealers that sell for either Monsanto, Pioneer, LG, AgReliant,

17  they are under a lot of restrictions as to who they can sell

18  seed to.

19          So if -- I'm assuming you don't have a farm; I don't

20  have a farm.  But if you or I would walk in, they would not sell

21  it to us because we have no legitimate reason to be buying it.

22  Although if we had farmland and could tell them that we were

23  taking it to go out and plant on our farm, they're much more

24  likely to sell it to you.

25          THE COURT:  So it would be easier for them to purchase

1    these 80,000 seed bags were they owners of farmland; is that it?

2              THE WITNESS:  Correct.

3              THE COURT:  Okay.  Thanks very much.

4              Mr. Griess, I apologize for interrupting you.

5              MR. GRIESS:  No, no problem, Your Honor.

6              Thank you.

7    BY MR. GRIESS:

8    Q.  The agreements that the seed dealers were required to have

9    purchasers, local purchasers sign are actually growers

10   agreements, which in general terms, very general terms require

11   the farmers to actually plant and grow the seeds that they're

12   purchasing?

13   A.  That's correct, in addition to a number of other

14   restrictions as well.

15   Q.  With regard to overt act No. 30, and this is several months

16   later, on September 17, 2007, the defendant Mo Yun asked Mo

17   Hailong if he could get any corn.  And defendant Hailong

18   explained that it's easy to pick and take pictures but caution

19   is needed to drive somewhere unseen as more vehicles are passing

20   by.

21             Based upon the entirety of the investigation, does

22   that have meaning to you?

23   A.  Yes.

24   Q.  Why?

25   A.  That's precisely what they were doing in the subsequent

1  years, stealing actual ears of corn from mature plants in the

2  August-September harvest season, and then they were categorizing

3  that, packaging it and sending it back to their personnel back

4  in Beijing for further exploitation.

5  Q.  Are you aware of a number of conversations whereby the

6  individuals who were actually stealing the corn seed are very,

7  very concerned about being detected or apprehended?

8  A.  Yes.

9  Q.  And using words like caution and being careful became very,

10  very common?

11  A.  Yes.

12  Q.  Turning to overt act No. 31, which refers again to a

13  conversation between Dr. Li Shaoming and Mo Hailong, Shaoming

14  tells Mo Hailong that he will be speaking with Mo Yun about

15  sending additional personnel to assist defendant Mo Hailong with

16  seed collection activities.

17           This, again, is October 31, 2007.  Does that have

18  meaning based upon the entirety of your investigation?

19  A.  Yes.

20  Q.  Why?

21  A.  It was very difficult for one person to undertake these, as

22  they call them, collection efforts.  They often wanted at least

23  two to three people in the car so one person could drive, one

24  person could get out, steal the corn, and another person could

25  sit in the back and categorize it and log it in on the computer.

1   So Mo Hailong was having extreme difficulty trying to carry out

2   all of those tasks on his own and needed additional help.

3   Q.   And, in fact, ultimately he received additional help?

4   A.   That's correct.

5   Q.   For a period of time in 2012, your investigation centered on

6   a number of those individuals who were present in Central

7   Illinois collecting or stealing seed from local fields, correct?

8   A.   Yes.

9   Q.   Now, when these seeds were stolen, were they just thrown in

10  a bag and transported or was there a certain amount of labeling

11  and marking and that sort of thing going on?

12  A.   There was a tremendous amount of labeling and marking going

13  on.

14  Q.   How do you know that?

15  A.   Just from the conversation on the listening devices that we

16  had active and physical surveillance and then the subsequent

17  search warrants as well.

18  Q.   When you seized or when law enforcement seized the seeds

19  that these individuals were attempting to transport to China,

20  were they marked and labeled in a manner consistent with what

21  you heard them discussing?

22  A.   Yes.

23  Q.   When you seized information from the search warrant of Mo

24  Hailong's residence and business, did you find spreadsheets that

25  essentially were keys to some of the markings you observed on

1  the corn packages that were attempting to leave the country?

2  A.  Correct.

3  Q.  And were you able to trace that key back to specific product

4  IDs of seed products sold by -- or being developed by, I should

5  say, Pioneer, Monsanto, and other companies?

6  A.  Just at this point it looks like Pioneer and Monsanto,

7  that's correct.

8  Q.  And that in part is the basis for your estimate of the value

9  of loss in this case?

10  A.  Yes.

11  Q.  Finally, overt act 32 indicates that on or about January 2,

12  2008, Mo Yun informed the defendant Mo Hailong that Dr. Li is

13  very glad to see the performance of the seeds that Mo Hailong

14  had sent, and then Mo Yun told the defendant Mo Hailong that his

15  work in the United States is very important to the defendant Li

16  Shaoming's plan and that Zhang Hongwei was asked to test the DNA

17  of all important seeds.

18          Does that conversation have meaning based upon your

19  investigation in its entirety?

20  A.  Yes.

21  Q.  How so?

22  A.  We developed compelling evidence as well that once these

23  seeds and these elite hybrid seeds were being sent back to

24  China, that they were undertaking procedures to extract the

25  underlying inbred lines used to create those elite hybrids, and

1  that's what that conversation is referring to.

2  Q.  During the course of your investigation, have you attempted

3  to obtain as much information as possible on the company that

4  the conspirators were employed at?

5  A.  Yes.

6  Q.  And which company is that?

7  A.  Well, they're employed by DBN, which is the parent company.

8  So here in the U.S. that would be similar to DuPont.  And these

9  individuals, the original six indicted individuals were all

10  employees of Kings Nower Seed, which is a seed subsidiary for

11  DBN.  So it would be like Pioneer is to DuPont.

12  Q.  And in conducting that investigation, did you attempt to

13  learn as much as you could about the management structure of

14  that organization, both from the parent company side as well as

15  the seed subsidiary side?

16  A.  Yes.

17  Q.  What did you learn about the parent company side as far as

18  how it's managed, who runs it, et cetera?

19  A.  The parent company, DBN, CEO and founder is Dr. Shao Genhuo,

20  who is the spouse of the defendant.  The seed division is headed

21  and run by the CEO, which was Dr. Li Shaoming, S-H-A-O-M-I-N-G.

22  And the vice president is another co-indicted -- or indicted

23  co-conspirator, Dr. Wang, W-A-N-G, Lei, L-E-I.

24  Q.  Were you able to obtain information as to the financial

25  worth of Dr. Shao Genhuo, the CEO of DBN as well as the husband

1  the defendant Mo Yun?

2  A.  Yes.

3  Q.  What did you base that upon?

4  A.  The annual Forbes list of world's billionaires.

5  Q.  And what was the information contained in that publication?

6  A.  As of July 16th, I think, I believe it was July 16th or

7  right around that time frame, his net worth was estimated at 1.4

8  billion.

9  Q.  And that's U.S. dollars?

10  A.  Correct.

11  Q.  Are you aware of the fact that there's no extradition treaty

12  between China and the United States?

13  A.  I am aware of that.

14  Q.  Did you yesterday do some research into a number of cases

15  that were cited by the defense that were essentially theft of

16  trade secret cases that were investigated by the FBI?

17  A.  Yes.

18  Q.  Were you able to gather information about those cases by

19  speaking with anyone within your management at the FBI?

20  A.  Yes.

21  Q.  Specifically with regard to the United States versus Jin,

22  what were you able to determine about the background and facts

23  of that case?

24  A.  Is Jin the Motorola engineer?

25  Q.  It's J-I-N.

1   A.   If I remember right, all three of the cases cited, the

2   individuals are naturalized citizens.  Jin, if I remember the

3   individual right, it was initially reported that she had a

4   one-way ticket to China, but it actually turned out -- or excuse

5   me, I believe that's the other case.  But she was a naturalized

6   citizen.  She had family in the United States and that she owned

7   property and her husband was remaining in the United States when

8   she was returning to China.

9   Q.   That's the case Q-I-N that you just referred to, correct?

10  A.   That could be.  Do you mind if I refer to my notes?

11  Q.   Yes.  If it would refresh your recollection, please do so.

12           MR. BIRD:  Your Honor, just for purposes of expediting

13  the proceeding, this information was laid out in the cases that

14  were cited.  To the extent that he's testifying about legal

15  matters, it calls for legal conclusions.

16           THE COURT:  Right.  And I assume what you put in the

17  brief about the three cases are what the witness would testify

18  to anyway, is that correct, Counsel?

19           MR. GRIESS:  That's correct, but it's not within the

20  cases, Your Honor, I don't believe.  This is background

21  information.

22           THE COURT:  All right.  Well, go ahead.

23  A.   That's correct.  Jin was the Motorola engineer, had family

24  in the United States, had property in the United States, and

25  although she did have a one-way ticket to China and was stopped

 1  with the trade secret, she was not charged for about another

 2  year, and all, from what I understand, indications were that the

 3  investigating agents believed that she would return.

 4  BY MR. GRIESS:

 5  Q.  In fact, there was also a public defender appointed to

 6  Mr. Jin in that case, is that correct?

 7  A.  Correct.  I believe Jin was a female.

 8  Q.  Thank you.

 9          With regard to the Qin case or Q-I-N, that is a

10  husband and wife that were charged in this case, is that

11  correct?

12  A.  That's correct.  They were engineers at General Motors.

13  They had been in the country both as naturalized citizens for

14  quite some time, I want to say since 1984 if I remember

15  correctly, and they also had property, family ties to the U.S.

16  Q.  And, finally, the case cited as United States versus Yang,

17  that also involved an individual with significant ties to the

18  United States, correct?

19  A.  That's correct, and that is the one that was initially

20  incorrectly cited as having a one-way ticket only.  It turned

21  out that he did have a round trip ticket.  He also had -- was

22  naturalized, had family here, had children in the United States

23  and had a, I believe it was a son that was attending Harvard at

24  the time.

25          MR. GRIESS:  Your Honor, I believe that's all the

1  questions I have for this witness.

2        THE COURT:  All right.  Mr. Bird.

3       MR. BIRD:  Thank you, Your Honor.

4               CROSS-EXAMINATION

5  BY MR. BIRD:

6  Q.  Good morning, Mr. Betten.

7  A.  Good morning.

8  Q.  Mr. Betten, you don't speak Chinese, do you, sir?

9  A.  No.

10  Q.  And how long have you been the Special Agent in Charge for

11  the investigation in this case?

12  A.  Well, I've just been a case agent.  I would like to be a

13  Special Agent in Charge; but since 2012.

14  Q.  Since 2012?

15  A.  Right.

16  Q.  And tell the court, if you would, please, what efforts --

17  well, let me do it a different way.  As part of the

18  investigation that the FBI conducted, you conducted some

19  electronic surveillance?

20  A.  Correct.

21  Q.  And you actually followed some of the co-defendants at

22  different times in 2012 -- 2011, 2012, is that correct?

23  A.  I'm not sure any physical surveillance started in 2011, but

24  certainly in 2012.

25  Q.  And you -- what other forms of surveillance did you conduct

1   besides physical observation?

2   A.   As referenced in the indictment and complaint, there was

3   electronic surveillance in the form of listening devices.   We

4   also utilized aerial surveillance which generated recordings,

5   and we also utilized pole cameras in the case, as well as other

6   electronic surveillance means.

7   Q.   And you also told Mr. Griess that upon -- in December of

8   2013, upon the arrest of Hailong Mo, that you seized some

9   computers and other electronic equipment, correct?

10  A.   Yes.

11  Q.   Has all of the information in those computers and phones

12  been reviewed now by the FBI?

13  A.   Yes.

14  Q.   Is there any other source of information concerning this

15  case other than the surveillance that was conducted in 2012 and

16  the review of the electronic equipment that was seized in

17  December of 2012 that you -- that was involved in this

18  investigation?

19  A.   Yes.

20  Q.   What?

21  A.   I don't believe I can say.   It's probably governed under

22  CIPA procedures.

23  Q.   I'm sorry?

24  A.   It's governed under CIPA, Classified Information Protection

25  Act.

1   Q.  I see.  Now, isn't it a fact, sir, that you have not

2   found -- in all of that investigation, you have not found any

3   communications involving Mo Yun, my client, that took place in

4   2011 or 2012?

5   A.  Not that we've seen to date.

6   Q.  And you've reviewed all of the evidence, right, that you've

7   collected to date?

8   A.  Correct.

9   Q.  But you've not found one communication involving Mo Yun in

10  2011 or 2012, correct?

11  A.  I believe that's correct.

12  Q.  All right.  Let's go back to the superseding indictment.

13  The superseding indictment, one part of it that Mr. Griess

14  didn't ask you about is paragraph 10.  The superseding

15  indictment at paragraph 10 alleges that Mo Yun ceased to be an

16  employee of DBN as of March of 2009, correct?

17  A.  I believe that's what the superseding indictment states,

18  that's correct.

19  Q.  All right.  And it also alleges that she was an employee

20  from 2001 to 2009, correct?

21  A.  Yes.

22  Q.  Have you discovered any communications between Mo Yun and

23  her brother, Hailong Mo, or any of the other co-conspirators

24  after July 2nd of 2008?

25  A.  I don't recall.  It's possible --

1  Q.  I'm sorry, I meant January 2nd if I said --

2  A.  I don't recall if there were communications after 2008 or

3  not.  It's possible there may be.

4  Q.  It's possible?  I mean, if it had happened, it would be in

5  the indictment, wouldn't it, if it were part of your

6  investigation, sir?

7  A.  Not necessarily.

8  Q.  All right.  Can you tell the court today, based on all of

9  the investigation that you've done, any acts in which you

10  have -- about which you have information involving my client, Mo

11  Yun, after March of 2009?

12  A.  No.

13  Q.  Can you tell the court today about any communications that

14  Mo Yun had with any of the co-conspirators after March of 2009?

15  A.  Not that I recall.  Not that I recall.

16  Q.  All right.  Can you tell the court about any communications

17  after January 2nd of 2008 between Mo Yun, my client, and any of

18  her co-defendants?

19  A.  It's possible there may be some limited communications, but

20  I'm not sure right now.

21  Q.  But you can't recall them?  You say it's possible, but you

22  can't recall, can you, sir?

23  A.  That's correct.

24  Q.  Tell us the information on which overt acts 27 through 32

25  are based.

1    A.   I don't have the indictment here in front of me.

2             MR. BIRD:  May I approach the witness, Your Honor?

3             THE COURT:  You may.

4             MR. BIRD:  May I --

5             THE COURT:  You may.

6             MR. BIRD:  I always ask about the well, Your Honor.

7             THE COURT:  That's fine.

8             MR. BIRD:  I can mark this if the court would prefer.

9             THE COURT:  I'll just take notice that he's reading

10   from the indictment.

11   BY MR. BIRD:

12   Q.   I am showing the witness a copy of the superseding

13   indictment in this case.  I'm going to ask you some questions

14   about the overt acts 27 through 32, Mr. Betten.

15   A.   Okay.

16   Q.   Do you want to take a moment to look at those?

17   A.   Yes, I've looked at them.

18   Q.   Did you review those before your testimony here this

19   morning?

20   A.   I've reviewed them in the past.  I didn't look at them -- I

21   haven't looked at them since the indictment was drafted.

22   Q.   As you sit here today, Mr. Betten, are you aware of any

23   communications involving my client, Mo Yun, other than the ones

24   that are referenced in overt acts 27 through 32?

25   A.   Yes.

1   Q.   What other ones?

2   A.   There are several other chats that she was involved in that

3   we obtained from the search warrant material that are not

4   referenced here in the indictment.

5   Q.   But you didn't put those in the indictment, did you?

6   A.   No.

7   Q.   You didn't consider those to be acts in furtherance of the

8   alleged conspiracy, did you?

9   A.   I don't believe that would be a fair characterization of

10  those communications.

11  Q.   Well, let's talk about the communications you did include in

12  the indictment.   And, first of all, are the communications that

13  you're referring to now, other than the ones that are in the

14  superseding indictment, are any of those after June -- I'm

15  sorry; January 2nd of 2008?

16  A.   Again, there might be some limited communications after that

17  time frame, but I cannot say with certainty here today.

18  Q.   All right.   You don't know one way or the other, do you?

19  A.   I'm just not sure about the dates.   No, that's correct, I do

20  not.

21  Q.   Are you aware of any that took place after March of 2009

22  between Mo Yun and any of the co-defendants?

23  A.   Again, there may be, but I can't say with certainty right

24  now.

25  Q.   And you've reviewed all of the evidence in this case,

1  haven't you, sir?  That's what you told Mr. Griess earlier?

2  A.  I've reviewed the vast majority of it, but we have a

3  tremendous amount, so I haven't read every piece of evidence

4  word by word; but in general I'm familiar with most of the --

5  just about all of the evidence.

6  Q.  All right.  And you can't recall any communications between

7  my client, Mo Yun, and any of the co-defendants after March of

8  2009, can you, sir?

9  A.  Again, it's possible there may be some limited

10  communications after that time frame, but I can't say with

11  certainty here today.

12  Q.  And you told Mr. Griess that you've done quite a bit of

13  research into the company and into my client's husband, the

14  chairman of DBN --

15  A.  Yes.

16  Q.  -- and some of the other co-defendants, correct?

17  A.  Correct.

18  Q.  And you're aware of the fact that at least as of March of

19  2009, that my client retired from the company to become a

20  full-time mother of her two children and did not work at the

21  company after that time, aren't you, sir?

22  A.  There is some evidence to indicate that she was still

23  affiliated with the company as recently as 2014.

24  Q.  And what is that evidence, sir?

25  A.  Open source reporting on the Chinese media.

1   Q.  Oh, you're relying on information that you got off the

2   Internet from the media?

3   A.  Correct.

4   Q.  And what is that information, sir?

5   A.  There's a few various web sites that we've had translated

6   that indicate that she was still affiliated with the company in

7   2014.

8   Q.  And when you say affiliated with the company, what does that

9   mean?

10  A.  It references her as being a counselor, an advisor to DBN

11  and having still professional relations with the company.

12  Q.  I see.  Notwithstanding that, you can't point to one

13  communication after March of 2009 between my client and any of

14  the co-defendants, isn't that right, sir?

15  A.  I don't know how many times -- I cannot say here today with

16  certainty whether there is or not.  There may be.  I just can't

17  recall specifically whether there is or not.

18  Q.  You did recall the ones that Mr. Griess asked you about,

19  though, correct?

20  A.  Yes.

21  Q.  All right.  Let's talk about that.  Mr. Griess asked you

22  whether or not the allegations in the superseding indictment

23  were, as I recall the question, based in part on your

24  investigation from 2011 and 2012, correct?

25  A.  Yes.

1   Q.   All right.   So, in other words, you're telling the court

2   that you interpreted language and communications back in 2007 in

3   the context of information that you had about acts that took

4   place in 2011 and 2012, correct?

5   A.   Yes.

6   Q.   And that was based completely on your interpretation of

7   words that you read from electronic sources, correct?

8   A.   No.

9   Q.   Oh, it was based on surveillance that you conducted?

10  A.   It was based on a totality of the entire investigation, not

11  just based solely on my interpretation.

12  Q.   I see, I see.   At any point during the investigation, did

13  anyone observe Mo Yun in this country in either 2011 or 2012?

14  A.   Yes.

15  Q.   I'm talking about my client, Mo Yun, in 2011, 2012.

16  A.   Not 2011 or 2012.   She did make a couple of entries into the

17  country in 2013 which people would have observed her, customs

18  officials, people of that nature; but 2011, 2012, you're

19  correct, no, they did not.

20  Q.   Okay.   So none of your -- is it fair to say that none of the

21  agents working with you in the investigation that led to the

22  superseding indictment, it did not involve any observation of Mo

23  Yun in this country, is that correct?

24  A.   That's correct.

25  Q.   All right.   Let's talk about the overt acts that Mr. Griess

1   asked you about.  First of all, we're talking about six overt

2   acts, correct?

3   A.  I'm assuming that's correct.

4   Q.  I'm just trying to -- I'm not trying to trick you here.

5   A.  Well, okay, six.

6   Q.  Okay.  Do you know whether or not the defense has received

7   copies of the underlying communications as to all six of these?

8   A.  I believe they were provided to your co-counsel yesterday by

9   AUSA Griess.

10  Q.  And do you know whether or not the communications referenced

11  in paragraphs 27 and 31 were also provided to us?  Because we

12  don't have those, Your Honor.

13  A.  I don't know if they were provided or not.  I'm assuming

14  they were not if you don't have them.

15  Q.  Do they exist?

16  A.  Yes.

17  Q.  Does the Assistant U.S. Attorney have those?

18  A.  I do not think so because they would have been part of a

19  three terabyte drive that was provided to Mo Hailong's defense

20  firm, and I don't believe the U.S. Attorney's office kept a copy

21  of that three terabyte drive.

22  Q.  Were they provided to the grand jury?

23  A.  Verbally more than likely.  I don't believe hard copies

24  were.

25  Q.  So the grand jury didn't get to see hard copies of what

1    these communications involved?

2    A.  I do not know.  I did not do the grand jury on the

3    superseding indictment.

4    Q.  I see.  Can you describe to the court what the electronic

5    communications were that were referenced in these overt acts 27

6    through 32?

7    A.  Yes.  They appeared to be cut and paste portions of instant

8    messaging communications that Mo Hailong was having with various

9    individuals, and it appeared that he would save them into Word

10   documents and things of that nature.

11   Q.  What do you mean by -- excuse me, Your Honor.

12           What do you mean by cut and paste?

13   A.  Well, it appears that when he was having instant messaging

14   communications with either your client or other individuals,

15   that there's really no mechanism to save that from the instant

16   messaging program.  So in order to save those, he was just using

17   his mouse, highlighting those communications and then saving

18   them to Word type documents or text type documents.

19   Q.  So you did not secure the actual messages themselves, is

20   that correct?

21   A.  I'm assuming the messages themselves are what is copied into

22   the Word document, so we do have those.

23   Q.  You have what was copied into the Word document, but --

24   A.  Right.

25   Q.  -- do you know whether that represents all of the

1    communications in their original form?

2    A.   No, I do not.

3    Q.   So you don't know what it was that Mo Hailong cut and pasted

4    from the original communications, correct?

5    A.   That's correct.

6    Q.   There could have been a lot of other information that was

7    included in the original communications which he didn't cut and

8    paste, correct?

9    A.   That would be correct.

10   Q.   Now, the so-called excerpts that we've received included

11   Chinese characters?

12   A.   Parts of it.  The majority of communication between Mo

13   Hailong and your client were in English.

14   Q.   In English.  In broken English, correct?

15   A.   I don't even think broken English would be a fair

16   characterization.  It was pretty well written English.

17   Q.   I see.  But there were characters that were included in some

18   of these, correct?

19   A.   Yes, just a few, very few.  Not a lot.

20   Q.   Those were interpreted by the FBI?

21   A.   Yes.

22   Q.   Were they presented to the grand jury?

23   A.   I do not know.

24        MR. BIRD:  I'm going to -- with the court's

25   permission, I would like to mark as Exhibit A and show to the

1  witness one of the excerpts, if you will, Your Honor, that was

2  sent to us yesterday.

3          THE COURT:  Any objection, Counsel?

4          MR. GRIESS:  No.

5          THE COURT:  You may.

6          MR. BIRD:  And with the court's permission, I'll give

7  a copy to Mr. Griess.

8          THE COURT:  That's fine.

9          MR. BIRD:  May I approach, Your Honor?

10          THE COURT:  You may.

11          MR. BIRD:  I'm going to ask that it be marked as

12  Exhibit A and present it to the witness.

13  BY MR. BIRD:

14  Q.  Now, Agent Betten, before you -- I apologize, Your Honor,

15  it's an old habit.

16          Agent Betten, would you read to the court paragraph

17  27, please, of the superseding indictment.

18  A.  Sure.

19  Q.  I'm sorry -- yeah, I don't mean 27.  It's actually 28.  27

20  is one of the two that we did not receive.

21  A.  So read 28?

22  Q.  Right.

23  A.  "On or about January 18, 2007, Defendant, Mo Hailong, and

24  Defendant, Mo Yun, discussed what seeds to collect.  Defendant,

25  Mo Yun, instructed Defendant, Mo Hailong to," quote, "send to

1    Dr. Li, he can check which is better," period, unquote.

2    Q.   And your interpretation of Exhibit A is set forth in

3    paragraph 28, correct?

4            MR. BIRD:  Oh, Your Honor, I'm sorry, may I approach

5    so that the court has a copy as well?

6            THE COURT:  No, but I don't need one because they're

7    in the brief and I also have it online here, so I have 28.

8            MR. BIRD:  Oh, you do?

9            THE COURT:  Yes.

10           MR. BIRD:  No, Your Honor, this is actually --

11           THE COURT:  No, I don't have that.

12           MR. BIRD:  May I approach?

13           THE COURT:  You may.

14           MR. BIRD:  My apologies.  I should have given this to

15   you earlier.

16   BY MR. BIRD:

17   Q.   And, Agent Betten, your interpretation of Exhibit A is set

18   forth in paragraph 28, correct?

19   A.   I think it's inaccurate to call it my characterization.

20   It's what's in the chats.

21   Q.   I didn't say -- I think Mr. Griess asked the word -- used

22   the word "interpretation."  You interpreted Exhibit A in the

23   context of acts that took place in 2011, 2012, and those produce

24   the allegations in Exhibit -- in paragraph 28, correct?

25   A.   I don't think that's a fair characterization of it.  I think

1    paragraph 28 reflects what is in the chat labeled Defendant's

2    Exhibit A.

3    Q.  All right.  And did you interpret what the chat that is in

4    Exhibit A as -- to be an act in furtherance of the conspiracy to

5    collect seeds illegally to send to China?

6    A.  Yes.  It's part of the larger conspiracy and fits with the

7    totality of the investigation as to this overall scheme of the

8    conspiracy.

9    Q.  I see.  Thank you.  That's helpful.

10           And as part of the larger conspiracy, you interpreted

11   what you read in Exhibit A in the context of acts that you were

12   investigating in 2011 and 2012, correct?

13   A.  That's correct.

14   Q.  Let's take a look at Exhibit A.  At the top of it, it says,

15   "Hailong says," and then it sets forth a link.  And you know

16   what I mean by a link?  Three links actually, one to the USDA,

17   the government site, one to a site called seedlover.com and one

18   to burpee.com.  That's part of this communication, correct?

19   A.  Yes.

20   Q.  That's not referenced in paragraph 28, is it?

21   A.  No.

22   Q.  Did you go on those sites to determine what information

23   existed on those sites?

24   A.  I'm generally familiar with the USDA.gov site.  I believe

25   I've been on the seedlover.com site some time ago.  And

1   burpee -- which is B-U-R-P-E-E -- .com, I do not know what that

2   is.

3   Q.  All right.  Well, actually the USDA government site is

4   available to all people and includes statistics about farming in

5   this country, correct?

6   A.  I'm sure that's one section of the site.

7   Q.  And Burpee actually has information on its site, including

8   the sale of small packets of seeds for children who want to

9   plant gardens in the backyard, correct?

10  A.  I don't know.

11  Q.  But that was part of the communication that is referenced in

12  paragraph 28, correct?

13  A.  Yes -- or -- that's correct.

14  Q.  And in Exhibit A there's a reference, as there is in

15  paragraph 28, to collection, correct?

16  A.  I'm sorry, can you repeat that?

17  Q.  You see the reference about six or seven lines down where it

18  says, "Hailong says:  Yes, I will make a collection first"?

19  A.  Yes, I do see that.

20  Q.  And do you have any information as to what this collection

21  refers other than to the information that you have in 2011 and

22  2012 and the events of those years?

23  A.  In general, from all of the evidence, they typically use the

24  term "collection" to refer to collecting elite hybrids and seeds

25  that they wanted to acquire.

1   Q.  And do you know whether or not Mr. Hailong Mo (sic) was

2   referring to collecting seeds from seedlover.com and burpee.com?

3   A.  No, I do not.

4   Q.  But you didn't -- that's not included in paragraph 28, is

5   it?

6   A.  No, it's not.

7   Q.  And then in addition to that, in Exhibit A there's a

8   discussion, purports to be a discussion -- we don't know because

9   it was cut and pasted, but purports to be a discussion between

10  Hailong and Mo Yun about corn for silage.

11          Do you see that?

12  A.  Yes.

13  Q.  And Hailong says, "Those links are examples how Internet is

14  used in the US for crop data statistics and sales."

15          And she says, "Ok"?

16  A.  Yes.

17  Q.  And then Mo Yun says -- he says, "Please confirm that our

18  target is 'Silage-Specific Corn' not 'Corn for Grain.'"

19          And she says, "I don't know the two words."

20          Do you see that?

21  A.  Yes.

22  Q.  Is that reported in paragraph 28, that she was unaware of

23  what these -- the difference between corn for silage and corn

24  for grain?

25  A.  No, it was not.

1  Q.  When you did your background research on Mo Yun and the

2  other members of her family, did you become aware of the fact

3  that her studies in school had to do with veterinarian science?

4  A.  I think I learned that later.  I knew that she had a Ph.D.

5  from a China agricultural university, but I did not notice the

6  specific discipline until after her arrest.

7  Q.  Right.  But you did learn that her specific discipline is

8  not -- does not deal with chemistry or biology or corn and such;

9  that she's a veterinarian by education and trade, correct?

10  A.  I did learn that she had a Ph.D. in the veterinarian field

11  or animal science.

12  Q.  Then she also says, "I don't know the two words," correct?

13  A.  Correct.

14  Q.  Then she says, "Maybe Dr. Li can understand"?

15  A.  Right.

16  Q.  Did you report in the superseding indictment the fact that

17  there was information that the FBI had and that the U.S.

18  Attorney's office had which suggested that Mo Yun was not

19  knowledgeable as it related to corn seeds?

20  A.  No, because I think that would have been inaccurate based on

21  prior conversations that she's had.

22  Q.  Now, in referencing the superseding indictment, the overt

23  acts related to Mo Yun, two of those overt acts relate to

24  conversations in which Mo Yun had no part, correct?

25  A.  Which two are you referring to?

1  Q.  27 and 31.

2  A.  She didn't take part in those particular conversations, but

3  she was the topic of those conversations.

4  Q.  Yes.

5  A.  That's correct.

6  Q.  And the -- and I'm using this word loosely now.  The

7  excerpts from which these allegations were made have been

8  produced in the U.S. Attorney's office, correct?

9  A.  I don't know if they're physically in possession of them

10  now, but at one point they would have been provided as part of

11  our discovery obligation to Mo Hailong's defense team.

12  Q.  Well, they certainly would have been provided to the U.S.

13  Attorney's office prior to the return of the superseding

14  indictment, correct?

15  A.  That's correct; but, again, they would not have been really

16  in a format easily reviewable by them.  They were provided

17  simply on a three terabyte drive for turning over to the defense

18  team.

19  Q.  So, in other words, would it be fair to say then that you

20  just told the Assistant U.S. Attorney what was in those

21  so-called excerpts and then he reported that to the grand jury?

22  A.  I provided him summaries, quoted summaries of many of these

23  chats, and at some point he would have seen some of the actual

24  chats as well.  But I was out of town, in fact, I was in Los

25  Angeles at the time when the superseding was prepared, so I'm

1   not exactly sure that sequence of events.

2   Q.  Is it fair to say that prior to Mo Yun's entry into the

3   United States that there was no mention of her in the original

4   December 2013 indictment?

5   A.  That's correct.

6   Q.  Is it fair to say that the FBI and the U.S. Attorney's

7   office didn't focus on her as a target until they learned that

8   she had entered the country in June of 2014, this year?

9   A.  I think that would be incorrect.

10  Q.  But the superseding indictment was drafted actually on the

11  same day that she was attempting to return to China, correct?

12  A.  I'm not sure what day it was drafted.  I just know it was

13  indicted on July 2nd, the following day after her arrest.

14  Q.  Were there any under seal complaints filed with the court

15  prior to June 25th of this year?

16  A.  Specifically regarding your client?

17  Q.  I'm sorry; relating to Mo Yun.

18  A.  Oh, no.

19  Q.  So the first complaint that mentions Mo Yun, that has

20  focused on Mo Yun would have been actually issued on July 1st of

21  this year, correct?

22  A.  That's correct.

23  Q.  Is there any instruction which is referred to in the

24  superseding indictment which Mo Yun issues to any of the

25  co-defendants?

BETTEN - CROSS

53

1   A.  Well, there's several where she -- where Dr. Li, who is Mo

2   Hailong's boss, instructs Mo, Mo Hailong, that your client is in

3   charge of the home country specifics and further --

4   Q.  That's not what my question was, sir.

5   A.  Okay.

6   Q.  I'm asking whether there were any references in the super --

7   isn't it fair to say, Agent Betten, that the superseding

8   indictment evidences no instructions specifically by Mo Yun to

9   any of the co-defendants?

10          MR. GRIESS:  Your Honor, I'm going to object.  We're

11  talking about conclusions based upon quoted summaries that were

12  seized from Mo Hailong's computer.  Those words speak for

13  themselves.  Agent Betten's interpretation of whether they

14  qualify as instructions is not relevant.

15          MR. BIRD:  Well, Your Honor, actually part of the

16  point here is they don't speak for themselves; that they've been

17  interpreted and misinterpreted, and they've been shaped as a

18  result of the government's reading and reading into otherwise

19  benign and innocent language.  That's exactly the point.  They

20  don't speak for themselves.

21          THE COURT:  Mr. Griess, here is my understanding.  You

22  were asking on direct about the significance of facts in light

23  of his knowledge.  The way I interpret his question here about

24  Exhibit A is he's saying, you know, what's your interpretation

25  of Exhibit A and how it relates to the indictment, so I'm going

1   to let him answer.  But maybe I don't have the right context.

2   Tell me.

3           MR. GRIESS:  Well, as I understand what counsel was

4   talking about was to whether or not any of the words that were

5   used as part of the chats which are cited and quoted in the

6   superseding indictment qualified as instructions.  I think that

7   would be ultimately a question for the jury.  I'm not sure how

8   Agent Betten's interpretation of that could be relevant to

9   today's proceedings.

10          THE COURT:  Well, I think it just goes to what they

11  claim is the weakness of the evidence against the defendant.

12          So you can answer.  Agent Betten, do you remember the

13  question?

14          THE WITNESS:  I think so.

15          THE COURT:  All right.  Do you want to go ahead and

16  answer it?

17  A.  Yes.  Mr. Bird, I think that's an incorrect

18  characterization.  For example, in paragraph 29, the overt act

19  alleged there states that Mo Yun told Mo Hailong that he could

20  go ahead and contact farm owners, implicitly providing him

21  authorization to proceed with the purchase plan, both from a

22  financial and logistical standpoint on behalf of DBN since she's

23  married to the founder.  It implies implicit permission that

24  she's married to the founder and that they have company blessing

25  to proceed with that.

1  BY MR. BIRD:

2  Q.  So you interpreted that statement that she had implicit

3  authority from the founder of the company to purchase property

4  in the United States?

5  A.  Yes.

6  Q.  All right.  And that's precisely the point.  Isn't that the

7  only reference that you found in all of the evidence that you

8  reviewed and that the government reviewed relating to Mo Yun,

9  that's the only evidence of what the superseding indictment

10  refers to as instruction, not me?  That's the only reference in

11  the entire superseding indictment and in all of the evidence

12  that you reviewed of any instruction; in other words,

13  instruction to contact farm owners and learn more about their

14  purchase?

15  A.  No, that would be incorrect.

16  Q.  It's the only one that's listed in your overt acts, though,

17  isn't it, sir?

18  A.  Arguably paragraph 32, the overt act there could be

19  construed as an instruction as well.  It's more in the words of

20  encouragement, encouraging him that his work is important to

21  Dr. Li's plan and work in the U.S.

22  Q.  And you're interpreting those words as instructions?

23  A.  It could be interpreted in that way, I believe, yes.

24  Q.  Those are two.  Are there any others that are listed in the

25  superseding indictment?

1  A.  No.

2          MR. BIRD:  Could I have a moment, Your Honor?

3          THE COURT:  You may.

4          (Pause.)

5          MR. BIRD:  Just one more moment, Your Honor, if I

6  could review my notes?

7          THE COURT:  That's fine.

8          (Pause.)

9  BY MR. BIRD:

10  Q.  Agent Betten, you've prepared 302s on all of the

11  investigative work that you've done, correct?

12  A.  Either a 302 or what we call an EC, correct.

13  Q.  Of course.  And those, of course, have all been provided to

14  Mr. Griess, correct?

15  A.  Not all of them.

16  Q.  So there might be some in the last few days that you've

17  prepared that haven't been provided to him?

18  A.  Yes, and also some that remain classified.

19  Q.  I see.  Do you know whether or not the defense has been

20  provided any of those 302s because we haven't received any?

21  A.  Are you referring to your defense firm or --

22  Q.  Yes.

23  A.  I'm not aware.

24  Q.  And you've done extensive investigation into the sale of

25  these seeds into China, correct; corn seeds I should say

1  generally?

2  A.  I guess you're going to have to clarify.  What do you mean

3  sale of seeds into China?  I don't understand the question.

4  Q.  Well, you did a lot of research into DBN, correct?  You told

5  the court you did?

6  A.  I don't know if -- not me personally.  Several of our

7  administrative staff conducted investigation.

8  Q.  And you've talked to them about that?

9  A.  Correct.

10  Q.  All right.  Isn't it a fact, sir, that China actually

11  prohibits the use and sale of GMO corn seed within China?

12  A.  Most GMO I believe is prohibited.  I think there's some

13  limited exceptions.

14  Q.  Just so that we're clear about that, the country of China

15  does not allow hybrid corn seeds to be used within China,

16  correct?

17  A.  No, that's incorrect.

18  Q.  You said most of it is prohibited?

19  A.  I said most GMO.  There's hybrid seed that's not GMO.

20  Q.  I see.  You talked about spreadsheets that you found on the

21  computer?

22  A.  Yes.

23  Q.  You reviewed those?

24  A.  Most of them.

25  Q.  There's no reference in any of those spreadsheets to Mo Yun,

1   isn't that correct?

2   A.   I don't recall seeing any.   I'm not saying that there's not,

3   but I don't recall seeing any.

4           MR. BIRD:  No further questions, Your Honor.

5           THE COURT:  Any redirect?

6           MR. GRIESS:  Yes.

7                     REDIRECT EXAMINATION

8   BY MR. GRIESS:

9   Q.   Let's take a look at overt act No. 30 if you would.   In this

10  particular overt act, Mo Yun asked Mo Hailong if he could get

11  any corn, correct?

12  A.   That's correct.

13  Q.   And Mo Hailong responds that it's easy to pick and take

14  pictures but caution is needed to drive somewhere unseen as more

15  vehicles are passing by.

16           Is that what it says?

17  A.   Yes.

18  Q.   Would caution be needed to order seeds online from Burpee or

19  other gardening seed companies?

20  A.   No.

21  Q.   Does that lend some information as to whether or not the

22  Defendant's Exhibit A is referring to purchasing seed from U.S.

23  commercial suppliers and manufacturers?

24  A.   Yes.

25  Q.   Do the words "caution is needed to drive somewhere unseen"

1   also relate to anything that you saw later in the investigation?

2   A.   Yes.

3   Q.   What?

4   A.   We have extensive evidence of them -- when I say "them," the

5   co-conspirators -- attempting to evade surveillance, being

6   surveillance conscious, constantly looking for either police or

7   farmers or field managers when they got out to acquire seeds,

8   and there was extensive evidence of that fact.

9   Q.   As part of that process that you just described, is there

10  also evidence that they were picking and taking pictures of the

11  corn seed that was stolen from the fields?

12  A.   Yes.

13  Q.   And those were, again, seized from Mo Hailong's computers?

14  A.   Correct.   Digital evidence from the computers, correct.

15  Q.   Based upon the chats and the communications between Mo Yun

16  and Mo Hailong that you have talked about extensively today and

17  are contained in the indictment, was it surprising to you that

18  defense counsel brought out the fact that she appeared to have

19  limited knowledge as it applied to the science side of the

20  conspiracy?

21          MR. BIRD:   Objection, Your Honor.   Whether it's

22  surprising to him is irrelevant.

23          MR. GRIESS:   As I understand counsel's questions, he

24  was trying to draw conclusions based upon the fact that she

25  didn't know words that related specifically to the science side

BETTEN - REDIRECT

60

1  of the investigation.  I'm attempting to expand upon that.

2         MR. BIRD:  He can certainly argue it, Your Honor; but

3  whether this witness is surprised by it is irrelevant.

4         THE COURT:  Yes, I think his surprise or nonsurprise

5  is not properly important.

6         MR. GRIESS:  Well, can I ask a different question,

7  Your Honor?

8         THE COURT:  You may.

9  BY MR. GRIESS:

10 Q.  Does your investigation lead you to the conclusion that she

11 was involved in the science side?

12 A.  Yes.

13 Q.  Was her primary role also -- did it involve providing

14 authority, giving the go ahead to take certain actions?

15 A.  Yes.

16         MR. BIRD:  Objection; calls for speculation.

17         THE COURT:  It is speculation.  Overruled.

18 A.  Yes.

19 BY MR. GRIESS:

20 Q.  The go ahead to purchase property?

21 A.  Yes.

22 Q.  The go ahead to gather additional corn for Dr. Li to test?

23 A.  Correct.

24 Q.  The go ahead to bring other individuals to the United States

25 to assist Mo in the collection of seed corn?

1  A.  Correct.

2  Q.  With regard to your identification of Mo Yun as a potential

3  conspirator in this case, did that identification take place as

4  a result of reading all of the information that you obtained in

5  this case?

6  A.  Yes.

7  Q.  And did that occur prior to you knowing that Mo Yun was

8  going to come to the United States?

9  A.  Some of it.  I have just a general idea of the nature of the

10  evidence against her prior to her coming.  Then once we were

11  notified she was coming, that's when we conducted a much more

12  thorough review.

13          MR. GRIESS:  That's all the questions I have.

14          THE COURT:  Mr. Griess, were all the other defendants,

15  were they in the United States?

16          MR. GRIESS:  Yes, they were.

17          THE COURT:  Okay.  All right.

18          MR. BIRD:  Just one question, maybe two.

19          THE COURT:  Yes, that's fine.

20          MR. BIRD:  Thank you.

21                    RECROSS-EXAMINATION

22  BY MR. BIRD:

23  Q.  I think I got this correct, but Mr. Griess asked you about

24  the extensive evidence of evasion of detection.  Any of that

25  evidence involve observation of Mo Yun?

1   A.   No.

2   Q.   The extensive evidence of evasion of detection all took

3   place in 2011 and 2012, correct?

4   A.   That would be -- again, I can't remember exactly if we

5   started surveillance in 2011 but certainly 2012.

6   Q.   And all of the conclusions that Mr. Griess asked you about

7   as far as Mo Yun giving authority to people, that's based --

8   your testimony is based on your reading of the so-called

9   excerpts that were taken from Mo Hailong's computer, correct?

10  A.   No, that's not correct.

11  Q.   They're based on what communications then?

12  A.   Well, they're based on those communications; but my opinion

13  as to her role in the company is based on more than just the

14  communications.

15  Q.   It's based on information that you secured in 2012 as part

16  of your investigation, correct?

17  A.   It's based in part on that information as well as additional

18  information that we've acquired since that time.

19           MR. BIRD:   No further questions, Your Honor.

20           MR. GRIESS:   Nothing further.

21           THE COURT:   All right.   You may step down.

22           Thank you.

23                              (Witness excused.)

24           THE COURT:   Mr. Griess, does the government have

25  further evidence?

1        MR. GRIESS:  No further evidence.

2        THE COURT:  Mr. Bird, does the defendant wish to offer

3  any evidence?

4        MR. BIRD:  No, Your Honor.

5        THE COURT:  All right.  Any additional argument,

6  Mr. Griess, legal arguments or some issue you want to make?

7        MR. GRIESS:  Just brief --

8        THE COURT:  And is the court right that this is all

9  about she's a significant risk?  That's the issue for the court?

10        MR. GRIESS:  Absolutely, Your Honor.

11        THE COURT:  All right.

12        MR. GRIESS:  Our arguments are based upon flight risk,

13  not danger to the community.  Clearly, Your Honor -- and most of

14  my arguments are set forth in my brief; but she has been

15  indicted by the grand jury which is per se a finding obviously

16  of probable cause.  I understand that there's going to be an

17  argument that the jury will ultimately consider as to how strong

18  that evidence is; but really the strength of the evidence

19  doesn't have anything to do with Mo Yun's flight risk, and she

20  is a huge flight risk.  If she were to in any way, shape, or

21  form leave the country, the United States would have absolutely

22  no recourse.  We could not get her back.  In the same way that I

23  don't expect to see any of the co-defendants that are currently

24  indicted in the United States, if Mo Yun were to return to

25  China, she would have absolutely no incentive to come back.

1   There's nothing we could do as the government to arrest her or

2   bring her back.  I know there's even at one point in the defense

3   brief an indication that a security team could travel with her

4   to China.  That would have no impact because once they were

5   there, they would be under Chinese law and we would never see

6   her again.  I think that's very, very clear from the facts in

7   the case.  She has family there.  She has very little, if not no

8   ties to the United States.  She was here on a short-term

9   vacation.  There's just no reason to believe that if she got out

10  of the United States that we would ever see her again.  And

11  there is a very real risk, given the consequences, that she

12  would have incentive to leave and would leave, in fact.

13          The penalties for this -- and I know the defense has

14  argued, well, she would be a candidate for probation, and that

15  ultimately may be the case; but there's penalties other than

16  prison time that are at stake here, most notably, you know,

17  restitution and forfeiture, which are going to play a big part

18  in this case due to the loss that the government is going to be

19  alleging.  She --

20          THE COURT:  Okay.  Mr. Griess, would you be willing to

21  concede that there are conditions that would assure her

22  appearance for appearing in this trial, et cetera?

23          MR. GRIESS:  Absolutely, Your Honor, I do believe that

24  there are conditions, in the same way that I believe those

25  conditions apply to Mo Hailong.  The problem that I want to

1  point out to the court about that is the fact that that is

2  something that we negotiated and worked with defense counsel on

3  for the better part of a month, with the defense doing most of

4  the legwork as far as finding an appropriate location, finding

5  an appropriate security company.  They -- "they" meaning the

6  defense -- are paying for all of those accommodations.  There

7  are many, many reasons why those conditions are reasonable and

8  fair given the circumstances of this case; but they were agreed

9  to by a number of different parties.

10         I don't think it's feasible to force the defense to

11 agree to that.  If they're willing to engage in those

12 negotiations and engage a security company, I do believe we

13 would be ultimately able to do that.  And if it was home

14 incarceration, like it is with Mo Hailong, here in Iowa with

15 electronic monitoring and some of the other conditions that are

16 contained, I do believe that would be appropriate.  But to

17 release her back to China or to release her to Los Angeles where

18 we would have much less control of her movements and, you know,

19 I think -- I know they indicated they don't want her to be under

20 house arrest.  I don't believe there are reasonable conditions

21 given her flight risk, and we would oppose those.

22         But to answer the court's question directly, we would

23 very much be in agreement with trying to arrive at the same or

24 similar conditions to what Mo Hailong is in here currently.

25         THE COURT:  All right.  Thanks very much.

1          Mr. Bird.

2          MR. BIRD:  May I approach, Your Honor?

3          THE COURT:  You may.

4          MR. BIRD:  Your Honor, I have three problems with the

5     government's position today, but let me start just generally.

6     The concept that the proposition before the court should be a

7     negotiation between the government and the defense is totally

8     foreign to the process that this court is well aware of.  I've

9     had an opportunity to read Leyba and Stenger and Adams and a

10    number of the court's opinions on these issues.  This is well

11    traveled ground, and it's not about negotiation.  The 1984 Bail

12    Act, as the court referenced earlier, makes it very clear that

13    there's a presumption that a person in my client's position

14    should be set -- should not be detained, and it's the

15    government's burden, as the court has pointed out, to come

16    forward and show that there are no reasonable -- there's no

17    objectively reasonable basis by which we can assure, not

18    guarantee.  And this court has addressed that, and so did the

19    court in Orta and others in the Eighth Circuit, other cases; not

20    guarantee but objectively reasonable conditions.

21          Now, the government has already stipulated that my

22    client's brother doesn't need to be detained, and there was an

23    agreement -- I mean formally detained, I should say.  He's not

24    in jail.  He's in a form of incarceration.

25          THE COURT:  Right.

1           MR. BIRD:  So they've essentially conceded that there

2    are conditions that exist, all right.  What we've proposed to

3    the court are some additional conditions which we believe are

4    reasonable.  It's not up to me to negotiate with Mr. Griess, and

5    I say that with all due respect.

6           And, in fact, one of the things that he doesn't

7    address in his brief, which we did address and this court has

8    written about and talked about and other courts as well in the

9    Eighth Circuit, is that it's incumbent upon the court at this

10   point to engage in a sequential progression of consideration of

11   those proposed bail conditions to determine the least

12   restrictive way in which my client can be reasonably -- the

13   court can be reasonably assured that she's going to be here.

14          All right.  So let's go -- and I'm going to go through

15   those proposed conditions so that we can consider what the

16   Eighth Circuit in Orta and this court has said should be

17   considered, not in the negotiation but through a rational

18   consideration as to whether we can be reasonably assured she's

19   going to be here at trial.

20          But let me quickly address the second problem I have

21   with the government, and we've been through an interesting

22   examination of Agent Betten.  And let me just say in a little

23   bit of context, I know the court isn't -- we've never met

24   before.  I've been doing this a long time obviously, started as

25   an AUSA, and I understand how indictments work.  We had a Chief

1    Judge in Los Angeles, Matt Byrne, who used to be the U.S.

2    Attorney, who used to say that the most powerful and dangerous

3    person in the courthouse was an AUSA with access to the grand

4    jury.

5              So a grand jury indictment is easy to come by.

6    Sometimes it's harder to prove.  And I believe that's going to

7    be the case here because what we've heard from Agent Betten was

8    a lot of conclusions about things that happened in 2011 and

9    2012, and I believe he's acknowledged now and admitted what's

10   clear from the face of the superseding indictment, not from

11   anything that we have an obligation to prove, but from their own

12   superseding indictment that my client had nothing to do with any

13   of this clearly as of March 2009, and there's no evidence that

14   she was involved in deceptive actions in 2011 or 2012.

15             But even more importantly, Your Honor, of the six

16   overt acts that are mentioned of Mo Yun, my client, four of

17   them -- only four of them involve communications.  None of those

18   communications on their face involve criminal acts.  The only

19   way you get to a criminal -- they're talking about seeds or

20   collection of seeds.  You can do that legally in this country.

21   You can collect seeds from Burpee.com and go plant them in your

22   garden, and there's nothing wrong with a company learning about

23   what other people -- how other people are planting their corn.

24   That's legal activity.

25             When Toyota or Mercedes want to find out how each

1   other engineers their cars, they go buy one, reverse engineer

2   them, and then they change their plans for the next year's car.

3   Nothing illegal about that.

4           What's become illegal is that Agent Betten and the

5   government -- and, again, I say this respectfully -- have taken

6   actions which took place in 2011 -- allegedly took place in 2011

7   and 2012 and they've retrospectively reconstructed what was the

8   intent or the purpose of language back in 2007, Your Honor,

9   six-and-a-half to seven-and-a-half years before today, and

10  there's no link in between.  There's nothing about such

11  communications in '08, '09, 2010 to link that up.

12          So now I'm talking about the relative weight of the

13  evidence and asking the court to consider the relevant weight of

14  the evidence in the context of this bail motion.

15          THE COURT:  Mr. Bird, I don't know the answer to this

16  and if you or Mr. Griess does, does the government frequently

17  indict foreign nationals that are not in the United States?  I

18  don't know the answer to that.

19          MR. BIRD:  I know we did it.

20          THE COURT:  I'm sorry?

21          MR. BIRD:  Yeah, I don't know.  To answer frequently,

22  I can't answer that question; but it's done.  It's done, yes.

23          THE COURT:  Okay.  I interrupted you when you were

24  telling me --

25          MR. BIRD:  That's okay.  I was talking about the

1   evidence.

2              And then we got to Exhibit A and -- if I may have a

3   copy of that.  I mean, this is one example, and we just got this

4   late yesterday, Your Honor, and printed it out at the hotel, and

5   we would have done it with others, but we didn't have time and I

6   apologize.  But just Exhibit A has to do with overt act, I think

7   it's 28.

8              I'm going to stretch out here a little bit here at the

9   lectern.

10             And Agent Betten and the government's interpretation

11  of Exhibit A is that it was an overt act in furtherance of the

12  conspiracy in that on or about January 18, 2007, my client and

13  her brother, Mo Hailong, discussed what seeds to collect as if

14  they're talking about seeds that were in and of themselves

15  illegal to collect.  And then they say that Mo Yun instructed

16  defendant Mo Hailong to send to Dr. Li, he can check which is

17  better.

18             And then when you actually read Exhibit A, you see

19  that Mo Yun didn't know anything about the difference between

20  the different kinds of corns and she says, I don't know the

21  difference between whether it's corn for grain or silage, what

22  is that, tell me what that is.  And, of course, she says send it

23  to Dr. Li because he's the one with whom -- who has that

24  knowledge.  She doesn't.  She's a veterinarian.

25             So they've taken what is I think objectively innocent

1    acts and they've made them into an overt act in furtherance of

2    the conspiracy.  Now, I know that the grand jury's indictment

3    deserves respect here.  I'm not talking about guilt or

4    innocence; but we are talking about the relative weight of the

5    evidence, and this is the kind of evidence that we're talking

6    about.  This is why my client will seek vindication.

7         Now, then we talked -- I questioned Agent Betten about

8    the evidence on which these overt acts -- or from which these

9    overt acts come, and he acknowledged, admitted, I believe, that

10   the so-called excerpts that they took from my client's brother's

11   computer were cut and paste.  He doesn't even know and he can't

12   know, no one can know, except for the brother, how much of the

13   original back and forth was cut and paste into that.  In other

14   words, they could just be small excerpts.  These may not be the

15   complete version.

16        So not only have they interpreted them according to

17   acts that they say took place in 2011 and 2012, not only are

18   these only from 2007, six-and-a-half to seven-and-a-half years

19   ago, but they're also cut and paste.  We don't even know that

20   these are complete.  I don't even know how they're going to

21   authenticate these when it comes time for trial.  We're going to

22   get into a big issue about that.

23        And then, in addition to that, there are actually

24   parts of these underlying communications which are in Mandarin

25   characters, which, of course, Your Honor knows will involve a

1   lot of back and forth as to what the interpretation of those

2   characters is.  And, of course, they're written in English and

3   he says, oh, it's great English, but they're written by non

4   English speaking people in a foreign language.

5          And then we all know how e-mails and text messages are

6   written these days.  We do it regularly, at least some of us

7   more than others, and we know how easily those are

8   misinterpreted.  This is weak stuff, a paucity of evidence, not

9   for us to judge in terms of guilt or innocence.  Mr. Griess can

10  make his argument to the jury and I'll make mine; but it's weak

11  stuff nevertheless as it relates to my client, Your Honor, not

12  all of this stuff that happened in 2011 and 2012.

13         Now, the last point, there's a lot of conclusory

14  language in the superseding indictment about how Mo Yun

15  instructed people to do this and that she -- Agent Betten says

16  that, oh, well, she must have had authority from her husband,

17  and so forth.  That is -- that grows right out of the head of

18  Agent Betten, with respect.  There's no evidence of that.

19         All right.  Let's get to the third point and whether

20  or not there is a collection of conditions which this court can

21  look to to objectively, reasonably assure the presence of my

22  client at trial.  That's really what we're supposed to do here

23  today, right, Judge?  That's what the obligation is; not to

24  negotiate this, but to figure that out.

25         First of all, we would respectfully submit that

1   electronic monitoring as is currently being used and is used

2   regularly in this district and in districts all across the

3   country is more than sufficient to advise the government, the

4   pretrial services probation department, the court as to whether

5   or not our client is making a run for the border or is not going

6   to be here.  And she doesn't have to be kept in a hermetically

7   sealed safe house, which is what other counsel apparently

8   stipulated to.  I'm not stipulating to that.  I have no problem

9   with her residing at the house with her brother.  We think that

10  would be appropriate; but we also believe that electronic

11  monitoring would more than suffice to allow her the kinds of

12  freedom that any person in this country would be provided in

13  advance of trial.

14          Now, let's remember, she's got two kids at home

15  thousands of miles away, her husband.  She's got ailing parents

16  and she's being kept here for months, at least months and

17  probably over a year in one house.  That's what the government

18  wants to do.  When you have the ability through electronic

19  monitoring and security, private security to make sure she's

20  going to be here at trial, why not do that?  What do we want her

21  to do?  We want her to be able to go outside and exercise.  We

22  want her to be able to shop if she needs to buy some clothes,

23  maybe have a dinner out, maybe go to the university and take a

24  class, at least the basic kinds of things that we all enjoy and

25  that any defendant should be allowed to do and enjoy before they

1    have a chance to vindicate themselves.  As long as she's got

2    that anklet on, she's not going anywhere.  And if she checks in

3    with pretrial services or probation and she gives notice, she

4    surrendered her passport, she's in the middle of our country,

5    It's not like she's going to be able to, you know, race away

6    somewhere.

7           Those are objectively reasonable conditions which will

8    assure her presence at trial and which we think are fair and

9    appropriate especially given the paucity of evidence that the

10   government has as to her, as to her.

11          Now, what else?  And, by the way, when I say

12   security -- and this was presented to the magistrate judge in

13   Los Angeles, and I understand that his rulings only -- and he

14   was very deferential, and appropriately so.  He made it very

15   clear, as Mr. Griess has pointed out in his brief, that the

16   extent of his ruling was until his client got to Iowa, and that

17   was appropriate.  But what's important -- and the court may not

18   know this -- Magistrate Judge Wilner, former AUSA, not long

19   since he was in the office, he knew the security people that we

20   proposed would be responsible.  He knew Steve Martinez to be the

21   Special Agent in Charge of the L.A. office of the FBI.  He also

22   knew the former U.S. Marshal who works with Steve Martinez at

23   Stroz Friedberg.  That's the name of the company that we

24   proposed to bring her to Iowa, and he accepted that.  He knew

25   those people personally.  He understood the conditions under

1   which they would be used, and he signed off on it, and he did

2   because he knew those people.

3          And what we're proposing to the court as an additional

4   condition as part of this progressive consideration is that that

5   organization, or any organization which is approved by the

6   court, be employed to transport, with notice to the court, with

7   notice to the government, our client to one of three places

8   prior to trial.  And we've asked for her to be released to

9   China, and I've addressed that, but another condition would be

10  to Los Angeles.  Why Los Angeles?  So that we can work with her

11  and so that she can meet there with her children.  Why not in

12  Iowa; they could come to Iowa?  Well, it's going to be a lot

13  easier for them to travel from China to Los Angeles than it is

14  to Iowa.  It's just as simple as that, and it's going to be

15  under circumstances that are going to make it a lot more

16  palatable and sensitive in terms of the children who aren't

17  going to understand a whole lot of this.  Also, in Florida where

18  she has a sister-in-law or in New York where she has a niece,

19  but always under the observation and control of the security

20  people and with notice to the government and with notice to the

21  court and with electronic monitoring.

22          Those types of conditions are imposed on a daily basis

23  throughout the country by district court judges, and they work

24  and they have worked, and there's motivation for Steve Martinez

25  and his colleagues at Stroz Friedberg to make sure that they

1  work because as soon as they don't work, they've lost their

2  livelihood and they've lost their ability to come into court --

3  I'm sorry -- through counsel and to say we can provide this

4  service to the court.  I mean, you're using -- right now the

5  government has authorized the use of a private security firm to

6  guard the brother.  That's all we're asking for.

7       We've proposed a reasonable appearance bond which

8  would be posted.  We've talked about -- and a reasonable curfew

9  so that she has to be in a secured place every night and, of

10  course, that can be worked out with pretrial services or the

11  probation department on the monitoring aspect of it.

12       THE COURT:  You should know this, from reading the --

13  she's posted a bond already?

14       MR. BIRD:  Actually she has not, Your Honor, but we

15  are prepared to do that.

16       THE COURT:  Okay.

17       MR. BIRD:  Judge Wilner made that a condition, but

18  because we were able to agree with Mr. Griess on having the FBI

19  transport her here, that was not necessary for us to post it.

20       THE COURT:  Mr. Bird, is it unrealistic to -- you

21  haven't waived the -- Ms. Yun hasn't waived any speedy trial.

22  If the case is as weak as you say, why would you not not waive

23  speedy trial, demand your --

24       MR. BIRD:  We may.

25       THE COURT:  Okay.

1           MR. BIRD:  I'm just new.  We got in this case two

2      weeks ago.

3           THE COURT:  Well, when you talk about a year, you

4      know, and it being a long time, I'm trying to -- you know, the

5      government has been working on the case a long time and you just

6      got it, so it's unfair for me to ask that; but I'm thinking

7      about the 70 days, and if the case is as weak as you believe it

8      is at this point, I was just thinking to myself -- I did want to

9      go over the, what I thought was some different thoughts you had

10     on page 17 and then page 18.  You say that -- this is on 17.

11     You say she's determined to clear her name and return to China

12     once her case is resolved and not before.  And then the next

13     page you tell me she should be permitted to travel to China to

14     be with her family for limited stretches and to Los Angeles

15     where her lawyers are based.

16          MR. BIRD:  Your Honor, I'm representing a 41-year-old

17     mother of two children.

18          THE COURT:  Okay.

19          MR. BIRD:  She doesn't work for the company.  I don't

20     care what Agent Betten says.  All right?  She's a mom.  That's

21     what she does.

22          THE COURT:  Okay.

23          MR. BIRD:  She's got a 12-year-old who's about to go

24     through a really important part of his life.  Education is one

25     of the common denominators throughout the world.  Every family

1   knows that education is important to them, and that's

2   particularly important in China and it's important in her

3   family.  She's going to be away from a 12-year-old for an

4   important part of his life.

5             THE COURT:  Okay.

6             MR. BIRD:  I'm representing somebody who believes, and

7   I think genuinely, that she's innocent of these charges.  So I'm

8   doing everything I can to represent that client as hard as I can

9   and as honestly as I can.  You bet we want her to go to China so

10  she can be with her children.  I understand what this court's

11  considerations are and what the allegations are, but I'm going

12  to ask for that respectfully.

13            THE COURT:  All right.

14            MR. BIRD:  That said, this is a -- as the court in

15  Orta and this court has said in other cases, we're supposed to

16  go through all of the conditions until we hit on the ones that

17  are going to do the job.

18            Now, a couple of other points, and I don't want to

19  forget them.  I'm looking at my list here.  Obviously, if there

20  are other conditions which the court normally imposes, those

21  should be imposed; but it is important to the client's well

22  being that she be permitted to get outside of that so-called

23  safe house under monitored conditions so that she can -- no

24  matter how long it's going to be.

25            Let me go back to the court's question.  I apologize,

1  I should have addressed it immediately.  When are we going to

2  try this case?  I can't answer that question today.  We'll be

3  able, as soon as I get the discovery, to answer quickly, and I

4  think there's more issues involved than just a speedy trial.  I

5  think we've got some severance problems here.  The government is

6  going to need to be ready to answer why it is that Mo Yun should

7  be tried with all of the co-defendants given the state of the

8  evidence.  But these are issues that I can't address in a

9  substantive way and knowledgeable way until I've gotten

10 discovery.  Once I get that, hopefully we'll get it soon, then

11 we'll be able to answer the court's questions more directly and

12 more completely.  But, sure, I've considered getting a trial --

13 as I understand it right now, the trial date is in December, but

14 I haven't talked to co-counsel.  I don't know what their

15 concerns are.  I mean, I haven't talked to them about the trial

16 date, and so forth, so I can't -- that's the best answer I can

17 give the court right now.  And I suspect that the court

18 understands that.

19         Those are the conditions.  We would ask the court to

20 order the return of a number of items that were taken from my

21 client.  Her purse was taken.  There is a Chinese citizen card,

22 a registration card, which I'm told is particularly important to

23 a Chinese citizen, that she used in China and that is very

24 important for her children and for family purposes.  That is

25 part of what was seized from her at the airport at LAX.  We

 1   would like that returned.  Her phone was taken from her.

 2   Obviously, the passport, we're not suggesting that be given back

 3   at this point other than if the court were to allow her to go to

 4   China.  But all her personal items that were taken from her at

 5   the airport, we would like those returned.  I see no reason why

 6   they shouldn't be.

 7          I think the weight of the evidence itself

 8   distinguishes my client from her brother and ought to forcefully

 9   and convincingly argue in favor of imposing the litany of bail

10   conditions which we believe will reasonably -- objectively and

11   reasonably assure her presence, which is the only issue before

12   the court at this time.

13          If I could just have a moment and make sure I didn't

14   miss anything?

15          THE COURT:  You may.

16          (Counsel conferring.)

17          MR. BIRD:  Thank you, Your Honor.  We'll submit it on

18   that basis.

19          THE COURT:  Thank you.

20          I will consider the matter submitted.  The court is

21   going to continue the present conditions.  I'll get a ruling out

22   shortly.

23          I do want to compliment Mr. Griess and Mr. Bird for

24   the thoroughness of both their briefs and their factual

25   presentation and argument.

1          We'll be in recess.

2          MR. BIRD:  Thank you, Your Honor.

3          (Proceedings concluded at 12:00 p.m.)

1                      C E R T I F I C A T E

2            I, the undersigned, a Certified Shorthand Reporter of

3     the State of Iowa, do hereby certify that I acted as the

4     official court reporter at the hearing in the above-entitled

5     matter at the time and place indicated.

6            That I took in shorthand all of the proceedings had at

7     the said time and place and that said shorthand notes were

8     reduced to computer transcription under my direction and

9     supervision, and that the foregoing computer transcription pages

10    are a full and complete transcript of the shorthand notes so

11    taken.

12           Dated at Des Moines, Iowa, this 29th day of July,

13    2014.

14

15

16

17                            /s/ Terri L. Martin
                              CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25

# EXHIBIT B

File Name:     Myun02252007.rtf

Filed Under Seal

File Name:     Myun02252007.rtf

Filed Under Seal

# EXHIBIT C

# EXHIBIT C

## Examples of Broken or Unavailable Hyperlinks in Instant Message Excerpts

**Filename: Moyun 1209.rtf**

| | |
|---|---|
| http://www.athenixcorp.com/ | Broken Link |
| http://www.beckerunderwood.com | forwards to http://www.agro.basf.com/agr/AP-Internet/en/ |
| http://www.athenixcorp.com/alliances.html | Broken Link |
| http://www.athenixcorp.com/tech2.html | Broken Link |

**Filename: moyun.rtf**

| | |
|---|---|
| https://www.grc.org/register/RegisterConfirm.asp?id=1607123 | Broken Link |

**Filename: Mo Yun_01-18-2007.rtf**

| | |
|---|---|
| http://www.dowagro.com/mycogen/silage/ | Broken Link |
| http://www.dowagro.com/mycogen/who/silage.htm | Broken Link |
| http://www.nass.usda.gov/sd/cr/crno1205.pdf | no PDF, active site; broken link |
| http://www.seedlover.com/products.php?catID=2233 | Broken Link |
| http://www.burpee.com/jump.jsp?itemID=223&itemType=CATEGORY&iMainCat=13&iSubCat=223 | Broken Link |
| http://www.bo-jac.com/images/corn/FSBplus06.pdf | Broken Link |

# EXHIBIT D

File Name:    Moyun_10302007.rtf

Filed Under Seal

# EXHIBIT E

File Name:     Moyun072007.rtf

Filed Under Seal

File Name:     MoYun_01-18-2007.rtf

Filed Under Seal

# EXHIBIT F

File Name:     moyun01282007.rtf

Filed Under Seal

File Name:     Lecture.rtf

Filed Under Seal

# EXHIBIT G

File Name:    Moyun.rtf

Filed Under Seal

File Name:     moyun 10142007.rtf

Filed Under Seal