IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA, :
:
Plaintiff, :
:
vs. : Case No. 4:13-cr-00147
:
MO HAILONG and MO YUN, : HEARING TRANSCRIPT
:
Defendants. :
- - - - - - - - - - - - - - - -X

Courtroom, First Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Wednesday, April 22, 2015
1:40 p.m.

BEFORE: THE HONORABLE STEPHANIE M. ROSE, Judge.

KELLI M. MULCAHY, CSR, RMR, CRR
United States Courthouse
123 East Walnut Street, Room 115
Des Moines, Iowa 50309

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JASON T. GRIESS, ESQ.<br>Assistant U.S. Attorney<br>U.S. Courthouse Annex<br>110 East Court Avenue, Suite 286<br>Des Moines, Iowa 50309-5053 |
| For Defendant Mo Hailong: | MARK E. WEINHARDT, ESQ.<br>HOLLY M. LOGAN, ESQ.<br>Weinhardt & Logan, P.C.<br>2600 Grand Avenue, Suite 450<br>Des Moines, Iowa 50312 |
| | MARK E. BECK, ESQ.<br>Mark Beck Law, P.C.<br>350 West Colorado Boulevard, Suite 200<br>Pasadena, California 91105 |
| For Defendant Mo Yun: | LEON F. SPIES, ESQ.<br>Mellon Spies & Pavelich<br>312 East College Street, Suite 216<br>Iowa City, Iowa 52240 |
| | PETER J. SHAKOW, ESQ.<br>GARY S. LINCENBERG, ESQ.<br>Bird Marella, P.C.<br>1875 Century Park East, 23rd Floor<br>Los Angeles, California 90067-2561 |

# I N D E X

## E X H I B I T S



| DEFENDANT MO HAILONG'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 1 - Discovery timeline | 74 | 74 |
| 2 - Minutes from hearing held on 1/29/14 | 74 | 74 |
| 3 - Minutes from hearing held on 4/30/14 | 74 | 74 |
| 4 - Excerpt of transcript of hearing held on 10/1/14 | 74 | 74 |
| 5 - Order filed on 1/16/15 | 74 | 74 |
| 6 - Excerpt of transcript of hearing held on 2/26/15 | 74 | 74 |
| 7 - Order filed 3/6/15 | 74 | 74 |
| 8 - *Des Moines Register* article | 74 | 74 |
| 9 - FBI reports dated 12/2/11 and 12/6/11 | 74 | 74 |
| 10 - FBI report dated 4/6/15 | 74 | 74 |
| 11 - Handwritten notes | 74 | 74 |
| 12 - FBI report dated 3/6/15 | 74 | 74 |
| 13 - Department of Justice memorandum | 74 | 74 |
| 14 - E-mail dated 3/18/15 | 74 | 74 |
| 15 - E-mail dated 4/2/15 | 74 | 74 |
| 16 - E-mail dated 4/16/15 | 74 | 74 |

P R O C E E D I N G S

(In open court.)

THE COURT: Thank you. You can be seated.

We are here today in the matter of United States vs. Mo Hailong and Mo Yun. It's Case No. 4:13-cr-00147. Joining us on behalf of Ms. Yun, we have Leon Spies, Gary Lincenberg, Peter Shakow; and on behalf of Defendant Mark -- I'm sorry -- Mo Hailong, we have Mark Weinhardt, Holly Logan and Mark Beck; on behalf of the United States, Jason Griess.

And joining us by telephone are Mo Yun and Mo Hailong, who are with Attorney Philip Hilder in Houston, Texas, as well as Kathy Lee, who is acting as an interpreter on behalf of Mr. and Ms. Mo.

We are here today to resolve Defendant Mo Hailong's motion for reconsideration of the magistrate judge's order concerning notice of evidence obtained through FISA surveillance which was filed on March 20th of 2015 at Docket 229. This motion to reconsider relates to the motion to compel production of discovery and inspection and for order setting deadlines that was filed by Defendant Mo Hailong at Docket 153 and joined by Defendant Mo Yun at Docket 166.

I have a few overview questions, and then I'll turn it over for argument to the lawyers in this case. Certainly, as the parties know, I'm relatively new to this particular case, and so I'm getting up to speed on it and I've been reviewing the

docket and reading all of the things that happened before I came on to the case.

It does not appear to me that there is any kind of stipulated discovery order in this case. Is that right?

MR. GRIESS: That's correct.

MR. WEINHARDT: That's correct, Your Honor.

MR. SPIES: Yes.

THE COURT: Parties didn't want to do that standard order or what?

MR. GRIESS: The standard order in this case, Your Honor, is very difficult given the nature of the evidence. It's the same issue which we're going to discuss a little bit, and that's what made it difficult, and that's why there wasn't.

THE COURT: Okay. So here, essentially, do the parties then agree that discovery is governed by Rule 16, as informed by Giglio and Jencks and Brady and Supreme Court authority of that kind?

MR. LINCENBERG: Yes, Your Honor.

MR. WEINHARDT: That is correct, Your Honor, although I would say that from the beginning it was actually the intent of the parties that there would be a stipulated discovery order entered into in this case and that discovery was going to proceed more or less along the terms of an order like that.

Because of some of the difficulties having to do with confidentiality of alleged trade secret information, that order

has never been put in place, and we're now in the process of negotiating a protective order. But I would say that the parties have proceeded from the beginning of this case on an assumption that discovery was not going to be handled in a way dramatically different from any other Southern District of Iowa case.

MR. GRIESS: Your Honor, just to respond to that, I think the trade secret issue is one of the issues but certainly not the only one. The issues of classification and the issues concerning FISA also play into that. It was the parties' intent, and there was discussion about this, that we would try and come up with a discovery order, a stipulated discovery order in this case, but given, again, those factors, we weren't able to do so.

THE COURT: Okay. It also does not appear, from review of the docket, that Mo Yun ever joined the motion to reconsider. She joined the original motion to compel but never joined in the motion to reconsider. Is she not seeking reconsideration of, essentially, the one issue resolved by Judge Bremer, which was the identification of FISA material?

MR. LINCENBERG: Your Honor, if the Court would permit, Mo Yun would join in that motion to reconsider.

THE COURT: Okay. Then could somebody -- and I assume I'll start with Mr. Griess and then allow the parties to supplement as necessary -- give me a general overview of what

discovery looks like in this case? What volume of discovery are we looking at? Generally, by broad classifications, what's the nature of what the parties are sorting through here?

MR. GRIESS: Your Honor, so I'm clear, you're talking about discovery that's already been provided?

THE COURT: I am. And here both parties cite cases that talk about the volume of discovery and whether the Government has an obligation to identify certain things or to pull out, cull out certain bits of evidence. What I'm trying to get a sense of is are we talking about, you know, millions of pages of metadata versus, you know, 500 real documents or are we talking about six terabytes of all real data, all true conversations, all real reports? Are we talking about hundreds of thousands of recordings, are we talking about two dozen? Sort of what, generally speaking, are we talking about?

MR. GRIESS: Well, it's impossible for me to sit here and give you an exact, and I know the Court doesn't expect that, but there is a lot of data. Much of it involves recorded conversations. There is some metadata, although I don't think the metadata is the overwhelming part of this case. There is data that involves GPS tracking. There are surveillance reports and logs, interview reports.

But I think probably the bulk of the material involves the electronic recordings that have been disclosed, the e-mails that have been disclosed, that were disclosed, all those things,

very, very early. But I think that's the bulk of the data that was involved in this case.

THE COURT: Okay. Mr. Weinhardt, would you generally agree with that summary?

MR. WEINHARDT: In general. I think our tally of this is that in the approximately six terabytes of information that have been produced, there is something in the nature of 500,000 discrete documents of one sort or another; e-mails, Word documents, intercepts, et cetera. I know that there are over 50 hours of recorded conversations and months of location tracking by a GPS, months or even years of pole camera surveillance of locations, and so forth.

Here might be a way to put this in context for the Court. I think it is literally true that the defense team in this case has spent thousands, not hundreds but thousands, of hours going over the Government's discovery, in large part just to understand what's there and what's missing in it.

MR. LINCENBERG: Your Honor, the only thing I would add to Mr. Weinhardt's comments is that all of this is complicated and magnified by the fact that much of this is in a foreign language, and because we've been given little direction on what documents are going to be used by the Government, what's relevant, it puts us on a wild-goose chase and causes us to spend lots of money and lots of time looking at things which may ultimately not be relevant.

THE COURT: And when we're speaking about foreign language, I assume Mandarin Chinese is the bulk of the language involved here.

MR. LINCENBERG: Yes.

THE COURT: Is that the recordings as well as the e-mails and documents, is it just the recordings, or is it a combination of both?

MR. LINCENBERG: It's both. There's been some of it is in English, but much of it isn't.

THE COURT: Any additional record on that you'd like to make, Mr. Griess?

MR. GRIESS: Your Honor, it is true that there has been a lot of data disclosed, but I will say and I want to make it clear that the Government has taken the broad view with regard to Brady and Rule 16 and provided a very expansive interpretation of what needs to be or what should be disclosed under those rules, and so that has increased the volume to a certain extent, and I think the Court needs to understand that as well.

THE COURT: In the Government's briefs it indicated it has produced all of Mo Hailong's known statements. Has it also produced all of Mo Yun's known statements?

MR. GRIESS: With the exception of the matters that are going to be handled pursuant to the FISA hearing and the CIPA hearing, Your Honor, I do believe that's the case.

THE COURT: Mo Hailong asked for, as part of his original motion to compel, law enforcement notes of interviews, but I didn't see that within the argument itself that you briefed. Is that still a request you're making?

MR. WEINHARDT: It is, Your Honor.

THE COURT: Okay. And any additional authority on that particular issue you'd like to cite?

MR. WEINHARDT: No additional authority, Your Honor, although when I have a chance to discuss the motion to compel, not the reconsideration part but the rest, I will give the Court some factual examples of why we believe we're entitled to notes because there has been, in some cases, a gap from notes to 302s in terms of a rendition of what happened in certain interviews.

THE COURT: And which of the law enforcement agencies we're talking about that you assert have law enforcement notes?

MR. WEINHARDT: Well, FBI that we know of. I'm not sure that we know of other agencies. But that gets a little bit into the scope of discovery and who's in the prosecution team question.

THE COURT: Okay.

MR. LINCENBERG: And, Your Honor, if I may, as an example of that, we recently received a 302 which was prepared years after the interview, and from what we've received, it was apparent that it was prepared based upon notes, which really raised a concern on our part that there are notes out there that

were not memorialized, and the idea that a 302 is being prepared years later really suggests that -- how somebody can remember what took place in an interview two years ago, they're just looking back at notes, and how they then interpreted that into a memo, it's very important in a case like this to be able to look at the notes.

THE COURT: Okay.

MR. LINCENBERG: And I would also add that the Department of Justice's own manual addresses the need to preserve the notes and making those available for the defense.

MR. GRIESS: Your Honor, if I could respond to that point.

THE COURT: You can.

MR. GRIESS: Thank you.

With regard to this particular document -- I think it was I learned about that this morning in the filing that the defense made -- those were not made based upon notes. That was made based upon another classified document.

What I have told this Court as part of our filing, that part of the delay and part of the deliberate nature of the discovery in this case was the necessity, the requirement, to work through those issues, and I tried to describe the process, the intentional process, that has to be navigated in order to get that information in a format that's disclosable.

There's a variety of ways that that can occur. One of

the ways that can occur is for information to be taken out of another document that is classified with the relevant portion disclosed. That's what happened with regard to this document. It was not prior notes.

THE COURT: Okay. There was also a discussion within the body of the briefs here about in particular one recording and two documents relating to declassified FBI 302 attachments. The Government had indicated it turned over the recording. I think, Mr. Weinhardt, your office acknowledges it now has that recording. The Government had indicated in its brief it intended within the next, I think it was, seven days that it would turn over these two documents related to the declassified FBI 302s. Has that now been done?

MR. GRIESS: I believe it has, Your Honor. I would say that there were some additional documents identified that were not disclosed. The declassification process has been engaged, and I believe those documents, the two documents, are ready for disclosure today.

I don't want to get into those because I have not seen the final declassification, but these are not documents that are earth-shattering in any way, shape or form, but they are going to be disclosed.

THE COURT: Finally, the parties -- finally from the extent of some generalized questions, and then I'll hear arguments and probably have follow-up questions there -- the

parties referenced, both parties referenced, their work on a joint protective order relating to the scientific and testing data on the seeds. Has that now been finalized? Is it still in dispute?

MR. WEINHARDT: It is still in dispute.

Mark, if you're in a better position than I am to talk about that.

MR. BECK: Yes. I'd be pleased to.

Your Honor, this protective order has been negotiated in the context also of motions to quash brought by Monsanto, AgReliant and Pioneer. Those counsel for those three companies have been working with Mr. Griess and with us in an effort to get to terms that might be acceptable.

As of yesterday, we completed our review of the latest red line we've had for about a week in this back-and-forth process that's taken about five or six weeks, and I think we're at a point where we agree on much. We disagree on a few points, and we're probably going to have to take this to Judge Bremer, but our next step is to talk with Mr. Griess, to call counsel for the seed companies, and try to sort out these final points.

THE COURT: Okay. So in reviewing the briefs here, essentially, the joint protective order that you're working on in these briefs is the same joint protective order that's being litigated in the motion to quash there, it's not two separate ones?

MR. BECK: Yes, Your Honor.

THE COURT: Okay. That was the point I needed to hear clarified.

Then let's go ahead and hear argument on these other matters, and undoubtedly I'll have some follow-up questions.

Who is arguing on behalf of Mr. Hailong this morning?

MR. WEINHARDT: I am, Your Honor.

THE COURT: Okay. Go ahead.

MR. WEINHARDT: Your Honor, if I may approach, I have some exhibits to support my argument that I'd like to hand up to the Court.

THE COURT: Yes. Is one of these a copy to be admitted into evidence?

MR. WEINHARDT: That is correct. So the one to Your Honor's clerk is to be admitted into evidence, and then one is for the Court's convenience as I speak this morning.

THE COURT: Kyle, will you give that to Kelli in case she wants to look at that.

MR. WEINHARDT: Your Honor, we will start picking the jury in this case on September 14th, less than five months from now. The case has been alive since December of 2013. Over the life of a case that spans that many months, there are certain milestones of when a Court would expect certain things to happen in discovery, and with less than five months to go, many things that the Court would and should expect to have happened a long

time ago, in some cases more than a year ago, have happened very late or at this date still have not happened.

There are broad categories of information that we still do not possess, and there are areas where we still just don't know what is available and what is not and even which agencies are involved and which agencies are not, and we believe, particularly now that the pretrial motion deadline has passed, that we're in a position of real and enduring prejudice and that that's only going to get worse as we get closer to trial.

I have prepared as Exhibit 1 a timeline of what we would say are the pertinent dates regarding discovery, and I won't go through the timeline in detail with the Court, the Court's reviewed the docket and is familiar with it, but I would highlight this: There are in bold four times where the Government has been ordered to produce discovery by a date certain. The first one we'll agree doesn't count. That was kind of the form order when our client was arraigned.

But we had an extensive pretrial conference almost exactly a year ago with Judge Bremer in which she set a date of June 16th of 2014, and we blew right past that date. And so in August of last year we produced a 22-page very detailed letter to the Government, which I won't burden the Court with, requesting that many gaps and deficiencies be remedied.

We had an extensive conference that both defendants

participated in with the Government on September 25th of last year, and coming out of that were a number of agreements and commitments. By December 15th, we concluded that those agreements and commitments were sufficiently behind, were not being honored, and we felt, with the case a year old, that we needed to file this motion to compel.

The Government's immediate response to that was to say, "Don't do that," or, "Don't make us resist this," other than the matter that we're discussing reconsideration about, which we knew there was just a legal dispute. But otherwise the Government's request, and this was at a meeting that I had with Messrs. Griess and Krickbaum on December 6th, was to say, "Give us a date certain by which we can make the final production of discovery to the defense, and that should resolve all of these issues."

And so we agreed to do that and suspended the obligation to resist. That meshed with an order that was put together at Judge Pratt's request setting out a number of other pretrial deadlines, including the motions deadline that has passed. So this January 31st, though it turned out to be the 30th because the 31st was a Saturday, was to be the final production of discovery in this case.

As the Court can see, discovery was produced on a number of occasions after that, and so on February 26th we had a hearing in front of Judge Bremer regarding discovery. At that

hearing the parties proposed, essentially by agreement, to the Court a remedy, which was that we would, by March 2nd, provide a letter saying what we thought the deficiencies still were and that the Government would make its final production on the 16th of March.

And I even, before Judge Bremer, without any dispute from the Government, categorized the January 31st deadline as the final, final and the March 16th as the final, final, final, and yet since March 16th more information has been produced, including information on the 10th of April that I'm going to discuss.

One of the things that is important about these deadlines is this: That the Government did not say in the construction of any of these three deadlines that there's a carve-out for classified information. It didn't say, "Well, this will be our final production unless we have to declassify things or unless we have to invoke procedures under the Classified Information Protection Act."

THE COURT: And to be clear here, are you talking about additional disclosures of discovery that the Government had in its possession and were readily available that could have been produced sooner or are you talking about new interviews?

MR. WEINHARDT: No. No, no, no. This is all information that was in the Government's hands at the time that we were talking about these previous deadlines.

So until the Government filed its motion asking for a pretrial conference under CIPA, there was never a proviso put in these earlier discovery orders saying final production deadline except for CIPA stuff, and so we understood that there isn't a classification problem or everything is being declassified. And yet on the 10th of April, the Government files its CIPA pretrial conference motion, and at page 12 of that motion, this is what the Government says: That at the upcoming pretrial conference, "the Government anticipates it will be prepared...to provide an estimate of the time necessary to conduct a complete review of any potentially relevant classified information. Based on that estimate, the Government will request a schedule for the filing of motions pursuant to Section 4 of CIPA relating to the deletion, substitution, and/or disclosure pursuant to a protective order of classified information otherwise subject to discovery" under the Federal Rules of Civil Procedure.

"Finally, the Government will file an ex parte, in camera motion pursuant to Section 4 of CIPA to address classified materials that may be subject to discovery obligations." And their footnote says that from this pretrial conference, the date for which I assume we'll set today, they want 60 days to do that.

And so we are told on April 10th of this year, for the first time, that they're going to need 60 more days just to tell this Court in camera what it is that we don't have and that

hasn't been produced.

Now, I'm grabbing in the dark here because I don't know what all has been classified and what we don't have, and neither does the Court, and the Government wants at least two months from now in order to tell the Court. How that meshes with a September 14th trial date and a motions deadline that has already passed, I don't know. And I cannot conceive of why this CIPA motion was not filed a year ago if the Court -- if the Government saw these issues coming.

There are a number of examples, and a number of the exhibits that I have attached are simply for the Court's reference; the orders or transcript hearing references regarding the obligation of the Government to comply with these deadlines. But starting at Exhibit 8, the Court will start to see the exhibits that we have that just detail some of the discovery issues that we know about.

Exhibit 8 is simply three articles from the *Des Moines Register*. My point is that the image of our client on his knees digging seeds up in a field is the newspaper lead about this case, and it's going to be the lead in the opening argument of the Government or the opening statement of the Government to the jury if the facts, in fact, hold up.

Now, at Exhibit 9 the Court will see what was produced to us in discovery about that incident or pair of incidents in May of 2011, and those are 302 interviews of two individuals, a

man named Holst and a man named Dolash. Now, in the search warrant applications for the home, the office, and some other things that are already of record, an unambiguous statement saying that our client was identified as digging in the fields was made to support those warrant applications. That unambiguous statement is contained in the indictment, in the superseding indictment, and as the Court can see, our jury pool is reading that unambiguous statement in the *Des Moines Register*.

Now, what is the reality of that? Well, when the Court looks at those two 302s, the Court sees that unambiguous statement isn't demonstrated by them at all. There's no visual identification. These people weren't interviewed in person, they were interviewed by telephone by the FBI months after the incidents in question. That's the discovery that we knew about when we filed our pretrial motions.

When the Court turns to Exhibit 10, what it finds is a 302 that was generated on April 6th of 2015 that is discussing material that the Government had in its possession on July 27th of 2011, and it's just a part of a broader file that hasn't been produced to us, the contents of which we don't know.

And so actually the investigation date is June 30th of 2011, so material that was in the Government's possession for over three years was not disclosed to us, was not reduced to a 302 that was discoverable to us. And moreover, even this 302 is

partially redacted.

And here is what is really grating about this is this 302 was drafted up after we filed our motion to suppress plainly as an attempt to respond to that motion to suppress, and that's why, when I wrote the reply brief, I said that we have now crossed the line from slow, sloppy, and mistaken to manipulative; that the information that could have informed this Court's decision about the motion was withheld from us until after we crafted the motions.

In addition, if the Court turns to Exhibit 11, it will find handwritten documents apparently obtained from DuPont Pioneer by the Government regarding the incidents on May 2nd and May 3rd of 2011. And here is what is in one of those documents; the idea that Mr. Mo or somebody was possibly digging. Well, possibly digging and digging are two very different things.

Given the importance of this incident to this case, I can't imagine why "possibly" as a modifier to "digging" isn't a piece of Brady material that needs to be produced to us posthaste, and yet this was withheld until April 10th of this year.

It is also partially redacted. There's this black thing at the bottom that is plainly a redaction, but then there's this sort of curious gap in white that may or may not be a redaction. Similarly, among the DuPont Pioneer documents that were produced, if the Court turns to the next page, there's

something where there's this white gap that has to be a redaction because it's the only item of substance in that document. There are numerous other examples.

So if the Court looks at Exhibit 12, there is an investigation that is done on September 21st of 2011, but the 302 is generated on March 6th of 2015. This is an example of what Mr. Lincenberg was talking about, but this is an interview of a Polk County Sheriff's Deputy. How is that national security classified information, just what the deputy saw out on the road?

There are other examples, and I haven't burdened the Court with all of the documents, but as an example, we have disclosed to us an April 8th, 2015, 302 indicating that several months, I believe five months, of the cell phone tracking data for our client's cell phone, the GPS tracking data, was lost. It was simply deleted by the FBI. And the body of the 302 makes it apparent that the FBI knew of that deletion, knew of that gap in the cell phone data for years beforehand but did not reduce that to a 302 until just in the last couple of weeks.

We were produced, on the 10th of April, multiple 302s occurring in December of 2011 and April of 2012 of Thomas Atherton, a DuPont Pioneer corporate security individual, and some of them at least don't appear to be redacted, they don't appear to be subject to any sort of confidentiality concerns, and there's no explanation why we only got them now.

There is an employee at Pioneer, a Jun, J-u-n, Yei, Y-e-i, for which there was a 302 done on December 20th of 2013. We only got that on the 10th of April of this year.

There is a witness that the Government will claim of some significance named Guo, G-u-o, Fenguang, F-e-n-g-u-a-n-g. He was interviewed in Texas, where he lives, on November 19th of 2014. A 302 was drafted the next day and finalized on December 3rd.

In that interview, they imaged Mr. Guo's computer. He then hired counsel and came to Des Moines for a proffer interview on December 4th of 2014. The 302 was drafted and finalized by December 17th of 2014. The Government knew all of this happened when it agreed to the final, final discovery deadline of January 31st, yet we didn't get it until March 16th of 2015. And what we got was the 302s. What we don't have today is anything from the image of Mr. Guo's computer.

There is an individual of Chinese descent, Lijuan Zhao, who works for an unrelated seed company, who lives in central Iowa. The Government came into contact with her in 2012 and obtained the hard drive of her computer no later than March of 2012. It produced documents from that computer to us for the first time on March 16th of 2015, three years later.

And finally, Your Honor, we will resist later this week, pursuant to the deadline, the Government's motion to extend expert witness deadlines, but I can just read two

sentences from that that talk -- that will inform the Court about the approach of the Government to discovery in this case. The first sentence is, "The corn being tested is corn from the seizures in May and September of 2012." That's at paragraph 5 of the motion.

And this is the first sentence of paragraph 7 of the motion: "Testing of the seeds has been a lengthy and complex process that began in January 2014." The Government sat on the seeds for 16 months before commencing any attempt at assessing their value as evidence.

Based on all of the things that I have recounted, Your Honor, we do not have any faith in declarations that discovery is done, declarations that only this much is left, and declarations that what you're going to get is not earth-shattering.

If I can now turn to a couple of the specific issues that are discussed in the brief. We've asked for the disclosure of Mr. Mo's statements, and the Government says we have all of them. Here's an example of why we doubt that: The Government did an intercept of phone calls from his cell phone, not pursuant to a warrant. We assume pursuant to FISA, but we don't know. The Government has disclosed to us 269 calls. The intercept lasted for a period of 18 months. I can assure the Court that Mr. Mo used his phone many, many more times than 269 times over 18 months. That's only once every other day. He

used his phone lots more than that.

Someone selected only a very few calls out of the total for us to receive. We don't know who made that selection. We don't know how they made that selection. We don't know whether they are part of what would be considered the prosecution team or not.

And that issue is similar to issues that we have for intercepts of written communications where thousands of his e-mails have been produced to us, and so we do not accept the representation that all of his statements have been produced to us.

I will not discuss, because I think it has been adequately briefed, the question of translations, only to say that in English the recording is in the evidence -- is the evidence, in Mandarin the translation is the evidence, and so in Mandarin the translations are our client's statements, and that's what is discoverable.

THE COURT: Do you have any case that says that?

MR. WEINHARDT: We rely on the authority that we cited in our briefs, Your Honor, and I think that that authority stands for that proposition. And I think it's a matter of common sense. I don't know how the jury makes use of a Mandarin recording.

Then, Your Honor, if I can just speak briefly about what the scope of the Government's obligation is. At Exhibit

13, I have attached the Department of Justice guidance regarding discovery matters such as this, and it extensively discusses, and I've highlighted the pertinent parts, the issue of who is on the prosecution team.

Now, in its resistance the Government says at least nine different FBI divisions and resident agencies have been involved in this investigation. "At least" gives us great pause. If the Government doesn't know exactly how many agencies and offices were involved, then how does it know how many to search that were on the prosecution team?

The other thing is we know that the involvement of the FISA statute and the CIPA procedure involves the National Security Division of the Department of Justice. It almost overwhelmingly likely involves the National Security Agency. We don't know who else.

But the very involvement of those sorts of things in this case takes this outside the bounds of the agencies who are listed in the prosecution team, and so we believe that those -- you know, minimally, the National Security Division, whose lawyers we think are on the way to this court -- that they have to be considered within that scope.

I have discussed classified information. The co-defendant Ye Jian is an example of another statement that the Government made about discovery that was just incorrect. In its March 16th letter to us it says we've disclosed everything that

there is about him, and then on April 10th it disclosed more.

We know of travel that he made to the United States in 2013, some of which the Government has disclosed evidence about, but some of which, where we understand there were seed seizures, we've received no evidence about.

I think we've adequately discussed the issue of attachments to items.

Let me talk about the scientific data issue because it's really broader than testing results. The testing that the Government is doing now that is the subject of this expert motion is not the only testing that's been done in the case. In these search warrant applications there are references to other testing that has been done, some of which allegedly, at least in some probable cause way, ties certain seeds to certain companies.

The Government seems to act as though the disclosure of any sort of testing result is all subsumed by the expert witness deadline and that the Government discloses to us those things that they want to use in evidence.

But every time that there was a test done that didn't conclusively identify a seed as being traceable back to something that is a trade secret, not just a product or a patented item but a trade secret of a seed company, that's Brady for us. That's evidence of seeds that were in the possession of the alleged co-conspirators here that weren't trade secrets.

All of that should be produced, and it's been in existence, we think, for a couple of years.

Moreover, though, particularly the documents that were recently disclosed about these incidents in the field in May of 2011 suggests to us that the Government has just broadly withheld anything and everything from a seed company on the strength of there is no protective order.

Well, that is not an issue for the defense. At no later than -- and I'm testing my memory, but I know that no later than September 25th, when we had the discovery conference with the Government, we said, "Please send us a draft of a protective order ASAP so we can put this together and get whatever it is that you're holding back on the strength of that protective order."

As the Court will see from Exhibits 14 through 16, we got that protective order draft -- and we talked about it many other times, but we got that protective order draft for the first time on March 18th. We turned it around in a matter of days, and then it came back to us on the 16th, and that's where we are now is trying to negotiate the last points of it.

But other than the period between March 18th and, I believe, April 2nd, all of that has been on the Government and on the seed companies, and we can't conceive of a reason why we didn't get a draft protective order last fall so that we could sort that argument out or sort the issues out back then instead

of being compressed before trial to do so.

I'd like to now talk about the request for a key documents list. We've already talked about the volume of discovery in this case, and it is immense. And in the briefing we've noted a number of courts that have -- and absolutely a discretionary remedy, but have ordered the Government to provide an itemization of key documents, not just for the Government, but for the defense as well. And it was a discretionary order that was imposed in many of these cases where discovery went smoothly as opposed to the way the discovery is going in this case. And I've already noted in my reply brief the ironic contradiction about the Liew case in terms of the Government's handling of that case.

Here, because of the way that the discovery has gone and because of the short time before trial, the issue, we think, very strongly tilts in the defense's favor; in other words, meaning that a key documents list here is called for not just because of the volume and complexity of discovery, but because of the delays and difficulties that we have encountered in trying to get that discovery.

And we could, if the Court wants us to do something more specific, we could draft a proposed order for the Court that would impose that requirement.

THE COURT: Here, I think, is part of the problem with nearly every argument you make: Rule 16 does not require the

Government to give you most of the stuff you're asking for, and you have not entered into an agreement with them that's enforceable by me for anything different than that.

They have to turn over Brady, but they don't have to turn it over to you now. They don't have to turn over 302s of interviews. They don't have to turn over agent notes, unless they're your own client's statements. There's nothing in the law that requires them to turn over the vast majority of what you're asking for here today. Not, obviously, the statements of your client; that's a whole different matter. That's covered by Rule 16 no matter what your agreement is.

But when I look at the Court's orders, and none of these were me, you know, we're talking about other judges, but they all specifically reference Rule 16 discovery. You're not entitled to 302s under Rule 16 discovery. You're not entitled to all of their testing data until they have to turn it over or unless it's Brady, but then you're not entitled to Brady material at this moment.

That's the problem we're running into here is that if the parties intended this to be an open file discovery, then you should have made it open file discovery that's enforceable, but you didn't. That's not what you've done. So I'm only bound here and can only enforce here Rule 16, and these timelines you want aren't in there.

MR. WEINHARDT: Your Honor, I have two responses to

that. First of all, I think it's more than plain that we have requested, and I don't think the Government would dispute that we have requested, discretionary discovery under Rule 16 such that materials that are -- or items that are material to the preparation of the defense are things that are within the scope of Rule 16, and I think that most, if not all, of what I'm discussing falls within the scope of those items. That's number one.

Number two, I would submit that while the parties never did reduce something to writing, that they have proceeded along the lines of a stipulated discovery order in this sense: The stipulated discovery order imposes on the Government open file obligations and it imposes on us confidentiality limitations in terms of who gets to see it, under the circumstances under which they get to see it, and things of that sort. We have carefully abided by all of those, and we have had a back-and-forth with the Government when the Government has given us things where they exceeded what they thought that they should have produced.

So, for example, there's a clawback letter that we're working on responding to right now to give the Government back an item of discovery that they believe was excessively produced because of a trade secret problem, and so forth.

So what I would say is this has been a two-way street in which we have observed the guts of what that order would say

and the Government has observed the guts of what that order would say, and I think it is now far too late in the day to wind back the clock to early 2014 and say, no, we're under a different discovery regime.

Had that been the understanding of the parties, we would have filed a motion or we would have done something very different back at that time. And I understand that the Court was not involved in the case at that point, but, you know, I think we have to administer this under the rules of the game as they were played before other magistrate judges back at the time.

THE COURT: I think the problem with that is when you come in and say, "Well, we really want to enforce what we all had in a mutual meeting of the minds in our oral agreement," but you clearly didn't because the Government says you've never turned over any reciprocal discovery. That's part of the standard stipulated discovery order. You say the Government hasn't turned over material.

So there wasn't a meeting of the minds, and there's nothing I can enforce now because you as a group didn't ever reduce it to writing. So the only thing the Court has been involved in administering at this point is Rule 16 discovery. Rule 16 discovery does not require the things you're asking for. Is it nice? Of course, it is. Can I under my discretion order them to do some of the things you want? Yes. And is this the

kind of complicated case where that may well be appropriate? Yes, it is. But there's nothing that requires the Government to do what you're asking them to do and nothing that requires you to give them reciprocal discovery if you don't want to do that because you haven't agreed to it.

That, to me, is what is underlying a lot of the angst in this case is that you all don't agree on anything, and so if you can't agree on anything, then I am bound by the terms of the law, and that's not what you're asking for.

MR. WEINHARDT: First of all, among the obligations that we consider ourselves bound by is reciprocal discovery. We have not produced any reciprocal discovery because we simply don't have any. You know, this is a case where they, soup to nuts, took anything from our client that would remotely be relevant to this case, and so they have it. And we're not trying to bring documents over from China or anything like that at this point. So we simply don't have any reciprocal discovery to produce to the Government, so we'll be allaying that concern.

And I guess the other thing that I would say, Your Honor, is the minimum that should come out of this is if the Court believes that there is no stipulated discovery order that obligates the Government to produce the things that I have been talking about, well, even though I still contend that many of those things are within the Rule 16 discretionary provisions, then that needs to be the outcome of today's hearing, that we

need to impose that order, because we're willing to keep giving what we have given, which is we're willing to give reciprocal discovery, we're willing to abide by confidentiality, but then we do want what that standard order provides.

THE COURT: Is that something the Government is agreeable to, Mr. Griess?

MR. GRIESS: Your Honor, it depends on what the agreement would be. But we're agreeable to continue to be reasonable, like we believe we have been throughout the entire case.

And if I can just pick up, if the Court wants me to address some of it now, I can pick up on a number of the points Mr. Weinhardt made.

THE COURT: I can or we can allow Mo Yun's team to argue and then have you respond globally to both, if that will work.

MR. GRIESS: That's fine.

THE COURT: And, Mr. Lincenberg, are you arguing on behalf of Ms. Yun -- I'm sorry -- Ms. Mo?

MR. LINCENBERG: Yes, Your Honor. Thank you.

Your Honor, let me start by adding to the answer to two of the questions that the Court posed to Mr. Weinhardt. One of the questions earlier was dealing with the question of whether there was authority as to whether the transcripts are evidence or the tapes. And Mr. Weinhardt, in his reply brief, I

believe it's Document 276, provided the authority, which he didn't have that in hand, but I can cite it to the Court.

It's at page 8 of that brief, U.S. vs. Placensia, an Eighth Circuit case approving a jury instruction explaining that where the discussions were in Spanish, the translated transcripts of the discussions are evidence.

The authority that Mr. Griess had cited in response, where he cited to the Court general cases talking about how the transcripts will not be evidence, the original recordings are, does not deal with the issue of translations.

THE COURT: And I don't dispute that. I agree with that line of reasoning. I'm familiar with it. Do you have any case that says you can require the Government to translate all of their foreign language evidence and hand it over to you as part of discovery?

MR. LINCENBERG: The answer is yes, but, I mean, I have to answer it in a more general sense because I don't have the authority in my mind. But this comes back to the point of the Government presenting to the defense the evidence they intend to introduce at trial. If there is an excerpt that is in Mandarin and they intend to introduce that in evidence at trial, it is the translation that they're intending to introduce, so the authority is that they're required to turn over the evidence.

THE COURT: And to be clear here, that's going to

happen. If the Government intends to offer something at trial, I'm going to make them translate it and provide the translation to you, and if you intend to offer it at trial, you're going to have it translated and make that available to me and to the Government.

The question is whether the Government has some obligation to translate everything it has, regardless of whether it intends to use it or not at trial. Do you have any authority that says that?

MR. LINCENBERG: No, I don't.

THE COURT: And is that what you're seeking? Because that's what I understand you to be saying is, "We want the Government to translate the millions of documents or pages of documents and recordings, whether or not they intend to use them."

MR. LINCENBERG: Well, let me respond by just saying as a starting point it would be nice to receive at least the documents that they're intending to introduce at trial, and, second, if there are documents that they have determined to be relevant, whether they're introducing them or not, whether they may constitute Brady or maybe something that they don't have on their original exhibit list but they believe are relevant, that they may be adding later, that has to be produced.

And part of the importance of having this done early is, first, there are so many documents; second, there are subtle

differences that in some instances are important differences in the translations. There may be one person who translates something as, "I would have known that," and another person saying, "I know that," or things like that, which can be critically important. And so it's very important that we get to this early.

And the main gist of what I want to add to Mr. Weinhardt's discussion is how all of this delay affects our client, Mo Yun, but before I get to that, I also want to address the second question that the Court had raised.

And the Court first, in the Court's introductory comments, the Court said you agree that I'm controlled by Rule 16 and Brady and Giglio, and I said yes, Your Honor, you are. To add to that, as the Court mentioned a moment ago, it's not only that the Court has discretion, but the Court has supervisory powers to control its courtroom and the processing of discovery. And underlying those supervisory powers in this case in particular is the importance of enforcing the ability to comply with the Speedy Trial Act.

Now, we believe the Speedy Trial Act has already been violated, and we believe that the conduct that has taken place in connection with discovery is creating a serious risk of putting my client in a catch-22 of wanting to go to trial as soon as possible versus receiving discovery so late that it makes it impossible to do so.

And if I may, because Your Honor is relatively new to the case, retrace a little bit of the history with respect to my client. So as the Court is aware, there was an indictment in December of 2013 which did not in any way involve my client, Ms. Yun. Ms. Yun came to the United States over five years after having discontinued her work even at the company DBN which is at issue here and came on vacation with two young children.

She was arrested on July 1st of 2014. At our bail hearing, because the indictment was so thin, the Court permitted us to cross-examine Agent Betten as to the nature and the strength of the evidence. After a finding that the evidence was thin as it relates to Mo Yun, the Court agreed to reasonable conditions of bail.

Since that time -- there had already been a trial date set of December 1st or 2nd, I believe it was December 2nd, of 2014. We would have preferred an even quicker trial date. We didn't get discovery for -- at all for several months, but we continued to push for that trial date and, in fact, filed a motion for severance because there was so little discovery that had been provided that our co-defendant's counsel felt that they couldn't necessarily go on that date because they didn't have sufficient discovery.

We even said we would be prepared to go to trial without -- without filing a motion to suppress the FISA

application because our client is innocent, the evidence against her proves that she's innocent, the evidence provided by the Government.

The only excerpts that are even referenced in the indictment are from 2007, and the only allegations of anybody going into seed fields and digging up seeds takes place in the 2011 to 2012 time period, long after our client had delivered her second child, left work years ago, and had nothing to do with any of this.

Our motion for severance was denied. Our attempt to go to trial in December was denied, and ultimately, due to circumstances that were unfortunate, which in part resulted in the case being transferred to Your Honor, we ultimately in January had to agree that a new trial date should be set, and that date was set later than the date that we requested.

So now here we are. It is April 22nd of 2015. My client has been living in the United States separated from two young children and her family for now ten months, a completely innocent woman waiting to get her day in court, and we are now facing a number of obstacles, some of which are created by a Government that indicted our client apparently without the evidence yet, not even having tested seeds yet. And so we're now faced with obstacles, including the fact that there's late discovery.

Mr. Weinhardt outlined witnesses in the United States

who we didn't get discovery in a timely basis, no translations. So essentially, other than some of the excerpts that are in English, but with regard to anything in Mandarin, no evidence. We don't have the evidence because it is those translated transcripts that are the evidence that would involve our client.

With regard to excerpts, we just got a brief filed by the Government which for the first time detailed a whole litany of reasons why they never did testing, and that will be subject for another hearing, but asking for even more time. And as part of the, for the first time, laying out a testing protocol, which says we need to -- it took us a long time to identify the genetic markers that we want to use to test and now they have to grow these -- plant these seeds and grow them and take DNA tests from leaves and the like, and we're supposed to respond to all of this in a month or two with a trial that's coming up in September.

We don't even have the seeds. Their experts apparently need the seeds to have as controls against which they're testing. We don't have these seeds. We don't have the time to necessarily do this lengthy amount of planting. And so while that motion may be for another day, I think it's important for the Court to understand it in connection with the late discovery and how this is prejudicing my client.

Third example is with regard to the FISA and CIPA issues. At this point a motion was filed, we joined in the

motion, and yet, as Mr. Weinhardt has outlined, there are incredible delays that are taking place there, and we have no witness list, we have no key document list.

All of this is being pushed and pushed to a point late in the day when there are going to be a number of other things on your plate, including motions in limine once we look at and see what their documents are and exhibits are, determining whether there are any witnesses who we may want to call, where they may be located, how we can get testimony, or, if there are documents responsive, if there's a way to get those documents.

You know, given the fact that this is a company based in China, that my client is here with, really, no -- no documents or anything, she had nothing to do with this, it's left to us to try to scramble at the last minute. And if all the sudden we get draft translations on August 15th in the middle of doing jury instructions and all of the other things that are taking place then, it puts us in an impossible position and a catch-22 because there is not a chance that we want to delay this trial. We want to get to trial as soon as possible, unless the Court dismisses the case based upon our motions before then, so that our client can get back home to her family.

So I think that given the discovery laws that the Court has at its disposal, given the fact that there are -- that there's a Speedy Trial Act that is important, and it is critical, that the Court use the Court's supervisory powers to

order that this discovery be finalized, take place, that there not be any violations by having discovery coming in afterwards so that the defense has a chance of being able to adequately prepare for trial in this matter.

Your Honor, there is one other thing I wanted to raise that I would wait until after Mr. Griess speaks, I just wanted to alert the Court, that relates to our client's visa. It's not on the Court's calendar. I mentioned to Mr. Griess I was going to raise it. I'll wait until afterwards, but I just wanted to alert the Court to that.

THE COURT: Okay. We'll circle back to that.

I do want some clarification from you. You've alleged that the Speedy Trial Act has been violated in this case. Is that your basic disagreement with the Speedy Trial Act that requires, because your client's joined with Mr. Mo, that time is excludable when he's asked for continuances, or are you alleging that there are more than 70 days that are not excludable time under the Speedy Trial Act that have elapsed for your client?

MR. LINCENBERG: The Court has entered orders on excludable time. We did not agree with them, we objected to them, and it's on -- it's on that basis.

THE COURT: Okay. And there is excludable time because your client is joined with Mr. Hailong, who has requested those continuances, right -- I'm sorry -- Mr. Mo, who has requested those continuances?

MR. LINCENBERG: Well, I would say excludable time. I mean, we are joined with Mr. Mo and we have joined in certain motions and filed some of our own, and that's the basis for some excludable time, but the main basis for the violation of the Speedy Trial Act and where the excludable time order is something we object to is brought on by the Government, not agreed.

And if you think back and, you know, the idea that we were going to go to trial on December 2nd, and if we think about what was supplied in March and April of this year, things that the Government had in their possession that they made no attempt to provide before that trial date, you know, that trial date was not changed until, I believe it was, the day before or the day of trial, and yet the Government was making no attempt to provide the discovery that Mr. Weinhardt outlined that came in late, and we're concerned about this being a rolling problem.

THE COURT: Mr. Griess, I'd like to hear your response.

And a few things here just globally for the parties to consider in responding and in making whatever rebuttal arguments you'd like to make. What I am most concerned about is under Eighth Circuit Rule 16 analysis what you have either not yet been disclosed -- and you may not know what some of that is, and we'll deal with that when it comes up -- but what you allege arrived late to you under a Rule 16 analysis of the Eighth

Circuit. That is not going to include a lot of what you've asked for, but I assume it does include at least some of what you've asked for.

When we start talking about things like how we deal with that, if the Government's been ordered to turn it over and hasn't and had possession of it, I need the Court -- or I need the parties to help me parcel out what exactly it is; not in this global, "We want them to search every agency in the world," kind of analysis, but really, truly under what the Eighth Circuit says is Rule 16, what has been turned over to you late, if anything.

There is no case law out there to support the proposition, in the Eighth Circuit, at least, that you're entitled to translations of everything. There is nothing that says you're entitled, under a Rule 16 analysis, to all the agent notes unless they are Brady, unless they are Jencks, unless they are Giglio, and those deadlines trigger closer to trial, and in a case this complex farther from trial than usual, certainly.

But some of what you've asked for, a chunk of what you've asked for, just doesn't have support under the Eighth Circuit's Rule 16 interpretations.

Now, the Government runs a very real risk, when it decides to use Rule 16, of violating Brady and Jencks because what they consider Brady may not be what you consider Brady or what I consider Brady or what an appellate court considers

Brady. That's why the Government almost always agrees to open discovery because then they're not caught deciding or differently classifying what constitutes exculpatory material.

The 302s you cited, which I've just glanced through, this is the first time I've seen them this morning, of the sort of digging in the dirt versus kneeling in the dirt, you know, if you consider that Brady, the Government may not, I may not and an appellate court may not, or I may, depending on the situation and the rest of the evidence available. But those are the risks.

So what I need to know is what has the Government truly turned over to you late that is statements of your client, and it sounds like there's at least some for Ms. Mo that are statements of her that have not yet been turned over. That's problematic under the Court's discovery orders, and what we do about that is another issue.

Why the seed corn wasn't being tested until January, I understand some of the real practical issues here for the Government, but, again, you know, there has to be at some point, you're right, a line drawn in the sand, and anything that's produced after that date --

(Interruption from cell phone.)

THE COURT: -- and maybe that line in the sand was drawn some months back, depending on what the nature of the item is, or we just say the Government doesn't get to use it -- you

can turn it off; it's fine -- out of fairness, or if the parties here wanted to, we move the trial date.

But I understand and am sympathetic to Ms. Mo saying, "Look, I'm in a foreign country and I want to get moving here, and it's not my fault that things are being dragged." And so those are all things that are going into the mix.

And, Mr. Griess, I'm interested in whatever response you might have to those overlying concerns and to the specific arguments made by opposing counsel.

MR. GRIESS: Thank you, Your Honor.

I'll try my best to go in order, but if the Court has any questions, I'd appreciate being asked directly. Much of this I'm responding to today wasn't in the prior motions.

Let me start off by saying what I think I tried to communicate as part of our brief. We have been in good faith compliance with our discovery obligations from the very beginning. We met with the defense early. It became very clear that -- and we made it very clear that the discovery in this case was going to be very complex, it was going to involve a number of techniques that were going to require something different than the typical, "Okay, here's the discovery in this case," and everyone acknowledged that and understood that.

And one of the earliest hearings, while there were dates set, everybody discussed and was under an understanding that it was going to -- this was going to be a rolling discovery

and that it was going to take place over a number of months.

There was a trial date set, I believe by Judge Bremer, early on, prior to Mo Yun's arrest, of December 2nd. Everybody at that hearing made it clear that that was not a realistic trial date, but Judge Bremer said I want to set it as a placeholder, and everybody agreed to that, and we moved forward. So that was never a trial date that was intending to take place. Nobody ever -- never had intended that, and as soon as Mo Yun was arrested that was communicated.

Just to pick up on another point Mr. Lincenberg said, he made it sound as if the Government didn't provide any discovery to her until months after her arrest. That's simply not true. In the Government's Exhibit 1 attached to its response, you can see as early as 7/17 we started making discovery, and then you can see 7/17, 7/24, 7/31, 8/28, and on and on. She received a tremendous amount of discovery, much of which is the discovery that is alleged in the indictment. In fact, I think as I indicated in the brief, almost 70 percent of that was disclosed in the very first one or two disclosures.

We have been -- it has been our intent from the beginning to go beyond Rule 16 and Brady in our compliance. We've been very broad. You know, in speaking with the agencies, we've asked them to comply with the numerous requests that have come in. You know, when they have reviewed the documents and they see things that they don't think were there that should be

or are referenced there, even though it's not Rule 16, we're complying with it. We're getting it to them.

In that way, it's preceded by text. I mean, we've cooperated with the defense to try and get them everything that they want, even though much of it is not only not Rule 16 but completely irrelevant to any of the issues that will ultimately proceed in this case. We have been in good faith from the very beginning, first of all.

Next I want to talk about the idea that this was the final, final, final, final, or whatever the allegation was. We have never agreed to that. And, in fact, there was a specific request made early on that we discussed whereby they said, "Okay, this is the deadline," and I said, "I will not agree to that." I made that very clear to Mr. Weinhardt because I knew there was still information out there that would be coming in that would be -- you know, we would have to locate. And that goes to the international nature of this investigation and the very complex FBI file, if you will, that exists just within the FBI.

And we have scoured that and we have made systematic reviews, and much of the discovery that's been made of late was material that was found either not where it was supposed to be or in a location where we wouldn't have expected, and as soon as we found it, we turned it over, whether it's, you know, Rule 16, relevant or not. We have been in good faith in our discovery

obligations from the very beginning of this and continue to be so.

With regard to a lot of the examples that Mr. Weinhardt talked about, first of all, their Exhibit No. 11, which we did turn over recently, we did not have that in our possession. That's a Pioneer document. In investigating some of the allegations that were made in the motions, the voluminous motions that were made that we're trying to respond to, that we will be responding to next week, there were some things referenced. We went back to the agent, said, "Where's this? Why did you make this? Where's the information?" And through discussing it with Pioneer and the agent, we found Exhibit 11. It was turned over immediately.

There is another report -- there are other reports that are -- you know, I think I addressed it already -- having to do with the notes. It wasn't based upon a note; it was based upon electronic communication. So in an effort to disclose that, we made it part of another report, which, obviously, was just prepared, and we sent it over.

Again, any time we discover anything that is an irregularity or answers a question that the defense may have, whether it's Rule 16 or not, we disclose it, and that's been our process throughout this entire life of this case.

With regard to the number of calls and the number of electronic communications, much of that's going to be the gap,

so to speak, much of that's going to be addressed through FISA. But I do think I need to point out to the Court that with regard to both the FISA and the CIPA process, those are occurring at not an unusual time in this case, in the pendency of the case, towards the end of the discovery process.

And I do not expect that there will be significant disclosures made to the defense as a result of that. I don't expect that to be part of the process. I can't talk about it much more than that because a lot of that's going to occur in camera with the Court, but I don't expect that as a result of that process we're going to be turning over volumes and volumes of discovery.

There are -- I would say there are two major areas left of discovery that are going to be disclosed. One of those are the test results. It is true that that testing started in the spring of this year, but, again, these seeds that were taken are the extremely valuable product of these seed company victims, and there are significant intellectual property concerns with regard to confidentiality, with regard to who is going to be testing, with regard to what is done with that information, who evaluates it further, and this has taken a tremendous amount of time to resolve.

It's taken a lot of time. We've had to work through the agreements. We have not been, as Mr. Weinhardt indicated, sitting on the seeds. We have not. In fact, we began that

process as early as July, if not earlier, of 2014. And, you know, any delays that occurred had to do with trying to work through the issues with the seed company and also trying to respond to some of the other concerns that the defense had with regard to discovery in this case.

I also think it needs to be pointed out, and I did in my brief, that while this is a complex investigation, again, we've said that too many times to the Court, and while the defense has speedy trial rights and we're doing everything in our power to get this going as fast as we can, the lifetime of cases like this, this is very short. The Liew case that's cited by the defendant took much, much longer to get to trial, you know. So that's something I think the Court needs to consider when it looks at the overall way that discovery's been conducted in this court.

So as soon as we get that protective order in place, which we have not been sitting on that, as soon as we receive -- we got a draft that was agreeable to everybody. The defense responded to it with significant changes. I again consulted with the seed company on numerous occasions working with them. They've responded. I expect to hear back from the defendants, and I think at that point we're going to be in a position where there's a few issues left to decide which we'll bring to the Court, and that will be resolved.

There is some information that needs to be provided

pursuant to that protective order, and it will be responded -- it will be provided immediately or very, very quickly. I think seven days is good because at this point we don't know exactly what the classifications are going to be pursuant to that protective order, and we're going to have to mark those documents pursuant to that ultimate protective order. So that's going to take a little bit of time, but I don't expect it to be a lengthy delay, and we'll be able to get it to the defense right away.

There are a few odds and ends documents that are going through the declass process now. I referenced those earlier. I expect those will be done today.

And then there are the test results, which we expect to have before the end of the month, but we don't know what the nature of those will be at that point, and so we've made the motion which we've made. We'd ask the Court to rule on that as soon as possible because if the Court does not find that it's going to grant that, then we're going to have to comply very quickly.

I think given the nature of this case and everything that's been going on, it's entirely reasonable, and I would, you know, ask the Court to give it serious consideration, but if not, we need to know quickly so that we can respond quickly.

THE COURT: I'll allow -- I'm sorry. Did you have more, Mr. Griess?

MR. GRIESS: I do, but I can --

THE COURT: No. Go ahead.

MR. GRIESS: Just with regard to a few of the other points that were made, we are aware of our obligations to check as far as what's the prosecution team. We don't limit that, and we are complying with those discovery obligations. We're checking everywhere, and when we find things, we turn them over immediately.

THE COURT: And perhaps you can answer this question, or perhaps you can't because of security issues, but I can conceive of a situation in which you would be recording phone calls, where I think it was 239 or 289, I don't know how many calls Mr. Weinhardt was talking about, over a period of 18 months on the phone where there was some kind of taint team set up who is minimizing what ultimately gets turned over to the prosecution team, or in electronic wiretap kinds of cases you often have a taint team set up who reads all documents and then only turns over to the prosecution team what are deemed to be relevant documents.

What I don't know and have not researched in any way is whether or not the taint teams that are involved in those kinds of processes are part of the prosecution team as far as an analysis of discovery. And so oftentimes those conversations are minimized or those documents are not forwarded out of privacy interests of the defendant at issue, but whether or not

then the whole that the taint team had can be turned over to a particular defendant but not the Government is a question I don't know the answer to and that I don't know how that interplays in cases where you have multiple defendants who may have different privacy interests that are being protected.

So that's something to think about as we move forward. I certainly don't expect an answer off the cuff from you, Mr. Griess, but if there is that kind of supplemental team out there that's worked on this case, at some point we're going to have to discuss that, either ex parte or ex parte and then with the defense attorneys, so we can figure out how to handle that issue.

MR. GRIESS: I absolutely understand the Court's question. I do not believe I can answer it today, but I will say it will be answered within the -- within the process.

THE COURT: Okay. And I didn't mean to cut you off.

MR. GRIESS: That's fine.

THE COURT: Any additional arguments you'd like me to consider on the discovery issues?

MR. GRIESS: Just trying to address a few of the other points that were raised.

THE COURT: Go ahead.

MR. GRIESS: With regard to the initial scientific testing that was referenced by Mr. Weinhardt, that was very, very limited testing; however, it does contain potential trade

secrets, and the seed companies have been very sensitive to that. That's something we do anticipate providing under the protective agreement, even though it does not necessarily relate to -- we don't know -- the fact of the matter is we don't know whose products those are.

There was some genotyping testing done, but we don't know whose those were, so that's the sensitivity there. We will be providing it pursuant to the protective order, but that's why it hasn't been provided today.

With regard to the transcripts and tapes, just briefly, and I know those are -- we have addressed that in the brief and I would stand upon that. I want to make it clear, though, that we intend to produce anything that we're going to intend to use at trial and whatever Court -- on whatever schedule the Court wants to impose.

This was first brought up in either December or January, and our initial response was absolutely, but we want reciprocal. We want -- you know, if you want our -- what we believe to be the translations of everything we've translated, that's fine. We just asked that it be reciprocal. We dropped it at that point. They didn't want to do that, and I understand that.

But we're not -- just so the Court is clear, we're not in any way indicating we're not going to give them translations of what we're going to offer at trial, much of which is

identified in the indictment. So we will be providing that on whatever timeline the Court wants to impose.

There were a number of other -- there were another -- one other thing with regard to the testing. They, the defense in this case, first raised, it was either December or January, as part of that process the idea that they might want to test the seeds. We never objected to that. They have never reapproached us and said, "Hey, we want to do that."

And so there's -- I mean, I assume what they're doing, if they do want to test it, is waiting to see what our results show, which I think is appropriate, but to make it clear, if they want to do that pursuant to appropriate protection orders and a process where we talk about the lab and who's going to be testing and make sure all the confidentiality agreements are in place, just like the process we went through, we don't have an objection to that. I assume they don't want to do that because they have not brought it back up.

The bottom line here, Judge, and I think we made this point, I completely disagree with the idea that we have been negligent or dilatory in any way in providing discovery. In fact, if anything, I've provided discovery too quickly in some ways, and that's why a lot of it isn't Bates stamped. We moved right away to get them everything we could as quickly as we could, and that's why it's been a little bit haphazard, to quote Mr. Weinhardt, because we're trying to get it to them as quickly

as we can.

We've been in complete good faith. When they've asked for documents that weren't produced, "Hey, there's an attachment here," we've responded and gotten that to them. To bootstrap those kinds of things into some sort of massive discovery violation by the discovery is just absolutely not supported by the record.

We'd ask the Court to deny the motion to compel, deny the motion for sanctions. If the Court does want to impose an ultimate deadline, we're not opposed to that. We would ask that it be prospective and allow us to complete the seed testing that is ongoing that defense has known about for quite some time and is completely reasonable, but it is nothing that is going to require delay of the trial.

There is nothing that I believe will be disclosed beyond some of the seed -- the trade secret information and the protective order that's going to be significant at this point, so I'd ask the Court deny the motion.

THE COURT: Okay. I'll circle back to each of the parties in just a moment here, but here is what I would propose sort of happens next. I think the parties and Judge Bremer and Judge Pratt worked hard early on in this case to try and set some deadlines. I think the reality of those deadlines is perhaps not answering some of the nuanced questions that have arisen in discovery since that time.

I agree that Rule 16 has provisions that talk about the Government turning over things that are material to the preparation of a defense, and therein is where I think we have this big cloud of vagueness that we have to tackle as a group to avoid sort of a lot of you investing huge amounts of time in fighting about, you know, what things mean and where we're going from here.

It's not a particularly effective use of any of your time, and you have a looming trial date in a very, very complex case, and all of you need, I would say, all of the time you have available, realistically, if we're going to move forward in mid-September, to prepare.

So what I would propose is that -- we have a hearing at this point set for May 1st -- after we conclude the portion of the hearing that we've set for May 1st, I would say we sit down as a group and we really try and knock out deadlines at which the Government is responsible for turning over, for instance, copies of the exhibits it intends to use at trial, which becomes, effectively, the key documents items; in turning over -- setting deadlines for when Jencks materials are going to be turned over, which will include any rough agent notes that exist of that particular agent; at which stage then the defendant will have to turn over its exhibits.

And while ordinarily those dates are paired up so they happen simultaneously, what I think is more effective in this

case, given the very complex issues that everybody here acknowledges, and I do think good faith efforts on everybody's parts to try and move forward together -- and to be clear, I'm not making any findings that the Government's done anything wrong here. I'm not educated enough on what's happened to know that. I think what's happened are some very basic disagreements of what Rule 16 is and what that means to both parties and what that means to deadlines.

But this may be a case where those are staggered; in other words, where the Government turns over sooner than the defendant turns over exhibits and exhibit lists and witness lists, and then the defendant, some weeks later, does the same so that the defendant has some sense of what really will be material to their defense, what are those key documents, in deciding how much it needs to produce or what kinds of exhibits it needs to produce at trial.

I think that's going to be a complex process for us, and it may be one that we have to work out every few weeks, get together and make sure we don't need to tweak more what's happening in a formal setting or an informal setting or however the parties want to propose that we do that.

But I think we should get started on that process on May 1st and start trying to figure out what those deadlines are. And what I need realistically is how soon is too soon. You know, is two months before trial way too early for the

Government to be ready to turn over at least what it anticipates its Government exhibits are going to be? Of course there are going to be last-minute changes and rebuttal evidence, and I understand that. Is one month after that too soon for the defendant to be ready to do the same?

How soon is Jencks material going to be turned over? The Friday before trial that we use in a standard, you know, one-count gun case is not going to work here, but is a month way too soon, is two weeks too soon? I don't know. Those are the things I want the parties to really think about, and to the extent you can reach some kind of mutual meeting of minds, fine; if not, fine.

But the deadlines that were set up initially that said, you know, we'll exchange witness and exhibit lists a month ahead of time I think would work if all discovery that was known was out there and the defendants had it all this time. I don't think it works as well when the Government's still sorting through, understandably, some very complex, you know, classified issues, FISA issues.

These are things over which I know Mr. Griess has no personal localized control over, and these are things that just take a period of weeks and months to move through the system. And we've got to sort out if there's taint teams, we've got to figure out how we're going to handle that. That also will then force early translations and transcripts of the key recordings

or the key documents by both parties, which hopefully will resolve some of those concerns that aren't really adequately covered by the law.

I think that there are not any terribly similar cases out there for us to look at. That's part of the problem. In cases this complex, where you have this kind of surveillance and when you have this kind of volume of discovery, you often also have, you know, terrorism tied to that or you have something else going on that means everything's been translated very early in the case and probably means less volume in some ways.

So I understand we are carving out a unique place for this case and we're all going to do the best we can to make it a fair and reasonable trial for both sides, but I'm going to need some help doing that from the parties. And I think the first thing we have to do is get our definitions lined up and then move forward with those joint definitions.

What I plan to do over the next week, before our May 1st hearing, is comb the document and -- the docket and the transcripts of hearings that have come before and try and find every deadline that's ever been set anywhere, and then what we build together beginning May 1st will supersede all of those prior deadlines so that we're all playing on the same page and the same document.

Here, every time I think I know when a reply brief is due, I find six other orders that change when that deadline was

set, and that's not good for any of us going forward.

So with all of that being said as sort of a global next step, what, if any, additional arguments, Mr. Weinhardt, would you like to offer at this time? And then I will turn to the issue of the expert deadline before we leave today.

MR. WEINHARDT: Your Honor, first of all, let me emphasize on behalf of our client that, like Ms. Yun, we strenuously contend that he is innocent of the charges against him and, like Ms. Yun, he wants his trial on September 14th, so we are in alignment as defendants both about our position on the merits of the case and when we want the case tried.

I think based upon the comments that the Court has just made, on May 1st we're going to be able to resolve or at least set up a schedule by which many of the things that need to be done will happen.

I would simply say this: That I think, and Mr. Griess has not contradicted this, I think that the parties have throughout acted as though an open file, standard discovery order was in place, and so the examples of late disclosure or things of that sort that I went through in my earlier presentation, because I think that the parties have acted under that assumption, that still gives us tremendous pause about the accuracy of the representations, I think often accuracy of representations that are made to Mr. Griess by others in law enforcement, but it still gives us tremendous concerns about

those. And so we come to today and to May 1st still very concerned about those, even though, as the Court points out, the legal landscape might be different.

I do think that the materials to the defense portion of Rule 16 plainly applies because, as I just looked, Exhibits 2, 3 and 5 all contain reciprocal discovery deadlines. They would only contain that if the Court issuing those orders thought that we had made that request.

It is the case that we will want to test seeds ourselves, and we are working on the arrangements by which to do that. Mr. Griess is exactly right, it only makes sense for us to see the Government's results first so that we're then able to test only those that matter, and we do believe that any earlier testing, even though it might be incomplete or didn't lead to a firm conclusion, we think all of that is still discoverable, and so presumably we'll be able to get that pursuant to the protective order.

Just to make clear at least our position about translations, although we may subsume this on May 1st, we're not contending that there is law that requires the Government to translate everything whether it was intending to translate it or not. Everyone is in agreement that if a party intends to use something in evidence that they must produce a translation of it in advance.

The middle ground is translations in the Government's

hands that are in existence now, whether or not those are discoverable. And that might still be a legal question the Court has to answer coming out of today's hearing because it is our contention that those are statements and not just helpful aids when they're a translation, and so we do believe that those are discoverable under 16.

THE COURT: Mr. Griess, is there a body of translations that you have in your possession that you haven't turned over?

MR. GRIESS: I know that there is a body of translations that exists. I don't know what the breadth, what exactly that is. I can certainly find out by the May 1 hearing date. But, again, we contend those aren't statements.

THE COURT: Right. And I understand where you're coming from there. I had thought that the request here was to translate things that had not already been translated. It is a different question if those translations have already been produced. Then I think we run into the definitional items of Rule 16 and whether the Government must turn them over or not, which is different. Again, we won't go back to that, but I appreciate that clarification.

Go ahead, Mr. Weinhardt.

MR. WEINHARDT: That said, Your Honor, two other notes. First, I know the Court intends to get to the expert deadline. The Court should know that, you know, the existing

deadline by which we're supposed to resist that motion is Friday, and that was what our plan to do was. The lawyer working on that resistance is not in the courtroom here today, and so I would urge that even if the Court wants to accelerate the resistance schedule that we not hear that today because the person that's put the most brain time into that issue just isn't here to handle it with us.

THE COURT: Okay.

MR. WEINHARDT: And then the one other issue is just scheduling. I think that we had told the Court that based upon the schedules of counsel we wanted to start the conference at 2 o'clock on May 1st. Does that work and is that still enough time to get everything done?

THE COURT: I don't know.

I think, Mr. Spies, you actually have a hearing somewhere else up to that point, correct?

MR. SPIES: I do, Your Honor, yes.

THE COURT: So 2 o'clock was the earliest I understood that the parties were all mutually available. So I think we get as much done as we can on the 1st. We're not anticipating that the portion of the hearing on May 1st that was set for 2 o'clock -- I think the parties had estimated that will take about an hour. Is that still a fair estimation?

MR. GRIESS: Yes.

THE COURT: So that will give us at least a couple

hours to really sit down. And part of that may be, you know, sitting down sort of off the record and chatting and then coming in and making a formal record with objections, if necessary, to some of those deadlines.

And I don't expect in any way we'll resolve everything. I just want to get us to a better place than we're in right now, which is sort of utter chaos, frankly, on deadlines and things.

Any other last points you want to make, Mr. Weinhardt?

MR. WEINHARDT: No, Your Honor. Thank you.

THE COURT: All right. Mr. Lincenberg, go ahead.

MR. LINCENBERG: I'm just going to make one point. Mr. Griess made a comparison to the Liew case, which apparently was charged in 2011, went to trial early in 2014. There's a host of differences, but Mr. Liew -- the most important difference for our purpose is Mr. Liew was a California citizen. He wasn't being separated from his family overseas. He was in no way pushing for a speedy trial, like we've been trying to do in this case.

It's not enough for the Government to say we can go out and arrest people and then, you know, we'll gather the evidence later and we'll go through procedures later, and if it takes years and years and you're separated from your family, so what, you know, we're compliant with some procedures. This is a complex case.

THE COURT: And I understand from a sort of human standpoint where you're coming from, but that is what the law says in complex cases. I mean, the Government is entitled, in complex cases, to take more than 70 days to try a case, and there's no dispute in this case this is a complex case under the legal definitions of the Speedy Trial Act exclusionary time.

So I understand very much and sympathize with the human aspects of why a trial taking place a year and a half later is frustrating to the defendant at issue and how that must feel for her, but there's nothing in the law that requires anything different than has happened.

MR. LINCENBERG: There's nothing in the law that requires a complex case to take place within 70 days, and we didn't even push for it to take place within 70 days. But even where a case is beyond 70 days, pursuant to the Speedy Trial Act, as well as constitutional principles against unjust delay, there is law that limits the amount. Simply because you go beyond 70 days doesn't mean you can go for years.

And there's also law that creates a presumption that after a year has passed that shifts the presumption in favor of a speedier trial. I think it may have even been referenced by Judge Pratt in one of the --

THE COURT: There is the presumptive delay regulation I understand, yes.

MR. LINCENBERG: And so I don't think there can be

that comparison to that case.

Second point I would briefly make is it's not an answer to the failure to live up to discovery obligations to say that we've produced a great volume, that they got 70 percent of their discovery in our case within a few months. The fact that big files are turned over when there are key interviews and when there are tests that were conducted in the past by seed companies and the like and critical information is not being turned over, this is not measured by number of pages.

We may have to fish and wade through the discovery that is provided, but the Government's conduct is measured by what it has not turned over, not by the number of pages that it has.

THE COURT: I understand those arguments.

Okay. Then we will take up on May 1st, after you've had time to reply, the expert deadline. I'll get you a ruling on that day orally there in court; if not, written shortly thereafter on the expert issues.

Anything else to resolve yet today?

MR. LINCENBERG: Yes, Your Honor. I had a side --

THE COURT: Oh, I'm sorry. There was a visa issue as well we needed to talk about, right?

MR. WEINHARDT: Well, and perhaps I erred in my assumption about this. I had segregated out the reconsideration of Judge Bremer's ruling in my comments, so I have not yet said

anything about that today.

THE COURT: The visa?

MR. WEINHARDT: Oh, no. So there's a visa issue for Mo Yun.

THE COURT: Oh, I'm sorry. Okay. I was trying to --

MR. WEINHARDT: That is completely apart from what I was going to respond to in the Court's question is there anything left. The reconsideration of Judge Bremer's ruling about that one FISA disclosure issue we haven't addressed yet.

THE COURT: Right. Okay.

Let me turn to -- I'm sorry, Mr. Lincenberg, I interrupted you. Go ahead with --

MR. LINCENBERG: Okay. Your Honor, when our client came to this country for a week's vacation with her children, she came here on a tourist visa, and, as I understand it, the way a visa, tourist visa, works is the visa is for a year; your current stay is for a period of time that terminates prior to that year.

And I believe that the period of time of the termination was on December 24th, and the visa would be in effect until, I believe it was, late March, may have been April. I think it was late March.

So back in December I started consulting both with immigration counsel as well as, December, January, started speaking with Mr. Griess about making sure that the proper

paperwork is in the system so that my client is here lawfully, and Mr. Griess indicated that he would take it up with his agents.

After a lot of back and forth, eventually he indicated to us that the paperwork has been adjusted so your client is here through, I believe it was, mid-March, and don't worry about it, we'll take care of it.

So when March rolled around -- and our request had been why don't we extend this until December 31st of 2015. And so we again contacted Mr. Griess in December, asked him to do it. He indicated he would take it up with his -- I guess it's the Customs and Border Patrol folks. We followed up, and then on March 18th he said, "I have an update for you. I know it's being addressed."

And I believe that Mr. Griess has attempted to address this in good faith, but there's a lack of visibility on our part, and I would like the Court to perhaps at least exercise some oversight of this. Our client is remaining in this country. Mr. Griess and I are in agreement that the paperwork needs to be adjusted. We never got a copy of whatever paperwork was adjusted.

I'm concerned that, you know, I could be -- I could be meeting with my client driving down the road, we get hit by a car, a local police officer says, "Can I see your ID," and goes into a system and all the sudden looks in the system and doesn't

find the proper paperwork. So we want to have a copy of the proper paperwork and we don't want to wait until the last minute or after the last minute to get it.

THE COURT: Okay. I don't have, of course, any authority over the Immigration folks, but what I will do is ask the Government to check into that and get me a status on May 1st, if you could.

MR. GRIESS: Could I --

THE COURT: Or do you know now, I should say?

MR. GRIESS: Well, I can say that, you know, I checked clear back when they first raised this issue. First of all, we have no intention -- obviously, she's out, we agreed to her being out. She's out pursuant to court order after being initially detained. Nobody on the prosecution team intends to contravene that by ordering that she be arrested or seeking her arrest, of course.

I don't think any sort of incidental contact, in my understanding, and I've talked with HSI about this, would result in her detention given her current status, and I've explained this and told this. In spite of that, I understand the concern.

It's my understanding that there's some paperwork process that occurs between the FBI and HSI where her parole or -- is extended, and I don't understand exactly what that process is. We've asked the FBI to engage that. I'm told they are. I don't have any additional information, but I will get an

update for the Court by May 1.

THE COURT: Okay. Mr. Weinhardt, I have someplace I need to be, so I can give you five minutes. Can you do your argument in five minutes on that small portion that's left of the motion to reconsider the FISA issue?

MR. WEINHARDT: If I may approach, I think I can do it in less, Your Honor.

THE COURT: Okay.

MR. WEINHARDT: I think the Court is familiar with the issue. There is no case that holds that a Court cannot require the Government to tell the defense where information already in the defense's hands came from, whether it came from FISA or whether it came from someplace else. No case cited either by the Government or in Judge Bremer's order that says that the Court lacks that power.

We believe that the fair reading of the FISA notice statute -- and this is the electronic one, but there is a parallel statute for physical searches -- we believe that the use of the words "that," "the," and "such" make it clear that the notice is not just, "Hey, we're going to use FISA," but the notice is what FISA evidence we're going to use.

There is no national security implication whatsoever in telling us where information came from if we already have it. No secrecy concern has been articulated by the Government or by Judge Bremer, and it would make the FISA proceedings in this

case make so much more sense. We would know what we're fighting about. Right now we don't know what we're fighting about.

Secondly, we believe that Rule 12(b)(4)(B) as applied to this situation likewise gives the Court that authority to tell us where the evidence came from if the Government intends to use it at trial so that then we can move to suppress it.

I will agree, I think, that this is a discretionary issue on behalf of the Court, although it's not a discretionary issue in terms of a finding of fact and that sort of thing because what this statute means is a pure law call, and I think on the law we're entitled to notice of where it came from.

THE COURT: In a very hyper-technical question, the Government could have used verb language and not noun language if they intended that to be the reading of the statute, right?

MR. WEINHARDT: Well, you mean Congress when they --

THE COURT: Right.

MR. WEINHARDT: -- drafted the statute?

THE COURT: Correct.

MR. WEINHARDT: I suppose that they could have, but what I would refer the Court to, before deciding what this statute means, is to look at the legislative history that we cite at great length in the FISA suppression and the FISA disclosure motions, because what that legislative history indicates, I think, is something wholly consistent with the version that we're advocating for rather than the version that

the magistrate judge found.

THE COURT: And I will look carefully at all that, and I agree it's sort of a hyper-technical issue.

Mr. Weinhardt, would you like to admit into evidence the exhibits you've offered today, 1 through --

MR. WEINHARDT: Yes. They are 1 through 16, Your Honor, and we would offer all of them. Thank you.

THE COURT: Any objection?

MR. GRIESS: No.

THE COURT: And those are admitted.

(Defendant Mo Hailong Exhibit Nos. 1 - 16 were offered and received in evidence.)

THE COURT: Any of those that need to be sealed for security reasons or any other reason?

MR. GRIESS: I don't believe so, Your Honor, but I'll take a closer look and advise the Court if they do.

THE COURT: Okay. One other thing to think about before May 1st, Mr. Griess, is whether or not the Government would be willing, in an ex parte setting, in an in camera setting, to tell me what FISA -- you know, what information in your discovery file derived from FISA, and that may help me decide how to interpret. Some of this verb language is really what we're fighting about.

And so I'll ask the Government to consider that. You don't have to make a decision now, and I don't know of anything

that requires you to do that, but if you want to think about that, I'll take that up on May 1st as well.

Okay. We are adjourned for now. I'll see everybody in about a week.

(Proceedings concluded at 11:18 a.m.)

C E R T I F I C A T E

I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28, United States Code, Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated at Des Moines, Iowa, this 30th day of April, 2015.

/s/ Kelli M. Mulcahy
Kelli M. Mulcahy, CSR No. 941, RMR, CRR
Federal Official Court Reporter