IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA, :
:
Plaintiff, :
:
vs. : Case No. 4:13-cr-00147
:
MO HAILONG and MO YUN, : HEARING TRANSCRIPT
:
Defendants. :
- - - - - - - - - - - - - - - -X

Courtroom, First Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Friday, May 1, 2015
2:00 p.m.

BEFORE: THE HONORABLE STEPHANIE M. ROSE, Judge.

KELLI M. MULCAHY, CSR, RMR, CRR
United States Courthouse
123 East Walnut Street, Room 115
Des Moines, Iowa 50309

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JASON T. GRIESS, ESQ.<br>MARC KRICKBAUM, ESQ.<br>Assistant U.S. Attorneys<br>U.S. Courthouse Annex<br>110 East Court Avenue, Suite 286<br>Des Moines, Iowa 50309-5053 |
| | MATTHEW R. WALCZEWSKI, ESQ.<br>United States Department of Justice<br>600 East Street North West<br>Washington, D.C. 20004 |
| For Defendant<br>Mo Hailong: | MARK E. WEINHARDT, ESQ.<br>HOLLY M. LOGAN, ESQ.<br>Weinhardt & Logan, P.C.<br>2600 Grand Avenue, Suite 450<br>Des Moines, Iowa 50312 |
| | MARK E. BECK, ESQ.<br>Mark Beck Law, P.C.<br>350 West Colorado Boulevard, Suite 200<br>Pasadena, California 91105 |
| | JOHN D. CLINE, ESQ.<br>Law Office of John D. Cline<br>235 Montgomery Street, Suite 1070<br>San Francisco, California 04104 |
| For Defendant<br>Mo Yun: | LEON F. SPIES, ESQ.<br>Mellon Spies & Pavelich<br>312 East College Street, Suite 216<br>Iowa City, Iowa 52240 |
| | TERRY W. BIRD, ESQ.<br>Bird Marella, P.C.<br>1875 Century Park East, 23rd Floor<br>Los Angeles, California 90067-2561 |
| Also Present:<br>(Via telephone) | PHILIP HILDER<br>IDA SHAW |

P R O C E E D I N G S

(In open court with defendants present via telephone.)

THE COURT: Thank you. You can be seated.

We are here today in the matter of United States vs. Mo Hailong and Mo Yun. It's Case No. 4:13-cr-00147.

Joining us on behalf of the United States are Assistant United States Attorneys Marc Krickbaum and Jason Griess, as well as a trial lawyer from the Department of Justice's National Security Administration, Matthew Walczweski.

Did I get that right?

MR. WALCZEWSKI: Perfect.

THE COURT: And on behalf of Mr. Hailong we have attorneys Mark Beck, John Cline, and Mark Weinhardt and Holly Logan, and on behalf of Ms. Mo we have Terry Bird and Leon Spies.

Do we also have joining us by telephone both defendants?

MR. HILDER: Yes, Your Honor. This is Philip Hilder. They are present in my office, Mo Yun and Robert Mo, along with Ida Shaw, who is a licensed court interpreter.

THE COURT: Thank you. And can you spell Ida's last name for us?

MR. HILDER: Shaw, S-h-a-w.

THE COURT: Okay. And Ida, I-d-a?

MR. HILDER: Yes.

THE COURT: Okay. We are here to take up essentially three issues today. The first issue is in response to the Government's April 10th, 2015, unresisted motion for a pretrial conference pursuant to the Classified Information Procedures Act, which was filed at Docket 264. Then we will work second to establish some deadlines for discovery-related and trial-related matters for the next 4 1/2 months or so before the trial date. And third we'll finalize some matters that came up during the April 22nd hearing and we set aside to discuss further today.

So let's turn first to the CIPA portion of the hearing. It's my understanding that at this preliminary stage I really have two issues to resolve today, to the extent resolution is the right word: To obtain from the Government some kind of approximate summary of the volume of materials that I'll need to review in camera and ex parte and about how long it will take me to get through materials, and then to set deadlines for when those materials need to be disclosed to me, when I would get an order back to the Government. The Government would then have a new deadline for either disclosing or filing a resistance of that disclosure or things along those lines.

Mr. Griess, is that a fair summary of what we need to take care of as far as the CIPA hearing goes today?

MR. GRIESS: I think so, Your Honor.

THE COURT: Okay. Can you go ahead and give me -- or Mr. Walczweski, is he the person speaking on these issues?

MR. GRIESS: I can do it, Your Honor.

First of all, with regard to volume, I can't say too much about that except I would say that I think that the volume is not so much that the Court couldn't get through it relatively quickly.

And I want to say this about the time necessary to -- excuse me -- the time that we asked to file the motion itself pursuant to Section 4. Initially we had asked for 60 days. We've been working diligently since that time, and we now believe that we could get that filed 30 days from today's date.

THE COURT: So by, essentially, May 31st --

MR. GRIESS: Correct.

THE COURT: -- or by June 1st, which is a Monday?

MR. GRIESS: June 1st would be excellent, Your Honor.

THE COURT: Okay. So that's the date upon which you feel like you could get those materials to me, along with a motion outlining whatever your position is with respect to disclosure or substitution or whatever position you may be taking?

MR. GRIESS: Yes, ma'am.

THE COURT: And when you talk about getting through the materials relatively quickly, in your mind is that an hour, a day, a week, a month? What's relatively quickly to you?

MR. GRIESS: Your Honor, I think in order to adequately address that, we need to do it ex parte, which we can

do.

THE COURT: Okay.

MR. GRIESS: But that's probably as far as I can go on that.

THE COURT: Okay. And so the materials will come to me on June 1st or by June 1st. I'll then get them turned around in whatever speed I need at that point, and then as I turn them around I'll set for you a deadline to either disclose or object to the disclosure, and then we take up whatever proceedings follow; is that correct?

MR. GRIESS: Yes.

THE COURT: Okay. For purposes of the record, I will say that I have met with the liaison with the Classified Information Protection Act Services, and we have ordered the safe and we have begun the process of getting security clearances for staff members that need security clearances so we'll be prepared within two weeks probably, certainly within a month, to accept those materials, so that's within the timeline that you're talking about.

Any additional? Essentially, that concludes the CIPA hearing, doesn't it, at this point?

Go ahead, Mr. Cline.

MR. CLINE: Your Honor, a couple of related but perhaps additional things with that.

The first is in connection with your CIPA Section 4

determinations. And although we will, for the record, oppose an ex parte proceeding, I understand it's going to happen ex parte and that's the reality, that's the way the courts do it.

What we would like to be able to do to guide Your Honor in making determinations about whether material is material to the preparation of the defense, whether a substitution is adequate, and so forth, which Your Honor's going to be doing ex parte, we would like the opportunity to submit to Your Honor, also ex parte, either in oral form or in written form, a fairly detailed outline of our defense theories so that you'll have that guidance as you're assessing the discoverability of material.

That's something that's happened in a number of cases. That happened in the Libby case, it's happened in several others, and I think courts have found that helpful. We do it ex parte, of course, because at this stage we don't want to be disclosing the details of our defense theory.

THE COURT: Of course.

MR. CLINE: So that's Request No. 1 in connection with the CIPA Section 4 proceedings that Your Honor's contemplating.

Separate from that, this being a CIPA pretrial hearing to talk about classified information issues generally, we did want to raise some other issues that relate to discovery.

If Your Honor determines that classified information needs to be produced to the defense -- I understand the

Government's position is going to be it doesn't have to be or it can be produced in unclassified form, but you may determine differently, and if you do, certain CIPA procedures will kick into action. There will need to be a protective order; there will need to be security clearances for the defense; there will need to be a place, probably in this courthouse, equipped for the defense to use to handle classified information.

It sounds like there's already a court security officer in place that Your Honor's dealing with on your issues, so that part is done, but rather than wait a month to begin those proceedings -- because if we wait a month, this is a cumbersome process, and if we wait a month it's likely to cost us our trial date -- we would ask that we begin those procedures now.

So, for example, one of the first things that happens in any case involving classified information is implementation of a CIPA protective order. By now those are pretty standardized. I would ask Your Honor to order the parties to get together, consult on that, and see if we can come up with an agreed CIPA protective order.

Security clearances for defense counsel, that is -- can be a lengthy process, although if Your Honor urges it to move quickly, it will move quickly. We'd like to begin that process. So that what we don't want is to find ourselves in, say, mid-June or the end of June where Your Honor has ordered

some classified information discovered and we're just then starting these things that I'm talking about.

THE COURT: As to the CIPA protective order, I think that's something that we can accomplish fairly quickly as we need to when I'm certain that that's going to be a need that we have in the case.

As to background clearances, while I understand the request, the problem is that is a very time-consuming and expensive process. There are ten lawyers involved right now in the case on the defense side that are of record. All of you have staff members that would also have to be cleared if they were going to touch anything, research anything, look at anything.

You're talking about tens of thousands of dollars that would have to be spent that may not need to be spent, and so I'm very reluctant to start that process before I'm sure that we really need to start that process, and I don't think a 30-day delay or a 45-day delay as I look through those materials that arrive in June is going to one way or another be worth costing the taxpayers potentially that amount of money.

MR. CLINE: Understood.

THE COURT: Okay. Anything else on that issue?

MR. CLINE: Not on that issue. Just a note of caution that this is time-consuming. So I guess the outstanding issue, then, is the defense request to submit under --

THE COURT: Oh.

MR. CLINE: -- CIPA Section 4 an ex parte submission to Your Honor about our theories of defense.

THE COURT: I have no particular objection to that. Would both parties like to do that?

MR. BIRD: Yes, Your Honor.

THE COURT: Any objection from the Government on that matter?

MR. GRIESS: No. No objection.

THE COURT: Okay. Then if you could get that submitted by June 1st, and that's when I'll begin my review, and I'll have those materials, then, at the same time.

MR. CLINE: We can do that. And you'd like that in written form, I take it?

THE COURT: I would, yes.

MR. CLINE: Yes.

THE COURT: How, whether it comes to me electronically or whether it's filed, however you want to do that is fine with me.

MR. CLINE: Understood. Thank you.

THE COURT: Thank you.

Okay. Then let's turn to the issues of deadlines, and in particular starting with the motion to modify the expert disclosure deadline filed by the Government.

In the Government's filing, you had indicated that you

expected to receive today, I think, your test results. Did those arrive?

MR. GRIESS: We received a draft of that, of those results, and we've had some preliminary discussion, Your Honor, although we do not have them in final form.

THE COURT: How long is it expected to be before you have them in final form?

MR. GRIESS: Certainly within the week.

THE COURT: And here, for purposes of the record, we're taking up essentially Docket 268, which was resisted by Mo Hailong on April 23rd at ECF 282 and by Mo Yun on April 24th at ECF Nos. 287 through 289.

I have reviewed all of the materials here and have taken a very hard and careful look at all of the deadlines we have. I think there is -- it is a mixed bag. There is some delay here that I think is understandably frustrating to the defense. I think there is some delay that has been outside the Government's control. I think some extension of that deadline is warranted, but not the full 30 days, because I think that really does box us into a very difficult spot.

So my thought on that is to grant in part and deny in part that motion and give the Government an additional week to get those materials disclosed, which would be Friday, May 8th. As part of that disclosure by the Government, the Government should be turning over to the defendants, if they have not

already, all prior testing of those seeds that's been done and the people who did those tests and what the results were.

From reading the docket, which I've now gone through from the very beginning and read the whole novel, so to speak, it looks like there is the equivalent of sort of the initial drug screening test kind of a test that was done very early on in this case but not one that can give you genome-specific information. So if you have those initial draft test results, they should be turned over under Rule 16.

Along with that, then, I will grant a similar extension to the defendants, so they will then disclose their experts, along with those experts' opinions and all related expert materials, by the close of business on Wednesday, July 8th, which is just one week different than it currently is set, and the Government will then continue to disclose any rebuttal experts on the date previously set, which is August 1st.

Are Daubert challenges expected with respect to the genome testing?

MR. WEINHARDT: Your Honor, we don't -- well, we know about BioDiagnostics as an entity; we don't know the identity of the individuals. So I can't say at this point whether there is going to be a Daubert challenge. A week and three days from now, I might be able to tell the Court, but I don't want to promise that there won't be one.

THE COURT: Okay. To the extent there are Daubert

challenges, I can only imagine that these are experts who we need to get booked sooner rather than later to testify, and these are complex issues that I'm going to want some time on. My thought would be that we set some initial Daubert deadlines now, and then, obviously, if, happily, we can remove them from everybody's calendar, we do so, but if we have to take them up then at least we've got a marker in my calendar and your respective calendars and with these experts.

Assuming you receive all this information on June 8th, could you have Daubert challenges prepared by August 14th, which will give us about a month before trial to resolve those matters?

MR. WEINHARDT: I think the Court said June 8th. Does the Court mean May 8th?

THE COURT: Oh, I'm sorry. May 8th, yes. I'm sorry.

MR. WEINHARDT: May 8th, and so what is the --

THE COURT: It's about 2 1/2 months, August 14th, which is about a month before trial.

MR. WEINHARDT: Yes, we could file whatever Daubert challenges we have by August 14th.

THE COURT: Okay. Does that work for Ms. Mo as well?

MR. BIRD: It does, Your Honor. As I understand it, the Government would file its reply. Would that include -- if I remember the original order, that would include new and possibly different experts?

THE COURT: Any rebuttal experts would be disclosed on August 1st.

MR. BIRD: Yes. And all I'm just noting -- I mean, August 14 should be fine, but if there's a brand new expert, it may take us more than a couple weeks to find out whether we're going to issue a Daubert challenge. We'll do the best we can.

THE COURT: And the only way here the Daubert challenge would be impacted by the expert would be if the expert was using a different method. I mean, otherwise you're not challenging the expert, you're challenging the methodology.

MR. BIRD: That's right. I have no way to know what is going to be filed on August 1st. I'm just noting that for the Court.

THE COURT: Then we'll set the Daubert deadline for motions as August 14th. Government will resist any challenge, if it wants to resist, by August 24th. Any reply would be due a week later, August 31st, and then I'm going to ask the parties to set aside -- do you think we could get this done in one day? Do we need more than one day set aside?

MR. GRIESS: I think one day is probably sufficient, Your Honor.

MR. WEINHARDT: I think so.

THE COURT: Yes?

MR. BIRD: I think one day will work, Your Honor.

THE COURT: Okay. Then please set aside September 2nd

of 2015 for Daubert, and we'll be here as long as we need to be here that day.

Then let's turn to the other deadlines of record here. We spent at our last hearing on April 22nd a lot of time talking about the motion to compel discovery and the different kinds of discovery that had been requested and that had been turned over and discussion from me about the fact that part of the complications in this case is the fact that we aren't operating under a stipulated discovery order, we're really just addressing Rule 16. Rule 16 does not have built into it a lot of deadlines, although certainly there is case law that talks about the Court's authority and discretion to direct the disclosure of certain things at certain times.

I have taken all that information and put it together and combed through the docket and the calendars and looked realistically at this trial date that the parties are wanting to maintain that begins in September, and here is what I have come up with, and then I'll throw it open to the parties to either object or suggest differently.

With respect to Rule 16 discovery -- and I understand here and I'm operating under the assumption that we are not talking at this moment about any of the classified documents or FISA-related documents that may be subject to later litigation, but with respect to everything else, that the Government shall have disclosed those materials to the defendants by June 15th is

sort of going to be your drop-dead deadline for any Rule 16 materials that fall within Rule 16, 26.2 and 18 U.S.C. 3500(b).

And this will be part of a written order later once we finalize these deadlines.

The Government shall also turn over by that day all Brady-related material. I understand, again, that the Government has turned most of this over, has not turned over all of it, and I know there's disputes over where those lines need to be drawn.

So ultimately this will be a question, if the dispute arises, of whether I qualify these materials as Rule 16 or not if they come in after this June 15 deadline. I caution the Government I read Rule 16 pretty broadly when it gets to the material that is material to the preparation of the defense, and that's where I think most of the fight is going to come.

If the Government intends to withhold or redact any information that would otherwise be discoverable under Rule 16 or Rule 26 or 3500, then you've got to get those materials to me in camera by June 1st so that I can make those decisions. And, of course, here Government is on notice that if you don't timely disclose those materials, they may well be precluded from being offered as evidence at trial.

I do need to know, as we work through these deadlines, is there any kind of protective order or limiting agreement in place with the parties already with respect to disclosure of

discovery?

MR. GRIESS: There isn't a protective order, not currently. We've been working on it. I think the Court is aware that the parties have been working on a protective order for quite some time.

It's my understanding in speaking with some of the seed companies who were party to some of the further discussions that occurred this morning that we're very, very close. And perhaps counsel can further enlighten the Court on that, but we're hopeful that we're very close to arriving at that protective order.

THE COURT: And when I'm talking about protective order, I include not only the seed company one, but what about the generalized protective order of, you know, turning over FBI 302s. You know, are those supposed to be restricted to the attorneys of record in this case? Do you have any agreement with them if you turn over grand jury materials what's happening to those materials, where they're going?

MR. GRIESS: We've been working on a universal global protective order from the beginning, Your Honor. So when I say we're close to that, I believe it would cover all those issues.

THE COURT: How soon do you think that will be ready?

MR. GRIESS: I'm hopeful very soon, but I wasn't party to the conversations that were ongoing this morning. Perhaps counsel can further enlighten.

I want to also tell the Court with regard to the testing results, those would also have to come under the protective order, so that is --

THE COURT: Okay. The testing results that you would otherwise turn over on May 8th?

MR. GRIESS: All of them.

THE COURT: Okay. So if that's not in place by May 8th, what happens next?

MR. GRIESS: That's --

THE COURT: That's the question?

MR. GRIESS: I'm hopeful that we can get it in place, and certainly the Government will do everything it can to have it in place by then.

THE COURT: Go ahead, Mr. Beck.

MR. BECK: Your Honor, we made more progress than I think we expected this morning with the counsel for the seed companies with regard to the protective order. The genesis of this was in part to cover disclosures in connection with the subpoenas we've served and the motions to quash. And we've gone back and forth, thought we might have had stalemate last week, and, in fact, we might have broken through.

So we may need to be before a court, it would be before the magistrate court on this, I believe, the way it's been left, or it could be here, to resolve an issue or two on the protective order, but I think we're at a point where we

could project, if we get counsel here in time, that we can meet a mid-May deadline for resolution of this.

THE COURT: Then how do we force the Government to turn over test results that are not yet protected? Because we've got to go back to square one, then, if the protective order isn't in place.

MR. BECK: Well, one solution --

THE COURT: And how do you continue to object to them extending the deadline?

MR. BECK: Well, in one -- excuse me.

I was this morning on the phone with the seed companies. We decided to pick dates for submission to the Court, did not have this May 8 date in mind, of course, wasn't -- we weren't aware of it.

I think the resolution might be to have a hearing on any difference we might have on the protective order before May 8 with counsel calling in from the East Coast and the Midwest and where their offices are. But I believe counsel can, by the middle of next week, get to resolution on everything but the remaining issue or two, maybe three that the Court could, I think, resolve there at that hearing, and that may be the solution.

THE COURT: Well, Mr. Griess and I are in a trial starting Monday.

MR. BECK: Okay.

THE COURT: I think trial will be over by Friday, but if it's not we can have a hearing Friday afternoon, and if the protective order isn't in place, we reset the deadlines. I'm not going to force the Government to turn over test results if there's not a protective order that's been worked out.

For the life of me I can't figure out why we're still dorking around with this. It's been months, months of being told, being told, that it's right around the corner, it's right around, months of that.

MR. BECK: Your Honor, all I can say is that as soon as the lawyers got it, on both sides, there was a much prompt back and forth. It has taken a while because of the three entities involved. And I'm not looking to make excuses, but I would expect that this will be in place without delaying anything, and we're on the verge of that. We thought we were ahead of any deadline in that regard, frankly.

THE COURT: Mr. Griess, what's your thought?

MR. GRIESS: I'm fine with the proposal that we have a hearing as soon as possible and try and resolve any other issues so that we can move forward. It's going to be a little bit difficult for me, given my obligations, but if the Court wants to leave the deadline on May 8th, we could do that.

One proposal from my perspective might be to extend it one more week, so instead of a one-week extension to a two-week extension, and then have the hearing as soon as possible.

Just to highlight another concern, once the Court orders us -- once a protective order is in place, we're still going to have to go through and mark, you know, pursuant to the protective order, the material, and that's going to require some coordination. Not that we haven't already done it, we have, but we still don't know the final terms of it, and that may impact the markings. We can't complete that process until we have an order in place, and that will take some time as far as the final disclosures. So, you know, those are the concerns I have.

MR. BECK: Your Honor, mindful now of a May 8 deadline, and, frankly, had the parties known we'd have that deadline, which we're pleased to have now, mindful of it, I'm fairly confident that we can have before the Court before that date, therefore next week, the final agreement as far as it's agreed, and the few points that are left to resolution by the Court can be decided at that hearing without a doubt.

THE COURT: Part of the problem there is going to be this has been before Judge Bremer. Judge Bremer's not available, which means the hearing will have to come to me, which means I'll have to be read in and get up to speed on it. And I have reviewed the materials, but this has not been an issue set for my resolution, so I haven't done the research on it. And, again, I'm sitting in a trial, a two-defendant trial, starting on Monday, so that's part of the issue.

So I guess let's talk preferences. We can either have

that hearing at which we bring in all the seed companies and everybody else and we hammer this out and I resolve it, if it's not already resolved, we can either do that Friday afternoon on May 8th, and then the Government -- I could extend until Monday, the 11th, or something, close of business, to get everything marked and turned over, or we can set it for the week of May 11th, hope that we don't have to have a hearing because you've resolved it on your own before that time, and the Government will turn over everything sometime that week.

I would then push back by one additional week the defendant's obligation to disclose their own experts so they have their two full months, and then we'll crunch in on the Government a little bit on any rebuttal experts.

Mr. Cline, what's your thought?

And then I will turn to you, Mr. Bird.

I'm sorry. Mr. Beck.

MR. BECK: Your Honor, either would work for us. The week of the 11th I think would work well for the defense. We are waiting to hear from the seed companies, but I'm sure a date could be found that week that would accommodate all schedules.

THE COURT: Well, we'll just order everybody to be here --

MR. BECK: Understood.

THE COURT: -- and they'll be here would be my guess.

MR. BECK: Of course.

THE COURT: Mr. Bird, what's your thought?

MR. BIRD: Well, I just wanted to add my perspective on the discussions we've had, also address one quick comment that the Court made.

We filed these subpoenas back in late January, early February. We understood that this Court and Judge Bremer places a great deal of value on counsel working out problems between themselves before involving the Court in these kinds of decisions, so we've worked hard, diligently, and I will say to be fair, on both sides, I think the other side has as well, to try to resolve this.

Unfortunately, I think -- and I try not to disagree with my colleague, Mr. Beck -- I think a hearing is absolutely necessary to make sure that the parties understand that this is not going to go on forever and that we're going to have a decision made by this Court or Judge Bremer at some point. I think that will help the process, knowing that there's going to be a deadline.

So I just wanted to throw in that explanation and my support for a hearing the week of May 11th would be best for all of us, sometime during that week, Your Honor.

THE COURT: Mr. Griess, I suspect the week of May 11th is better for you too, just given your trial schedule.

MR. GRIESS: Yes.

THE COURT: Is there a particular day you want me to

aim for there? I've got hearings here and there, but we can largely work around most issues that week.

MR. GRIESS: Your Honor, we'd defer to counsel as far as the hearing date.

MR. SPIES: Your Honor, I would just ask not May 13th. I'm in front of Judge Bennett in Sioux City on the 13th.

THE COURT: I'm just looking for my calendar here.

MR. BIRD: Your Honor, I'm planning on being in town later that week, so Friday would be -- Thursday or Friday would probably be best.

MR. BECK: And my notes show that the 11th and 12th might be difficult for several counsel.

THE COURT: Okay. It looks like our Friday is pretty good. How about Friday morning at 9, Friday the 15th? Does that work?

MR. GRIESS: Yes, Your Honor.

MR. BECK: That would be fine, Your Honor.

THE COURT: So 5/15/15 at 9 o'clock we'll get back together if the motion to quash has not been resolved. We'll have everybody that's a stakeholder in those decisions here, and I'll unrefer that matter from Judge Bremer, who still will not be available on the 15th, and I'll start getting better up to speed on that particular issue. And then we'll talk about expert disclosures at that point when we know more what's going on. If, of course, you all work it out sooner than that, let me

know, and we'll take that off the calendar.

MR. BECK: So, Your Honor, would be both argument on the motions to quash and any resolution on the protective order that is the subject of negotiation?

THE COURT: Correct.

MR. BECK: Great.

THE COURT: That will essentially be resolved one way or another by the end of that hearing.

MR. BIRD: Thank you, Your Honor.

MR. BECK: Thank you.

THE COURT: Okay. Then let's look at reciprocal discovery obligations.

Oh, and I should say this: Because I am ordering, essentially, Rule 16 discovery earlier than the statute might typically require because of the complexities of this case, it is important to me that there be some kind of protective order in place. If the parties want to negotiate what the terms of that are, that's fine, but if you don't get that done in the next week or so, my order is going to come out with my built-in protective order, whatever I think is best.

So if you want a say in that, get me something in the next few days that is your outline; otherwise, I will likely model it after the stipulated discovery order that's typically used in our district here.

Of concern on that is exactly where these materials

can go. These are higher security items, some of them, than are typically seen, which means you all need to talk about, if you have not, who can have access to those materials.

MR. GRIESS: Your Honor, we have had discussions about that, and there is an understanding.

THE COURT: Okay.

MR. GRIESS: And we will reduce it to writing.

THE COURT: Reciprocal discovery will then be due July 14th, which is about a month after you should receive all of the Rule 16, if it has not yet been turned over. This shall include all materials falling under Federal Rule of Criminal Procedure 16(b), as well as any notices of alibi, insanity or public authority defenses under Criminal Rules of Procedure 12.1, 12.2 and 12.3.

Supplemental discovery, obviously, both of you need to turn over on a continuing basis if something new arises. Of course, we'll have to take up whether the Government can use that information if it's inculpatory information and it's late disclosed, but otherwise expect that I'm going to look at a reasonable time to turn that over is three to five business days after you receive it, it ought to be making its way to the other party if it's newly discovered.

And, of course, if there's exceptional circumstances or extraordinary things that come up, we'll take those up, but these should be the general guidance going forward.

Third-party subpoenas have already been served so that doesn't look like one we need to adjust. Is that right?

MR. WEINHARDT: Your Honor, there may be third-party subpoenas that we need to serve on other -- what we think are much less controversial subjects, and so we would like an opportunity to do that. We did what we did with the seed companies because we knew that it was going to generate a lot of heat and light and it would take a lot of time.

THE COURT: If you get those out at least a month before trial, both sides, by then you'll have seen everybody's discovery and that will give us time to resolve them.

Go ahead, Mr. Bird.

MR. BIRD: Yes, Your Honor. I was going to raise for the first time with the Court something similar to that, and just I'll put a bookmark on it now, we'll put it in your order, I'm happy to talk about it, and that's a Rule 15 order by the Court for out-of-the-country depositions.

I spoke with AUSA Griess on Wednesday to let him know that we were going to be talking about this so he can do whatever research or discussions were necessary so we could have this discussion with the Court today. I'm happy to talk about it now or sometime according to your schedule.

THE COURT: I will circle back to it. Are you anticipating any foreign documents that will have apostille or the equivalent considerations of self-authenticating affidavits

and issues like that? That came up in our last --

MR. BIRD: It did?

THE COURT: -- foreign-based travel and it took, oh, I don't know, a week of our time to resolve. So if we're going to talk about that, we should start talking about that sooner rather than later.

MR. BIRD: What I would suggest to the Court is that we set a schedule for that. I can't tell you that we have specific documents in mind. I can think of one or two categories that might be -- or one or two examples that might fit into those categories, but I can't tell you with great certainty at this point.

THE COURT: I know it's early days yet and you haven't seen everything from each other, but we'll put a bookmark on that is a good way to phrase that.

MR. BIRD: Okay.

THE COURT: Pretrial motions that are triggered by any new disclosures that you receive on or before June 15th, you can have until July 6th to file whatever those new motions might be. The Government should file a resistance to any new motions that are filed within ten days after the new motion being filed.

Experts disclosed by either parties, we've already talked about.

MR. BIRD: Your Honor.

THE COURT: Yes.

MR. BIRD: A point of clarification. I apologize for interrupting the Court.

So pretrial motions, do you mean to include motions in limine that would normally be filed --

THE COURT: No. We'll circle back. This would be motions to suppress, motions to dismiss, anything of that nature.

MR. BIRD: Okay. Got it. Thank you.

THE COURT: Yes. Giglio and Jencks material, consistent with what the parties had agreed to previously, will stay August 3rd. Again, just like the way I read Rule 16, I read Jencks pretty broadly as well, and certainly in my view that includes the agents' notes, if they still exist, of any of the 302s they'll be testifying about or the equivalent of whatever agency is involved if it is the policy and procedure of that agency to make draft notes.

If they shred them automatically when they create their 302, then you don't have an obligation to turn them over. Now, if the policy says shred them and they, in fact, in practice don't, you're going to have to turn them over. So you'll have to look into those on an issue-by-issue basis.

Rule 404(b) evidence, consistent with the deadline the parties agreed to at Docket 175, will stay August 3rd. You'll continue, again, by your agreement at Docket 175, to exchange witness lists by August 17th and -- witness lists by August

17th, both witness and exhibit lists.

The Government shall also provide the defendants with a copy of its anticipated exhibit list -- I'm sorry. I changed this one. The Government shall turn over its proposed exhibit list, not the exhibits themselves but the proposed exhibit list, by July 31st.

So what I did was bump that up two weeks. That in part is to cover the issue of key documents and other things that the defense attorneys have asked for in their motion to compel, because I will be denying that portion of your motion to compel. But this should answer that question. You'll know which documents the Government appears to be relying upon by virtue of their exhibit list.

The defendants then will continue to turn theirs over two weeks later, so you'll have a couple weeks to process what those key documents are and what your response might be.

Continuing with the earlier set deadlines, the proposed jury instructions shall be exchanged August 17th; proposed voir dire, if you have it, August 17th.

And we will, on issues of voir dire, come back as a group as we get a little closer to trial and talk about how many jurors you think we're going to need to bring in, how many we may lose to the length of the trial or to pretrial publicity or because they're farmers with contracts with some of these companies or things like that. We'll talk through those closer

to trial.

Motions in limine will continue to be due by August 17th. That was the date you all had agreed to as part of your Docket 175.

There was no deadline listed in your prior agreement for resistances to motions in limine. Please have those on file ten days later for each other's motions in limine, with any reply by the week after the resistance is filed.

Trial briefs along the same lines, August 17th, which is the same day almost everything else was agreed to. Trial briefs just didn't happen to be in your earlier motion.

And then you will exchange your exhibits themselves, not just the lists but the actual exhibits, by August 31st. That's two weeks before trial. At the same time, get them to me. I do use them during trial, so please bring them to me tabbed in a notebook or, as the case may be, a shelf of notebooks, whatever we have going on. But please don't bring them in electronic format because we'll be busy enough, would be my guess, as we close in on this date.

Any exhibit that's going to involve a recording needs to have a transcript if it's going to be used at trial and any relevant translation. I know that doesn't always happen, but here I think we're going to need those transcripts.

And so if you read each other's transcripts and for some reason you don't agree, we're going to want to take that

up, you know, a week or two before trial so that we can sort out how to instruct the jury. So any transcript or translations should be simultaneously delivered when you're delivering your exhibits to each other. Make sure the translations and transcripts are there as well. Don't just hand each other a CD full of recordings.

Any miscellaneous motions that are not covered by this specific order or are FISA- or classified-related that will be covered by later orders, get used to the idea of ten days after the motion's filed you file a resistance, seven days after a resistance you file a reply. That's going to be the deadline we'll stick to just to help keep things moving.

Now, we'll circle back to the benchmarks that we left in place on the Rule 15 and the foreign documents deadlines. Can you think of any other trial-related or discovery-related deadlines that I missed in my comb through the docket?

Go ahead, Mr. Bird.

MR. BIRD: Just items that fall into those categories. A jury questionnaire. I'm pretty sure we're going to be asking for the Court to have the prospective jurors fill out a questionnaire. When would you like that?

THE COURT: We do -- in fact, let me walk you through, if you haven't had a trial with me, how I do that, and we'll do it even earlier than usual in this case.

I preselect our jury and put them in a seating chart,

and I will give counsel the seating chart that has not only who our jurors will be but also the order in which they came out. I will also give you what essentially is the strike list, meaning if anybody disappears from the box who rotates in next and after that, and so forth down, so that you know who the real fight is going to be about and who it's not.

We have a fairly comprehensive questionnaire, and I can get you, Mr. Bird, or I'm sure Mr. Spies could as well, what that questionnaire looks like blank so you know what kinds of materials are covered.

If the parties are going to request supplemental aspects to that questionnaire because of the nature of the case, I need to know that probably at least 60 days before trial so that we have time to get those questionnaires out, get them back, and get them distributed to the parties, so if there are particular questions you want me to ask about their ties to any of these companies, things of that nature.

Now, the down side of asking those kinds of specific questions of the jury early on is that jury is going to know almost immediately then what kind of case they're being called in for and they're going to start doing research. So as you think through what kinds of questions, if you seek asking supplemental questions in a questionnaire format, think through what this might mean as far as pretrial publicity and exposure to issues of that kind.

If they are just questions you want me to ask of the jurors or you would like to ask of the jurors, I will certainly do that once we have them in the room and control over them. I will also send to the parties the questions of all -- the list of all the standard questions I ask in any criminal case and give the parties the chance to supplement what you might want me to ask in your particular case.

I typically allow the defense attorneys to decide whether you want me to hit on what can be more sensitive topics like presumption of innocence or race or right to silence. Some defense attorneys feel strongly they want to handle that in their own way and they're used to doing that. Some prefer the jurors, if they're angry, would be angry at me. Whatever your preference is, I'll follow your preference.

If there are sensitive issues you want me to ask about that relate to specifically this case or China or feelings about China or things about that, I'm happy to ask whatever you suggest to me. We'll set up that as your exchanged proposed voir dire, which is now an August 17th deadline.

I am not asking you to list for me every question you're going to ask of this jury, but if there are bodies of questions that you want me to cover, that's what I really need to know. So in that exchange of proposed voir dire, that's what I'm talking about when I talk about voir dire is something that you want the Court to take action on. We will talk as we get a

little closer to trial about how much time realistically you each need to conduct your voir dire.

We will, in all likelihood, be in trial one floor up, which is our ceremonial courtroom, because I just don't think there will be room for us otherwise with interpreters and everything else. That is a harder acoustic environment as far as recordings, as far as the interpreter hearing you, so expect that if you're going to walk about, you're going to have to wear a lavaliere mike. And it's a little harder to use the technology upstairs, but we'll have time for all of you to practice those kinds of issues.

As to Rule 15, how soon do you feel like you will be able to identify whomever you might need to take depositions from? And is China the country we're talking about here or are there other countries involved as well?

MR. BIRD: Right now we're talking about China. I don't have specific names or identities, but we do have -- to answer your question directly, I would say within two weeks after we've received the Government's -- two weeks after 7th -- July 31st.

THE COURT: Okay. So I think that's going to be way too late in the game to take depositions, won't it be? That's within a month of trial.

MR. BIRD: Not necessarily. It depends on how extensive any motions might be. As I read Rule 15, we could be

required to file a motion with the Court. The Court has the discretion to order them or not order the depositions. The rule also contemplates an agreement of parties, and I intend to speak with Mr. Griess about setting up a procedure and a location and a timing and the logistics well in advance of the end of July so that we don't have to file a motion, just a -- unless there's some objection to the individuals that we end up identifying.

THE COURT: I have no particular objection to the taking of foreign depositions here as necessary and as agreed to by the parties. I'll sign very quickly whatever orders come in along those lines.

There is a lot of coordinating that will have to happen on the Government's behalf for them to attend those kinds of depositions. The paperwork alone to get them --

MR. BIRD: Yeah.

THE COURT: -- money to get over to a foreign country, and the fact that it is China, with whom we've got difficult relations at times, is going to complicate their ability to travel.

If you decide to take foreign depositions, I'm going to expect you'll have transcripts and translations for the jury to use and I'm going to expect that the parties will work very hard to redact down that deposition video to the point where it's as much as you feel is necessary but not more than that because those are very brutal on jurors.

MR. BIRD: And those are more than reasonable requests. It occurred to me that I may have misled the Court slightly. When I said China, I meant to say that we're proposing that the depositions be taken in Hong Kong, which is an important variation.

THE COURT: That would make it in some ways easier from a security standpoint.

MR. BIRD: Yes.

THE COURT: But still it is going to -- again, having been with the Department of Justice most of my career, the amount of paperwork that that will take is enormous, and --

MR. BIRD: We understand.

THE COURT: -- so there needs to be a time.

So I'll let you get back to me on that issue. If I haven't heard anything -- or maybe we can even take it up -- we have a suppression hearing in two weeks. Maybe we could just at the end of that hearing get --

MR. BIRD: We just wanted to bookmark it, make sure while we're talking about scheduling that that's plugged into the decision tree.

THE COURT: Let's take that up then, and, again, we can always revisit it down the road.

MR. BIRD: Your Honor, may I raise one clarification point?

THE COURT: Yes. Go ahead.

MR. BIRD: You mentioned jury instructions, and my understanding is that those are to be filed by August 17th. I anticipate that there will be some discussion, maybe even dispute, over maybe not a lot of jury instructions but certainly ones that will be very important to the defense and to the Government.

I didn't hear a hearing, and that's what I'm asking. Should we -- can we set up a timing, after the initial filing of those jury instructions, as to how the Court wants to deal with those?

THE COURT: Yes. And we will absolutely have pretrial hearings as we get closer to trial where we will take up motions in limine and practical issues like hours of time and talk through the, you know, nitty-gritty of which witnesses are going with which lawyers and where you're going to stand and sit and things like that, and we'll take up jury instructions at that time.

When I say exchange proposed jury instructions, what I'm, again, really after here is anything that is not a model jury instruction. If you want a model jury instruction, just let me know what the number is, and I'll work with that. You don't have to spend a whole lot of time, you know, producing for me a 100-page tome of all model instructions. That's not a good use of your time.

So all I really need is if you're requesting something

that you crafted or that the Eighth Circuit doesn't have a model instruction on so you're going to the Ninth Circuit or Seventh or wherever you're pulling from. Those are the ones I really need to know about by August 17th.

Once I have them, I will put together relatively quickly a draft, at least preliminary jury instructions, to push out to all of you. You'll have that well in advance of trial so you can make objections. And the draft preliminary instructions will really do not much more than tell them don't talk to anyone, don't listen to anyone, here's a brief overview of what the case is about, you know, take good notes and pay attention.

And if you want to see any kind of sample preliminary jury instructions, certainly there would be a number out on the public Web sites from old cases that I've had and it will look very similar to that.

I'll also, as we get closer to trial, ask for help from the parties with pronunciations of locations, of seeds, of companies, of names. And although I can absorb vast amounts of information very rapidly, names are absolutely my kryptonite, to use a Superman reference, so I'm going to need a fair amount of coaching on that from the parties. So expect you're going to hear a lot of questions like, you know, how we pronounce your name, and there will be assistance from everybody on my team trying to help me do that.

Any other kind of generalized questions I can answer

right now?

MR. WEINHARDT: Your Honor, a couple things. One is two items with regard to discovery. And it may be that the Court is going to issue a written ruling on the motion to compel as briefed and filed, in which case it will subsume these things.

THE COURT: I will be. And we have a fairly lengthy order drafted, but we wanted to finalize today. So go ahead.

MR. WEINHARDT: So one issue that I think was sort of cleanly drawn at the conclusion of our proceedings last week was whether or not translations that exist already in the Government's hands are statements under Rule 16 that need to be produced, and then I need say nothing further if the Court is treating that issue in its order.

THE COURT: If they are translations of anything that would come to you through Rule 16, the translation should come too --

MR. WEINHARDT: Okay.

THE COURT: -- if it's already been done. I'm not going to direct them to translate something they haven't already translated.

MR. WEINHARDT: And then the other issue that is of particular concern because of the classified nature of things in this case and who the agencies are, and Mr. Cline is prepared to speak to this a little bit more today if the Court wishes, is

who is on the prosecution team for the purposes of the discovery deadlines that the Court has now set out for us.

THE COURT: And I can't answer that question.

Mr. Griess or anyone else, can you help me with who you're considering part of your prosecution team for determination of, you know, collection of Jencks material or collection of discovery material?

MR. GRIESS: Your Honor, I can say that we set that out in our response to the motion to compel.

THE COURT: Go ahead, Mr. Cline.

MR. CLINE: Just for one second, Your Honor. The Government -- this is at page 14 of Document 263, which is the document Mr. Griess was just referring to. The Government identifies those agencies as FBI, U.S. Customs and Border Protection, Polk County Sheriff, and U.S. Citizenship and Immigration. And what we wanted to do is just flag one sort of odd issue for the Court's attention, and maybe the Government can address this.

At the beginning of that resistance -- this is Document 263 on page 4 -- the Government is describing the difficulties of preparing and producing classified material or formerly classified material. They describe the various levels of review, and in the course of that they talk about the investigative agency, how there has to be a submission made to the investigative agency, the investigative agency has to

approve it at a very high level, and then ultimately it's produced to the defense.

That investigative agency -- this is on page 4 of this pleading. That investigative agency is never named, so it's unclear whether it is, for example, the FBI or whether perhaps it's the NSA, which also seems possible, given the nature of some of the surveillance. Whatever that investigative agency is, it is clearly part of the prosecution team and we would maintain should be covered by the prosecution team umbrella for discovery purposes.

THE COURT: And I understand your position. I'll take this up in sort of two parts. First, I'll expect that the Government will turn over whatever falls within Rule 16 that's in their possession. To the extent the question becomes is it reasonably or should it reasonably be within their possession, I'm not going to direct the Government to, you know, search every single FBI office across the country, but they should be searching all that they know to have any connection to this case whatsoever and providing those materials.

If the Government has anything that under that broader umbrella they feel like they should not have to disclose under Rule 16 because it's too attenuated, then certainly they can submit that to me ex parte, you know, sort of separate and apart from the FISA request issues, just like you would have any other discovery dispute when if you have a Giglio issue or things like

that. You can feel free to submit those to me whenever you have them come up, and I'll get back to you quickly on those matters.

Now, the danger is if they don't turn it over and we find out about it later, you know, we may have new trial or we may have to set aside or, you know, all kinds of bad things can happen. But there are a lot of agencies involved, and they're going to have to help narrow it down for you who their investigative agencies are and where those materials have been culled from as part of their disclosure.

MR. CLINE: And I'm sorry to sort of flog a seeming dead horse, but it appears to us that, although, of course, we don't know for sure, but it looks as though -- well, we know that there was some FISA surveillance. We don't know exactly what it encompasses, but obviously there was. It is likely that that FISA surveillance was undertaken at least in part by the NSA, and so it is possible, maybe likely, that there are statements of Mr. Mo, Mr. Hailong, that are within the possession of the NSA that are relevant to this proceeding within the meaning of Rule 16, and I think what we want to make sure of is that those statements are being collected and produced.

THE COURT: And I assume that if they are statements of your client that were collected pursuant to FISA that have not been disclosed, they'll be brought to me for a ruling whether they fall within Rule 16 under whatever mechanism they

arrive.

Now, obviously, if they've got, you know, eight years of collection of your client's statements, most of which don't relate at all to seeds, they don't have to turn that over. But if they're arguably exculpatory or inculpatory, i.e., relevant, of course they should be turned over.

MR. CLINE: Fair enough. Thank you.

MR. BIRD: Just to follow up on that point, Your Honor and also seek a clarification of another one, in reading the Government's recent filings it seems to me there's going to be some dispute as to what the scope of materiality or relevance is, and there are going to be at least two different versions, maybe more, of what the alleged conspiracy here is and what it isn't.

So when the Court says, well, if it doesn't have anything to do with seeds then we don't have to produce it, that's not the way they're casting this case, at least as to their most recent filing as it relates to my client, Mo Yun.

So --

THE COURT: Right.

MR. BIRD: -- I don't want to hear Mr. Griess come in and say, "Well, we didn't have to produce anything that didn't have to do with corn seeds," and then get up and argue to the jury that things that had nothing to do with the allegations, that we believe have nothing to do with the allegations in this

case, are very much part of the conspiracy because that puts us at an unfair disadvantage.

THE COURT: And I understand where you're coming from. To the extent the Government is not of a mind to disclose whatever they may have at this point -- I don't know what they have either -- then they'll come to me and I'll make a determination and ultimately we'll move forward depending on what that determination is.

MR. BIRD: And that sounds great, and I think that's going to work great, but I just don't want Mr. Griess to say, "Well, the Court said on May 1st that if it didn't have to do with corn seeds, we didn't have to produce it to them."

THE COURT: And I used that in shorter terms than I should have. What I mean is, obviously, if they're investigating him on drug running or something that doesn't have any part of this case, they're entitled to withhold that for security reasons.

MR. BIRD: Well, their view of what's relevant and our view is obviously going to be much different.

THE COURT: I understand.

MR. BIRD: I would like to revisit the translation and transcript issue. As of now my understanding is that those are to be provided on August 31st. At the last hearing on the 22nd of April Mr. Griess said he would have an idea by today as to how many translations they currently have. That would be

instructive to us and would determine what the workload's going to be ultimately. Not to bind him, it's not to suggest that that's the end of the discussion, but it would be helpful.

Because August 31st, I expect that there's going to be a good deal of discussion, argument, both to the Court and to the jury, about at least some of these translations, and they're going to be crucial ones.

THE COURT: And we're talking about two different things. The Government is and will be directed in my written order when they turn over all whatever is left of the Rule 16 materials by June 15th, if they have any of those Rule 16 materials that have already been translated, they are directed to turn over those translations to you.

What they have to turn over by August 31st to you is the transcript if it hasn't yet been transcribed. In other words, what I'm saying is we're not going to play recordings in front of this jury if we don't have a transcript to give them to help them follow along.

MR. BIRD: Got it. All right. Thank you. And that's very helpful. I appreciate that.

THE COURT: Anything else on those general issues of deadlines?

MR. WEINHARDT: I don't believe so. At some point when the Court is ready, I'd like to visit a little bit about how the pretrial motion hearing starting on the 19th is going to

go, but I can do that whenever it comes up in the Court's order of things.

THE COURT: Okay. Let me bring that up at the end. I want to go back and clean up some of the issues from April 22nd or finalize those. With respect to the motion to quash, you've given me now an update on where we're at with that issue and we've set aside some time to finalize that.

Mr. Griess, you were going to check into Mo Yun's immigration status and the processing of paperwork. What can you tell me about that?

MR. GRIESS: I did, Your Honor. One moment.

So what we've determined is that what the defense needs to do is file an I-596 request for change of status or extension of her visa. Those are granted, my understanding is, in six-month intervals. They should list the FBI, specifically the Omaha -- or the Des Moines resident office of the Omaha division of the FBI, as a contact to support the necessity aspect of that, and that will suffice to take care of that issue.

THE COURT: Okay. Mr. Bird, anything more you need on that? Do you want some kind of court order from me to attach to that application --

MR. BIRD: I --

THE COURT: -- or do you want to tag me if you decide you need me on that?

MR. BIRD: To be honest, Your Honor, it's not my area of immediate expertise. We have immigration counsel who are assisting us with this. If we need an order, we'll come back to the Court for that.

THE COURT: Okay. Let me know if it's not resolved in short order.

For our planning purposes, as the local attorneys know here and as the rest of you will soon learn, we're a small district, which means we only have three court reporters on staff. If you are anticipating asking for daily transcripts during trial, we need to know now or near now so that we can get another court reporter contracted to help us with the case.

As you think through that decision, understand that the daily transcript is likely going to run about $1500 a day, if it's of average length, at $6.05 a page is I think what the daily rate is. So thinking through how much money that may be, and I don't need an answer this minute, but I do need it within a couple weeks to make sure that if we have to go through the process of getting somebody long-term contracted to help us with the trial.

MR. WEINHARDT: We'll get that answer, Your Honor.

THE COURT: Okay. Thank you.

MR. SPIES: Your Honor, may I raise a related issue?

THE COURT: Go ahead.

MR. SPIES: If we're going to be in the big courtroom

upstairs, because of the acoustic challenges in any courtroom for me, will realtime transcription be available to counsel at counsel table?

THE COURT: We have never gone down that route. Let me think about that and talk with our court reporter about that.

MR. SPIES: Thank you.

THE COURT: And I'll get back to you with an answer when we get together for our suppression hearing.

Let's talk then, Mr. Weinhardt, you had some questions about how we're going to proceed on the 19th. Go ahead with whatever your questions were.

MR. WEINHARDT: Well, a couple of things. One was, Your Honor, that I sent counsel for the Government a letter yesterday alerting the Government to witnesses that we're interested in having testify as part of the evidentiary portion of that hearing, and maybe that will be completely noncontroversial. Certainly for the motion to suppress statements and the motions to suppress car stops, they should have no surprise as to our interest in having those witnesses here, and in some cases it's their burden to go forward with the evidence.

The one thing that might be a little less usual that I wanted to flag is that we want to make an evidentiary record regarding the manner and scope of the search of electronic devices, so we're requesting that the Government supply the

technicians or forensic analysts who did the analysis of, for example, our client's laptop computer for the purposes of the home and office motion to suppress and the ESI issue we raised there. And if the Government is not going to agree to do that, then we're going to need to quickly initiate the procedures to require that to happen.

THE COURT: So let me double back to the witnesses you're interested in calling. Is that a practical issue, meaning we want the Government's help getting them to the hearing, or is that a Touhy kind of issue where you need to go through the process because they're federal agents and you need to obtain approval to call them as a witness?

MR. WEINHARDT: I hope it's not a Touhy issue. That's never been my experience in this district that I've had to go through that. When we've had issues like this, we've always been able to work them out without that. But if it is a Touhy issue, I want to know now so we can make application and go through that. And that's true for our statements motion. I assume Mr. Bird has the same issue for his statements motion at the LAX interview of Mo Yun.

MR. BIRD: We do, Your Honor.

MR. WEINHARDT: And then it's true for the two car stops, one in Illinois and one in Bondurant, and then it's true for the analysis of our client's electronic devices.

THE COURT: Mr. Griess or Mr. Krickbaum, any thought

on those?

MR. KRICKBAUM: Judge, I think the only area of disagreement is about -- well, there may be two. The first is witnesses with respect to the Government's search of Mo Hailong's electronic devices. In our view, none -- none of the motions to suppress require the Court to make any factual findings or resolve any factual disputes.

Mo Hailong made several legal arguments about those searches, including the fact that there was no computer search protocol, that the warrant was overbroad, and that the computer should have been returned to him or the nonresponsive information should have been returned to him. Those are legal claims. In our view, they have no basis in the law of this circuit, but more importantly, they don't require an evidentiary hearing to resolve. We're quite confident the Court can resolve those issues after reading the briefs. So the objection is not to producing the witnesses, it's to an evidentiary hearing at all on that issue.

We also don't -- are not currently aware of any evidentiary disputes about Mo Yun's statements at the L.A. airport. If there are any disputes, I don't think the defense has raised them at this point. Maybe there will be after they file their replies, but it seems that the facts of that are agreed and the only question is whether Ms. Yun was in custody.

MR. BIRD: Well, Your Honor, as Your Honor's aware,

there are six factors that the Court's going to take into consideration as it relates to voluntariness of those statements. The facts very much will decide -- will inform the Court as to that decision, so, yes, we believe we do have a right to cross-examine the agents involved in the questioning of Mo Yun.

There are a number of questions -- let me give you an example. We haven't filed a reply yet, but there was a translator who was available. Now, we may not have a dispute as to whether or not a translator was used, but we want to get into why the translator was not used when it was -- she or he was standing a few feet away from our client and when the agents knew that she spoke at best broken English and incomplete English. Those are very much factual questions, and we do request respectfully that the Court ask that those -- or require that those agents be available.

THE COURT: Okay. Have you prepared or already served subpoenas on the various people?

MR. WEINHARDT: We have not, Your Honor.

THE COURT: So you've just sort of served the notice to the Government saying --

MR. WEINHARDT: Exactly.

THE COURT: -- we want your help getting these folks here?

MR. WEINHARDT: Exactly.

THE COURT: To the extent the Government disputes any particular witness, get me some kind of filing because it's going to turn into sort of a motion to quash situation and we're going to have to resolve that, and, obviously, we want to resolve it and have somebody either travel or not travel as necessary.

MR. WEINHARDT: And I guess what we would request -- and we can talk about availability and get subpoenas together, and so forth. Our request would be that the issue of ESI, where the Government disputes the relevancy of testimony, we think that the testimony is relevant for a couple of different reasons.

I think the Government has, for example, misanalyzed what our argument is about exceeding the scope of the warrant. Just in the same way that if one analogized a laptop computer to a building, our argument is that they went to places in the building that the warrant didn't authorize. The only way that we can make a record about that is by having the person who walked around in the building testify to where he or she went.

Similarly, with regard to the issue about protocol, I understand that the Eighth Circuit does not so far require a protocol. I believe that in the wake of Riley vs. California the law about that is going to change and that perhaps in the Eighth Circuit this is the case that's going to change that, but that only makes sense to a reviewing court and will only make

sense to this Court if the Court knows what it was that was on the electronic document if it was -- or device.

If it was a device with ten documents on it and all of them had to do with seeds, then there's no issue about whether or not a protocol was necessary. If the device had hundreds of thousands of documents and many of them had nothing to do with seeds, then the record is much more ripe for considering the necessity for protocol.

What I would ask is that the Court not necessarily have to decide that right now but that the Court at least have the witnesses available. If we can reach an agreement or we'll issue subpoenas or whatever, and if by the time the Court gets to the hearing, after it's read our reply on these issues, if the Court's view is witness testimony is unnecessary, fine, but if the Court's view is that witness testimony is necessary for the resolution of the motion, at least we've got them and we don't have to now interpose a delay to go have another hearing where we call those witnesses.

THE COURT: Yeah. And I'm not going to make them travel if they're not going to testify, so instead, by close of business on May 11th, parties are to jointly update me on who is in dispute and who's not, and then I'll get some kind of filing on file and I'll resolve who has to come and who does not. And you can respectively brief however you're going to brief that for me, and then I'll get a decision out within a day or two so

you can either get folks here or not get folks here as needed.

Anything else with respect to preparing for our next hearing on May 19th that we should resolve today?

MR. WEINHARDT: I had just sort of a general suggestion for how to go about the hearing in terms of order, which was it seemed to us -- and all of us on our side have talked about this -- that even though there will be witness testimony for some of the motions that we should do things motion by motion rather than having a whole pile of witness testimony about everything and then argument on the motions.

But we thought it would make sense to take those motions that we know will have witness testimony first and get that out of the way, so we would start with the statements motion for us, the statements motion for Mo Yun to the degree there will be testimony, the car stop motions, and so do those for sure. Then next we would suggest taking the home and office warrant motion, which may or may not involve a Franks hearing and may then also, we expect, involve testimony about the ESI issues, and then take the remaining warrant motions after that since many of the other warrant issues are somewhat derivative of what's in the home/office one, and then take the remaining motions after that, so the other two motions from Mo Yun, the James hearing motion, the motion challenging warrantless searches. That was our suggestion of the order of proceedings for those three days.

THE COURT: Mr. Bird or Mr. Spies, does that work for you folks?

MR. BIRD: It does, Your Honor.

THE COURT: Mr. Griess and your team, Mr. Krickbaum?

MR. KRICKBAUM: Judge, I haven't been able to parse Mr. Weinhardt's schedule precisely. I think our interest is that we may be having a number of witnesses from out of state, and we would like to consolidate their testimony so that they are not sitting here while we're arguing, you know, legal points.

So we'd like everybody to be able to testify on Monday or -- excuse me -- I think it would be on Tuesday, the 19th, if possible, so we would like to consolidate whatever witness testimony there is on that day. That's our only interest.

THE COURT: And that's what I was sort of hearing you say is we take all the witness testimony or we take up the motions that have witness testimony first.

MR. WEINHARDT: Well, take up the witness-laden motions first. I don't think, once we've got the testimony in, that the arguments, for example, on the car stop incidents or the suppression motions are going to be terribly lengthy, and so I would rather argue them at the close of the testimony on each one rather than hearing testimony on Tuesday and then maybe late Wednesday or on Thursday start talking about what it was the

Court heard.

But subject to that, I'm in agreement that we want to get the witness stuff all out of the way at the front end of the hearing.

THE COURT: We'll make sure that happens, then. If you could also please provide to me exhibits and witnesses that you plan to use at least the Friday before so I have time to look at that and so our court reporter has time to build some of those names and ideas into her vocabulary before the hearing.

And will the defendants be personally present for the suppression hearings?

MR. BIRD: Mo Yun will be here, Your Honor.

THE COURT: Okay.

MR. WEINHARDT: Your Honor, I am having a meeting with our client next week, after which I will know more about that topic.

THE COURT: Okay. We will make sure we have translators, then, available for those hearings. Do any of the witnesses themselves need a translator?

MR. GRIESS: I don't --

MR. KRICKBAUM: I don't think so, Judge.

THE COURT: Any of your witnesses need a translator, other than potentially the defendants if they choose to testify?

MR. WEINHARDT: I don't believe so, Your Honor.

MR. BIRD: No, Your Honor.

THE COURT: Okay. Then we won't need any additional interpreters beyond our main person.

Anything else to take up today? Other than I have one additional topic I need to talk in camera with a couple of you, but anything else that we need to take up today?

MR. GRIESS: No, Your Honor.

MR. WEINHARDT: No, Your Honor.

MR. BIRD: No, Your Honor.

THE COURT: Okay. Then, Mr. Weinhardt and the other lawyers for Mr. Hailong, I need to speak to you briefly in my chambers in a sealed setting about an issue that came up some time back that I just am catching up as I'm newer to the docket.

And it should just take a few minutes, and then we'll come back out and conclude the hearing at that point, so if you'll just stand down for a minute while I talk to Mr. Weinhardt and his folks, and then we'll come back.

And I'll need you, Kelli.

(The portion of the transcript from page 58, line 20 through page 61, line 17 is contained in a separate transcript filed under seal.)

(In open court.)

THE COURT: Okay. That portion of the record will be sealed, and I'll ask Mr. Weinhardt to visit with Mr. Griess about the pertinent parts of that conversation or Mr. Spies as necessary or not necessary in this case or his team.

Anything else to take up today?

MR. WEINHARDT: No, Your Honor. Thank you very much.

MR. BECK: Thank you.

THE COURT: Okay. I'll see everybody in a couple weeks, then. Thank you.

MR. BIRD: Thank you, Your Honor.

MR. SPIES: Thank you.

(Proceedings concluded at 3:19 p.m.)

C E R T I F I C A T E

I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28, United States Code, Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated at Des Moines, Iowa, this 12th day of May, 2015.

/s/ Kelli M. Mulcahy
Kelli M. Mulcahy, CSR No. 941, RMR, CRR
Federal Official Court Reporter