IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Criminal No. 4:13-147 |
| vs. | |
| MO HAILONG AND MO YUN, Defendants. | TRANSCRIPT OF HEARING |

- - - - - - - - - - - - - - -X

First Floor, South Courtroom
United States Courthouse
123 East Walnut Street
Des Moines, Iowa 50309
Friday, May 15, 2015
9:00 a.m.

BEFORE: THE HONORABLE STEPHANIE M. ROSE, Judge.

Terri L. Martin, CSR, RPR, CRR
United States Court Reporter
Room 189, U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa 50309

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JASON T. GRIESS, ESQ.<br>MARC L. KRICKBAUM, ESQ.<br>Assistant U.S. Attorneys<br>U.S. Courthouse Annex, Suite 286<br>110 East Court Avenue<br>Des Moines, Iowa 50309-3899 |
| For Defendant Mo Hailong: | MARK E. WEINHARDT, ESQ.<br>HOLLY M. LOGAN, ESQ.<br>Weinhardt & Logan<br>2600 Grand Avenue, Suite 450<br>Des Moines, Iowa 50312 |
| | MARK E. BECK, ESQ.<br>350 West Colorado Boulevard<br>Suite 200<br>Pasadena, California 91105 |
| For Defendant Mo Yun: | LEON F. SPIES, ESQ.<br>Mellon & Spies<br>312 East College Street<br>Suite 216<br>Iowa City, Iowa 52240 |
| | TERRY W. BIRD, ESQ.<br>PETER SHAKOW, ESQ.<br>Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow<br>1875 Century Park East<br>23rd Floor<br>Los Angeles, California 90067 |

ALSO PRESENT:

| | |
|---|---|
| For the Movant Pioneer: | JOAN M. FLETCHER, ESQ.<br>JENNIFER JOHNSON, ESQ.<br>ROBERT R. BARON, ESQ. |
| For the Movant AgReliant: | TODD DIXON, ESQ. |
| For the Movant Monsanto: | CATHERINE HANAWAY, ESQ. |

P R O C E E D I N G S

(In open court, defendants not present.)

THE COURT: Good morning. Please be seated. I'm sorry you're a little crowded.

We're here in the matter of United States versus Mo Hailong and Mo Yun, and it's Case No. 4:13-CR-00147.

Joining us on behalf of the United States are Assistant United States Attorneys Jason Griess and Marc Krickbaum. On behalf of Monsanto, Catherine Hanaway. On behalf of AgReliant, Todd Dixon. On behalf of Pioneer, Rob Baron. Also from Pioneer are Joan Fletcher and Jennifer Johnson. On behalf of the defendants, for Mo Hailong, Mark Weinhardt, Mark Beck, and Holly Logan, and on behalf of Mo Yun, Terry Bird and Leon Spies. And I'm sorry, I forgot, Mr. Shakow, which one do you represent?

MR. SHAKOW: Mo Yun.

THE COURT: Mo Yun, okay, great.

We are here for a couple of purposes this morning, but we'll start with the one that involves our seed companies so that they can leave and leave the rest of us to finish out our day. So first we'll move to resolve the third-party movant Pioneer, AgReliant, and Monsanto's motions to quash subpoenas that were filed by defendants; second, we'll work to finalize deadlines and discovery-related and trial-related matters; and, third, we'll finalize the protective order for all of the

matters going forward, although the parties have done the bulk of that work, at least by the way of the e-mail that I received last night and I appreciate that. And, finally, we'll wrap up some issues connected to our suppression hearing that starts next week just to give the parties as much ability to prepare additionally for that as I can give to you.

So let's turn first to the four motions to quash which collectively relate to subpoenas served upon Monsanto, AgReliant, and Pioneer by both defendants on January 30th of 2015, February 2nd of 2015 and as revised by the meet-and-confer meetings on February 24th of 2015.

Motion to quash No. 1 was filed on March 4, 2015, by Monsanto at Docket 207. This motion was resisted by defendants on April 3rd of 2015 at Dockets 257 for Mo Yun and 259 for Mo Hailong. Monsanto replied to the resistance filed by the defendants on April 20th at Docket 271.

Motion to quash No. 2 or second motion to quash relates to the same subpoenas but are separately briefed. So as to defendant Mo Hailong, which was filed March 4th by AgReliant at Docket 208, resisted by defendant Mo Hailong April 3rd at Docket 260 and replied to by AgReliant in a docket filing April 20th at 270.

The third motion to quash relates to the subpoena of defendant Mo Yun filed March 4th by AgReliant at 209. This motion was resisted by Mo Yun on April 3rd at Docket 257, and as

noted previously, AgReliant replied to both of those resistances at Docket 270.

The final motion to quash relates to subpoenas of both defendants. It was filed March 4th by Pioneer at Docket 210. This motion was resisted by defendant Mo Yun on April 3rd at Docket 257 and defendant Mo Hailong at Docket 258. Pioneer filed a joint reply to the resistances at Docket 273 on April 20th.

As I said in my e-mail to counsel yesterday, I have reviewed all the relevant filings and attachments, as well as the pertinent case law, the statutes, the Federal Rules of Criminal Procedure. So I think we can probably resolve what's left of this matter with argument of about 15 minutes each or less by the parties of interest.

And we'll start with in the order they were filed, so argument on behalf of third-party Monsanto. And you're welcome to sit, stand, podium. Whatever is most comfortable for you is fine with me.

MS. HANAWAY: Good morning, Your Honor.

THE COURT: Good morning.

MS. HANAWAY: May it please the court. My name is Catherine Hanaway, and I represent the Monsanto Company. Monsanto is a victim in this proceeding, and discovery is not allowed in criminal cases, rather Rule 17 provides for a time and a place for the inspection of evidence that's going to be

admitted at trial, and under the Nixon case, that evidence needs to be relevant, admissible and specific. As you know, Rule 17 does not allow for fishing expeditions, traditional discovery, and it cannot be -- these requests subject, subpoenas subject to Rule 17 cannot be overly broad and burdensome upon the party, certainly not to a victim of the alleged crime.

Also, the information sought, the materials and evidence sought by the subpoena need to be otherwise unavailable to the party serving the subpoena. And certainly if the discovery is available from the government, the first and best source of that information is for the defendants to collect the evidence under Rule 16 from the government.

The defendants should not be allowed here to get through discovery what they are alleged to have conspired to steal from Monsanto, and I greatly appreciate that you have read all of the briefing, and I think it's useful to go to the specific requests made by the subpoena.

So request No. 1 pertains to visitor logs, entry logs, agendas for specific -- well, for not very specific visits to Monsanto facilities. And our objections are twofold: One, the fact that the defendants at some time made a lawful visit to Monsanto's facilities seems to have no relevance as to whether or not on other occasions they unlawfully stole seed, surreptitiously visited farms, and otherwise conspired to steal the trade secrets of Monsanto. But further the defendants

themselves have the best access to the information that they are seeking here. They know when and where they visited, but they buried them.

We would ask, Your Honor, that this request be narrowed substantially so that the defendants identify the specific dates, whether or not these visits were made in Missouri or in Iowa, and that entry logs, agendas, tour itineraries be specific only to the defendants. We don't see any need for them to have information regarding who else might be on those entry logs or visitor logs.

The second request similarly pertains to information that the defendants have the best access to. They know with whom they communicated and the fact that there was some lawful communication or even assistance provided on the part of Monsanto is not relevant to whether the defendants later engaged in some unlawful conduct. But, similarly, we would ask that the defendants identify with whom they believe such correspondence took place rather than putting the burden on Monsanto to do some kind of a corporate wide search to identify with whom such correspondence took place.

The third request pertains to exchanges between Monsanto, DBN and BKN in connection with a series of events that are listed in the request. Similarly, we're not certain how defendants' attendance at events that were also attended by Monsanto is relevant to their later incursions unlawfully on

test fields. It's somewhat analogous to saying that because a defendant in a business attended a Chamber of Commerce meeting that it's relevant to whether at some later date the defendant victimized the business in a Ponzi scheme. Monsanto may have had tens, if not hundreds, of people at these conferences.

This request is extremely broad and extremely burdensome. We have met and conferred repeatedly with defendant as recently as yesterday. They were able to provide us some categorical information with respect to No. 3a, no specifics with respect to 3b, some categorical information with respect to -- and by that I mean that they said that the discussions happened with senior research counsel staff, so not a specific name. And then for 3d and e, they were able to provide us some names.

So to the extent that this court finds that request No. 3 is relevant and not overly burdensome, we would ask that the court narrow the request in such a way that Monsanto need not search on a companywide basis to determine who was at these conferences and who might have had these contacts.

Requests 4 through 10 are similar in nature. Each refers to a different specific farm. Our concerns here are that in request a, the defendants are seeking the specific varieties grown including the inbred parents. This type of information is some of Monsanto's most secret information. Even the farms do not know what they are growing. And as we set forth fully in

our briefing, the defendants need not prove that they were seeking to -- that they actually were successful in stealing a trade secret, that this is a conspiracy case and not a theft of trade secret case as you noted in your order regarding the bill of particulars.

We don't believe this information is relevant. At a minimum, we have some initial testing back from the government, but we need to further analyze that to determine if any of the varieties that were tested came from the locations that are cited in these requests 4 through 10.

With respect to part b of requests 4 through 10, the photographs of particular locations where the events articulated took place, Monsanto just isn't the right party. We don't have -- the defendants should go to the farms for this information.

And then request c -- and we had some discussion during our media conference yesterday with respect to the grower agreements, leases, contracts, agreements between Monsanto and the owner of the farm. We are very concerned that this seeks commercial information about pricing and terms that have no bearing on whether or not the defendants conspired to steal trade secrets or even, in fact, whether or not Monsanto took steps to protect its trade secrets. I think we made some progress yesterday, Your Honor, in terms of narrowing the request from the defendants, but I would ask that the court

formalize that specificity so that Monsanto only be ordered, if it is ordered to produce anything, provisions regarding the security precautions taken to protect the trade secrets and that Monsanto not be required to produce commercial terms and pricing.

With respect to requests 11 and 12, very briefly, Your Honor, those two locations from which the defendants are seeking contracts and agreements simply are not part of the superseding indictment. They were in the original indictment, but they are no longer in the superseding indictment and we don't believe that they are relevant here.

Similarly, with respect to requests 13 and 14, we don't believe that they are relevant since they are not mentioned in the superseding indictment.

We are not taking up request No. 15 today.

Request No. 16 is a similar request for entry logs, agendas, tour itineraries. We don't believe the fact that a lawful visit was made at some point by -- forgive my pronunciation -- Wu Hougang is relevant to whether or not unlawful surreptitious incursions were made on farms for the purpose of conspiring to steal trade secrets.

And then, finally, 17 and 18 we believe are information that is available and that its best source is the government.

For those reasons, Your Honor, Monsanto would ask this

court to quash the defendants' subpoenas.

THE COURT: Thank you, Ms. Hanaway.

On behalf of AgReliant, Mr. Dixon, is that you?

MR. DIXON: Yes, Your Honor.

THE COURT: Go ahead.

MR. DIXON: May it please the court.

THE COURT: You can even leave it unbuttoned if you want. Be comfortable.

MR. DIXON: I feel safety.

THE COURT: Okay.

MR. DIXON: Your Honor, I guess I could just stand up here and say me, too, to the extent that their comments apply to us, but there are a couple of other things I would like to point out.

The first three requests are very similar in our subpoena to different farms. Looking down at 3, request number a, we question the relevance of the documents sufficient to identify the varieties. As Monsanto's counsel ably stated, the relevance of that, we don't feel it's there and, further, the Rule 17 subpoena is not the proper vehicle, proper mechanism to get that information.

Moving on to b for 1, 2 and 3, the photographs, we don't feel there's any relevance there as well, and on the grower agreements, again, we don't see, given the superseding indictment and the charges of conspiracy, how any of that

information is relevant here.

Moving on to No. 4 -- and I'm being brief because I don't want to be redundant as to what Monsanto said. Moving on to No. 4, it's our understanding that we're going to be holding on those pending the government's testing. If I'm incorrect on that, please, someone let me know here.

And then on the test results and testing protocol on 5 and 6, again, we don't see the relevance to a conspiracy charge. Under our understanding of the law, they could have walked out of there with basically bags of gravel and if their intent was to steal and they did indeed meet prior to make that, we feel that would be conspiracy. So we don't think any of this is relevant.

That being said, the parties have worked diligently on putting together a protective order. We feel that we have an agreement -- again, correct me, someone, if I'm incorrect on that. We have an agreement on that that does provide some protections, but our objections remain on any of the identification information regarding the seeds and on any of the product identification regarding the seeds.

THE COURT: Thank you, Mr. Dixon.

And on behalf of Pioneer, Mr. Baron.

MR. BARON: Thank you, Your Honor.

I'll be brief as well, and actually we have a few -- fewer objections because we've been able to work out some

compromises.

So, first, I just want to state for the record to repeat what Mr. Weinhardt communicated to the court I believe last week, request 13 of the Mo Hailong subpoena and all of the Mo Yun subpoena that relates to 13 for -- well, basically all of the Mo Yun subpoena has been deferred, put on pause until the testing. So that's not here before you today. And that relates specifically to the production of patent applications and patent numbers and PVPA numbers as they relate to specific hybrids and product ID numbers for the hybrids, which is a trade secret of Pioneer as well as I assume the other seed companies.

So in terms of what is still before you, Your Honor, we did not object on the subpoena on the part of us to 1 or 2. 3, which is the communications between Pioneer and the seed company, DBN or its affiliate BKN, we have through meet and confer substantially narrowed that, and they have submitted to us, in effect, a revised version of 3. That version, which I can recite to you if you wish on the record, but we had memorialized that and agreed on it; however, all that does is mitigate and remove our burden. We still don't think it's relevant. So we appreciate what they've done, and we're not going to assert a burden objection anymore; but we still don't understand why it's relevant for them to have conversations between Pioneer and certain people, Pioneer and DBN. The reason that they set forth in their brief is that it might explain why

their clients were on our facilities. And if that is the rationale that they've provided, then it seems to us then the request should be even more specific than what they've offered and it should be for documents that provide that DBN personnel will be able to come onto the fields of Pioneer. And short of that, I don't know why any other communication would be relevant.

So moving on to 4a through 8a, so those are -- 4 through 8 are requests, as Ms. Hanaway stated, I think it's a parallel for Monsanto, relating to grower agreements and information about the fields where in the superseding indictment the defendants were charged with trespassing. Our view is this. Let me be straight. We're a victim. We don't want to get in the way of the government's prosecution. We feel these people should pay their time; but as Ms. Hanaway said, we're sensitive to the fact that we're being asked by the people charged with trying to steal our trade secrets, now they're asking for the trade secrets, and so it's a sense of position for us. We want to provide what we need to do; but we don't want to provide any more, and given the ongoing investigation, what we propose, which is not in our briefs, is that for 4a, they ask for the varieties in the fields.

Now, there's no evidence in the superseding indictment and there's no charge or allegation that these defendants actually knew the specific inbreds that were in each field. It

just looks like they knew they were inbreds, they knew they were secret, they knew that they wanted them and they went in to dig them out and they got them.

So for us to present and provide the two inbreds that we put in the ground specifically and then what hybrid those two parents make is a colossal set of trade secrets that seem to be more than what is necessary to provide.

That being said, to make things move forward, I think that what we're willing to provide is, if we can make this go away, is one inbred, the identity of one inbred. We think that is a fair compromise in that it really eliminates the defendants' claim that -- and, obviously, we agree with everything that Monsanto and AgReliant said about this being a conspiracy and what the obligations are for proof; but, nonetheless, it cuts any argument that they have about needing to know whether or not it was or wasn't a trade secret because we'll identify one. But to identify both is a whole other trade secret and to identify the hybrid they make is a whole other secret, and there's no need for that certainly at this time.

In terms of the grower agreements, we've come to an agreement on that. We don't need any resolution from the court. That's 4c through 8c, we've narrowed that and come to an agreement on the production of that, and we don't have any photographs. I would just say that to the extent that the defendants wish to pursue that with any of our farmers, we ask

that they work through us.

So what remains is really 11. We objected to 11 and 12. We've agreed to produce 12 sufficient -- which is documents sufficient to show when two of our dealers or distributors began to use restriction agreements with their customers. What we won't agree to is request 11a and b which asks for every use restriction agreement that two different dealers and distributors have entered into; in one instance for a one-year time period and for another instance for a three-year time period, that any customer, not them, not the defendants, but any customer at all for a one- or three-year period of time.

Now, to be fair to the defendants, we did talk and they offered a shorter period of time as a pilot, but to me that seemed like we were agreeing to some stuff and then we were -- it wasn't an amenable deal to us because it seemed like it was give us something now and we'll come back and ask for more later. We would rather just deal with it now.

So unless you have any other questions, Your Honor, I think that summarizes where we are.

THE COURT: Thank you, Mr. Baron.

And I did appreciate the charts in your filing. It flashed me back to biology and botany, but they were --

MR. BARON: Anything we can do to shed a little light we thought would be helpful.

THE COURT: Thank you. They were helpful to the

novice farmer, I guess.

Mr. Weinhardt.

MR. WEINHARDT: Mr. Beck is going to be handling this.

THE COURT: Mr. Beck.

MR. BECK: Yes. Thank you, Your Honor.

Thank you, Your Honor, and good morning.

THE COURT: Good morning.

MR. BECK: I will say the parties, to the credit of I think all counsel, have spent more time than I would have imagined in this circumstance trying to take from this court's docket issues that didn't need to be resolved by the court or, if they might have to be, will be presented to the court much later.

And beyond that, this protective order should serve the purposes requested in the motions to quash and the responsive papers well before that proposed order was completed, and now that is, subject to the approval of the court, I think as you heard today and as Your Honor reads in the papers, any of these objections really do dissipate. They aren't necessarily withdrawn, but the concerns raised become resolved because of the provisions that are provided in that agreed protective order that was completed just yesterday.

The relevance portion of this, with the court's invitation, will be addressed in chambers briefly, and our effort will be to just address relevance as the court has

questions and we interpret that so that our prospective defense case can be explained to the court and our belief as to what the government is going to put on and, therefore, what we are assembling as a defense can be communicated because these subpoenas were issued in the context of that anticipated government case and, of course, our responsive defense case. And we're prepared to do that as soon as the court this morning requests it.

To the extent the argument that each of the parties has put forth focuses on relevance, then we'll defer on that with the court's permission until we can provide some context; but speaking first more generally to the points raised by all three parties and then specifically to a few additional points, we would ask the court to look at these subpoenas in the context of what is occurring in this case.

We've received hundreds of thousands of documents as the court knows. We've been accorded work. We do not have the information that we seek in the subpoenas. Through the meet-and-confer process, some of the requests that we had made we agreed we might get from the government and, therefore, after first serving the subpoenas and listening to these discussions in the context of the burden that these subpoenas might impose upon these companies, we believed it made more sense to hold on to a few of the requests, whittle some of them down, let's see what we get from the government. But for those requests that

are still outstanding, we tried to be as specific as we could and as narrow as we could and did take into account the burden upon these companies.

And when we did that, we also had in mind, Your Honor, that by our count these companies have met with the government during this very same period at least 90 times officially and many, many more times -- and I say "met," they've had communications. Some were certainly by telephone, but some were full-blown sit-down meetings, and most noteworthy I think were the meetings that we know Monsanto and Pioneer had with the government to discuss, among other things, the subpoenas that we served. These meetings occurred after we served the subpoenas.

So there has been communication between those two parties. That's fair game. We don't complain about that. But when we talk about burden, we must scratch our heads I think a bit because the burden we are imposing upon these companies we believe is pretty slight in contrast to the effort already undertaken by these companies to communicate with the government, response to questions or voluntarily, either way. And it's in that regard that we have pursued these subpoenas as modified. We've gone further -- and it's been at the initiative I think of each of the parties. We've gone further in the last week or two to try to be more specific and resolve some of this. And beyond moving the very involved request for patent numbers relating to all kinds of seeds off as the court was advised just

a week ago to see if we really need it, we went through and yesterday and the day before, I believe, with Pioneer, went through and provided the names of people we thought were at the particular meetings in request No. 3, and we even withdrew one of those particular requests because we weren't sure we could identify anybody in particular. It was just a conference. So we got more specific.

With regard to the rest -- and we tried to do that with Monsanto to the extent possible, and we made some headway; but with regard to the rest, beyond the objection of the parties on relevance, to the extent there is an objection as to specificity -- and I guess the other side of that coin is burden because it's not specific that a large company where you go and where you look. I think the best we can say, and I think it's sufficient under Nixon, if we're using Nixon as the standard here, is that we've identified the particular person involved in the meeting when we've known, the month of the meeting, the other parties to the meeting where we've known that, and we've sought information concerning that, communications and documents.

We can't be more specific. We do know those meetings took place, at least based on what we've seen, and we will discuss relevance when we meet with the court; but to the extent it is relevant, we can't be more specific without looking in, say, the Monsanto files or the Pioneer files, which, of course,

isn't our prerogative.

None of these requests are fishing expeditions. We would very much like to know many other things, but it's not for us to get that. And we're sensitive to the very notion that the companies that are alleged to be victims -- and, of course, we dispute that; but the companies that are alleged to be victims shouldn't be victimized by their being required to turn over something that the very case is about, if that occurred.

Now, from the defense perspective, that's what we'll explain, we don't think any of that occurred; but we understand their sensitivity in that regard. To the extent that sensitivity focuses really on the sensitivity of the matters in question, the technology, the trade secret, or protected material from their perspective, this protective order was essential because that should give them all of the protection they need. If it doesn't, then it doesn't serve the purpose that is essential in this case and every case of this sort. But there really isn't any other way to deal with the subjects in hand if they're relevant without having them in hand. And we don't have them, the government may not have them. If they have them, we're probably going to get them from the government, but we don't think they do. And if these companies have them, then we've got to put them in play, and, of course, we're open to any additional requirements the court believes is appropriate using the powers of the court to safeguard these secrets. We don't

look to make -- to violate any of those particular rights that the companies come to court with; but we do have in the context of due process the rights that we stand on here, that we have relied on here and that we've tried with all reason to be fair in making the basis of these particular subpoena requests, and we've come to court seeking that relief and prepared to make a showing in camera with regards to relevance.

Thank you.

THE COURT: Thank you. I'll give you the opportunity shortly.

Mr. Bird or Mr. Shakow?

MR. SHAKOW: Mr. Bird will be.

THE COURT: Mr. Bird is going to be arguing this one.

MR. BIRD: Thank you, Your Honor.

Let me start by hopefully clarifying one point. While we have agreed to take off certain issues related to PVP and adequate protection and the varieties, the specific paragraphs and not argued those to the court today, we, of course, have matched our subpoena to Mo Hailong's subpoena so that the issues related to relevance and burden and specificity are very much at issue for us today, and so I want to address those. And, of course, we will address at whatever length the court feels necessary the question of relevance in chambers when we have that opportunity.

The argument has been made that the seed companies

ought not as the victims in this case be required to produce trade secrets. Of course, this court is well aware of the fact that we are very much at balancing interests. My client, to the government's acknowledgment, had nothing to do with any of the acts in this case after late 2008, early 2009. Much of the subpoenas focuses on events that take place in 2007 and 2008 when my client was employed by DBN.

The government has argued that -- in recent briefs, not, of course, related to the motion to quash, that some of those actions were taken -- or some of the actions of my client taken in 2006, even before the government alleges that the conspiracy started, were taken in furtherance of the conspiracy.

So the interests of my client are very much at stake here because she is being -- the government seeks to hold her responsible for actions for which she had no knowledge, she had no participation, she had no intent to join.

So the court is being asked, I would suggest respectfully, to balance these interests, and we have taken great pains to take the interests of the seed companies into account, obviously in the context of our obligations to our clients. So for the last three months, Your Honor, we have done more than simply meet a handful of times as may have been suggested. The last three months we have met a series of times on the phone and in writing with the seed companies in order to narrow the specifications. When we served the subpoenas, we did

it by specifying allegations in the superseding indictment to which we believed our specifications were relevant so that the seed companies would know up front. We attached a copy of the superseding indictment to our subpoena so that we could have that conversation. We allowed the seed companies the time that they requested in order to file their motions. We met with them and after talking with them and hearing their concerns, we narrowed our specifications. As Mr. Beck has said, we have continued to narrow our specifications, and we offer still to narrow the specifications if that is required because we want to seek some balance of the interests here.

Now, let me address, if I might, simply at this point, because we will address relevance more completely with the court, the question about meeting the Nixon standards and whether or not this is a fishing expedition and whether or not it's burdensome. I have yet to hear or see a declaration or a specification by the seed companies as to how it is that our requests are burdensome in terms of the amount of time or work or effort that will have to be put into this. We have heard them make those arguments in their briefs and to us orally, but I've yet to hear any specification of real burden. That is an experience which I have had in other cases where the third party will come in and say, it's going to take us X number of hours and X number of people. They haven't done that here, and I don't think that they really can reasonably do that in a way

that's going to convince this court that in the context of the balancing of interests that are at issue here, that it's going to be a real burden. And we've worked hard over the last three months to make sure that these seed companies are not going to be so burdened. We've even postponed arguments today as to some of the even more sensitive issues so we can get to these key issues.

THE COURT: Is it your assertion that they have to say how many hours it will take? I mean, in their briefs they say, we're international companies, we have this many offices, we have this many employees, you're requiring us to search this many things, and certainly implied in that is hundreds and hundreds and hundreds of numbers of hours of labor for these folks to respond to your subpoena. You're not really arguing the law requires them to say how many hours it will take --

MR. BIRD: No.

THE COURT: -- before I can find it's burdensome?

MR. BIRD: No. I'm not suggesting that, Your Honor, but what I am suggesting is we have worked hard and I do not believe that, in fact, it will be overly burdensome because we have narrowed significantly the work we're asking them to do. Of course, there's going to be work involved. Of course, there is. We've done everything we can to narrow it -- and Mr. Beck gave you a couple of examples of that today -- by withdrawing certain specifications or by focusing on a particular month or

on particular individuals. And I will, again, get into the relevance of this so the court can understand why we say this is a balancing of interests.

We've also linked our specifications to particular requests that the government has made. And as Mr. Beck noted, there are a number of communications. We're aware of those because the government has given us proof of those meetings and requests. So this is not new and different. We're simply asking for information which has already been collected or already produced to the government in some instances.

Your Honor, I do have -- I'll leave it at that. I think the bulk of the presentation that I would make will relate to relevance so that the court can put these competing interests into context.

Thank you.

THE COURT: Okay. And just by point of clarification, with respect to the proposed stipulated protective order that was sent to me last night, is it intended that this would resolve the concerns of the seed companies with respect to the testing, the testing that's been done on the seeds so that that can now be turned over subject to the order?

MR. GRIESS: Yes.

THE COURT: And does this also propose to cover whatever discovery that the government may have gathered from the seed companies which the government would then be turning

over as part of the discovery file in this case?

MR. GRIESS: Yes.

THE COURT: Okay. So what we're really talking about at this point with respect to the subpoena requests is anything that the government doesn't already have that's going to come to the defendants as soon as this is signed and entered?

MR. GRIESS: Indeed, Your Honor.

THE COURT: Okay. So then let's take up the in camera discussion with each defendant, and we'll start with Mr. Hailong. Mr. Weinhardt, Mr. Beck, and, Ms. Logan, if you would join me. And Ms. Martin I will need you as well.

MR. BIRD: Your Honor, is there any reason why we -- since we're -- our subpoena is based in part upon a showing that they're going to make, why we can't join in that process?

THE COURT: If the parties are okay sharing their theories of defense, that's fine. I was going to allow you to make whatever record you wanted to make privately.

MR. WEINHARDT: We're brother and sister. We talk a lot.

THE COURT: All right. Come on back.

(The ex parte discussion in chambers with defense counsel was not transcribed.)

(In open court.)

THE COURT: Okay. We are back on the record in the courtroom as a whole in the presence of the seed companies and

their counsel and the United States and its counsel, and we have all of defense counsel back as well. And here is where we're going to go.

I agree with the seed companies that these are very broad subpoenas and that they do impose upon the seed companies as drafted undue burden. And so I am going to quash all of the subpoenas, and that includes Docket 207, 208, 209 and 210. However, I do think there is relevant information that the seed companies have that could be specifically requested that the seed companies should have to provide; but I think in practical terms, there's just a better way to do it than has been approached in this case.

This is a case that I think would benefit from in many ways a more civil like approach in the sense of an interrogatory just to a specific question, was X person ever a visitor at your company by any logs you have? The answer is either yes or no. If it is yes, it was on certain dates. Were grower agreements in place? You know, at what point? Did that start in 1993, did it start in 2013? When did that start? And if they materially changed, in what generic ways, without getting into the pricing or the particular people. I do think there's ways to gather up whether or not DBN had contacts with these companies that would have allowed them to think they could go collect corn out of your fields or they didn't. And if they did, who were those people.

So I think we could very narrowly craft -- when I say "we," I mean the parties could work together to narrowly craft what those exact issues are and allow the seed companies to answer those questions by way of affidavit or informal statement, or if the seed companies are uncomfortable with the questions that are being asked -- and here I am directing the defendants to ask those with the greatest specificity they can. And if the seed companies are concerned about whatever answer might provide, then you can present those materials to me in camera and I will review them and decide whether or not it should be turned over or maybe generically answer the question as there do not appear to be any communications that fall within that parameter, or however we're going to do it. I can examine in camera and say, these fields did have patented corn, these fields did have PVPA protected corn, these fields did have, you know, parent company -- or parent corn or hybrid corn without talking about which ones were growing there and when and how they were growing there. I can talk or answer if the companies don't want to what kind of security measures in general are used in these grower fields.

But I think that can allay some of the concerns that the seed companies have, and I understand those concerns, and I would have them, too, were I in your place, as well as the defendants' concern that they're trying to marshall a defense to the claims that have been presented, and they're entitled to

certain information about whether the seed companies took certain steps to protect what's alleged to be trademark material here and whether or not their clients could reasonably have known or should have reasonably known that what they were taking or collecting, if that is proven at trial, was trademarked or that they could have believed that it was trademarked.

So what I would propose is that the seed companies and the defendants work together to try and get to those answers and that the defendants now review whatever is turned over in discovery under the new protective order to see if those answers may lie in what exists.

I think that this process may help, you know, jump start us forward as far as these issues and that if agreements can't be reached, I'll try and resolve them. If additional subpoenas need to be filed, then we'll look at those at a later date. I'm lifting sort of the restriction on third-party subpoenas that you would agree to to allow you to continue to resolve these matters.

I ask the seed companies to be as helpful as you can be without, of course, revealing your secret information. And I make this decision not lightly, but because I think this is a very unusual case in the sense of we're dealing with an Economic Espionage Act case. We are dealing with not just any third parties but the alleged victims of these particular thefts, and we are dealing with not just any information but the alleged

most secret information that the companies were trying to protect, and I think that puts us in an unusual situation.

So this is essentially the solution I've crafted, and we're just going to have to start down that road and see how it goes; but I'll invest as much time as I need to in helping the seed companies review these matters confidentially and helping joint stipulations be developed or judicial notice be taken or whatever we can do to move the case forward in a way that's fair and reasonable to everybody involved.

That really ends our discussion of the issues with the seed companies. Unless there's any questions or clarifications you would like, I'll let you leave, and we'll get on with the rest of the business that we have today.

Go ahead, Mr. Bird.

MR. BIRD: Your Honor, you just mentioned what is perhaps the most important factor in this, and that is time. We all know that September is coming very quickly. It's taken us a long time to work out where we are today, and we'll as quickly as possible craft these. So it would be helpful if we had the court's assistance in establishing a time frame that's going to help us in terms of keeping our September trial date. In other words, if this gets dragged on and there's back and forth, it's going to essentially -- it's going to prevent us from putting on the defense we need to put on.

THE COURT: Sure. Assuming you received all of the

government's discovery relating to the seed companies Monday, the protective order is in place, assuming you get that Monday, how long do you need to craft the interrogatory like questions to these seed companies?

MR. BIRD: We are in hearing next week, but we'll have people working on it and try to get it to them by the end of next week.

THE COURT: And as to the seed companies, I know without seeing exactly what the questions are it's hard to decide how quickly you could respond, but what's your kind of outer limits of how quickly you think you could get answers back to the defendants on whatever questions you think are reasonably answered?

MS. HANAWAY: Your Honor, a great deal depends on the specificity. I mean, if they are yes/no questions about specific people and specific dates and locations, you know, I would think that a couple of weeks would be a reasonable time frame. If they continue to be what contacts were had by anyone from your company at a conference, a much longer period.

THE COURT: Sure, understood.

Mr. Dixon, Mr. Baron, generally you agree that, you know, two weeks or more, depending on the specificity with which those questions are posed?

MR. DIXON: Yes, Your Honor, and also depending upon the number of questions. I think that would be important as

well.

THE COURT: Sure.

MR. BARON: I concur.

THE COURT: Okay.

MR. WEINHARDT: Your Honor, just for our side, I'm not quite as aggressive as Mr. Bird. I would ask for a week from Monday rather than a week from today --

MR. BIRD: I'll concur in that, Your Honor.

MR. WEINHARDT: -- to get the questions propounded.

MR. BIRD: My wife tells me I'm often unrealistic when it comes to time.

THE COURT: I think a week from Monday is Memorial Day. Does that have an impact on you?

MR. GRIESS: Your Honor, could I -- I apologize. I hate to do this, but --

THE COURT: Yes.

MR. GRIESS: -- as you recall, I mentioned last time we are going to need a little bit of logistical time to get all of this marked. There's a lot of material in the protective order that was just reached that has specifics as to how the documents are to be marked. We're going to go as fast as we can, but Monday is not realistic for us. If we could have -- Mr. Weinhardt and I discussed various time levels, but we would be agreeable to a week from today. That would allow us to get everything marked and disclosed, and if we can do it quicker

than that, we will.

THE COURT: What is the date on that?

MR. WEINHARDT: Well, a week from today would be Memorial Day. Could we just make it that Friday before?

MR. KRICKBAUM: The Friday before.

MR. BIRD: A week from --

THE COURT: Today is the 15th, so the 22nd.

MR. WEINHARDT: Yes.

THE COURT: Okay. Then you would need at least a week from that day?

MR. WEINHARDT: Yes. Could we have one week from when that production is complete?

THE COURT: Okay.

MR. BIRD: And, Your Honor, the second issue that I wanted to raise -- and I didn't mean to jump in there, but I want to make sure that we discuss it, and that's admissibility. In other words, assuming that we can work this out with the seed companies, assuming we don't have to -- that we don't choose to serve additional subpoenas, then the question is, is the government going to say that this isn't admissible and we can't get it into evidence or are we going to have to fight about that.

THE COURT: And I think that will probably depend on what the questions are and how the answers are provided; but what we can do is set up a time limit on that, too, for the

government to object, and we'll have a hearing if we need to and decide how to resolve those matters. The kinds of testimonial objections that would come from the government doing the same thing are less of a concern here. We don't have those other issues here, Sixth Amendment issues; but, of course, they're entitled to cross-examine or expound upon whatever the questions and answers might be, and I assume that process will take a little time; but we'll address that down the road.

It is certainly my hope and intention that this would act as a way of replacing testimony from the seed companies on these same issues so that they come in either by stipulation of the parties or they come in by judicial notice of the parties -- or of the court to the jury so that we can reduce these same individuals from the seed companies having to come into court for days and days and days to testify about the same things. But we'll have to -- some of that is going to depend on how the questions are posed and what they are.

So what we'll do then is the government will disclose all of the seed company material, subject to the protective order, not previously disclosed by May 22nd. The defendants will then craft and deliver their interrogatories to the respective companies by the 29th of May. We'll give the seed companies two weeks to respond to those interrogatories. If you're going to be unable to do that, you can move for an extension with me and explain, you know, it's this particular

question we're struggling with or this particular issue, and I will either grant or deny those particular requests, and then we'll go from there. And that's undoubtedly going to require us to get together and talk a little bit about what the next deadlines will be.

Any additions or clarifications before we let our seed companies go?

MR. WEINHARDT: Just one. In propounding these interrogatory-like questions -- and I certainly hear the court about breadth and burden, but if there are very particular documents that are implicated by the questions -- let me give an example. Was there a meeting between Mo Hailong and official X at Pioneer during such and such a month? Can we at least then say, and if there is a document memorializing or requesting that meeting, could you please produce that document? Could we include a document request of that limited scope?

THE COURT: Yes, I think that's fair.

MR. WEINHARDT: Okay. Thanks.

THE COURT: Any additional clarifications, Mr. Baron?

MR. BARON: Yes, Your Honor. First a question. In terms of the relevance because -- I mean, putting your finger on the breadth of the questions will dictate how much time we will need. Has there been any -- we weren't obviously part of the proceedings in camera, but was there any light shed for the defendants on what more narrow basis they could ask --

THE COURT: Yes.

MR. BARON: -- because we've got a pretty substantial and broad relevance objection.

THE COURT: I think part of why the questions were as broadly phrased as they were is because they didn't have the ability to ask the interrogatory type question that could get to a specific date or a specific person or a specific act that they are interested in. I'm expecting, and they agree, that they can narrow substantially what they're asking and try and really pinpoint what they need from you. And most of those questions are going to be either yes or no, either somebody was at your respective buildings on such a day, or there was a grower agreement with this person or there wasn't on a particular day, and if there was a grower's agreement, you know, what specific security or limitation restrictions were placed on them, without looking at the price or any of the things you're most concerned about.

Now, if you feel a question is not relevant or too onerous to respond to, certainly you can raise that with me and I'll deal with it as they come in.

MR. BARON: Okay. Thank you, Your Honor.

And then as well, in terms of the question, sometimes to answer the question, we may need to do some investigation or using documents, due to Mr. Weinhardt's comment; and, if so, I think we reserve the right to come to you, as you said, Your

Honor, to seek additional time?

THE COURT: Of course.

MR. BARON: Okay.

THE COURT: The goal, obviously, is to just move forward quickly for everybody concerned.

Any additional clarifications or further questions that I can answer now?

Okay. Then we'll go ahead and let our seed companies leave. And why don't we take a ten-minute break, and then we'll come back and start talking about the rest of the issues for today.

(Recess at 10:35 a.m., until 10:45 a.m.)

THE COURT: I don't think we're going to be here a real long time, but if defense counsel want to spread out, you're welcome to do that, too.

MR. BECK: Thank you, Your Honor.

MR. SHAKOW: Mr. Beck really likes being next to me, Your Honor, so --

THE COURT: Okay. We can facilitate that all through trial. That will be fine.

Let's talk about just some sort of general housekeeping issues and other deadlines. After our last hearing -- or at our last hearing, I announced a lot of pretrial deadlines and discovery deadlines, a couple of which are now going to have to move around because of the changed deadlines on

disclosing the seed material; but Mr. Spies had asked at the conclusion of that hearing for sort of a written version of that. There is an order coming, but I did take time yesterday to create a written version of just the deadlines that I thought might be helpful to the parties in the meantime.

So Mr. Chrismer is going to hand out to counsel those announced deadlines, and these are as I stated during our hearing on May 1st. When you're looking at the deadlines, you'll see on some of them there's a highlighted -- and I made two copies for each defense team there. Some of them say updated, which is highlighted. That means it's different than what the parties originally agreed to way back at, I think, Docket 175 in January or it means it was never previously addressed or it was a previous court order that's been changed.

And so these are what those deadlines are. None of these should be different than what I said in court on May 1st, but certainly you can look those over and I'll give you some time at the end of this hearing and see if you have any questions or clarifications.

We also had talked at our last hearing about, a little bit about voir dire and what might be coming in voir dire. I had advised the parties that I would get to those attorneys who are not familiar with the Southern District of Iowa's jury questionnaire, a copy of our questionnaires, so I have copies of that as well for the parties. I also have copies of what are my

standard voir dire questions in a criminal case for the parties to see. I haven't yet had an opportunity to have trial with even local counsel in this particular case. So these are my standard questions in a non-drug essentially criminal case. This, of course, is not a standard case, but this will at least give you a flavor of what I typically ask and how I typically ask it.

And we're nowhere near in time when we'll make a record on this, but I thought it would be useful to you as you move forward in the case to have some of those reference materials.

Let's also talk then about and finalize the government's motion to modify the expert disclosures. Based upon what we've heard today and now the protective order that will be entered, I will grant in part and deny in part the government's motion to modify the deadlines for expert disclosure that was filed on April 14th at Docket 268. I will -- that was, of course, resisted by Mo Hailong on April 23rd at ECF No. 282 and by Mo Yun at Docket 287 through 289.

So the government now will disclose by, we've said today, May 22nd their experts, their opinions, their related materials by close of business on May 22nd. That also shall include, as I said on May 1st, all prior testing of the seeds in this case by whatever laboratory and whatever expert tested

those seeds.

The defendants will then have essentially a month to turn over their own materials, or 30 days. I'll have to rework this deadline a little bit because it changed yet today, but I think that will become then Wednesday, July 22nd.

MR. BIRD: Two months, Your Honor.

THE COURT: Oh, two months, I'm sorry. You're right, from May 22nd to July 22nd, two months. And then the government will disclose its rebuttal experts -- we're going to shorten that time frame a little bit, but essentially by August 10th.

Any Daubert challenges should be filed by August 17th, any resistance to a Daubert challenge by August 24th, any reply to the resistance to the Daubert challenge by August 31st. And then we'll still have that hearing we talked about before on September 2nd if there are any Daubert challenges filed. And those will be contained within a written order that will come out.

Let's talk then about -- any questions on those matters?

Okay. Let's talk then about a few other things that we have going on. As we gear up for the hearings next week, I want to give you some early rulings just to help you structure your evidence and arguments. I will not be holding a James hearing in this case. We're going to follow Bell. That's what the Eighth Circuit does. So I am denying Mo Hailong's request

at 239 and Mo Yun's request at 248 which were resisted by the government at Dockets 293 and 295. I do understand the concerns that are raised, but we're just not going to undertake that Fifth Circuit process here.

Second, I have reviewed all of the pleadings, and I do find that of the defendants have failed to establish grounds for a Franks hearing in connection with the search warrants issued in this case. Thus, I will essentially be making a determination of probable cause based on the four corners of those documents. Neither party is to present evidence related to the probable cause matters, and those Franks requests were found at Docket 253, resistance by the government at 290.

Regarding that same motion, there was essentially a request to have witnesses on the question of the search protocol utilized in searching the computers. That's purely a legal question. I can resolve that based on argument and briefing. So I don't need witnesses on search protocol matters.

Last, on the issue of Mo Yun's statements at LAX, which is a motion to suppress at Docket 242, the government has conceded in its resistance that Ms. Mo was interrogated, and the question then becomes was she in custody. The recording is certainly helpful and it does shed some light on that issue, but I think testimony is necessary to fully understand the circumstances under which she was interrogated, and so I do need at least a witness to talk about those matters. It looks like

there were probably four people who were there, an interpreter, an FBI agent, and a couple other people there. Any one of the four who can reliably outline what happened is fine with me, or if the government wants to bring all four, that's fine; but we will need at least some testimony on that particular matter.

Any questions or clarifications on those issues for next week?

MR. KRICKBAUM: Nothing from the government, Your Honor.

THE COURT: Mr. Weinhardt.

MR. WEINHARDT: Your Honor, and maybe this will be followed up by a written order, but if not, I wanted the court's ruling to be clear. The court has ruled that there will not be evidence taken on the question of whether a protocol should have been used for the search of electronic sort of information. We also argued in our reply brief that witness testimony was relevant and admissible on the question of whether the government exceeded the scope of the search warrant. Is the court's ruling the same?

THE COURT: It is. I mean, to the extent they got in and opened every file, looked at every document, that's a legal question. I'm assuming those are the facts. Now, if those aren't the facts, then witness testimony will be helpful; but I'm going to make my ruling based on the assumption that they looked at every single thing on the computer they could possibly

look at.

MR. WEINHARDT: All right. Understood.

THE COURT: I've given the parties the voir dire information. We've talked about deadlines.

We also spoke at the last hearing about foreign depositions, and the parties raised the issue of potential depositions of foreign witnesses in this case. I do think it will be helpful to set some deadlines in connection with those particular requests. So if either party wishes to depose a foreign witness, an application to depose that individual should be filed by no later than July 1. Such an application should contain enough information for the other party to object if necessary, so it should include at least a brief summary of what the expected testimony will be and identify information regarding that particular individual, including whatever their relationship may be to the defendants in this case, whether they're current or former employees of these particular companies, what their purported knowledge is of the relevant facts, and to also cover why that witness is not available to testify in this particular matter.

Any resistance to those requests should be filed within two weeks, so by July 15th, and I will promptly rule on those requests. We may need to have a hearing, it will just depend on what those requests look like; but we'll get to those quickly so we can allow the parties to move forward with any

depositions that do need to be taken.

Also, we've been e-mailing one another back and forth and I've just generally been grabbing an old e-mail and hitting apply all, because I'm lazy that way; but it might be easier for the court to have sort of an e-mail group that has everybody on it that you want on it, whether they are legal assistants who can find you, or others in your offices. So if you want to get me those names of who you would like on that particular e-mail group, let me know. Of course, since we may be talking about sensitive or sealed material, make sure it's those people who are appropriately on that e-mail group.

Finally, I ask that the parties please, please, try not to file overlength briefs unless you feel you need to file an overlength brief. You know, our local rules give you five pages for reply brief. I think the longest I've found so far is 66 pages. You don't have to repeat from brief to brief what the facts are. Assume if you filed it, I've read it. I'm doing my best to keep up with what you're filing; but I think there were 28 motions filed the first four days of this week, hundreds and hundreds of pages that I'm taking home every night and I'm reading my way through it. But inundating each other and me may not be the best strategy in this case. So please do what you can. I know these are complicated issues, and I know the government in making joint responses is going to have longer briefs, and I understand that; but please try and save it for

the truly exceptional circumstance and not the routine, which is not a completely faithful description of what's going on. I think you're all doing your best, but I needed to express that.

We did have one additional issue. Mr. Spies, you had asked us about real-time reporting and some other issues. Ms. Mulcahy was not able to be here today, but we're going to take that up next week and she's got some research and other information to provide to you.

MR. SPIES: Thank you.

THE COURT: Anything else to take up for the good of the order today?

MR. KRICKBAUM: Judge --

THE COURT: Mr. Krickbaum.

MR. KRICKBAUM: -- with respect to the schedule for next week for the hearings, we're trying to inconvenience our out-of-state witnesses as little as possible. So our request would be to start with the Mo Hailong post-arrest statement hearing, which involves FBI agents from Florida. And then after that the Mo Yun interview involves -- we are going to bring Customs and Border Patrol agents from California because Mo Yun has requested that and we'll make them available; but we would like to get them back home. And then following that the traffic stops of Mo Hailong involve some police officers from Chicago, so we would ask that we do that. I think those are actually the only evidentiary hearings we're holding, but that's the order we

would prefer.

THE COURT: Okay.

MR. BIRD: A couple of things, Your Honor. First of all, let me take up this last point. My colleague, Gary Lincenberg, will be handling the LAX issue. My recollection of the interchange is that we did not request live hearing. In fact, we believe that the government had essentially stipulated to the facts. Now, if the court wants that evidence, I'm not going to, you know, object, of course, but --

THE COURT: I'm sorry. I don't think I'm tracking. Which issue are you talking about?

MR. BIRD: LAX statement.

THE COURT: Correct.

MR. BIRD: Of Mo Yun.

THE COURT: Correct.

MR. BIRD: And I believe Mr. Krickbaum just said that we had requested that the agents come out. My recollection of the interchange between Mr. Lincenberg and the government was that we were not -- that we had said that we don't believe that testimony is required because of the government's brief. So I just wanted to make that clear on the record that we didn't request it that they come out.

THE COURT: Okay.

MR. BIRD: And we submitted a footnote in our filing and we also I think advised the government of that. We said in

the footnote, in an e-mail dated May 11, the court has asked the government whether it intends to present any witnesses at the suppression hearing, including a particular witness who would be able to describe the general circumstances under which Ms. Mo's statement was made. Notably, in its opposition, the government does not dispute any of the facts or circumstances summarized in Ms. Mo's motion. If the government changes course and intends to dispute any of these facts, Ms. Mo respectfully asks the court to order the government to have available all three interrogating agents. The conduct of all three agents, not just the FBI case agent, factors into the objective analysis of the custody issue.

That's the position that we took on the record.

THE COURT: Okay.

MR. KRICKBAUM: Judge, I don't think there's anything to respond to. The court said that you --

THE COURT: I need it.

MR. KRICKBAUM: -- you believed that you would want to hear evidence on this issue.

MR. BIRD: Yeah.

MR. KRICKBAUM: And given that the defense has requested that we provide all three witnesses if there's a hearing, we're going to do that.

THE COURT: Yes.

MR. BIRD: I didn't want to have to go back to

Los Angeles and answer to Mr. Lincenberg there, Your Honor.

THE COURT: That's fine.

MR. BIRD: Now, there are a couple of other points.

THE COURT: Go ahead.

MR. BIRD: All right. On the Rule 15 witnesses, the way the order was originally issued or at least as of May 1 was that we would be -- the government would be required to produce its witness list prior to presentation of applications and that we might be able to work out with the government voluntarily some of these issues according to Rule 15. As it now stands, we will not be benefitted by the government's filing of the witness list. As I understand it, that will be filed -- won't be filed until August 17.

THE COURT: I actually moved that -- or I moved up when the government is disclosing it. That's actually earlier than you previously agreed to.

MR. BIRD: Oh, so when is it then? Maybe I misunderstood.

THE COURT: The government is now providing its exhibit list on July 31st. It used to be August 17th.

MR. BIRD: Okay. If I said exhibit list, I meant witness list.

THE COURT: And the witness list you had previously agreed to August 17. That didn't change.

MR. BIRD: Right. So, in other words, we won't have

their witness list before we make our Rule 15 applications?

THE COURT: Is there a concern there that the government may well bring in one of those witnesses that you would otherwise need to depose?

MR. BIRD: Or that we may not need to bring somebody in, depending upon who they're going to bring in.

THE COURT: Certainly you're willing to confer with the United States about what -- I assume when you file your application to depose somebody, the government is either going to say or not say we're bringing them in anyway, so it's not necessary.

MR. BIRD: Well, it's not just -- the people that we would seek to depose are not going to be people that the government could bring in; but they may bring in other witnesses that will make it unnecessary for us to bring -- to go and have a deposition over in Hong Kong or someplace. That's all I'm saying.

THE COURT: Yeah. And that could be -- we just can't wait that long. Depositions just can't be arranged in foreign countries and then translated and transcribed and edited and presented if they are pointed out to the jury in that space of time when you're all going to be drowning in trial issues at that point.

MR. BIRD: Right.

THE COURT: And I don't think realistically disclosing

your exhibit and witness lists any sooner will work because you're just not going to be prepared two months before trial to know who your real witnesses are.

MR. BIRD: Got it. I think that -- oh, as to the hearings next week, I understand Your Honor's ruling on the Bell procedure. Does that mean that the court will not entertain any discussion at all or even for the record as to our co-conspirator arguments?

THE COURT: No. I certainly will hear argument, and you may say something that will cause me to reconsider if it's different than what's been in your brief, and there may be some mechanism by way of the government disclosing at least what the key statements it anticipates offering are going to be; but we're not going to have a full-blown pretrial hearing on what every conspirator there may be, if that makes sense.

MR. BIRD: In the James -- you're talking about the James hearing?

THE COURT: Right, the James hearing, the co-conspirators.

MR. BIRD: That was my question; but the other part was, what do we do as far as argument next week? And you will hear argument --

THE COURT: I will hear argument, yes. I just didn't want the government to think they need to bring witnesses on that particular matter.

MR. BIRD: No, I don't think there will be any witness. There were no witnesses that I anticipated to be brought in for the co-conspirator statements in any event.

All right. And then, Your Honor, I want to do this very respectfully. As to the motions to quash, I would like to just discuss that, and I know the seed companies aren't here; but I want to take this opportunity to make sure that the record is clear that we are not agreeing with the quashing of the motions.

THE COURT: I understand.

MR. BIRD: I want to make sure that that's on the record for whatever purpose in the future. So while we appreciate very much the opportunity to seek the interrogatory type questions that the court has -- and I think that's not only novel, I think it's a creative and productive way to proceed. The concern I have is that I've done a lot of civil litigation, I've done a lot of criminal litigation, and I'm very concerned about the lack of time that we have before trial and I can see that process being stretched out. If I had thought more quickly, I would have asked the court to hold its ruling in abeyance at least to see whether or not the interrogatory process would be productive so that the seed companies had some incentive to work with us.

THE COURT: And I think to be clear here, I'm quashing those particular subpoenas. I'm not saying you can't subpoena

them again. If they're not cooperative, if they're not timely responsive, then craft some new subpoenas that are more narrowly focused and I won't quash those and then they'll have to comply. So I hope that's enough to get their participation. Having this hearing was in part to get everybody in the same room at the same time --

MR. BIRD: Yes.

THE COURT: -- and explain what our positions were and what my position was going to be and have them meet me and understand that I do think they have relevant material that you're entitled to, but I also -- you know, I understand your concerns. So I don't want you to feel like I'm never going to allow you to subpoena; I will, just not those particular subpoenas as broadly as they were phrased.

MR. BIRD: All right. Thank you, Your Honor. I appreciate that.

MR. BECK: And, Your Honor, just for the record, we join in said remarks but do understand what the court is trying to accomplish and we'll try to abide by that.

THE COURT: Okay. As to Mr. Krickbaum, your request, you can present that in whatever order you want to present the evidence. It's the government's burden; but if you want to go one, two, three, that's fine with me. And if for some reason one of your witnesses is delayed and you have to take those out of order or you need to take up issue 3 on Tuesday and issue 1

on Thursday, that's fine with me as well.

MR. KRICKBAUM: Thank you, Judge.

THE COURT: Anything else to take up today?

Mr. Weinhardt.

MR. WEINHARDT: So -- it's almost a conversation between me and Mr. Krickbaum to which the court is a spectator.

So we think we can get the statements motion done Tuesday as long as we don't ask too terribly many questions of those three witnesses, right?

MR. KRICKBAUM: Yes.

MR. WEINHARDT: So the court knows, Your Honor, we are endeavoring, consistent with his obligations elsewhere, to have our client present at least for that day of the hearing at which the statements motion will be litigated. I can't yet say for sure whether that's going to work, and so forth, but it was important to us to know when that hearing was going to be held so we could try to have him here for that.

THE COURT: All right. If for whatever reason you're able to narrow down to Mr. Hailong or Ms. Yun -- Ms. Mo, I'm sorry; Ms. Mo or Mr. Mo will only be here on one particular day or two of the particular days, let us know so we can cancel the interpreters, but otherwise we will have only for them.

MR. WEINHARDT: Based upon what I've heard today, I can tell the court that if our client will be here, he will only be here on Tuesday.

THE COURT: Okay. What about Ms. Mo?

MR. BIRD: Yes, Your Honor. She will be here for the entirety of the hearings and will need an interpreter.

THE COURT: Okay. Then we'll make sure that interpreter is here.

Mr. Griess or Mr. Krickbaum, one thing I thought of as we were talking about interpreters, do we need to find an interpreter and have their background check done so that an interpreter can help us with any classified materials that may arise, or are we just too far -- is that too many steps down the road to know the answer to right now?

MR. GRIESS: Yeah, Judge, I don't know the answer to that right now, but I would say I don't think so; but we will work on that between now and next week.

THE COURT: I didn't know if that was a question for my classified information security officer or for you, but something to think about and consider.

All right. Anything else?

Okay. We'll see everybody next week.

MR. WEINHARDT: Thank you.

MR. BIRD: Your Honor, may Mr. Griess and I have a moment of your time before --

THE COURT: Yes. Come on back.

Do we need Terri or this is just --

MR. SPIES: No.

THE COURT: Okay.

(Proceedings concluded at 11:10 a.m.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated.

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to computer transcription under my direction and supervision, and that the foregoing computer transcription pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 16th day of May, 2015.

/s/ Terri L. Martin
CERTIFIED SHORTHAND REPORTER