IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | |
| vs. | Case No. 4:13-cr-00147 |
| MO HAILONG and MO YUN, Defendants. | PARTIAL HEARING TRANSCRIPT |
| | Arguments Re: Docket No. 245 |

- - - - - - - - - - - - - - - - -X

Courtroom, First Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Wednesday, May 20, 2015
9:00 a.m.

BEFORE: THE HONORABLE STEPHANIE M. ROSE, Judge.

KELLI M. MULCAHY, CSR, RMR, CRR
United States Courthouse
123 East Walnut Street, Room 115
Des Moines, Iowa 50309

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JASON T. GRIESS, ESQ.<br>MARC KRICKBAUM, ESQ.<br>Assistant U.S. Attorneys<br>U.S. Courthouse Annex<br>110 East Court Avenue, Suite 286<br>Des Moines, Iowa 50309-5053 |
| | MATTHEW R. WALCZEWSKI, ESQ.<br>United States Department of Justice<br>600 East Street North West<br>Washington, D.C. 20004 |
| For Defendant Mo Hailong: | MARK E. WEINHARDT, ESQ.<br>HOLLY M. LOGAN, ESQ.<br>Weinhardt & Logan, P.C.<br>2600 Grand Avenue, Suite 450<br>Des Moines, Iowa 50312 |
| | MARK E. BECK, ESQ.<br>Mark Beck Law, P.C.<br>350 West Colorado Boulevard, Suite 200<br>Pasadena, California 91105 |
| For Defendant Mo Yun: | LEON F. SPIES, ESQ.<br>Mellon Spies & Pavelich<br>312 East College Street, Suite 216<br>Iowa City, Iowa 52240 |
| | TERRY W. BIRD, ESQ.<br>GARY S. LINCENBERG, ESQ.<br>DAVID H. CHAO, ESQ.<br>Bird Marella, P.C.<br>1875 Century Park East, 23rd Floor<br>Los Angeles, California 90067-2561 |

P R O C E E D I N G S

(In open court, with Defendant Mo Yun personally present and Defendant Mo Hailong present via telephone.)

\- - -

THE COURT: So let's turn to the cut-and-paste issue with respect to Mo Yun's motion, and that is Docket 245, entitled, "Motion In Limine To Exclude...Excerpts Of Instant Message Conversations Based On Failure To Meet The McMillan Authentication Test."

Mr. Griess, is this one yours or are you --

MR. GRIESS: Yes, Your Honor.

THE COURT: Okay. Go ahead.

MR. GRIESS: First of all, Your Honor, just let me say that I think that, obviously, the question here is one of authenticity, and we believe that the proof of private custody of these IM chats, together with the detail of those chats, are strong circumstantial evidence of the authenticity of these documents and that there's nothing further that needs to be done to authenticate them.

I think the law has been more than provided in the brief, and we'd rely on that. There's obviously some facts that I think the Court needs to take into account in making these decisions.

First of all, with regard to the proof of the private custody rather than the Government custody or Government

creation of these chats, these were documents that were saved on Mo Hailong's computer that were seized as a result of the search warrant that the Court was just dealing with at his office in Boca Raton. The speakers in those chats were identified by their Chinese characters for both Mo Yun and Hailong. Many of the chats are identified by date as well.

In addition to that, the circumstances of those chats more -- again, more than establish their authenticity. There's discussion about the purchase of corn seed, about the purchase of farmland. There's discussion about DBN, which, of course, is the company that both of these defendants worked for. There's discussion about other employees of DBN. There's discussion about the type of business that DBN was involved in, including animal breeding and disease. There's discussion about Pioneer and Monsanto. There's discussion about personal matters that would impact both Mo Hailong and Mo Yun, including mention of, quote, our uncle, unquote.

One of the e-mail addresses that's utilized as part of these or surrounding these chats is MoYun@dbn.cn; cn, of course, being the moniker for China, the Internet moniker for China.

I think a big part of this question involves whether or not strict application of McMillan rules are required in this case, and I think clearly they are not. And I think one of the cases that both parties have focused on is the O'Connell case, United States vs. O'Connell, an Eighth Circuit case that was

issued in 1988.

The defense argues that O'Connell stands for the proposition that the McMillan factors must be applied to private recordings in a practical light to assure the reliability of the recorded material. The quote that at least in part is talking about it is as follows from O'Connell: "When the facts demonstrate that the recording was made by a defendant, we believe the considerations underlying the McMillan test should be applied in a practical light to assure the reliability of the recorded material."

But what's most important is the very next sentence: "We do not believe, however, that under such circumstances mechanical or wooden application of the McMillan requirements is necessary." So the Court here is recognizing that you just don't do a tick-off, step by step of the requirements set forth in McMillan.

The Court continues that, "Private use of recording equipment has become widespread, and the products of such devices can have the same significance as the products of a pen or typewriter, which might also be seized with a search warrant and offered into evidence. All require a sufficient showing of authenticity to be admissible, but this does not mean that a recording found in a defendant's possession should be subject to the same requirements we apply when a Government agent or informant initiates a conversation knowing that it is to be

recorded," i.e., the McMillan requirements.

I think clearly the O'Connell court and the Eighth Circuit has recognized that there is not to be a strict McMillan analysis when deciding the authenticity of this particular type of evidence. In fact, what's required is looking at the totality of the circumstances and making a decision and making the decision with regard to whether or not there's a rational basis for the party's complaining -- or the party's claim, rather, the Government's claim in this case, that the document is what they are asserted to be.

If you look further at O'Connell's analysis, they talk about a number of factors that they do consider, and they do -- they do factor in the McMillan test. They involve some of the same factors, but they're analyzed much differently than you would do if it were a Government informant or a Government agent that was making the recordings.

The first thing they talk about is whether or not there's sufficient circumstantial evidence of the authenticity and correctness of the recording. In O'Connell they highlighted and focused on the fact that the recording machine upon which the recordings were located was in O'Connell's Florida warehouse.

In this case, those same recordings -- the IM recordings, rather, were found in Mo's, the Defendant Mo Hailong's, Florida business. The Court goes on to say, "it is

not necessary for the Government to verify the accuracy of every part of a recording," and that the substance of the communication may in itself be enough to make prima facie proof. That's exactly what we have in what I just talked about in terms of the facts that are present in these IM chats. There is more than enough substance in the chats to make a finding that they are, in fact, authentic.

Secondly, the Court talks about the integrity of the recordings, and much is made by the defense of the integrity of these recordings. But the Court says, "We do not believe the Government should be required to prove directly the pre-seizure integrity of a tape found in the defendant's possession." These are not tapes like they were in Jackson that the Government made and then inadvertently deleted, which led to their exclusion. That is not the case here.

These are cut-and-paste chats that encompass a wide range of conversations that both involve the business and personal life of these two individuals. There's no reason to question their integrity. They were saved by Mo Hailong, and given all the circumstances that are contained within and where they were located, there's more than enough evidence of the fact that they're authentic.

Thirdly, whether the speakers are adequately identified. And in that case we're dealing with voice identification, which, of course, is not an issue here. But

what is really not at issue is who was speaking there because they're identified both by name and by e-mail address and by the business they work for, and on and on and on. There's more than enough evidence to establish that the speakers are who they are.

Finally, the Court focuses on the fact that McMillan requires a showing that the conversation elicited was made voluntarily and in good faith without any kind of inducement. And what the Court says is, "When private conversations are involved," as opposed to Government- or informant-initiated conversations, "we believe a simple showing of voluntariness will ordinarily be sufficient."

In this case, there's no evidence to suggest that these were conversations -- these IM chats are anything other than voluntary. There's no Government inducement involved. There's no Government involvement whatsoever. This is just evidence found in the defendant's possession, and as such the circumstances which we've more than enumerated, both today and in the brief, establish that they are what they claim to be.

Everything else that the defendant argues with regard to authenticity, all the questions they have and the lack of metadata, that all goes to the weight of the evidence, and that is the jury's domain. We'd ask the Court to deny this motion.

THE COURT: Thank you, Mr. Griess.

Mr. Lincenberg.

MR. LINCENBERG: Thank you, Your Honor.

Your Honor, what Mr. Griess ignores about the O'Connell holding, which is really the only case that the Government relies on to suggest that McMillan should not apply here, is the fact that O'Connell was not in the same shoes as Mo Yun. O'Connell was in the same shoes as Mo Hailong.

And that distinction is all the difference in why O'Connell has no bearing in this case, and it makes sense that the analysis would be different because courts regularly look to the fact that when something is seized from your home or your computer that there is a greater indicia of a connection between that item and you and that you have the opportunity to provide testimony on the document and any gaps in the excerpts, and so forth.

Mo Yun does not have that opportunity because the apparent custodian, the apparent person who created these excerpts, was Mo Hailong, who is somebody who is unavailable to us in this trial as a witness.

And, in fact, when Mr. Griess was making his argument, he kept referring to and quoting from language in O'Connell which talks about the defendant, and the O'Connell court emphasized that at the heart of its ruling was that this was a recording device which was in the home of the defendant.

Now, the court in O'Connell clearly did apply the McMillan factors to that case. The court said there are some differences in the analysis when we're dealing with a recording

which is seized from the person who was challenging it. That's true. And the court said that there's some differences in how we apply that analysis in that type of situation versus where it's a Government recording. We don't deny that either.

And that would be a very different argument we'd be having here today if I was representing Mo Hailong and I was trying to challenge this on the basis of authentication. In fact, the court in O'Connell cited to the McMillan case at least five or six times in discussing these factors, in that case holding in favor of the Government.

The other thing that was present in the O'Connell case, which the Government ignores here, is that the integrity of the recordings was established by the testimony of an agent, and that is something that is being challenged here as well and which I'll get into as the next part of our argument.

So what we have at the core here is we have Word documents which are being portrayed by the Government in this case as if they were not Word documents, as if they were Internet chats, recordings that took place. And the Jackson case clearly states that the heightened burden for authentication that was established in the McMillan case applies to these type of Internet chats.

What we also have here is an expert who comes to the conclusion that evidence as to the origination of the files of interest here are inconclusive.

THE COURT: Is this Mr. Polus?

MR. LINCENBERG: No. Actually, that's the Government's expert --

THE COURT: Okay.

MR. LINCENBERG: -- who came to that conclusion, Matthew Grant, which was set forth in the October 14th, 2014, declaration -- or 302, which is attached as Exhibit B to our reply brief.

To support that and add more depth to it, we submitted declarations both of Peter Shakow, my partner, who analyzed the documents and pointed out the various gaps, as well as a declaration of a defense computer forensic analyst, Mr. Polus.

And what Mr. Shakow's declaration pointed out, which is set forth in our brief, are numerous problems in suggesting that these are recordings, such as date and file names haven't been created and added to the cut-and-pasted documents. Some of the files contain dates of only a month and year, others don't contain the year but only a month, others contain no date information at all.

And, of course, the Government expert who tried to determine what the actual dates of the chats are found no conclusive evidence of that, so even the dates we have are simply dates which apparently Mo Hailong put on these documents at some point or another for whatever motive he had at that time.

Second, there are several excerpts that are merely partial versions of longer excerpts saved under different names, and we provided some examples of that, including one where there's two different versions of the same document.

Now, we can only imagine that if we found occasions where there are two different versions of the same document that eight years ago, when this was taking place, if it was taking place eight years ago, that Mo Hailong may have had different versions and some he saved and some he later deleted and some he may have inserted for whatever recordkeeping purposes he was trying to serve.

Third, we have documents where there are hyperlinks to outside Web sites which are broken, and many are unavailable or dead even when typed directly into an Internet browser. These are very important in this case.

For example, in Overt Act 30 there is a reference to a September 17th, 2007, alleged Internet chat, and this is where the Government in the indictment quotes information from this cut-and-paste excerpt of Hailong apparently saying -- talking about taking pictures and picking ears of corn and needing caution to drive somewhere unseen.

Now, on that same excerpt, you have shortly before it a discussion about visiting Purdue, visiting the University of Illinois, visiting or talking about a visit with a guy from Monsanto. After Hailong makes that statement, there's no

response in this cut-and-paste stuff that's going on. That doesn't mean that there's no response in time, but you would read it as if there's no response until a couple lines down, again, there seems to be this completely disconnected discussion about Purdue.edu/turf Web sites.

And what was on those links could be critical to an understanding of whether this cut-and-paste makes sense, and we don't have any way to look at this. And the age of this is part of the problem as well and part of why it's so important to have proper authentication when you're looking to introduce an eight-year-old document.

Fourth, we give an example of attachments that appear to have been embedded within the original instant messages which are unavailable. Now, as we all know from common experience, oftentimes Internet messages or e-mails are very brief and the substance of what's being discussed is in the attachment, and yet we give an example which has a file name that appears to reference a date of March 2 -- of, I guess -- well, I guess October 30th of 2007, where the attachment is not there.

There are blank areas and unusual spacing in numerous excerpts. There are numerous excerpts that appear to start in the middle of a discussion, and there are offline communications referenced in a number of excerpts that are not available.

When Mr. Polus, our expert, looked at this, he came to the obvious conclusion, which is quite consistent with the

Government computer scientist's conclusion, only Mr. Polus explained it in greater detail, of why this means that this is simply unreliable. And if I can find his declaration, he notes, for example, a few other things that were not picked up on either by my partner or by the Government scientist.

He went back and did an analysis of what type of Microsoft instant messaging applications were available, and in paragraph 7 of his declaration he speaks about how they changed over the years and the like, and he then says, you know, if this time frame is right, this one, Windows Live Messenger and MSN Messenger may have been in use. Both of them, frankly, had options to indefinitely save conversation histories by going to the options menu, and so forth and so on.

And so there could have been -- there may be cases in the future where there are seizures where you have actual copies of the live Internet chats in the proper format with the metadata. That's not the case here.

At paragraph 12, Mr. Polus concludes that the validity and reliability of these documents are lacking due in part to the following five points: that the true source PC of these documents is unavailable and therefore we cannot use original hard drive metadata and original operating system files to provide supporting evidence; that the RTF files lack additional metadata to help identify authors, modifiers and versions; the conversation excerpts are not properly date/time stamped and not

generated through a systematic process such as the built-in logging feature of Windows Live Messenger; the RTF files are inconsistently formatted, which indicates selective copying or later editing; the RTF files appear to have been created not by any systematic process, which would have helped ensure accuracy of the content, but by a manual process, which carries with it inherent potential for inaccuracy. None of that is disputed.

And Mr. Griess' argument as to other ways that we sometimes look to under Rule 901 to determine authenticity is simply irrelevant, just as the three cases they cite in their brief do not have to do with recordings. There's no dispute that for regular documents under Rule 901 there is a lower burden that the Government has to establish for authentication.

Your Honor, there's a fourth expert who supports the testimony of both the Government's expert, my partner Mr. Shakow, and the defense expert Mr. Polus, and that's the excerpt -- that's the expert who testified in the Jackson case, Kevin Peden, P-e-d-e-n, who, at page 869 and 870 of U.S. vs. Jackson, testified as a computer forensic expert.

Now, recall that in the Jackson case we had an undercover person who was recording online conversations between himself posing as a 14-year-old girl and the defendant, which were held to be inadmissible, and among other things, what the forensic expert in that case testified to, which the Court found compelling, was that when he is doing an analysis, he always

produces a bit-stream image of the hard drive, which was the forensic copy of the hard drive and is the best way to confirm the chat. There are other ways to accurately save computer chats, would include -- which would include a screen capture where a log file is saved to the hard drive, found in unallocated space, or use of the ypager log found in Yahoo.

"He also testified that there were third-party software programs available in 2001 that would accurately save the online chats, and the basic 'print screen' and 'file-print' options would likewise have captured the entire chat."

He testified that the cut-and-paste method employed by Mr. Margritz was the least effective way to capture the chat log. He testified at great length regarding the errors that he believed existed in that case, including operating errors, missing offline messages, selective cut-and-paste where lines were separated from each other, the timing of the message wasn't possible, and so forth.

So there's four different experts who support our position in this case. And remember that it is the Government's burden here to authenticate, so, in short, this is a very straightforward motion.

There is an Eighth Circuit case in McMillan which sets forth factors. There is no case cited by the Government which deals with a situation where you have a defendant who is not the person who is maintaining or saving or knowing how these

alterations may have taken place, and we have application of the McMillan rule to online chats. This motion should be granted.

THE COURT: Thank you, Mr. Lincenberg.

Mr. Griess, do you want to respond to any of that?

MR. GRIESS: Just briefly, Your Honor.

The Jackson case involves Government recordings, recordings that the Government created. It is inapplicable to this case. Yes, they were IM chats, but they were not created by the defendant, as they were here.

Most of Mr. Lincenberg's arguments go directly to questions that are in the jury's province. They are not questions that the Court needs to decide to determine authenticity. Chats themselves as far as the location of where they were found and the circumstances that they were found more than establishes authenticity, and we'd ask the Court to deny the motion.

THE COURT: Thank you, Mr. Griess.

This is one that I intend to take under advisement. I think it's a very complicated issue, I think in part because we're dealing with technology that just doesn't have a good fit with case law that's developed. So you can certainly imagine, and I imagine all of us can find cases, where some sibling kept select letters or cards from another sibling and, you know, they have them cobbled together in real paper, and we could look at that, or text messages from one phone to another, and we could

look at that.

But here I think we have, unfortunately, several layers of issues to get through. We have the basic McMillan issue. We have some Bruton issues, I think. I think we have some 403. You know, even if the Government could arguably authenticate this, I think there's still a pretty significant danger of unfair prejudice to Ms. Mo when we don't know exactly when and how this was created.

Although it's not the Government's fault, in a situation like this, I think you almost need one-half of this conversation to explain the context in which these were gathered, and here the Government has neither half because both people are defendants in this case and neither one of them is cooperating and neither one of them at this point has indicated any desire to do so.

So I think the Government is doing everything it can do. I don't find there's any problem with the way the Government's proceeding. I think we're just in uncharted territory, and, unfortunately, I think that puts the Government in a pretty difficult position as far as these messages go.

If the parties want to tackle any of those three issues with any additional briefs, of course, I'll read them, but there's hundreds of pages already out there. If anybody comes up with a magical case that helps us, I'd look at that.

I assume that there isn't information here,

Mr. Griess, that -- maybe there is -- even could authenticate that this is for certain her e-mail. I mean, do you have anybody who says she and she alone uses this e-mail address or she and she alone would be under this name?

I mean, certainly my family has an e-mail account and e-mail from my e-mail address could be my children, me, my husband, or anybody who is a guest in my house. Things of that nature are problematic, I think, when we're talking about not having the underlying metadata to corroborate that there were even these exchanges.

We don't have, you know, the back story on any of this, and I think, through no fault of your own, I don't know that you can get that because it appears that that half of the story is told in China.

Do you have anything like that, anyone who can say, yes, she used that e-mail, that's her e-mail address?

MR. GRIESS: Your Honor, that's a question I'd like to have some time to answer due to the evidence in the case.

THE COURT: Whatever corroborating information you might have that's available to me would be helpful. And this just may be one that we have to defer until a little later. Part of my concern -- and, again, I may know only a small part of this story, but part of my concern with the timing is it looks to me like most of the Government's case hangs on these issues, as well as the admissions that I have now suppressed.

If there isn't more against her and I'm going to keep this out, I think we need to resolve that sooner rather than later because you may not have a case left against her.

MR. GRIESS: True, Your Honor.

THE COURT: Okay. So we'll circle back to that one, but if you could get me any new briefs on that in the next ten days, I'll look at those issues at that time.

And, Ms. Mo, I'll make a quick decision on that matter.

(Partial transcript concluded.)

\- - -

C E R T I F I C A T E

I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28, United States Code, Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated at Des Moines, Iowa, this 28th day of May, 2015.

/s/ Kelli M. Mulcahy
Kelli M. Mulcahy, CSR No. 941, RMR, CRR
Federal Official Court Reporter