IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA, :
Plaintiff, :
vs. : Case No. 4:13-cr-00147
MO HAILONG and MO YUN, : HEARING TRANSCRIPT
Defendants. : Volume I
- - - - - - - - - - - - - - - - -X

Courtroom, First Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Tuesday, May 19, 2015
9:12 a.m.

BEFORE: THE HONORABLE STEPHANIE M. ROSE, Judge.

KELLI M. MULCAHY, CSR, RMR, CRR
United States Courthouse
123 East Walnut Street, Room 115
Des Moines, Iowa 50309

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JASON T. GRIESS, ESQ.<br>MARC KRICKBAUM, ESQ.<br>Assistant U.S. Attorneys<br>U.S. Courthouse Annex<br>110 East Court Avenue, Suite 286<br>Des Moines, Iowa 50309-5053 |
| | MATTHEW R. WALCZEWSKI, ESQ.<br>United States Department of Justice<br>600 East Street North West<br>Washington, D.C. 20004 |
| For Defendant<br>Mo Hailong: | MARK E. WEINHARDT, ESQ.<br>HOLLY M. LOGAN, ESQ.<br>Weinhardt & Logan, P.C.<br>2600 Grand Avenue, Suite 450<br>Des Moines, Iowa 50312 |
| | MARK E. BECK, ESQ.<br>Mark Beck Law, P.C.<br>350 West Colorado Boulevard, Suite 200<br>Pasadena, California 91105 |
| For Defendant<br>Mo Yun: | LEON F. SPIES, ESQ.<br>Mellon Spies & Pavelich<br>312 East College Street, Suite 216<br>Iowa City, Iowa 52240 |
| | TERRY W. BIRD, ESQ.<br>GARY S. LINCENBERG, ESQ.<br>DAVID H. CHAO, ESQ.<br>Bird Marella, P.C.<br>1875 Century Park East, 23rd Floor<br>Los Angeles, California 90067-2561 |
| Also Present: | JANE HU and CHAN PING CURTIS<br>Interpreters |
| Also Present:<br>(Via telephone) | STEPHANIE McGUIRE, ESQ. |

# I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Edward Becerril | 24 (Krickbaum) | 42 (Lincenberg) | 80 (Krickbaum) | 87 (Lincenberg) |
| Mark Betten | 90 (Krickbaum) | 106 (Lincenberg) | | |
| Gerome Esguerra | 140 (Krickbaum) | 145 (Lincenberg) | | |
| Robert Dale Burnett | 151 (Griess) | 161 (Weinhardt) | | |
| Cass Bollman | 173 (Griess) | 187 (Weinhardt) | 200 (Griess) | |
| Angel Lorenzo | 204 (Griess) | 213 (Weinhardt) | | |
| For Defendant Mo Hailong: | | | | |
| Alexander Reina | 229 (Weinhardt) | 240 (Griess) | | |

# I N D E X (Cont.)

## E X H I B I T S


| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 1 - Photograph | 34 | 34 |
| 2 - Excerpts of IM chats | 104 | 104 |
| 3 - Trip log | 161 | 161 |
| 4 - Aerial photograph | 161 | 161 |
| 4-1 - Aerial photograph | 179 | 179 |
| 5 - Aerial photograph | 212 | 212 |
| 5-1 - Aerial photograph | 240 | 240 |

| DEFENDANT MO HAILONG'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| A - Field interrogation report | 172 | 172 |

| DEFENDANT MO YUN'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| A - Report with transcript of interview | 76 | 76 |
| C - Diagram | 75 | 75 |
| D - FBI 302 dated 7/11/14 | 110 | 110 |
| E - Copy of photograph | 110 | 110 |
| F - FBI 302 dated 7/7/14 | 112 | 112 |
| G - Diagram | 125 | 125 |
| H - Text seized from Mo Hailong's computer | 128 | 128 |

P R O C E E D I N G S

(In open court with Defendant Mo Yun present.)

THE COURT: Good morning. You can be seated.

We are here today in the matter of United States vs. Mo Hailong and Mo Yun. It's Case No. 4:13-cr-00147.

If the clerk could please swear our interpreter.

JANE HU, INTERPRETER, SWORN

CHAN PING CURTIS, INTERPRETER, SWORN

THE COURT: And for purposes of the record, I know we have Jane Hu, H-u.

Ma'am, could you introduce yourself as well?

INTERPRETER HU: Jane Hu.

INTERPRETER CURTIS: Chan Ping Curtis.

THE COURT: Can you spell that for us?

INTERPRETER CURTIS: C-h-a-n P-i-n-g first name. Last name is C-u-r-t-i-s.

THE COURT: Thank you.

Joining us on behalf of the United States are Assistant United States Attorneys Jason Griess and Marc Krickbaum and a trial attorney from the Department of Justice, Matt -- and, I'm sorry, I've forgotten how to pronounce your last name.

MR. WALCZEWSKI: Walczweski, Your Honor.

THE COURT: -- Walczweski.

And on behalf of Mr. Mo, we have Holly Logan, Mark

Beck and Mark Weinhardt. And on behalf of Ms. Mo, we have Gary Lincenberg, Terry Bird, Leon Spies, and David Chao. And we have some IT folks helping us as well and a number of other people here in our audience today.

We are here today to resolve, essentially, 22 motions to suppress or motions that relate to 22 different searches by law enforcement in this case. These motions include, from Mr. Mo, Defendant Mo Hailong's filing at Docket 234 entitled "Motion To Suppress Evidence Obtained From Unlawful Vehicle Stops," which relates to traffic stops that took place on September 6th of 2011 and May 4th of 2012. This motion was resisted by the Government at Docket 298 with a reply filed by Defendant Mo Hailong at Docket 321.

Next is Defendant Mo Hailong's filing at Docket 253 entitled "Motion To Suppress Warrant Searches," relating to evidence seized in connection with seven searches, five of which are relevant at our hearing this week. That motion was resisted by the Government at Docket 290 with a reply filed by Defendant Mo Hailong at Docket 316. And 316 relates to the GPS tracking of the CR-V; at Docket 318, the reply relating to the GPS tracking of Mr. Mo's cell phone; at Docket 329 a reply relating to the Yahoo e-mail account; and at Docket 334 a reply relating to the iCloud account.

The portions of this motion that we'll hear evidence on this week relate to searches of Mr. Mo's residence in Boca

Raton, Mr. Mo's office in Boca Raton, Mr. Mo's Yahoo account, Mr. Mo's iCloud account, and GPS tracking of his cell phone.

Ms. Mo also filed motions that we'll hear this week, including her filing at Docket 242 entitled, "Motion To Suppress Statements Made At Los Angeles International Airport." That motion was resisted by the Government at Docket 296, with a reply filed by Defendant Mo Yun at Docket 325 and Docket 349, which I think at least appears to be a duplicate of that earlier response.

And then Ms. Mo Yun's filing at Docket 245, entitled "Motion In Limine To Exclude Excerpts Of Instant Message Conversations Based Upon Failure To Meet The McMillian Authentication Test," this motion was resisted by the Government at Docket 297 with a reply filed by Ms. Mo at 327.

There are also 12 other searches that are subject to pending motions to suppress. Allegations related to these 12 searches are found in Defendant Mo Hailong's filing at Docket 233, entitled "Motion To Suppress Nine Unlawful Searches." The Government has asked to defer a ruling on this motion by their filing at Docket 294. In particular the Government seeks a deferring of this motion until after the FISA-related litigation has been resolved. Defendant Mo Hailong replied to and resisted this request to defer at Docket 317.

We also have Defendant Mo Hailong's motion to suppress evidence seized from his storage locker in Adel, Iowa, filed on,

essentially, three occasions. Those searches occurred on June 5th of 2012, October 2nd of 2012, and November 28th of 2012.

Mr. Mo's original motion was filed at Docket 253 and then withdrawn at Docket 322 and then refiled last week on May 11th at Docket 330 in a motion entitled "Defendant Mo Hailong's Motion To Suppress The Unlawful Searches Dated June 5, 2012, October 2, 2012, And November 28, 2012 Of Storage Unit 48 Located At The AM Mini Storage Self Service -- Self Serve At 420 Nile Kinnick North, Adel, Iowa." The United States has not yet been able to respond to that particular motion.

Mr. Griess or Mr. Krickbaum, is this another search, those three storage unit searches, that will be related to FISA material?

MR. KRICKBAUM: Judge, I think Mr. Walczweski is going to address that issue.

THE COURT: Okay.

MR. WALCZEWSKI: Your Honor, although the Government has not yet filed a motion on that, we would oppose it in the same way we did Docket No. 233 and ask to defer ruling on that.

THE COURT: Okay. Then let's hear argument from the parties, if they want to present any, on the request to defer.

On behalf of Mr. Hailong.

MR. BECK: Yes, Your Honor. If I may.

MR. BIRD: Your Honor, I'm sorry, one logistical note. I don't believe, and perhaps I didn't hear it, the Court make

reference to Docket 248, and that's Mo Yun's motion in limine concerning co-conspirator statements.

THE COURT: And we're going to come to that, yes.

MR. BIRD: All right.

THE COURT: Go ahead.

MR. BECK: Yes. Briefly, Your Honor, if these, in fact, relate to FISA, well, that makes sense to defer. If they don't, we would ask the Court to consider the motion today. It is possible that these searches were conducted pursuant to some other statutory scheme or with no authority at all.

We're not looking for yet another reconsideration of the magistrate's decision with regard to disclosure of what is FISA and what's not, but with regard to this, we'd simply ask that the Court inquire, perhaps in chambers, if the Court feels it appropriate, as to whether or not these searches, these 12, fall within the FISA statutory scheme.

THE COURT: Okay. Mr. Walczweski, any thought on that?

MR. WALCZEWSKI: Your Honor, as we've argued in other motions, the Government cannot, you know, confirm or deny, you know, whether certain information was obtained pursuant to FISA, and we don't have much more to add, other than what was in our written opposition. We believe it would be most prudent to delay ruling on these motions to suppress until after the FISA litigation has been resolved.

THE COURT: Okay. Is there any other kind of statutory authority under which these 12 searches might have been conducted such that we would want to resolve them through an evidentiary hearing today?

MR. WALCZEWSKI: No, Your Honor. We've turned over all of our --

THE COURT: So essentially these will either be found to be part of that later litigation with authority there or there will have been no authority, in which case they'll all be granted; is that your understanding?

MR. WALCZEWSKI: I believe that's accurate, Your Honor.

THE COURT: Then in that case I will go ahead and grant the motion to defer, both the written motion to defer filed at Docket 294 and, essentially, the Government's oral motion to defer today relating to Docket 330. So those motions will be taken up after or consistent with the other FISA-related or FISA-derived motions pending in litigation at Docket 224, which is Defendant Mo Hailong's "Motion to Suppress Evidence Obtained Under FISA," and Docket 225, which is Defendant Mo Hailong's "Motion for Disclosure Of FISA Applications, Orders And Related Materials."

Then we have four other pretrial motions, two of which the Government has agreed to suppression relating to. By filing at Docket 290, in particular page 1, paragraph 2, the Government

did not resist Defendant Mo Hailong's motion to suppress evidence seized in connection with the GPS tracking of his Honda CR-V, which was part of Mo Hailong's motion to suppress evidence filed at Docket 253. That was one of the six searches highlighted in that particular filing. That portion of Docket 253 is therefore granted.

Last evening the Government advised me and opposing counsel that it was no longer resisting Defendant Mo Hailong's filing at Docket 236, entitled "Motion To Suppress Statements." This motion had originally been resisted by the Government at Docket 292 with a reply filed by Mr. Mo at Docket 320. Defendant Mo Hailong's motion to suppress as it relates to his post-arrest statements is therefore granted as well.

Also, last week we took up the two issues relating to the co-conspirator hearsay statements and the request for a James hearing. Those were filed by Defendant Mo Hailong at Docket 239, which was entitled "Motion For Pretrial James Hearing," for disclosure of alleged co-conspirator hearsay statements. This motion was resisted by the Government at Docket 293 with a reply filed by Defendant Mo Hailong at Docket 321 and was filed through Ms. Mo's filing at Docket 248 entitled, "Motion In Limine To Exclude Statements And Acts Of Alleged Co-Conspirators." This motion was resisted by the Government at Docket 297 with a reply filed by Defendant Mo Yun at Docket 327.

As I indicated last week, at the conclusion of our motion to quash hearing, I'm not going to hold a pretrial Franks hearing or a pretrial James hearing or a pretrial co-conspirator hearing. We'll follow the Eighth Circuit's standard Bell procedures in that case. But at the conclusion of this week's hearings, I'll allow the parties to make whatever record or arguments on that matter you'd like to make. And, of course, if your arguments move me, I might reconsider those decisions. I'll also allow you to make arguments regarding my denial last week of Franks hearings in connection with Docket 253.

Finally, before we get started, we have to resolve the question of Ms. Mo's request to join in Mr. Mo's motions to suppress. Motions to suppress were due no later than March 27th of 2015. Numerous motions were filed on or slightly before that date. The United States responded to that array of motions to suppress on April 27th of 2015.

On May 8 of 2015, Defendant Mo Yun filed a series of motions requesting permission to join Mr. Mo's motions, and these are filed in the Docket at 309 to 313. In particular, 309 is a joinder or request to join the James hearing request; 310 is a request to join the motion to suppress warrant searches, which would include here Mr. Mo's home, office, Yahoo e-mail account, iCloud account, and the GPS tracking of his phone; at Docket 311 the motion to suppress from the two vehicle stops in which Ms. Mo was not a passenger or a driver; at Docket 312,

which relates to the post-arrest statements by Mr. Mo, which I assume is now moot given that that's been granted; and at Docket 313, which is the motion to join the nine motions to suppress relating to that presumably FISA-related litigation that we have upcoming.

The Government resisted joinder at Docket 319 on three grounds: first, that the motions were untimely; second, that Ms. Mo had no standing to assert suppression on any of those searches; and, third, a general denial that there was any merit to the motions in any event.

Would Ms. Mo like to make any argument regarding the timing of the motion or her standing on any of those suppression-related motions?

MR. LINCENBERG: Your Honor, we responded in our reply brief, and I think succinctly I answered with three points, and we have nothing further to add beyond those three points, those three points relating to the fact that when you join a motion, Your Honor, the intelligent thing is to review the motion after seeing it and also look at the response and then determine whether it makes sense to join, number one; number two, there's no prejudice to the Government in our doing so because the arguments are the same, we're not adding new arguments in favor of the suppression; and it's in the interest of justice.

And with regard to the question of standing, we responded in our papers. Unless the Court has further

questions, we would submit on our response.

THE COURT: Okay. Any argument, Mr. Krickbaum?

MR. KRICKBAUM: Judge, I'll be brief. We continue to think that these joinders are untimely. I have not heard any good cause for the late filings. Ms. Mo or Mr. Lincenberg says that it took a significant amount of time to review all the motions, but I believe Ms. Mo ended up joining all of them, and it should have been, I think, apparent after Mr. Mo filed them whether or not they related to Ms. Mo.

They do raise unique issues that we've not been able to -- we were not able to brief in our responses, that particularly the standing issue, and so even if the Court were to overlook the lateness of these joinders, I think standing is just a problem that Ms. Mo cannot overcome here.

We don't think she has pointed to evidence of a reasonable expectation of privacy in any of the locations that were the subject of the search warrants. She did not have a reasonable expectation of privacy at her brother's house in Florida, in an office building in Florida when she was living in Beijing. She didn't have a reasonable expectation of privacy in his e-mail account or his iPod account or his cell phone. She did not have a reasonable expectation of privacy in a rental car that was pulled over that is the subject of these traffic stops.

And so I think that's an independent basis to deny the motion, and, obviously, on the merits, the Court will be

considering that the remainder this week.

THE COURT: Mr. Lincenberg.

MR. LINCENBERG: So, Your Honor, Mr. Krickbaum, of course, says nothing to suggest any prejudice to the Government. The arguments are the same. The only issue before the Court is one of standing. And Mr. Krickbaum does not respond to the cases cited in our reply brief, U.S. vs. Warshak in particular as well as U.S. vs. Bode, which talk about a reasonable expectation of privacy in the ISPs which contain these communications.

With regard to the expectation of privacy that Ms. Mo possesses in the alleged excerpts that were taken off of her brother's computer, that is where you start getting into a closer call for the Court. It's not a close call with regard to the Yahoo account and the Gmail accounts. And with regard to what is seized off of her brother's computer, it's a closer call because the case law is not developed in that area.

Katz vs. United States, which is a seminal case, talks about an expectation of privacy in phone calls. There's a lot of discussion about whether or not these were Internet chats and there's a lot of case law in the other motions which talk about Internet chats being akin to phone calls for purposes of Fourth Amendment analysis. So we would suggest that the dominant case, although more general, the Katz case, provides a reasonable expectation of privacy.

Finally, the Government does not dispute that discovery continues to trickle in in this case. Between the last hearing and this hearing, we got more discovery, and it is still unclear where documents were seized from, part of this because of the secrecy shrouding the FISA issue, and it's only prudent for us to join in these motions because there still may be further evidence which comes about.

What I would ask the Court to do is the Court is holding hearings on these motions and that the Court should hold off on the standing question until we develop the arguments in connection with those motions further. If the Court is denying them, then it doesn't -- then it's moot reaching the standing question; if the Court is granting them, then we can have further argument as that argument develops.

THE COURT: Okay. It's a little bit of a mixed bag here. It does matter because it becomes a question of whether or not you're entitled to cross-examine the witnesses that are brought before us this week which is regarding the searches that solely involved, as near as I can tell, Mr. Mo.

I'm not aware of any authority that says she has standing in his car when she's not a passenger or driver or that she has standing in his home or his office or his e-mail account or his cell phone. I don't know of any standing, and to read the rule as broadly as you're asking me to is to throw open that door in basically every single criminal case that we have, and

I'm not going to do it. I'm just not.

However, if, as discovery trickles in, to use your phrase, you discover that some document or something was seized from her or from something in which she does have a possessory or a reasonable expectation of privacy interest, then we'll just have to throw this open yet again and the Government will bear the burden of bringing the witnesses back, and we'll do what we need to do at that point.

Now, with respect to the IM chats, that's a closer question, although I don't think there's standing there, but I'll let you have some opportunity to question any witnesses that happen to be brought in on that issue, if there are any, just so we can develop a better record on standing.

MR. LINCENBERG: And, Your Honor, I don't dispute that it's a strained argument with regard to the search of cars, and the reason that we joined there was largely in part because there's such a trickle-in effect that we don't want to be caught with our pants down if evidence later comes in.

And second, although this is not directly a standing argument, because there's some overlap of the fruits argument, and if it turns out that we learn in connection with the search of the cars that some of the cause presented related to a prior illegal search where there was standing, there's a relationship, so in the interest of caution we would assert standing on those motions as well.

THE COURT: All right. So officially for the record, I will grant your motion to join Docket 309, which is the James request, although that's largely probably moot based on my prior ruling. I'll deny as fully moot your request to join Docket 312, which was the post-arrest statements, which they've now agreed should be suppressed.

And I'll deny your request to join in Docket 311, which is the vehicle stops, and Dockets 313 and 310, which relate to the whole gambit of searches, unless later evidence develops indicating that Ms. Mo has any kind of, again, reasonable expectation of privacy or possessory interest with respect to those areas or items that were searched, in which case I'll allow you leave to file new motions, despite the timing of whenever that might happen.

So having made that particular decision, we're going to proceed as follows: The Government will present its witnesses in whatever order it deems fit. As the Government calls each witness, please identify, if you can, which motion this particular witness' testimony relates to. Whichever defendant that motion relates to will have the opportunity to cross-examine that particular witness.

And I'll allow Ms. Mo latitude with respect to the instant message -- instant messages that are purported to be there between her and her brother to cross-examine that particular witness or witnesses; otherwise, you'll have to stand

silent on each other's witnesses to the extent that arises.

Okay. A couple more procedural issues. Both the Government and Mr. Mo discuss at length in their briefs the presence of suspected co-conspirator insiders at these particular seed companies. Those people are identified by name in many of the filings. Some of those are under seal, some of them are not.

Are those names that we should be protecting during this hearing? In other words, should we be using initials? Have those people been completely cleared of suspicion? And if they haven't been cleared of suspicion, I think the policy generally is we shouldn't be referring to them by name in a public setting, but what's the thought of the parties?

Mr. Krickbaum or Mr. Griess.

MR. KRICKBAUM: Judge, we are fine with proceeding by identifying them by initials, and we can submit a redacted version of our brief that uses their full names.

THE COURT: Okay.

MR. KRICKBAUM: I don't know that there's -- I don't expect there's going to be evidence on this point. I think it would only come up in argument related to, I think, a Franks issue. I believe that's the only context in which we'll be hearing about that.

THE COURT: Okay. Mr. Weinhardt or Mr. Beck or --

MR. WEINHARDT: I think in discussing this in open

court -- first of all, I agree with Mr. Krickbaum that I don't think that there will be evidence taken regarding that issue. There is a Franks argument that we have that may get into a name or two, and in general, regarding the home/office warrant, we may get into the name of one individual. We're happy to refer to that individual by initials.

THE COURT: Okay. And Mr. Lincenberg or Mr. Bird or Mr. Spies?

MR. LINCENBERG: Nothing further.

THE COURT: That works for you as well?

Then I'll ask the United States to take a good look at in particular Docket 290-2. That seemed to be the one where I ran into the most names that is not already a sealed document. And either redact it or we can just seal it, if that's easier, depending on what the Government would like to do there. Just let me know by the end of the day, if you would.

Okay. Having resolved all those preliminary matters, I have one additional ask of the parties as we move forward. I've read everything you've filed. All, I would estimate, probably 2,000 pages of material, I read. I listened to the recordings, I have looked at every exhibit. But we are still talking about people and places and things that are pretty unfamiliar to me, and in particular the complication of having many of those be names that are in Chinese with surnames that flip back and forth from my English version of things, so

please, as much as possible, stop and spell names or terms or, you know, scientific terminology that may come up during the hearing for both me and the sake of our court reporter.

As to our court interpreters, please let me know if you need a break. This is a lot of talking, so if you need a break to rest your voices or certainly a restroom break or something, let me know.

As to everyone else, we'll try and make sure we take a break every hour and a half to two hours, but if you need more than that, let me know.

Mr. Weinhardt.

MR. WEINHARDT: One other procedural matter I wanted to note, Your Honor. Mo Yun is here in court. Our client, Mo Hailong, is not. For reasons that are of record under seal and which the Court is well aware, he's not able to participate in this proceeding in person, nor is he early in the day able to participate in it telephonically.

He will join the proceeding today, tomorrow, and if we go Thursday, on Thursday he will join telephonically when he becomes able after the other obligations with which the Court is familiar, and he waives his right to personal presence or presence for the first part of today's proceedings for that purpose. But I wanted to get that on the record.

THE COURT: And I understand his availability will be around 9:45 each morning; is that right?

MR. WEINHARDT: Ballpark, yes.

THE COURT: Which is in a few minutes. So we will endeavor to add him in as soon as we can each day.

And I should have introduced Ms. Mo as well to the record. She's here.

If at any time you have trouble hearing or understanding, just put your hand up, and we'll know to stop and fix that before we go forward, okay?

And as to everyone else, the acoustics in this particular courtroom are better than our upstairs courtroom, but please keep your voices up. If you're going to be moving around in particular, you need to keep your voice up so the court reporter can hear you, as well as everybody else.

And at the end of our days together here, we'll talk more about trial scheduling. One of the things we've discovered is that we'll have to have trial in here, so start getting used to wherever you're going to sit and think through those issues. Because of some reconstruction going on in the courthouse, we are going to be holding trial in this particular courtroom.

So, Mr. Griess or Mr. Krickbaum or Mr. Walczweski, are you ready to call evidence?

MR. KRICKBAUM: We are, Judge. We're going to start with Mo Yun's motion to exclude her statements at Los Angeles International Airport, so our first witness would be Officer Ed Becerril.

THE COURT: Okay. And we'll try and get Mr. Mo on the phone now, since this is about the right time, while we're getting that witness pulled forward.

MR. LINCENBERG: Your Honor.

THE COURT: Yes.

MR. LINCENBERG: I noted that Agent Betten stepped out of the room, and I understand that Officer Esguerra is in the building and outside of the room. For the record, we ask that the Court order that other witnesses not be present in the courtroom.

THE COURT: I can do that with respect to everybody except the case agent because the Government's entitled to have their case agent present if they want to, but certainly they don't have to.

MR. LINCENBERG: I discussed this matter with Mr. Krickbaum. In this case we would ask that the case agent be ordered out of the room since he's --

THE COURT: One of the primary witnesses here?

Do you have any objection to that?

MR. KRICKBAUM: Judge, that's fine. We will not argue that.

MR. WEINHARDT: And, Your Honor, we don't get there until we get to --

THE COURT: I'm sorry. Just one minute.

(Defendant Mo Hailong joined the proceedings via

BECERRIL - DIRECT


telephone.)

THE COURT: Go ahead, Mr. Weinhardt.

MR. WEINHARDT: Your Honor, we join the motion to sequester witnesses, although we won't get there until we arrive at the car stop motions on Mo Hailong's behalf. And unless I'm incorrect, I don't think we object to the case agent being present. I don't think he's going to be a witness.

THE COURT: Okay. All right.

Thank you. If you'll raise your right hand.

EDWARD BECERRIL, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. KRICKBAUM:

Q. Good morning, Sir.

A. Good morning.

Q. Please tell us your name and spell it for the record.

A. Edward Becerril, E-d-w-a-r-d, last name is B-e-c-e-r-r-i-l.

Q. And what do you do for a living, sir?

A. I'm a U.S. Customs and Border Protection supervisor.

Q. How long have you worked for U.S. Customs and Border Protection?

A. Since 2001. I began with the U.S. Department of Immigration, which later became Homeland Security, and Customs and Border Protection was evolved as part of that.

Q. And how long have you been a supervisor?

A. For about ten years.

Q. Do you also have a role with the FBI?
A. Yes. I'm currently assigned to the FBI's Joint Terrorism Task Force based at LAX, and I've been assigned there for about seven or eight years.
Q. And LAX is Los Angeles International Airport; is that correct?
A. That's correct.
Q. What are your general responsibilities?
A. I coordinate and participate in any activity involving the FBI and U.S. Customs and Border Protection involving border searches, border arrests, outbound inspections, inbound inspections.
Q. And other than for a brief period of time in the summer of 2014, have you personally been involved in the investigation of this criminal case here in Iowa?
A. No, I have not.
Q. All right. I want to talk to you about your interview of Mo Yun on July 1st, 2014. Can you start by telling us, where did that interview take place?
A. That took place at Terminal 2 at Los Angeles International Airport. LAX has eight terminals. This happened to be at Terminal 2. It's a terminal that multiple airlines use; Hawaiian Airlines, China Airlines, Air China, at the time Northwest. There's a myriad of different airlines, and this happened to take place at Terminal 2.

Q. And did you participate in that interview?
A. Yes, I did briefly.
Q. If you saw Mo Yun in the courtroom today, do you believe you would recognize her?
A. Yes, I would.
Q. Can you please identify her for the record?
A. The lady to my right with the white jacket on and black slacks, black hair.
MR. KRICKBAUM: Your Honor, for the record, the witness has identified the Defendant Mo Yun.
THE COURT: It will so reflect.
BY MR. KRICKBAUM:
Q. Who else was involved in that interview, other than you, Officer?
A. Officer Esguerra was also a CBP officer and Special Agent Mark Betten.
Q. All right. I want to set the scene a little bit. Can you tell us what you were wearing that day, in general terms anyway?
A. Sure. I was wearing a pair of khaki Docker slacks and button-down shirt untucked. I was in plain clothes that day. I wasn't in uniform. Shirt was untucked. Just shoes and pair of khakis.
Q. Were you armed?
A. Was armed.
Q. Was your gun displayed?

A. No, it wasn't.
Q. It was covered by your shirt?
A. Yes, it was.
Q. How about Officer Esguerra, what was he wearing that day?
A. He was in full uniform, which includes matching dark blue shirt and pants; gun belt, which includes his side arm, a baton, a radio, handcuffs.
Q. And Special Agent Betten, what was he wearing?
A. He was wearing a suit.
Q. Did he have any weapon displayed at any point that day that you saw?
A. Not that I seen.
Q. All right. Can you describe for us where you were in the airport when you first saw Mo Yun on July 1st?
A. Yes. I seen her at the end of Terminal 2, right where the concourse ends and the gates open up. She was near a Hudson News kiosk. It's not a store because at the time the airport was under construction, which it still is now. So I guess the store had closed and this is just like a newspaper stand. They sell refreshments, candies, waters, sodas, that type of deal.
Q. And what was she doing at the store?
A. She was making a purchase for her and her children. I believe she was buying like candies maybe and a water or snacks.
Q. She had children with her?
A. Yes, she did.

Q. How many?
A. She had two children, a young boy and a young girl.
Q. How far is that Hudson News kiosk from the actual gate area in Terminal 2?
A. About 20 feet.
Q. And in addition to that Hudson News kiosk, are there other shops nearby?
A. Sure. There's a duty-free at the entrance of the terminal, there's a Starbucks, Burger King, and I think maybe like a Wolfgang Puck's restaurant all within that general vicinity.
Q. Did you observe Mo Yun move anywhere from that Hudson News kiosk?
A. Yes. Once she completed her purchase -- there was a long line of patrons attempting to make their purchases and it was a pretty congested area because it's a main thoroughfare -- she veered off to her right towards her gate, that general vicinity, and she started to fall off to the right. If she's facing the newsstand, she's veered off to her right, correct.
Q. And what did you do at that point?
A. We approached her.
Q. And when you say "we," who do you mean?
A. Officer Esguerra and myself.
Q. Can you describe the approach?
A. Officer Esguerra made initial contact because he was in uniform, I was not. When we walked up, I arrived about a second

or two after Esguerra had spoken to her.
Q. And before we get into what was said, was she on the move at the point that you and Officer Esguerra encountered her?
A. She was on the move with her children.
Q. And where was she headed toward?
A. Towards her gate.
Q. Were you able to hear the initial contact that Officer Esguerra had with her?
A. Briefly. Not -- not very clearly. I was, like I said, right behind, but it was very loud in the terminal.
Q. Okay. Actually, let's talk about that for a minute. Can you describe more generally the atmosphere in the gate area and the terminal that day?
A. At that time of the day, it's very, very busy. We have multiple flights departing and arriving, so it's very loud. Seating's very limited, so most -- for the most part, if you find a seat, everybody heads for the seat. All the gate areas happened to be pretty congested at the time.
Q. All right. I think I sort of interrupted you. You were talking about the initial encounter with Mo Yun. Can you please tell us what happened?
A. I think, like I said, about a second or two prior to me arriving, Officer Esguerra had approached her, identified himself. I walked up, I identified myself. I displayed my credentials to her. I asked her if she spoke English. She said

she did. I asked her her name and I asked her for some identification, which she produced her passport.

Q. Now, was there any discussion with Ms. Mo Yun about whether she was willing to talk to you or answer questions?

A. There was no question as to -- I didn't ask her if she was willing to answer any questions. I approached her, I started talking with her. She started talking back.

Q. At any point did anyone say anything to Ms. Mo about -- well, let me ask you this, as part of the identification, just walk us through, how did that go?

A. Walk up -- I walked up -- usually walk up to a passenger, inbound or outbound, identify ourselves, let them know that --

MR. LINCENBERG: Your Honor, I'm going to object. This is nonresponsive. The witness is talking about what he usually does as opposed to what he did here.

THE COURT: Objection is overruled.

You can go ahead and answer.

A. Well, we'll ask the passenger for some identification and we'll start questioning them regarding their travel, anything regarding their travel, where they went, why they're here, to that manner.

BY MR. KRICKBAUM:

Q. Now, is there a phrase or a question, you know, "Customs and Border Patrol. Can we ask you some questions?" Is that a phrase that's used?

A. Very much. But it's more implied inbound and outbound when people are entering and exiting the country.
Q. And was that phrase used by either you or Officer Esguerra when you were talking to Ms. Mo?
A. I think maybe Officer Esguerra. I didn't use that phrase.
Q. Okay. Can you then continue on and explain the initial encounter you had with Ms. Mo?
A. Once she handed over her passport, I went to her visa page, I made a positive ID of her. I was able to visually ID her, her visa and her passport. I asked her -- I believe I asked her if those were her children. She said yes. At the time she was walking further towards the gate, not in a manner to evade us, but just, I guess, trying to get the open seats that were available.
Q. So as you're having this conversation with her, looking at her passport, you're on the move?
A. We are. But it's not a great distance that we traveled.
Q. And who was the one -- did you ask her to move?
A. No. She was moving on her own freely.
Q. And where was she headed toward?
A. Towards the open seats near the gate area.
Q. Is that where she had been headed before you approached her?
A. I would believe so.
Q. She was at least headed in that same direction?
A. That is correct.

Q. Where did you end up landing?
A. We ended up, there were some open seats right against the glass wall that faces the outside of the tarmac, and there's a picture here --
Q. And we'll look at that in a minute. But in general, were you in the gate area?
A. We were in the gate area.
Q. Is that in a seating area?
A. That is correct.
Q. Now, did you instruct Ms. Mo Yun as to where she should go in the gate area?
A. Not at all. That happened to be the only seats that were available at the time.
Q. At that point in your encounter with her or at any point in your encounter with her that day, did you take her -- or I should say before she was arrested, let me be clear about that, did you take her to a corner of the airport?
A. No.
Q. Did you take her to a corner of the gate area?
A. No.
Q. And when Ms. Mo walked to the only empty seats in the gate area, were there people nearby?
A. There were people beside her, people behind her, people in front of her, and there was some people standing.
Q. How close were these people?

A. Within a foot or two. Some people were sitting right beside her, and then some people -- there's outlets on the floor so people plug their phones in and lay on the floor and sit on the floor. But the nearest person to her was sitting right next to her, and there was somebody with her back towards her.

Q. And these people that you say were sort of on all sides, these are fellow passengers?

A. That is correct.

Q. You referenced a moment ago a photo. If you would, please take a look at Government Exhibit 1, which I think is in front of you.

MR. KRICKBAUM: And, Judge, you should have a copy, I believe.

THE COURT: I do.

BY MR. KRICKBAUM:

Q. Do you recognize that photo?

A. Yes, I do.

Q. What is that?

A. That's Terminal 2 gate area.

Q. Did you take that photo?

A. I did.

Q. When did you take it?

A. Last week sometime.

Q. Is the layout of the seats in Exhibit 1 identical to the layout of the seats in that gate area on July 1st, 2014?

A. No, they're not.
Q. What's different about it?
A. The seats happen to be going sideways down and more -- there was more rows going east -- north and south at the time. I apologize if I'm --
Q. Some of the seats were facing different directions?
A. That is correct.
Q. Other than that difference, is this generally an accurate photo of the gate area in Terminal 2 where you had your encounter with Mo Yun?
A. That is correct.
MR. KRICKBAUM: Judge, I would move to admit Government Exhibit 1.
MR. LINCENBERG: No objection.
THE COURT: Government Exhibit 1 is admitted.
(Government Exhibit No. 1 was offered and received in evidence.)
BY MR. KRICKBAUM:
Q. Now, when Mo Yun walked to the empty seats in the gate area, can you see, at least in general terms, where that was as depicted in Government Exhibit 1?
A. Yes, I do.
Q. Are you able to verbally describe it?
A. Sure. In between these two pillars, that open area of glass --

Q. Yes.
A. -- towards the middle of that area.
Q. All right. Now, at some point during your conversation with Mo Yun, did FBI Agent Betten join you?
A. Yes, he did.
Q. And how long was that after you first encountered her?
A. From when we encountered her en route to this area, it must have taken us about five seconds, ten seconds to get there, and Agent Betten joined us almost instantaneously as we arrived there.
Q. All right. Have you listened to a recording of the interview of Mo Yun on July 1st?
A. Yes, I have.
Q. And is that recording an accurate recording, at least of those portions of the interview that were actually recorded?
A. Yes, they were.
Q. And have you also seen a transcript of that recording?
A. Yes, I have.
Q. And generally an accurate transcript of the recording?
A. Yes, it is.
Q. At what point does the recording start -- or maybe let me ask a better question. How long had you been speaking to Mo Yun by the time the recording began?
A. About ten seconds.
Q. So the very initial contact is missing; is that fair?

A. That is correct.
Q. Now, when Ms. Mo goes to the empty seats in the gate area, who was present from law enforcement in that immediate area?
A. Officer Esguerra, Agent Betten had joined us, and myself.
Q. And Mrs. Mo still has her two children, I assume?
A. That is correct.
Q. Now, at this point is Mo Yun sitting or is she standing?
A. She was in between. She was standing and sitting. Her daughter was -- she was holding her daughter, then her daughter wanted to get down, her daughter would get back up. Her son was sitting on the chair next to her playing with some type of video game device, and she had a bunch of her bags in one of the empty chairs.
Q. At some point after Mo Yun moved to this area of the gate, did you step away from the conversation with her?
A. Yes, I did.
Q. At what point was that?
A. I'd say about a few minutes into the interview, I stepped away for a brief second.
Q. And where did you go?
A. Back here (indicating). Going back to Exhibit 1, there's an exit door near the picture -- on the picture. I stepped over there. I had one of my -- one of my partners was there and we were trying to make arrangements.
Q. For her children?

A. That's correct.
Q. Did you tell Mo Yun that you were leaving to go make arrangements for her children?
A. No, I did not.
Q. And at some point you came back into the conversation; is that right?
A. That's correct.
Q. Was that toward the end?
A. That is correct.
Q. Were you present when Agent Betten told Mo Yun that she was under arrest?
A. I was.
Q. And that she was not free to leave?
A. I was.
Q. And you also informed her of that; is that correct?
A. I did.
Q. All right. I want to talk to you about the time before that happened. Before that happened, you may have answered this, but was Mo Yun sitting or standing or both?
A. She was doing both.
Q. And during the time that you were present, was she ever told not to stand up?
A. No, she wasn't.
Q. Was she ever told that she had to sit down?
A. No, she wasn't.

Q. Was she ever told that she had to move in any particular way?
A. No, she was not.
Q. Was she interacting with her daughter during this time?
A. Yes, she was.
Q. How?
A. As a matter of fact, her daughter was playing with her hair.
Q. Was she holding her daughter in her arms?
A. Yes, she was.
Q. Before Agent Betten told her that she was arrested, was she ever told that she couldn't interact with her daughter?
A. Not at all.
Q. She needed to put her daughter down?
A. No.
Q. She needed to be separated from her daughter?
A. No.
Q. Was she ever separated from her children in any way before Agent Betten told her that she was under arrest?
A. No, she was not.
Q. Was she ever moved to a different location of the airport before she was told she was under arrest?
A. No, she was not.
Q. Was her cell phone taken?
A. No.
Q. Was she searched?

A. No, she was not.
Q. Was she handcuffed?
A. No, she was not.
Q. Before Agent Betten told her she was under arrest, had anyone told her before that point that she was under arrest?
A. No.
Q. And was she ever told that she was not free to leave before that point?
A. No, she was not.
Q. Did she ever ask if she could leave?
A. No, she didn't.
Q. Did she ever say that she didn't want to answer any more questions?
A. No, she didn't.
Q. I want to talk to you briefly about her language ability, her English ability. How common is it for you to speak with people who do not speak English as their native language?
A. Very common. On a daily basis I speak to about 100 people, roughly, that English is not their first language.
Q. When you were interacting with Mo Yun on July 1st, for at least parts of that interaction, were you face to face with her?
A. Yes, I was.
Q. You could see her clearly?
A. Yes, I could.
Q. Did she appear to understand what was being said to her?

A. Yes, she did.
Q. Could you understand what she was saying to you?
A. Yes, I could.
Q. Did she ever say that she did not understand what was being said?
A. No, she did not.
Q. Did she ever ask for an interpreter?
A. No, she did not.
Q. Did she ever say that she doesn't speak English?
A. No, she did not.
Q. Were you involved in any way about the decision about whether or not to use an interpreter or not with her?
A. No, I wasn't.
Q. You've, I think, told us briefly about some other law enforcement that was generally around. Can you provide us with an explanation of who else was present?
A. My partner, David Gates, is a Special Agent with the FBI. He was over by the exit door. He was trying to coordinate arrangements for her children.
Q. And what was he wearing that day?
A. He was wearing a suit.
Q. Did he stand out in the gate area?
A. No, he didn't.
Q. Did he interact with Mo Yun at all before she was placed under arrest?

A. No, he did not.
THE COURT: Can you spell Gates for us?
THE WITNESS: G-a-t-e-s.
THE COURT: Just how it sounds. Thank you.
I'm sorry.
Is it working now?
Thank you. Go ahead, Mr. Krickbaum.
MR. KRICKBAUM: Thank you, Judge.
BY MR. KRICKBAUM:
Q. Officer Becerril, we talked about the point of conversation where Agent Betten told Mo Yun she was under arrest --
A. Yes.
Q. -- and she was not free to leave.
A. Yes.
Q. Can you describe her response when she was told that?
A. She was shaking her head no. She became a little -- a little frantic, very upset. She just kept saying, "No, no, no, no."
Q. Did she express surprise?
A. She seemed very surprised. Kind of disbelief.
MR. KRICKBAUM: Nothing else at this time, Your Honor.
THE COURT: Thank you, Mr. Krickbaum.
Cross-examination.
MR. LINCENBERG: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. LINCENBERG:

Q. Good morning, Officer Becerril.

A. Good morning.

Q. Officer, was July 1st the first day that you understood that there was an investigation of Ms. Yun?

A. I believe so, yes.

Q. Were you aware on June 25th, when she entered the airport, that there was a brief questioning of her?

A. Yes, I was.

Q. And when did you become aware of that?

A. Probably -- I think the day before or a few days before.

Can I give you a little background? In order for anything to take place in our CBP area, controlled area, it's an implied border, they have to send a request to me, and I send the request to my management, letting them know that we're requesting some kind of exam.

Q. And that was a few days before June 25th?

A. Correct.

Q. And did you speak with Agent Betten during that time frame?

A. No, I didn't.

Q. Okay. Did you speak with FBI Agent Gates?

A. No, I didn't.

Q. Did you speak with anybody from the FBI at that time?

A. Somebody from our office might have coordinated with me, "We

have a" -- that's called an inbound inspection -- "We have an inbound on Saturday," which we perform about 200 in a week.
Q. When did you first speak with anybody from the FBI about your participating in the interrogation of Ms. Mo?
A. I believe on the day of.
Q. And who did you speak with?
A. Agent Betten.
Q. What time was that?
A. Maybe at two hours before the event, a few hours before.
Q. And was there a meeting between any CBP officers and the FBI that morning to plan out the arrest?
A. Not so much a meeting but a quick brief.
Q. In the quick brief, was there a discussion about a plan to try to interrogate Ms. Mo prior to her arrest?
A. No. There was no plan.
Q. Was there a discussion of the fact that Ms. Mo would be arrested that day?
A. Yes, there was.
Q. You were informed that there was a warrant for her arrest that had been obtained in Iowa?
A. Yes, I was.
Q. Was there discussion about searching her luggage when it was checked in at the airport?
A. Yes, there was.
Q. And was there anybody set up to monitor her entrance into

the airport?
A. Not that I recall. I don't remember. Usually our the airline will notify us, "Hey, your passenger has arrived," or there's a passenger.
Q. Was there a discussion about whether to conduct the interrogation after she had already gone through security and checked her bags?
A. I believe so.
Q. And was the discussion that that is what the game plan would be as opposed to interrogating her when she was out near the streets?
A. Our authority for CBP doesn't include the street. We wait until they're inside of the airport.
Q. So by waiting until she was inside the airport, that was an area that you had greater authority?
A. Correct.
Q. And fair to say you had even greater authority after she had gone through security?
A. Correct.
Q. And was there a discussion of the fact that once she had gone through security there would be a greater ability of law enforcement to control the situation?
A. Yes.
Q. For example, you knew that once somebody goes through security, TSA has checked to ensure that they have no weapons,

correct?
A. Correct.
Q. And once they're through security, they've already checked their bags, correct?
A. Yes.
Q. Makes them less likely to be able to leave the airport, correct?
A. Correct.
Q. And you understand that in that situation the passenger's goal is to be able to get on the airplane, correct?
A. That is correct.
Q. And to the extent that she has gone through security solely with her two children, you understood that there would be nobody else present who could possibly assist her in dealing with a situation posed by an interrogation; is that right?
A. For me to think that through, that's not something I did.
Q. All right.
A. I didn't think about if she was traveling with anybody else or if she had a friend traveling on the flight. I didn't know that, sir.
Q. Well, you knew that you had been briefed that she would be traveling with two small children --
A. That's correct.
Q. -- correct?
A. Correct.

Q. And that she would be traveling with no one else?
A. Correct.
Q. Okay. Now, you mentioned being a supervisor of CBP at LAX. Are there Mandarin speakers in the Customs and Border Patrol group of officers at LAX?
A. I'm not 100 percent sure. We have a mixture of employees that are non-law enforcement, that are agriculture specialists, that they more or less run the gamut of languages, language skills.
Q. All right. But I believe you testified that you did not arrange to obtain the Mandarin interpreter?
A. That is correct.
Q. And but you were aware that there was a Mandarin interpreter who was being brought with you, correct?
A. That's correct.
Q. So after Ms. Mo checked in at the check-in point, was she surveilled constantly after that point?
A. Not that I'm aware of.
Q. Okay. So were you stationed inside of Terminal 2 --
A. Yes, I was.
Q. -- looking for her?
A. I was stationed near the gate area at Terminal 2.
Q. And when were you first notified that she was entering that area?
A. I was notified when I saw her. There was another team doing

her bags so they would have had prior knowledge when she arrived prior to before I did.
Q. So part of your team was on notice that she was at the airport and would soon be entering the gate area?
A. Correct.
Q. Now, inside of Terminal 2, my understanding is then that there was -- that the people present from law enforcement assigned to this matter included Agent Betten, Agent Gates, Officer Esguerra, yourself, and an interpreter; is that right?
A. Right. Correct.
Q. And anybody else inside of Terminal 2?
A. Not that I'm aware of. I think they may have a roving patrol there of the airport police, but nothing to do with us.
Q. Okay. Now, you mentioned that Officer Esguerra was in full uniform; is that correct?
A. That's correct, yes.
Q. And Officer Esguerra was the person who first approached Ms. Mo; is that correct?
A. Correct.
Q. And he had his weapon and a baton displayed --
A. Correct.
Q. -- correct?
And when you and later Agent Betten approached Ms. Mo, you indicated that you were part of the team of law enforcement officials with Officer Esguerra, correct?

A. Correct.
Q. And, in fact, you had your shirt untucked so that if there was something on your belt it would not be displayed, correct?
A. That's correct. We work more as an undercover unit at the airport.
Q. Okay. Now, I believe you indicated that you listened to the recording of the interrogation, correct?
A. Yes, I did, sir.
Q. When did you first listen to the recording of the interrogation?
A. I believe that was last week.
Q. That's the first time that you listened to it in a year?
A. Yes.
Q. And it's your testimony that the recording accurately reflected the -- that that was an accurate recording of the interrogation?
A. Yes, sir.
Q. Now, when you listened to the recording last week, who else was present with you?
A. I was listening to it by myself at the time.
Q. Now, did you also review the report prepared by FBI Agent Betten of the interrogation and arrest?
A. Yes, I did.
Q. Okay.
A. You're referring to the transcript where it lists the

recording?
Q. Yes.
A. By verbatim, yes, sir.
Q. Let me place in front of you --
MR. LINCENBERG: Your Honor, this is Exhibit A, which was filed under seal, and it begins at page 6 of 45 and runs through page 26 of 45. It is also marked in a packet of tabbed exhibits as Defense Exhibit 4.
Can I have a copy of that placed before the witness?
BY MR. LINCENBERG:
Q. Officer Becerril, if you can look at what's been marked as Defense Exhibit 4.
A. Okay.
Q. Defense Exhibit 4 is a report of interview prepared by Agent Betten, along with a transcript of the recording. Is that what you're looking at?
A. Yes, I am.
Q. And when you looked at the -- when you listened to the recording, did you also read a transcript?
A. I did.
Q. And was Defense Exhibit 4 the document that you were reading?
A. Yes, it was.
Q. And did you also read the part of Defense Exhibit 4 which is Agent Betten's description of the interview of Ms. Mo in the

gate area?
A. Yes, I did.
Q. And your testimony is that that's an accurate and complete description; is that correct?
A. Yes, sir.
Q. Now, does Defense Exhibit 4 make any mention of the fact that the first time that Ms. Mo was approached was in the walkway area outside of the Hudson News kiosk?

Let me direct your attention to the first page of that exhibit, where it says, under "Interview," "Mo was initially approached by CBP Officer Esguerra only at approximately 1210... while she was sitting in the gate area with her two children." Do you see that?
A. Yes, I do.
Q. That's, in fact, inaccurate, correct?
A. Yes.
Q. Did you point that out to Agent Betten when you read that?
A. No, I didn't.
Q. Now, if you go down through the transcript -- well, your testimony a moment ago was that Ms. Mo said that -- you asked Ms. Mo if she spoke English and she said that she did. Do you recall your testimony in that regard?
A. Uh-huh. Yes, sir.
Q. Now, if you look at the transcript, which is on page 2 of Defense Exhibit 4, and you look down near the bottom, where it

says, "Officer Becerril: You speak English -- a little bit?" Do you see that?
A. Yes, I do.
Q. And is that, in fact, what you recall saying her, not, "Do you speak English?" but, "Do you speak English -- a little bit?"
A. Yes.
MR. LINCENBERG: I'd like to play the portion of the transcript which is at 30 seconds into the transcript.
THE COURT: Go ahead.
(Recording played in open court.)
MR. CHAO: Thirty seconds?
MR. LINCENBERG: Thirty seconds.
Your Honor, may I approach the witness with a copy that's on my iPad? I think I can quickly point to the correct spot.
THE COURT: Yes.
MR. LINCENBERG: I'm going to play it from the beginning, since it's just 30 seconds into it.
Let me turn up the volume.
MR. BIRD: Gary, see if you can get a microphone.
(Recording played in open court.)
MR. LINCENBERG: Okay. I'm going to pause it there.
Your Honor, may I stand here for a moment?
THE COURT: Yes.

BY MR. LINCENBERG:
Q. Officer Becerril, you heard where you said, "You speak English -- a little bit"?
A. Yes, I did.
Q. And is my tone of voice accurately copying what yours was where there was a pause in the middle where you said, "You speak English -- a little bit?" Is that accurate?
A. Yes, that's accurate.
Q. And did you hear any response on the tape recording?
A. I heard an "Uh-huh."
Q. Okay. Let me go back and play that again.
MR. BIRD: Gary, use the -- use this.
(Recording played in open court.)
BY MR. LINCENBERG:
Q. Let me ask you again, Officer Becerril, is it your testimony that in this recording you hear Ms. Mo saying yes?
A. Yes. I don't hear her say, "Yes." I hear her say, "Uh-huh."
Q. I see.
A. And she nodded her head at the same time.
Q. So let's retrace that. First of all, your testimony on direct examination that she responded by saying "Yes" is no longer your testimony, correct; it's now your testimony that you believe that you heard her say, "Uh-huh"?
A. I did hear her say, "Uh-huh."

Q. Okay. She didn't say "Yes"; is that right?
A. No, she didn't say "Yes," not to me.
Q. Okay. And at that time you also said that she nodded her head --
A. Correct.
Q. -- in the affirmative.

Now, Officer Becerril, is it true that throughout the 20-minute or so interrogation there were frequently occasions where Ms. Mo would say, "Uhm" --

MR. LINCENBERG: Which, for the court reporter, I would say is u-h-m.

BY MR. LINCENBERG:
Q. -- or "Hmm"?
A. I don't recall exactly.
Q. When you reviewed the transcript and listened to the tape again, you saw several entrants -- entrances into the transcript where there's written comments like "Uhm"?

For example, on page 3 of the exhibit, the third line down, where it says "uh" and "uhm," and if we go down to page 5 of the exhibit and we look near the bottom, and if we look at page 6 of the exhibit, on two occasions where she's asked about what hotel she's staying at, she says, "Umm."

"How did you get to the airport?

"Umm."

And so page 7, if we look four lines down, where she

says "Umm, Michael."
A. Yes, sir.
Q. And does that refresh your memory that throughout the interview this was Ms. Mo's way of sort of responding that she's in a conversation with people in authority?
A. That is correct.
Q. Okay. And, in fact, throughout the conversation she would -- was often nodding her head as if she's trying to follow what you're saying, correct?
A. Correct.
Q. Okay. Now, let's go back for a moment. I believe you said that Officer Esguerra first approached Ms. Mo in the hallway, in the -- near the Hudson News.
A. Okay.
Q. Is that correct, between there and the gate area?
A. It's the gate area.
Q. Right.
A. They're all in the gate area. That's the gate area. She was closer to the Hudson News than she was to the -- to the door to the gate.
Q. Okay. She wasn't in the seating area at that time, correct, she was where people walk from Hudson News to the gate?
A. Correct. There's seating there also, but that's not where she ultimately sat.
Q. Okay. And initially Officer Esguerra approached her alone;

is that correct?
A. Not so much alone. I was trailing. I was right behind him.
Q. How far behind him were you?
A. About a second or two.
Q. Okay.
A. Two steps.
Q. Okay. Was it your understanding that Ms. Mo saw you as part of the team of Officer Esguerra's? What was your perception?
A. I'm not sure, but I did show her my credentials.
Q. In that central area?
A. Yes, I did.
Q. And what other discussion took place in that central area?
A. We asked her about her visa.
Q. Okay.
A. And she started gravitating toward the open seats, and we followed her.
Q. Okay. Now, sir, your testimony was that you just let her choose where she was going to sit --
A. Correct.
Q. -- right?

Now, you had, at this point, at least three of you, potentially to be followed by a translator, correct?
A. Correct.
Q. And you were looking to speak with her in a place where you could have everybody be able to focus and not be interrupted by

other passengers, correct?
A. That's very difficult to do at the gate area. So it wouldn't matter where we were at in the gate area, it's very loud and there's people right next to you, so it's not very private whatsoever, sir.
Q. Right. I understand that. But one area where you could command her full attention would be if you went near the wall, correct?
A. Not necessarily, sir.
Q. If you went near the wall, there would not be people sitting on both sides of --
A. There was somebody sitting across the way from her. Where the glass window is, there were single-sided chairs like there is now.
Q. Let's take a look at Exhibit 1 again.
MR. LINCENBERG: Your Honor, may I approach so I can follow along with the witness on this exhibit?
THE COURT: You may.
MR. LINCENBERG: Thank you.
May I go through the well, Judge?
THE COURT: Oh, yes. That's fine.
BY MR. LINCENBERG:
Q. So, Officer, I understand that the seating arrangement is different than it was then, but I believe your testimony is that when you interrogated Ms. Mo, it was between these two posts,

and I'm pointing to the left side of Exhibit 1; is that correct?
A. That's incorrect. It was between these two posts.
Q. Oh, okay. Between those two posts?
A. Right. With the open window, where the three open windows are.
Q. So is it accurate that you were standing with your back to the window?
A. I was standing with my back towards the passengers on this side.
Q. You're saying that you were facing the window?
A. My side was.
Q. Your right side was facing the window?
A. Yes.
Q. Okay. Was Ms. Mo facing the window?
A. She was standing up facing me and facing her children at different times.
Q. There were three -- at some points there were three federal officers conducting the interrogation, correct?
A. Yes.
Q. And tell us the location of all three officers vis-a-vis the window and Ms. Mo.
A. To the best of my knowledge, to my memory, I was standing with my side towards the passengers, my other side towards the glass. She was standing up. Her back was facing this

direction, which would be to the north side of the terminal. Agent Betten was right near her against the glass, and Officer Esguerra was (indicating).
Q. And were all of you in between that last row of seats and the glass?
A. There was an aisle. Officer Esguerra wasn't right on top of us when we were doing the interview. He would step away, as would I.
Q. So then let me rephrase the question.
A. Yes, sir.
Q. When you were there with Officer Esguerra and Agent Betten and Ms. Mo, were all of you in that area closest to the glass?
A. Yes. In that area generally.
Q. And so which direction was the boarding gate?
A. It was over here.
MR. LINCENBERG: And if the record could reflect that Officer Becerril has pointed to the right side of the --
THE WITNESS: Photo.
MR. LINCENBERG: -- Exhibit 1.
BY MR. LINCENBERG:
Q. And that's south?
A. Yes. That's south, sir.
Q. So you were standing between Ms. Mo and the boarding gate; is that correct?
A. At a time.

Q. Okay.
A. I also readjusted. Her kids were jumping from her -- her daughter was jumping on different seats.
Q. Right. Okay. So you were standing between her and the boarding gate. To the direction which would be east --
A. Yes.
Q. -- was this wall and window, and to the direction --
A. And a row of seats.
Q. Okay. And to the direction north, there's a wall over here; is that correct?
A. No. There's more gates here.
Q. There's more gates?
A. There's a wall, two gates, and three gates down.
Q. Okay. Okay. And behind her she was blocked by a plethora of different seats and people?
A. Yes. There's a lot of different seats in that general area.
Q. Now, going back for a moment, your testimony was that when you were in the -- what I'm going to refer to as the walkway, the area between Hudson News and most of the seating for the gates, when you're in the walkway, that you asked for her visa?
A. Asked for her passport, yes.
Q. Asked for her passport?
A. Yes.
Q. Did you ask for anything else?
A. No, I didn't.

Q. Okay. Now, did you discuss with Agent Betten a game plan for who would ask the first series of questions of Ms. Mo?
A. Us at CBP would have to initiate the conversation in our area. They're more than free to initiate if they wanted to, but since we were -- she was an outgoing passenger, we were going to take that role.
Q. And if we review the transcript, we see that the first series of questions had to do with questions relating to her visa, correct?
A. Correct.
Q. So you asked her, for example -- and if you want to look at the transcript, I'm looking at Exhibit 4, page 2. You say, "We just have some questions we need to ask you."
Do you see that?
A. Page 2, you said, sir?
Q. Page 2. Right in the middle.
A. Yes.
Q. Now, you understood from Agent Betten that he wanted to see if he could interrogate Ms. Mo before actually taking -- actually taking her into handcuffs, correct?
A. Yes.
Q. You didn't have any questions that you needed to ask her, correct?
A. Well, I need to identify her, make 100 percent confirmation that it is her identity-wise, because there was a warrant for

her and we were going to process that warrant as an outbound international passenger, so there's certain things that we need to verify.

Q. You knew at the time that she had already checked in for her flight under the name Ms. Mo, correct?

A. Correct.

Q. You understood that agents were searching luggage of Ms. Mo, correct?

A. Correct.

Q. And Agent Betten had already told you that's Ms. Mo, correct?

A. Correct.

Q. Now, is it part of the obligations of Customs and Border Patrol in verifying identification that you also have to ask somebody if they still work for a company called DBN?

A. Not necessarily.

Q. In fact, the only way that you knew she worked for DBN was because Agent Betten had given you some background information, correct?

A. Correct.

Q. And he had asked you to ask that question?

A. Correct.

Q. And when Officer Esguerra asks -- and if you look at the transcript on page 3 -- about when she worked there, that was also a question that Agent Betten asked you to ask? By "you,"

Customs and Border Patrol to ask, correct?
A. He asked me. He might have asked Officer Esguerra, but you'd have to ask him.
Q. Now let's go down to the bottom of page 3 of the transcript. Now, first of all, we see in the transcript another mention of it being difficult to hear on the recording due to background noise and interference. Do you see that?
A. Yes.
Q. Is it your testimony that throughout the interrogation there was a lot of background noise and interference that might make it difficult for one to hear or understand what the other person is saying?
A. Yes. That's a fair assumption.
Q. At times there were -- there was background noise stemming from Ms. Mo's children; is that correct?
A. Correct.
Q. At times there was background noise stemming from flight notifications --
A. Correct.
Q. -- correct?
At times there was background noise from other passengers in the area, correct?
A. Yes.
Q. Now, on the bottom of the page, it shows that you are pointing to an e-mail address. Do you see that?

A. Yes.
Q. Now, I take it you are pointing to an e-mail address on a sheet of paper; is that right?
A. I believe so.
Q. And who gave you that sheet of paper?
A. I believe Officer Esguerra had the paper. I didn't have any paperwork on me.
Q. Okay. Were you, in fact, the one pointing to the e-mail address?
A. I was.
Q. And do you know who gave Officer Esguerra the sheet of paper?
A. I would assume Agent Betten. I don't know.
Q. Fair to say that discussing with Ms. Mo a sheet with five different e-mail addresses had nothing to do with any information you would need to identify and process her?
A. No.
Q. That was something, in any event, that was Agent Betten asking CBP to do, correct?
A. Correct.
Q. And this was all being done prior to Agent Betten even being introduced, correct?
A. I believe so.
Q. So from your recollection of what is on tape and off tape --

A. Yes, sir.
Q. -- fair to say that you do not recall there ever being mention of the FBI up to that point in time, correct?
A. Correct.
Q. And up to that point in time, there was no mention that your approaching her had anything to do with a criminal investigation, correct?
A. That is correct.
Q. At any point did you hear -- well, let me ask you, at any point did you ask Ms. Mo if she would agree to consent to an interview with you?
A. No.
Q. At any point did you advise Ms. Mo that she was free to leave?
A. No.
Q. At any point did you hear any other federal officers advise Ms. Mo that she was free to leave or ask her for consent to speak with you?
A. No.
Q. Now, my understanding is that there was a recording device that Agent Betten had on his person, correct?
A. Yes, I believe so. I don't know where he had it on him.
Q. Did you have any recording device?
A. I did not.
Q. To your knowledge, did Officer Esguerra?

A. Not to my knowledge.
Q. Now, you mentioned in your testimony that a few minutes into the interrogation you stepped away.
A. Correct.
Q. So I take it that your testimony that this transcript accurately reflects the conversation is not correct insofar as the conversation that took place when you stepped away; is that correct?
A. That is correct.
Q. And if you look at the transcript, can you tell me where it was, at what point in time, you stepped away?
A. I believe it was like halfway down page 5, sir.
Q. So on page 4, Officer Esguerra introduces Agent Betten. Do you see that? Middle of the page.
A. Yes.
Q. And you introduce yourself. You say my name -- "I'm Officer Becerril." Do you see that?
A. Yes, I do.
Q. And prior to that -- well, and then on page 5 is where Agent Betten, in the middle of the page, where he takes over the questioning. Do you see that?
A. Correct. Yes.
Q. And was that the time that you stepped away?
A. I believe so. It is, sir.
Q. And can you tell us in the transcript at what point you

resumed being part of the interrogation?
A. The middle of page 6.
Q. Okay. So we see on page 6 that you're back involved in questioning. Do you see that?
A. Yes.
Q. And so you're saying that in that gap, from about the middle of page 5 to the middle of page 6, you stepped away?
A. That is correct.
Q. All right. And I'll represent to you that that constitutes approximately one minute's worth of time.
A. I stepped away twice, sir, just to make you aware.
Q. Okay. So is it consistent with your memory that on the first time you stepped away, you had stepped away for about a minute?
A. That's about correct, sir.
Q. Now, I believe you said that you had stepped away to discuss with Agent Gates arrangements for the children; is that right?
A. That's correct.
Q. Was that during this first time stepping away?
A. It was both times.
Q. Both times. Okay. Can you tell us where in the transcript was the second time that you stepped away?
A. Towards the bottom of page 7.
Q. Okay. So where is -- at what entry in the transcript are you referring to?

A. "Not a good idea?"
Q. All right. And when did you come back into the interrogation?
A. Towards the bottom of 13. I believe so.
Q. Okay. So from the bottom of page 7 to approximately the bottom of page 13, and I'll represent to you that that's approximately 11 minutes worth of time. Is that consistent with your memory?
A. I don't recall, but it sounds probably right.
Q. All right. So then the actual point at which Ms. Mo is advised that she's going to be placed under arrest is at page 13 of the transcript, correct?
A. Yes.
Q. So of the approximately -- I'm sorry. It's at the top of page 13, where Agent Betten says, "Can we talk to you away from your kids?" Do you see that?
A. Yes, I do.
Q. Okay. So of the approximately 16 minutes that is on the tape of the interrogation, fair to say that you're present for about four or five of those minutes, correct?
A. That's about accurate.
Q. And is it still your testimony that this transcript is a fair and accurate depiction of the tape-recorded interrogation that took place?
A. To the portion that I witnessed.

Q. Now, when Ms. Mo was told that she was under arrest, she fairly quickly after that said that she wanted to call a lawyer. Do you recall that?
A. I believe so. She asked me if she could call an attorney.
Q. Right. And the reason why she wasn't placed under arrest at the beginning was a topic that was discussed at your pre-planning meeting, correct, that Agent Betten said he wanted to interrogate her before telling her she was under arrest?
A. I don't recall him saying that to me personally.
Q. Do you recall it coming up in the pre-planning meeting or is it you don't recall one way or the other?
A. I just remember him saying he wanted to question her, he'd question her on the outbound.
Q. Was there a discussion that you recall at that pre-planning meeting about the fact that we want to question her before we have to give her her Miranda rights?
A. No. That was never said.
Q. But you understood that that was the case, correct?
A. No.
Q. So you thought that as you went into this interrogation, you didn't know whether Agent Betten was going to read her her Miranda rights or not?
A. No, I did not.
Q. Now, if we look at page 18 -- I'm sorry. It's page 18 of 45. I'm sorry. On the transcript it's page 13, where you

re-enter the conversation, you say, "There's a warrant for your arrest so you cannot leave." Do you see that?
A. You said on page?
Q. Page 13, near the bottom.
A. Okay.
Q. Do you recall telling Ms. Mo, "There's a warrant for your arrest so you cannot leave"?
A. Yes, I do.
Q. And is that because your understanding of the law is that when there's a warrant for somebody's arrest, they cannot leave?
A. Correct. And by the behavior that she was exhibiting. She was shaking her head no at the time, and --
Q. Right.
A. -- I didn't want her to wander off.
Q. And you repeated, "You're under arrest. You cannot leave," correct?
A. I believe so.
Q. And that warrant was in existence before the interrogation began, correct?
A. Correct.
Q. Your understanding was that Ms. Mo was not free to leave during the entire interrogation, correct?
A. Correct.
MR. LINCENBERG: Thank you, Your Honor. Nothing further.

MR. BIRD: Your Honor --

MR. LINCENBERG: May I have a moment?

THE COURT: Yes.

MR. LINCENBERG: Your Honor, just for some clarity, I'd like to have a -- prepare a little diagram with Officer Becerril. I don't see a butcher block. Can I approach and we'll use a blank piece of paper and have him draw some locations?

THE COURT: Yes.

MR. LINCENBERG: Mr. Krickbaum, if you want to join me --

MR. KRICKBAUM: Yes.

MR. LINCENBERG: -- to watch what he's doing?

What I'd like to do, and I'm going to mark this as a demonstrative exhibit, I'm just going to pick a number I know we're not going to use, Your Honor; 12, demonstrative Exhibit 12.

THE COURT: Can you pick a letter?

MR. LINCENBERG: Sure. Let's call it B because A -- Well, let's call it C because A and B were under seal submissions. Demonstrative Exhibit C. And I'm going to write "Officer Becerril Diagram of Terminal 2 Gate Area."

BY MR. LINCENBERG:

Q. Okay. Now, can you diagram for us where the Hudson News was --

A. Okay.
Q. -- where Officer Esguerra first contacted Ms. Mo, and then where the China Air gate area was and then where the interrogation took place?
A. I'm not an artist, so cut me some slack here.
Q. Maybe you can do a north, south, east, west on here.
A. Okay. We'll do that.
So this is going to be where -- you want the whole terminal or do you want --
Q. You can just do that area, and I may ask you to add some things.
A. Okay.
Q. But are you pointing where the initial contact was?
A. No. I'm pointing to where the Hudson News is.
Q. Okay.
A. So here is the corridor that you called it.
Q. Okay.
A. Here is the cash register for the Hudson News.
Q. Okay. So let's, in the corridor, write the word "Corridor."
A. These are newsstands.
Q. Okay.
A. Okay.
Q. And then where the Hudson News is, you drew a box. Maybe you could put in HN.
A. This is actually the Hudson News. This is the cash

register.
Q. Okay. So put HN, and you made a dollar sign for the cash register. Okay.
A. There's chairs immediately here. This is immediately the gate area.
Q. Okay. Can you put the gate, the China Air gate where people begin to embark on the airplane.
Okay. So you wrote "CA"?
A. That's the initials for China Air.
Q. You wrote "CA" for the gate for China Air.
A. This happened to be Air Canada or Aeromexico. They share gates.
Q. All right. So you're drawing another rectangle which has AC for Air Canada gate, okay.
A. These are those two pillars that you see here.
Q. Okay. Now, those are near the window, correct?
A. Correct.
Q. Okay. So maybe you could draw the wall that the window is.
A. The wall is about here.
Q. Okay. That's on the east side; is that correct?
A. Correct.
Q. Okay.
A. There's chairs here, here, here, and there's -- they had aisles developed between some of the chairs into the different seating areas.

Q. Sure.
A. This is a glass wall. There were chairs against the wall here. This is a larger --
Q. Okay. Wait, wait, wait. I'm going to slow you down. Can you just put GW for glass wall?
A. (Witness complied.)
Q. Now, can you put where Mo Yun was at the time of the interrogation.
A. (Witness complied.)
Q. Okay. You've done that with an X. Can you put YM for Yun Mo.
A. (Witness complied.)
Q. Now, I understand that you testified that you moved at times, but during the bulk of when you were with Ms. Mo over here, can you put down B for Becerril.
A. (Witness complied.)
Q. And when Agent Betten was present, can you put SAB.
A. (Witness complied.)
Q. And when Officer Esguerra was present --
A. He was here, he was here. He was in a few different spots.
Q. So you've put an E in two different spots to represent two of the spots --
A. Correct.
Q. -- where Officer Esguerra was?
A. And once I stepped away, when I came back, I think I may

have been on this side or this side. I --

Q. All right. And during the interrogation, for much of the interrogation when you were there, Ms. Mo's 5-year-old daughter was in her arms, correct?

A. In her arms, sitting down, jumping on the chairs, jumping on her, playing with her hair, with her mom's hair.

Q. All right. And the 12-year-old son?

A. He was sitting in a chair, one of the empty chairs.

Q. Okay.

A. And next to him were a lot of their bags from souvenirs they had purchased.

Q. So the initial contact is over here in the corridor near the Hudson News, and then the interrogation takes place here between these chairs and the glass walls; is that correct?

A. Correct. We made contact about here, because there was a line of people trying to make their purchases, and she stepped towards the gate area is when I first ID'ed her.

Q. Okay. And when you say "here," you drew an X which is just adjacent to the Hudson News cash register, correct?

A. Adjacent, in between the seating and cash register. They had passed this row of seats, but these were all taken so she couldn't sit there.

Q. All right. And is the entrance to -- is the exit of the airport --

A. The exit's south.

Q. Is south?
A. Yes.
Q. Okay. So let's just put exit.
A. (Witness complied.)
MR. LINCENBERG: Did you want to -- while we're here, if Mr. Krickbaum wants to ask my questions about that.
MR. KRICKBAUM: Just one small point. Can you just label the location of the initial encounter? I think you marked it with an X, but just label it so we remember what that is.
MR. LINCENBERG: Maybe you can put an arrow and put "initial encounter."
Okay. Thank you, Your Honor. I'm going to rip this off my pad, and I will leave it with the clerk for the moment, and if we have a break, maybe with the Court's permission if we could make copies.
THE COURT: We can do that. And are you offering demonstrative Exhibit C?
MR. LINCENBERG: We'll offer that into evidence, yes, Your Honor.
MR. KRICKBAUM: No objection.
THE COURT: Demonstrative Exhibit C is admitted.
(Defendant Mo Yun Exhibit C was offered and received in evidence.)
MR. LINCENBERG: Your Honor, we would also offer Exhibit 4.

THE COURT: Which is A? Is that what you called A?

MR. LINCENBERG: It's already A. If it's going to be unclear, we'll leave it as A.

THE COURT: Generally speaking, defense attorneys use letters, the Government uses numbers, so if we can leave it as an A, that will be easier. If it is admitted, we need to redact the identifying information from the first paragraph, which is your client's date of birth and passport number. Other than that, there doesn't appear to be anything that would need to come out.

Mr. Krickbaum, any objection to Defendant's Exhibit A?

MR. KRICKBAUM: Perhaps we want to redact the full names of Ms. Mo's two children. They're both juveniles, obviously. That's in the second paragraph, right under the heading "Interview Of" --

MR. LINCENBERG: Your Honor, my suggestion would be that we just keep it under seal. It's already in the record with the date of birth and the kids' names.

MR. KRICKBAUM: That would be fine.

THE COURT: That would be fine. So Defendant's Exhibit A is admitted under seal.

(Defendant Mo Yun Exhibit A was offered and received in evidence.)

MR. LINCENBERG: Would the Court prefer that for the balance of the hearing that I refer to that as Exhibit A or 4,

which it's been identified as Defense 4?

THE COURT: Use letters.

MR. LINCENBERG: Okay.

THE COURT: And so I'd call it Defendant's Exhibit A.

MR. LINCENBERG: Thank you, Your Honor.

THE COURT: And for purposes of our record, when counsel was speaking with the witness about the transcript page number, it's actually the report number, which is Defendant's Exhibit A, and it's the number built into the report, not the CM/ECF docket number running across the top. And page 1, which is really a cover sheet, is page 1 when they're talking about the transcript page 1 rather than the second page, which is actually where the transcript begins.

So for purposes of clarity, any time there's a page number discussion between counsel and the witness, what the reference is is to the FBI report number that's the, essentially, second line of each page.

MR. LINCENBERG: Your Honor, may I -- one other area I wanted to follow up.

THE COURT: Yes. But let's go ahead and take a break, then.

MR. LINCENBERG: Okay.

THE COURT: So let's take a 15-minute break. It's 10:52 now. If everybody can be back in your seats and ready to go at 10 after.

MR. BIRD: Your Honor, one request. Can we ask respectfully that the Court instruct the sequestered witnesses to refrain from discussing testimony during the break?

THE COURT: With the person who's already testified?

MR. BIRD: Yes. Or with anyone else.

THE COURT: Yes. That is naturally built into the witness sequestration order.

So you can certainly take a break, just don't speak with anyone else during the break.

We'll see everybody in about 15 minutes.

MR. BIRD: Thank you, Your Honor.

(Recess at 10:53 a.m. until 11:11 a.m.)

THE COURT: We are ready at this time to continue.

We're missing our witness.

MR. KRICKBAUM: We'll get him, Judge. Sorry about that.

And, Officer, you are sill under oath.

THE WITNESS: Yes.

THE COURT: And you can continue with your cross-examination, Mr. Lincenberg.

MR. LINCENBERG: Thank you, Your Honor.

BY MR. LINCENBERG:

Q. Officer Becerril, can I direct you to Exhibit A, page 14 of 21? Do you see in the middle of the page where you tell Ms. Mo -- well, let me let you get to that spot.

A. Okay.
Q. This is the time frame when you're explaining to Ms. Mo her options, correct?
A. At which point, sir?
Q. Well, I'm looking at the middle of 14. It begins on page 13 of Exhibit A.
A. So at this point --
Q. So at this point you're telling her that she's under arrest, that you're going to separate her children, that the kids are crying, she's shaking, she's crying. Do you recall that?
A. I do. Her daughter was crying. Her son was not crying.
Q. Correct. Right. And Ms. Mo herself was quite shaken at that point?
A. Correct.
Q. Okay. Now, in the middle of page 14 of Exhibit A, you tell her that we can take your kids to "children's protective service home"? Do you see that?
A. Yes.
Q. What is Child Protective Services?
A. It's a government organization that takes children that are in need of protection because their parents are unable to take care of them for whatever reason.
Q. Is that a Los Angeles County agency?
A. There's numerous ones, but that's one of them.
Q. Did you at that time have any reason to believe that Ms. Mo

would know what that county agency was?
A. No.
Q. Are you familiar with the names of any county agencies in Beijing, China?
A. No. I've never been to Beijing so I wouldn't know.
MR. LINCENBERG: Thank you, Your Honor. Nothing further.
THE COURT: Redirect, Mr. Krickbaum?
MR. KRICKBAUM: Yes, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. KRICKBAUM:
Q. Officer Becerril, I want to start by talking to you about your initial encounter with Mo Yun. I believe we established that that occurred when she was near the Hudson News kiosk; is that right?
A. Correct.
Q. And was Special Agent Betten with you when you approached Mo Yun at that point? Was he walking along with you or was where he, if you recall?
A. He was off to the side. He wasn't directly next to me.
Q. At what point did he actually join the group; "the group" meaning you, Officer Esguerra, and Mo Yun?
A. Once we got to the area where she was able to sit down, to the open seating area.
Q. In the gate?

A. Correct. Well, I know there's a little confusion. When you say the gate area, the Hudson News area, anything beyond screening is considered gate area --
Q. All right.
A. -- because that's where the gates begin.
Q. Did he join you when you were at the place where you ended up landing?
A. That is correct. That is correct.
Q. Okay. And before you approached Mo Yun, near the Hudson News, had Agent Betten pointed her out to you and identified her?
A. Not that I recall.
Q. And before you actually saw her passport, had you confirmed for certain who she was?
A. No.
Q. You looked at Government Exhibit 1, which is the photo of the seating area, part of the seating area at the gate; is that right?
A. That's correct.
Q. Was the seating area more or less or about the same as -- I'm going to have to stop my ungrammatical question and start a better one.
Was the seating area more or less crowded?
A. It was more crowded.
Q. More crowded that day?

A. Definitely more crowded.
Q. Mr. Lincenberg talked to you about parts of the transcript, and I want to go over a couple parts again and for the record. This is Defense Exhibit A. Starting on page 13 of 21, do you see near the bottom of that page, tell me if I've got this right, this is where you first tell -- you first tell Mo Yun that there's a warrant for her arrest?
The line of yours begins, "There's no choice. Right now let me tell you the options."
A. Yes.
Q. That's where you first told her there's a warrant for her arrest?
A. That's correct. That's where I first informed her.
Q. Is that the first time you heard anyone tell her that there was a warrant for her arrest?
A. I believe Agent Betten had already informed her.
Q. Fair enough. Had he talked about -- yes. And that's at the top of page 13. Do I have that right?
A. Yes.
Q. And that was the first point that anyone talked to her about being under arrest?
A. That is correct.
Q. Now, when you told her that there was a warrant for her arrest, going back towards the bottom, what was her response, according to the transcript?

A. She shook her head no. She -- she looked in disbelief to an extent.
Q. And according to the transcript, did she then say something the next line down?
A. She just kept saying, "No." After my statement? After mine?
Q. Yes.
A. She just says, "No." And I said, "Yes." I reiterated, "Yes," there is. She said, "No."
Q. All right. Now, turning to page 14, and this is the part that Mr. Lincenberg just asked you about where you referred to children's protective service home, do you see that?
A. Yes, I do.
Q. And what is Mo Yun's response in the next line?
A. "I have to be arrested?"
Q. Can you read that again?
A. "I have to be arrested?"
Q. And --
A. Oh, "I have been arrested?" I'm sorry.
Q. "I have been arrested?"
A. Yes.
Q. Now, the transcript indicates it was a question. Is that a question she asked you?
A. It appeared so. I answered her question.
Q. All right. You then replied, "Yes." Do you see that?

A. Yes.
Q. And Agent Betten says, "Your kids are going to" -- right?
A. Correct.
Q. And then what does Mo Yun say?
A. "I want to call the lawyer."
Q. And you tell her, "You can do whatever you want, but right now you're under arrest." Do you see that?
A. Yes.
Q. And what's her response?
A. "No."
Q. Then on page 15 do you see -- this is maybe a third of the way down -- Mo Yun says, "You already have this kind of," and then it's unintelligible, and she says, "You can talk with our lawyer here." Do you see that?
A. Can you repeat that question?
Q. Sure. Do you see where, it's maybe a third of the way down, maybe a little more, Mo Yun says, "You already have this kind of"?
A. I do.
Q. And your response is, "You're under arrest. You cannot leave. You're not free to leave, okay?" Do I have that right?
A. That's correct.
Q. And what does she say in response?
A. "I have to stay here, right now?"
Q. Now, was that a question from her or a statement?

A. A statement.
Q. A statement?
A. It seemed like a statement.
Q. Okay. Have you reviewed the part of the recording where that -- well, let me ask you this: Do you recall specifically that part of the recording to know whether she's asking a question or not?
A. I do not.
Q. And then on the bottom of that page, do you see the Agent Betten says, "We have a warrant that is charging you in the same conspiracy"? Do you see that?
A. I do.
Q. And what's her response?
A. "Can I go back to China and we can talk to our lawyer?"
Q. And then you reply that, "You're not leaving today." That's what you tell her, right?
A. That is correct.
Q. And what's her response on the next page, page 16?
A. "I want to come back China."
Q. What's at the top of 16?
A. Oh, I'm sorry. It goes from page -- hold on. It goes from -- what page were you on? I'm sorry.
Q. Looking at the top of 16. And if you don't have it, I can give you my copy.
A. Okay.

Q. So just to go back to the bottom of 15. You say to her, "You're not leaving today," right?
A. Correct.
Q. And what's her response on the top of 16?
A. On the top of 16 is Agent Betten's first -- the first line is Agent Betten.
Q. All right.
A. Is that what you're referring to?
Q. You may have a different version than I do. Does yours say 16 of 21 at the top?
A. 16 of 45.
Q. Ah. I'm asking you about --
A. It's not in order. Then it jumps 13 of 21 and --
Q. Okay. I think you're looking at the pagination at the very top of the page indicating it's a 45-page document; is that right?
A. Okay. I'm sorry. Yeah. I'm confused. Okay. I'm at 16 now.
Q. Okay. So just, again, to be clear, on the bottom of 15, you say, "You're not leaving today," right?
A. That's correct.
Q. And what is her response on the top of 16?
A. "Really?"
Q. And then someone tells her, "Yeah. You're going to jail," and her response is what?

A. "How can I leave now? How can I leave?"

MR. KRICKBAUM: That's all I have, Judge. Thank you.

THE COURT: Thank you, Mr. Krickbaum.

Mr. Lincenberg, any recross?

MR. LINCENBERG: Briefly. May I do it from here, Your Honor?

THE COURT: You may.

RECROSS-EXAMINATION

BY MR. LINCENBERG:

Q. If we look at the entry on Exhibit A, the top of 16, where she -- where Ms. Mo says, "Really?" the question, now, was it your understanding, your perception during this conversation that she was confused as to what was going on?

A. No.

Q. So when you say, "You're not leaving today," and she says, "Really?" to you did that express a lack of understanding of --

A. More a lack of disbelief.

Q. A lack of disbelief or a disbelief?

A. A disbelief. I apologize. Disbelief.

Q. And if we go back, for example, to where on page 13 of 21, where Mr. Krickbaum just asked you about when Ms. Mo said, "No," "No," "I have been arrested?" your response to Mr. Krickbaum at first was that that was --

A. You said 13, sir? I'm sorry.

Q. Yes. 13 of 21.

A. Okay.
Q. And I believe your response, even though the transcript has a question mark, your response was that that was a statement, correct?
A. Which line are you referring to, sir?
MR. KRICKBAUM: It's on 14.
BY MR. LINCENBERG:
Q. Okay. That one, I'm sorry, that one skips to --
MR. KRICKBAUM: Mr. Lincenberg, I believe it's page 14 of 21 that you're looking for.
MR. LINCENBERG: Yes. Thank you.
BY MR. LINCENBERG:
Q. Okay. Officer Becerril, on page 14 of 21 --
A. Okay.
Q. -- when Mr. Krickbaum asked you the question after the discussion about child protective services and the transcript says, "I have been arrested?" you said that was a statement, not a question. Do you recall your testimony?
A. I recall my testimony. I'm trying to find where it's at on this.
MR. LINCENBERG: May I approach, Your Honor?
THE COURT: You may.
A. Right here?
BY MR. LINCENBERG:
Q. That's it. Officer Becerril, isn't it true that today as

you sit here today, you really don't remember whether it was a question or a statement, correct?
A. That particular one, no.
Q. You're just reading a transcript, correct?
A. Right now I am.
Q. And when Ms. Mo says, "I have been arrested?" whether you remember it as a question or a statement, again, didn't you understand her to be expressing confusion as to what was happening?
MR. KRICKBAUM: Objection; asked and answered.
MR. LINCENBERG: This is a different point.
THE COURT: Witness can answer.
A. Repeat your question, sir.
BY MR. LINCENBERG:
Q. Isn't it true that you, as you were discussing this matter with Ms. Mo, perceived her not just to have disbelief but also confusion?
A. No, I didn't.
MR. LINCENBERG: Thank you, Your Honor.
MR. KRICKBAUM: For the Government, I have no further questions for this witness.
THE COURT: Okay. You can step -- actually, I have a couple questions. Other than your desire to verify the identity of Ms. Mo, did you actually have any immigration-related need to ask her about her visa?

THE WITNESS: No.
THE COURT: Okay. What time did her flight leave?
THE WITNESS: I don't recall at this time.
THE COURT: And the approach to her was at about 12:10, at least according to the report?
THE WITNESS: Yes.
THE COURT: All right. You can step down.
MR. LINCENBERG: Your Honor, I'm sorry, I didn't hear the answer to your question, to Your Honor's question as to what time --
THE COURT: The flight left? The answer was he didn't know.
MR. LINCENBERG: Thank you.
THE COURT: You can step down, Officer.
(Witness excused.)
THE COURT: The Government may call its next witness.
MR. KRICKBAUM: We call FBI Special Agent Mark Betten.
MARK BETTEN, GOVERNMENT'S WITNESS, SWORN
THE DEPUTY CLERK: Thank you.

DIRECT EXAMINATION

BY MR. KRICKBAUM:
Q. Good morning, sir.
A. Good morning.
Q. Please tell us your name and spell it for the court reporter.

A. It's Mark Betten, B-e-t-t-e-n.
Q. And what do you do for a living?
A. Special agent with the FBI.
Q. How long have you been an FBI agent?
A. It will be 18 years in August.
Q. And what did you do before you joined the FBI?
A. I served eight years in the U.S. military.
Q. In what service?
A. Air Force.
Q. And what were your responsibilities in that position?
A. First four years I was military police, assigned to Germany for base defense in the eighties, and then I was a prison guard for several years, and the last four years I was a JAG attorney.
Q. What are your responsibilities in your current position at the FBI?
A. In a small office such as the Des Moines office that I'm assigned, agents there do a little bit of everything. I primarily work in the counterintelligence field, though.
Q. What is your role in this specific case?
A. The primary case agent.
Q. And as part of your responsibilities as the case agent in this case, did you interview Mo Yun on July 1st of 2014?
A. Yes.
Q. Do you see Mo Yun in the courtroom today?
A. Yes.

Q. Can you please identify her?
A. Sitting at counsel table on the far -- my far right in the white sweater or blouse.
MR. KRICKBAUM: Judge, again, for the record, the witness has identified the defendant, Mo Yun.
THE COURT: It will so reflect.
BY MR. KRICKBAUM:
Q. Can you tell us where that interview took place on July 1st?
A. At the international terminal at the LAX airport.
Q. And give us a sense of what the atmosphere was in the terminal that day.
A. It was extremely busy.
Q. Crowded --
A. Yes.
Q. -- with passengers?
A. Correct.
Q. Who else participated in the interview with you?
A. Uniformed officer -- CBP uniformed Officer Gerome Esguerra, it's E-s-g-u-e-r-r-a, and supervisory CBP Officer Edward Becerril.
Q. And you mentioned Officer Esguerra was in uniform. Was he the only one uniformed that day?
A. Yes.
Q. Is he the only one whose weapon was displayed?
A. Yes.

Q. Can you describe for us how you first came to encounter the defendant at the airport that day?
A. We knew -- we had an agent down near the gate area that reported her checking in with her children and so we knew she was heading towards the gate area, and at some point, I believe it was Officer Esguerra and Officer Becerril first observed her sitting in the gate area for her departing gate with her children.
Q. When did you first encounter the defendant?
A. Shortly after they observed her and started walking over to begin talking with her. I was just a few feet behind them, probably 15, 20 feet behind Officer Becerril.
Q. And did you record the conversation with the defendant once you arrived?
A. Yes.
Q. And at what point -- how long had Officer Becerril and Officer Esguerra been with the defendant before you started recording?
A. It was just a few seconds. I would say maybe ten seconds. She was just beginning to stand up as I was getting there, so it was just a few seconds.
Q. Had you met with Officer Becerril and Officer Esguerra before the approach of Mo Yun?
A. Yes.
Q. And had you spoken to them in advance about what they were

going to say to the defendant when they encountered her in the airport?
A. Yes.
Q. And what was that?
A. The plan that we agreed to was that Officer Esguerra, the uniformed officer, would approach Ms. Yun first and simply ask if he could speak to her about some questions about her visa.
Q. Now, at the time that you actually joined Officer Esguerra and Officer Becerril in the seating area, you had a warrant for Mo Yun's arrest; is that right?
A. Yes.
Q. Did you tell her that when you approached her?
A. No, we did not.
Q. And at some point during your conversation with the defendant you talked to her about her brother's case. Do you recall that?
A. Yes.
Q. In general terms, what did you tell her?
A. I just told her I was the primary investigator on her brother's case and I had some questions I would like to ask her about it.
Q. And did you talk to her about what you were going to do with that information?
A. Yes.
Q. What did you say?

A. I explained to her that under the U.S. law that any evidence or testimony -- or basically evidence that could be helpful to him, there's an obligation for the Government, the U.S. Government, to turn that over to the defense and that it appeared that she might have some information that could potentially be helpful to his defense.
Q. And why did you tell the defendant that?
A. To try to put her at ease and feel like it was a non-threatening environment, to try to make her feel free that she could talk to me.
Q. Were you actually motivated that day by a desire to turn over helpful evidence to her brother?
A. No.
Q. Now, once you joined the conversation, does there come a point pretty quickly where you take the lead in questioning Mo Yun?
A. Yes.
Q. And at that point are you the one, at least for a significant period of time, exclusively questioning her?
A. Yes.
Q. I want to jump ahead for a moment to toward the end of your conversation with her. Did there come a point where you told the defendant that she was under arrest and that she wasn't free to leave?
A. Yes.

Q. That would have been at the end of your interview of her; is that fair?
A. Yes.
Q. And before that time, where were you located during your conversation with her?
A. Standing next to her, not directly in front of her but kind of to the side of her, I would say.
Q. Is this, again, in the seating area of the gate?
A. Yes.
Q. Did you move the defendant away from that location?
A. No, we did not.
Q. You said it was crowded in the gate area. Were there other people nearby the area where you were speaking to Mo Yun?
A. Yes. There were quite a few people nearby, and I felt a little uncomfortable talking with her about it because I assumed some of those folks could hear what we were talking about.
Q. These were the other passengers; is that right?
A. That's correct.
Q. Now, during your conversation with the defendant in the gate seating area, was she sitting or standing?
A. She was seated when officer -- the uniformed officer first approached her, but she was standing the remainder of the time.
Q. And during the time that you were with her, was she ever instructed not to -- not to stand up or that she needed to sit down?

A. No.
Q. Was she ever instructed not to move in any particular way?
A. No.
Q. During the conversation you had with her, was she interacting with her children?
A. Mostly her daughter. Very little with her son.
Q. How do you recall her interacting with her daughter?
A. Her daughter was small, and I think she was 4 or 5 years old, but she was holding her daughter during the entire duration of the interview.
Q. Holding her in her arms?
A. Yes.
Q. Before you told Mo Yun that she was going to be arrested, was she separated from her children in any way?
A. No.
Q. Did you take her cell phone away from her?
A. No.
Q. Did you search her?
A. No.
Q. Did you handcuff her?
A. No.
Q. Up to the point where we hear in the recording that you told her she was under arrest, had anyone told her she was under arrest before that?
A. No.

Q. To your knowledge, had anyone told her that she wasn't free to leave?
A. No.
Q. Did she ever ask if she could leave?
A. No.
Q. Did she indicate to you that she did not want to answer any further questions up to the point where you told her she was under arrest?
A. Well, immediately before telling her she was under arrest, when I asked her about an inconsistency in the chat about having knowledge of farmland, at that point she said maybe I should speak to her brother's lawyers, so other than that, no.
Q. Was that the first time she said anything that you interpreted as her saying she didn't want to answer any more of your questions?
A. Yes.
Q. Do you have in front of you Defense Exhibit A, the transcript? It may be behind Tab 4.
A. Yes, I do.
Q. Take a minute to look at it and tell me if you recognize it as a copy of the transcript of the recording.
A. Yes, it is.
Q. And to your knowledge, is that generally an accurate transcript of the recording that you made on July 1st?
A. Yes.

Q. I want to ask you about who else was present from law enforcement during your conversation with Mo Yun. Was there anyone else involved in the questioning of her in the seating area?
A. No.
Q. Who else was present in the general area?
A. We had two agents, I believe there was two agents from L.A. that are assigned to the airport that were in the general area, and one of those agents did ask some questions about arranging for transportation for her minor children, so he did ask some questions after she was advised that she was arrested, but those two were in the general area. And then we had a contract Mandarin linguist. And I think as far as immediate area, that was all that I'm aware of at this time that I can think of.
Q. Did any of those people have any interactions with Mo Yun before you told her she was arrested?
A. No.
Q. If you could take a look at Government Exhibit 1, it should be a photograph.
A. Okay.
Q. Do you recognize that?
A. It appears to be the gate area where we conducted the interview.
Q. Does the seating arrangement appear to be slightly different than it was on July 1st?

A. I -- I couldn't say. That's the first time I've been in that section of that airport, and so it looks similar, but I'm not sure if the seating arrangement is slightly different or not.
Q. You didn't take that photo, did you?
A. No, I have not.
Q. Have you been back to this gate or this terminal at LAX to look at this area since July 1st?
A. No.
Q. Are you able to tell in the photo of the general area where the conversation that you and Officer Becerril and Officer Esguerra had with Mo Yun, where that occurred?
A. Yes, I believe so.
Q. Okay. Are you able to describe it?
A. Yes. If you're looking at the right, far right of the picture, above the Government Exhibit sticker, the gate, the actual counter for the gate, is immediately to the right, off the picture, and we conducted the interview closer to that second round circular pole, about on the left third of the page.
Q. Is there a marker up there on the stand, Agent?
A. Yes.
Q. Can you mark with an X the general area where this conversation with Mo Yun took place.
A. Yes.
MR. LINCENBERG: Your Honor, may I briefly approach

just to see where Agent Betten --

THE COURT: Yes.

MR. KRICKBAUM: I'd like to do that too, Judge.

THE COURT: Go ahead. Just keep your voices up for the interpreters and the court reporter.

BY MR. KRICKBAUM:

Q. Now, Agent Betten, you mentioned one of the people who was present in the gate area that day was a Mandarin linguist; is that right?

A. Yes.

Q. Are you one of the people who made arrangements for her to be -- well, was it a man or a woman?

A. It was a woman.

Q. And was she in uniform or otherwise identifiable as law enforcement?

A. No.

Q. Were you one of the people who made arrangements for her to be present that day?

A. Yes.

Q. And why did you do that?

A. In the event the defendant, Ms. Yun, feigned an inability to speak English.

Q. You said feigned an inability to speak English?

A. Yes.

Q. Why do you use those words?

A. Because I knew she spoke English from a couple different sources of information.

Q. Why don't you tell us about those.

A. The first -- first one is the chats that have been brought up in this court before. Majority of those were English, very good English, quite frankly, well-written English. So that was the first source.

But just because they write English doesn't always indicate they can speak and understand it, so when she came in on her inbound trip to the United States we arranged for an inbound interview inspection of her by CBP, and during that interview one of the agents that was present reported that her English skills were very good.

Q. You mentioned the chats. Will you take a look at Government Exhibit 2.

A. Okay.

Q. Do you recognize those as excerpts of certain chats that were seized as part of the investigation in this case?

A. Yes.

Q. Now, these are not all the chats in question; is that true?

A. That's correct.

Q. Generally, what time frame did the chats that you referred to earlier that you were aware of -- what time frame did those chats occur in according to the information that you have?

A. I assume the majority were from the 2007 to 2008 time frame,

perhaps some in 2009.
Q. And what is your testimony about that? What's that based on?
A. Just my recollection of the chats off the top of my head right now. I'm not certain on those dates, but seemed most of them were from the 2007, 2008 time frame.
Q. Where did you obtain these chats from?
A. From Mo Hailong's computers that were seized from his -- either his residence or business. I believe these came from the business search, I believe.
Q. And have you identified the participants in the chats?
A. Yes.
Q. Who are they?
A. Defendant Mo Yun and her defendant brother, Mo Hailong.
Q. How have you identified them as such?
A. These chats came off his computer, and his name is reflected as being one of the parties.
Q. Meaning Hailong?
A. Correct. And then for her, for Mo Yun, she has her Mandarin characters for her name in the chats, which Mandarin linguist for the FBI said is her name.

MR. KRICKBAUM: Judge, I move to admit Government Exhibit 2.

MR. LINCENBERG: No objection. But is this multiple chats or one chat?

MR. KRICKBAUM: It's multiple chats. It's actually from your exhibit with respect to a different motion.

MR. LINCENBERG: Is there an identification of the dates of the different chats?

MR. KRICKBAUM: I think they're identified in file number -- or, excuse me, a file name, which is not listed on each individual chat.

MR. LINCENBERG: Your Honor, for purposes of this hearing, I don't object to these being admitted, I'll just explore it in cross, but it really is unclear what the purpose of a bunch of these particular chats was. There was one chat shown to Ms. Mo during the interrogation. I'm just not sure where some of these come from, but --

THE COURT: Okay. Government Exhibit 2 is admitted.

(Government Exhibit No. 2 was offered and received in evidence.)

BY MR. KRICKBAUM:

Q. Now, Agent Betten, these chats are written in English, correct?

A. Yes.

Q. Now, is that based on a translation from Mandarin or did you encounter that -- when you discovered them, were they written in English?

A. They were written in English when we found them on the computer.

Q. When you had your conversation with Mo Yun at the airport on July 1st, did she appear to understand the questions that you were asking her?
A. Yes.
Q. Could you understand what she was saying to you?
A. Yes.
Q. Did she ever tell you that she couldn't understand you?
A. No.
Q. Did she ever tell you that she doesn't speak English?
A. No.
Q. Did she ever ask to speak to you in Mandarin through an interpreter?
A. No.
Q. All right. I want to jump forward then again to the end of your interview. Can you describe for us how the interview came to a close?
A. Yes. Essentially it came to a close when we ran out of time and the plane was starting to board and we still had yet to deal with her two small children, so that forced somewhat the end of it. And also she stated at that point that she wanted to speak or she should speak to her brother's attorneys, so at that point that's when we advised her that she was under arrest and we had a warrant for her arrest and that we needed to handle her arrangements for her children.
Q. Before you told her she was under arrest, did you ask her

whether she would step away from her kids?
A. Yes.
Q. Did you direct her to step away from her kids or did you ask her?
A. No. I asked her.
Q. And did she agree to do that?
A. No, she did not.
Q. And it was at that point that you told her she was under arrest and she was not free to leave?
A. Yes.
Q. Is that the first time you told her that?
A. Yes.
Q. Is that the first time you heard anyone tell her that that day?
A. Yes.
Q. How would you describe her reaction when you told her that?
A. I would say surprise, disbelief.
MR. KRICKBAUM: Nothing further, Your Honor. Thank you.
THE COURT: Thank you, Mr. Krickbaum.
Mr. Lincenberg.
MR. LINCENBERG: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LINCENBERG:
Q. Agent Betten, let me just, if I may, start with Exhibit 2.

I believe that Mr. Krickbaum indicated that there were parts of a number of different transcripts that are part of Exhibit 2. Is that your understanding?
A. Yes.
Q. Now, did you show Ms. Mo more than one transcript during your interview of her?
A. I didn't show her any transcripts, just the one portion of the one chat.
Q. Right. Did you show her a portion of the June 2007 excerpts of a chat?
A. Yes.
Q. And that was the only one that you showed her, correct?
A. That's correct.
Q. Agent Betten, when did you first learn that Ms. Mo was going to be entering the country?
A. It would have been a day or two before she actually entered. I want to say maybe that weekend before, so not the weekend before her entry, but -- correction. I'm sorry. About, yeah, probably the weekend before her entry. So maybe that weekend of -- I don't have a calendar in front of me, but seemed like it was around the 22nd or 23rd of June.
Q. And how did you learn that?
A. Through a CBP alert. When somebody is going to travel the country, we can identify certain individuals that we want to be notified of.

Q. Did you then have discussions with CBP officers in Los Angeles?
A. I don't believe so. It would have been with our FBI agents in Los Angeles assigned to the airport.
Q. Did you cause your FBI agents in Los Angeles to -- did you ask them to put into place an effort to stop and question Ms. Mo upon her entry into the United States?
A. Yes.
Q. And what did you instruct them to do; just to verify her identification?
A. Verify her identification, her location of travel, and how long she was planning to stay in the country.

MR. LINCENBERG: Your Honor, I'd like to have marked as Exhibit D a document which is in front of Agent Betten behind Tab 1. It's behind Tab 1 of the documents that we gave to Your Honor and Government counsel, Exhibit D for identification.

BY MR. LINCENBERG:
Q. Agent Betten, do you see that in front of you?
A. Yes.
Q. And is this a 302 that you prepared in connection with the June 25th inbound inspection involving Ms. Mo?
A. Yes.
Q. Okay. And, first of all, in this 302, is there any discussion of Ms. Mo's language capabilities?
A. No, there's not.

Q. And was it your understanding that this was a brief detention to ask where she was going and to see her at least?
A. I think to call it detention would be inaccurate. It was just a routine when you come through the entry lane there, just routine questions.
Q. Is it your understanding that that would have taken place in a much quieter atmosphere than the departure gate where you interrogated her?
A. Yes.
Q. And is it your understanding that that would have been part of a process that every inbound passenger enters through and are subject to questioning?
A. Correct.
MR. LINCENBERG: And let me have marked as Exhibit E for purposes of identification a photograph which is behind Tab 2 of the materials that I have distributed to the witness, the Court and counsel.
BY MR. LINCENBERG:
Q. Do you see the photograph marked as Exhibit E?
A. Yes.
Q. And is it your understanding that this was a photograph that was taken of Ms. Mo and her daughter on June 25th upon entrance?
A. That's correct.
Q. All right. And as you look at the photograph of Ms. Mo's daughter, it's the same person that you saw on July 1st at LAX,

correct?
A. Yes.
Q. And just as in this photograph of Ms. Mo on June 25th, it appears that she's holding her daughter; is that right?
A. Correct. Correct.
MR. LINCENBERG: Your Honor, I'd ask that Exhibits D and E be admitted into evidence.
MR. KRICKBAUM: No objection.
THE COURT: Defendant's Exhibits D and E are admitted.
Would you like D held under seal because of the privacy information it contains?
MR. LINCENBERG: Yes, Your Honor. D and E.
THE COURT: E and D will both be sealed.
(Defendant Mo Yun Exhibits D and E were offered and received in evidence.)
BY MR. LINCENBERG:
Q. Now, during the week that Ms. Mo was in this country did you have her under surveillance at all?
A. I don't believe we did, no.
Q. Now, you knew where she was staying from her telling the inbound customs officer where she was staying, correct?
A. Assuming that was correct. We didn't verify if that was truthful or not.
Q. You could have gone to the -- I believe it was the Alpine Motel near Disneyland and conducted or attempted to conduct an

interview at that time, correct?
A. Yes.
Q. And that was something you considered, correct?
A. I don't believe it ever was under serious consideration.
Q. When did you first come to Los Angeles in connection with this case in and around June of 2014?
A. I think it was the day before she was scheduled to fly out on July 1st, so I believe myself and another agent flew in the day before, I believe.
Q. Was the other agent Agent Militello?
A. Yes.
Q. And he's from the Nebraska field office, which as I understand it is part of your broader office here?
A. That's correct. Our field office is Omaha. He's assigned in Des Moines with me.
Q. And were there other agents present at LAX on July 1st who assisted you?
A. Yes.
Q. I believe we heard the name Special Agent Gates. Is that correct?
A. That's correct.
Q. Was there anybody else?
A. There were a couple other agents. There would have been another FBI L.A. agent, as well as a couple agents that are assigned to the -- what we call the substantive squad, so our

counterpart squad in the L.A. field office. I believe they had two or three agents at the airport that day, but I don't believe they were in the immediate gate area during the interview, if I recall.

Q. Now, if we take a look behind Tab 11 --

MR. LINCENBERG: I'd like to have marked for identification as Exhibit F an FBI 302 prepared by Agent Militello.

A. Yes.

BY MR. LINCENBERG:

Q. And is this a report of, among other things, Mr. Militello's work at the airport in connection with Ms. Mo's arrival at LAX in checking in?

A. Yes.

MR. LINCENBERG: Your Honor, we would move Exhibit F into evidence.

MR. KRICKBAUM: No objection.

THE COURT: Exhibit F is admitted.

(Defendant Mo Yun Exhibit F was offered and received in evidence.)

BY MR. LINCENBERG:

Q. Now, Agent Betten, there are some large spaces between some of the paragraphs. To your knowledge, is there anything redacted from Exhibit F?

A. I do not believe so.

Q. And was it part of your game plan to search Ms. Mo's luggage?
A. Yes.
Q. And part of your game plan to interrogate her after she was separated from her luggage?
A. Correct. Well, assuming she checked her luggage. We didn't know if she was going to check her luggage, but we were going to question her at the gate area.
Q. You knew from her arrival that she had large bags that had been checked in, correct?
A. I don't think that -- I don't think that was communicated to me at the time. I knew she stopped at the gate area, but I'm not sure what pieces of luggage she had at the time.
Q. You knew she had been in the United States for a week with two children, correct?
A. Yes.
Q. Your understanding is that she would be checking luggage, correct?
A. Correct. Well, again, not necessarily. She could have carried it on.
Q. She could have carried three suitcases and other luggage is your testimony?
A. Yes.
Q. Okay. And were there any other agents involved in surveilling Ms. Mo while she was at LAX?

A. Other than what I've already mentioned, I don't recall additional agents or personnel being out there that day.
Q. Now, after when Ms. Mo was checking in, did Agent Militello tell you Ms. Mo's at the airport, she's checking in, and then later that she's proceeding to the gate?
A. No one told me that, but I think either Officer Becerril or perhaps Special Agent Gates got notified that she was at the gate area and then they relayed that to me.
Q. Now, Agent Betten, let me just go on a brief tangent. I believe that you were speaking with Officer Becerril in the hallway during our break; is that correct?
A. Correct.
Q. Did you speak at all about his testimony?
A. No, we did not.
Q. Now, at any point in time when Ms. Mo was in the airport, did you see her separate from her two little children?
A. I did not.
Q. And is it your understanding and your expectation that she would not be separating from her 5-year-old daughter at that time, correct?
A. I wouldn't think so.
Q. And when you formulated your plan for interrogating her, that was part of what you took into account, correct?
A. I don't think that factored in. Our main consideration with the interview was how to handle the children after we were going

to arrest her.
Q. Did you have a team meeting at the airport with other law enforcement officials --
A. Yes.
Q. -- prior to the interrogation?
A. Yes.
Q. Who was present?
A. It was myself; Agent Militello; Agent Gates; I believe Agent Nina Vicenia, V-i-c-e-n-i-a; the CBP Officer Becerril; CBP Officer Gerome Esguerra. I believe the Mandarin translator was there. She -- I don't think she sat in that portion of the room, but she was in the office. And then I also believe we had a social worker present as well from the Los Angeles Department of Human Services, if my memory is correct, but I don't think she sat in that portion of the briefing as well.
Q. Prior to the interrogation, was there ever a time when you told the Mandarin translator that you were going to attempt to conduct the interrogation in English?
A. Yes.
Q. And did you tell her at some point not to accompany you up to Ms. Mo when you approached Ms. Mo?
A. Correct.
Q. And was the Mandarin translator an Asian, ethnic Asian woman?
A. Yes.

Q. When did you hire her?
A. I think to say "hire her" would be incorrect. She's a contract linguist for the FBI so she's employed and paid by the FBI.
Q. Oh, I'm sorry. I misunderstood. So she wasn't simply contracted for this occasion; she's under contract with the FBI?
A. Correct. Many of the FBI translators are independent contractors, and she fits within that characterization.
Q. What was her name?
A. I don't -- I don't remember what it is.
Q. Now, when you were discussing with the other officers a game plan, did you tell the other officers that you intended to not read Ms. Mo her Miranda rights prior to your questioning?
A. Yes.
Q. And was there any response from the other officers in that regard?
A. No.
Q. And did you tell them why you were not going to read her her Miranda rights?
A. Yes.
Q. What did you tell them?
A. I told them that we were going to conduct a consensual interview in the gate area, make it appear, the initial contact, that it was a routine CBP essential interview, and that at no time would she be told she was under arrest, and we would

attempt to conduct it as a consensual interview.
Q. Now, let me ask you to take a look at Exhibit A, which I believe is behind your Tab 4. You may want to pull that out of the paper clip. It will be easier for you to work with it.
Look at page 2 of your 302, right under where you say, "12:10 p.m., Gate Area at LAX." Do you see that?
A. Yes.
Q. And you stated into the tape recording as the first thing that this was a consensual interview. Do you see that?
A. Yes.
Q. Now, at that point in time you had no idea whether or not Ms. Mo would consent to the interview, did you?
A. No, we did not.
Q. And, in fact, did you tell the other agents in your planning meeting that you did not intend to ask Ms. Mo for her consent to speak with you?
A. Not with me, but the plan was for the uniformed officer to ask for her permission to speak with her.
Q. To your knowledge, did the uniformed officers ask if she would consent to an interview?
A. To my knowledge, they did.
Q. Is that suggested someplace in the recording?
A. Not on the recording, it is not.
Q. So is it your understanding that this took place prior to the recording taking place?

A. Yes, although Officer Becerril did ask may we -- "We have some questions we need to ask you, okay?"
She responded, "Okay." So to that extent it is her consenting to the questions.
Q. Well, first of all, I'm asking you -- my question was in response to your answer that, "not on the recording," it was not. I asked if you were aware of whether any officer asked her for consent for an interview prior to the recording beginning. Can you answer that for me?
A. They told me afterwards that they asked her, "May we ask you some questions?" so they didn't use the terms, "Will you consent to an interview?" they used the terminology, "May we ask you some questions?" and she consented to that.
Q. This is what they told you that they said?
A. Correct.
Q. Because you didn't hear it, correct?
A. That's correct.
Q. And in the transcript where you then point to -- or Officer Becerril says, "We just have some questions we need to ask you, okay," it's your testimony that that's consent by Ms. Mo to respond to an interrogation about the facts relating to a complaint that had just been returned in Iowa?
A. No, that's not my testimony.
Q. Now, I believe that you testified that this took place in the international terminal at LAX?

A. Correct.
Q. Is that also called Bradley Terminal?
A. I don't know.
Q. All right. Are you familiar with the -- there's seven different terminals at LAX?
A. I -- I'm not familiar with how many terminals there are.
Q. In any event, this was not -- this did not take place in Terminal 1, 2 or 3, it took place in the international terminal?
A. That's my understanding.
Q. Okay.
MR. LINCENBERG: Your Honor, may I approach the witness? I want to mark as Exhibit G an exhibit I'm going to ask Agent Betten to diagram where this was initiated.
THE COURT: Yes. Go ahead.
BY MR. LINCENBERG:
Q. I have written on a sheet of paper, "Exhibit G. Agent Betten Diagram of Terminal Area."
Agent Betten -- and I'm going to get a couple of different colors. It may help. But can you first give the outline of the diagram of the terminal area as best you recall it?
I'm going to make this north, south, east and west, and --
A. That's not going to help me because I don't know which directions were there.

Q. Okay. This is the exit, I'm going to put near south. This is my representation. And I'm going to also -- if we look at Exhibit 1, which is the photograph, you can use that to assist you.

Let me first ask, this window that we're looking at in Exhibit 1, where would that be if this is the --

A. What direction is that?

Q. Well, that's east --

A. It would be over here.

Q. -- is my understanding.

Okay. So why don't you mark where the window is in a little picture and a W.

A. (Witness complied.)

Q. Now, where was Ms. Mo when she was first approached? If you can put that on the diagram.

A. This is the counter for the gate.

Q. Okay.

A. It seemed that the approximate location where she was sitting was over in this area.

Q. Okay. So am I putting a YM next to the X where Ms. Mo was sitting?

A. Yes.

Q. And where you wrote "Counter Gate," this is your understanding of where the gate was to enter the China Air flight?

A. Correct.
Q. And this is the point when you first saw Ms. Mo?
A. Yes.
Q. Okay. Now, tell me, if you can, where you were standing, and we can use a red pen and just put SAB for Special Agent Betten, where you were standing during the interrogation.
A. I would say approximately here.
Q. Now, you have listed in the diagram that you were further west of Ms. Mo; is that correct?
A. I believe that is correct, although I've been to that terminal one time, just on that one day for the however long that -- those questions lasted, so that seems correct.
Q. Isn't it true that you had your back to the window when you were facing Ms. Mo?
A. I don't -- I don't remember.
Q. Okay.
A. That's possible, but I don't specifically remember that.
Q. Okay. As best you can recall, can you put an E where Officer Esguerra was.
A. Initially, Officer Esguerra was the one talking to her, and I would say that he was -- she stood up, he was directly in front of her. And also, if I remember correctly, when she stood up it seemed that she might have been facing a window, but I'm not sure. But he was -- he was basically right next to me.
Q. Okay. So if we look at Exhibit 1, which is the photograph,

you marked an X in between two poles to the left center of the photo near the window, correct?
A. That seems the general vicinity of where the interview occurred, yes.
Q. And can you mark where -- with a B where Officer Becerril was during the interrogation?
A. He was immediately between me and Officer Esguerra.
Q. And what was behind Ms. Mo?
A. Seemed like -- seemed like the chair -- it seemed like she stood up and that row of chairs was there, and it seemed, if I remember correctly, her son was sitting immediately across from us, which leads me to believe that she might have been in these rows that are facing each other.
Q. Can you indicate on the diagram where the chairs were, where her son was sitting, where she stood up from, in black pen?
A. Seemed that she was -- yeah. I don't remember totally, but when she stood up, her son was sitting close by that I could see his face so he was obviously --
Q. So as best as you can recall, in black pen, just put down where the chairs and where the son was.
A. Where the sun was?
Q. I believe you said he was in the chairs.
A. Oh, okay. I thought you meant the shining sun.
Q. No. Ms. Mo's son.
A. Okay. Let's see. I want to say she was in a chair perhaps

here and her son might have been sitting right next to her. So they might have been in the row that was facing the window. I can't tell from Government Exhibit 1 if there's a row that faces the window. It doesn't appear in this picture there is, but she was in that general vicinity.
Q. So as best you can recall, there were seats facing the window?
A. To my recollection.
Q. And she stood up from that chair and spoke to agents who were in front of her?
A. Yes.
Q. All right. So in this location, Ms. Mo was -- and approximately how tall is Ms. Mo?
A. She's fairly short. I would say 5-5.
Q. Perhaps 5-3?
A. Okay.
Q. All right. And so she had three larger male agents who were standing in front of her at that time, correct?
A. Well, not -- not initially.
Q. Right. Not initially, but --
A. Yeah.
Q. -- during your interrogation?
A. During our questioning at some point it was just primarily me and Officer Becerril, and I'm not sure where -- I think Officer Gerome Esguerra was standing off somewhat to the side.

BETTEN - CROSS


Q. Okay. So it changed over time, but during much -- some of the interrogation there were three of you, during some of the interrogation there were two agents who were standing in front of her, correct?
A. Correct. Correct.
Q. And to one side, she had a window, correct?
A. To my recollection, right.
Q. And there was a seat behind her, correct?
A. I believe so. Because she stood up and I don't recall her moving at all.
Q. There were these posts to the side, correct?
A. Yes.
Q. And surrounded by lots of people, correct?
A. Correct. Correct.
Q. She had no place to run, correct?
A. I don't think that's correct. If she wanted to run, she could have fled on foot, which is why we had -- considered unlikely, but on the off chance she did try to do that, we had agents around the --
Q. So during the interrogation as you were standing with her, your testimony is that you took no steps whatsoever to place yourself in a position in front of her so that she could not just start running away from you; is that your testimony?
A. Yes, that is my testimony.
Q. Thank you.

MR. LINCENBERG: Your Honor, we'd offer Exhibit G into evidence.

MR. KRICKBAUM: No objection.

MR. LINCENBERG: And I'll give a copy to the clerk.

THE COURT: Defendant's Exhibit G is admitted.

(Defendant Mo Yun Exhibit G was offered and received in evidence.)

MR. LINCENBERG: Your Honor, what is the Court's schedule for break?

THE COURT: How much longer do you have?

MR. LINCENBERG: I have a certain amount to go.

THE COURT: What does that mean? Approximately how much more time?

MR. LINCENBERG: Perhaps 20 to 30 minutes.

THE COURT: Really? Keep going.

MR. LINCENBERG: Okay.

BY MR. LINCENBERG:

Q. Now, Agent Betten, during the interrogation Ms. Mo also had a 5-year-old daughter for large parts of it hanging on her, correct?

A. I would say probably the entire part of it.

Q. And it's still your testimony that you believe that there was a risk that she could leave that area and run away from the questioning; is that your testimony?

A. No, that's not my testimony. I'd consider it highly

unlikely that she would try to run away, so because of that we didn't position ourselves in any strategic location to try to prevent that. We positioned ourselves in a manner that was conducive to conducting a consensual interview, but if she wanted to try to run away, she could have. We considered that unlikely.
Q. And would you consider it also a strategic location to ensure that somebody not simply walk away or run away the fact that three agents were standing right in front of her?
A. Can you repeat that question?
Q. I'll withdraw it.
Now, at your planning meeting ahead of time, did you discuss with the other officers and agents a game plan that would involve some deception of Ms. Mo?
A. Yes.
Q. And was one of the aspects of that that you would have the CBP officers initially question Ms. Mo as to some of the questions that you wanted answered?
A. Correct.
Q. And that included, for example, questions about where she worked and when she worked there and e-mails, e-mail addresses that might be relevant to your investigation, and so forth, correct?
A. Yes.
Q. And what did you tell the other officers as to the reason

why you were going to have them ask those questions rather than yourself?

A. Just so that it would be less alarming and alerting to her and would appear more to be a routine CBP interview.

Q. Your intention was to make this appear to be a routine CBP interview as opposed to an interrogation about an espionage case, correct?

A. Correct.

Q. And then I believe you testified in response to Mr. Krickbaum's question that when you discussed asking her questions about her brother's case that that also was intended to mislead her as to your true purpose in questioning her, correct?

A. Yes.

Q. At one point you said that you felt uncomfortable questioning her because others might hear what you were speaking about. Do you recall that?

A. Yes.

Q. And one of the things you did in order to not have others hear as much was you stood fairly close to her, correct?

A. That was primarily out of necessity due to the noise out in the surrounding area.

Q. Closer than you might otherwise stand if you were speaking to somebody?

A. In a quiet environment, certainly.

Q. And was it your understanding from the interrogation that Ms. Mo also felt some discomfort for the same reason, that there were people all around who might be listening?
A. I don't -- I don't know. I couldn't speak to that. She never expressed that.
Q. Let me mark as Exhibit H and ask you to turn to Tab 10, which is the June 29th, '07, cut-and-paste text. Do you recognize what's been marked for identification as Exhibit H to be a four-page document containing text that you seized from Mo Hailong's computer?
A. Yes.
MR. LINCENBERG: Your Honor, we move Exhibit H into evidence.
MR. KRICKBAUM: No objection.
THE COURT: Defendant's Exhibit H is admitted.
(Defendant Mo Yun Exhibit H was offered and received in evidence.)
BY MR. LINCENBERG:
Q. Now, when you showed this to Ms. Mo, first of all, you told her that you have a chat here between her and her brother, correct?
A. I believe that's what I said. It would be on the recording.
Q. Right. And at the time, if you want to double-check, it's page -- it's Exhibit A at page 10 of 21 of your 302. If you look in the middle, you say "All right. We have a chat here."

Do you see that?
A. Yes.
Q. And at the time you understood that what you had here was a Word document with text which had been cut and pasted onto it, correct?
A. That was our assumption, correct.
Q. Did you tell that to Ms. Mo?
A. No.
Q. Did you show her a Mandarin translation of this to review?
A. No.
Q. Did you hand her this English language document to fully review?
A. No.
Q. Now, at one point you say to her, "You can read through that," if you would like. Do you see that? That's on page 10 of 21 of Exhibit A.
A. Yes.
Q. But you really didn't offer her an opportunity to read through it, did you?
A. I offered her as much time as she wanted to read through it.
Q. But first of all, you continued to hold the document, correct?
A. That's correct.
Q. And you said, "You can read through that. But you can see that he's talking about the problems with his wife," and so

forth. Do you see that?
A. Yes.
Q. Ms. Mo never read through this document in its entirety, correct?
A. I would assume not in that short period of time.
Q. And you describe this as a pretty long chat, correct?
A. The portion I was showing her was just one page of it, so --
Q. But on page 10 of 21, you describe the document that you're saying she can read through as being a, quote, pretty long chat, right?
A. Correct. But at that point I was just showing her the one page.
Q. Now, when you went to interrogate Ms. Mo, you had a warrant in hand, correct?
A. I believe we did. I'm not certain on the timing on that. I think it was sworn out that morning and may have had to have been faxed to the RA, but I knew we had a warrant either in hand or imminent.
Q. And prior to executing it, you wanted to interview Ms. Mo to see if you could gain evidence to help your case, correct?
A. Correct.
Q. It was something that would be beneficial that was not necessary, correct?
A. Correct.

Q. All right. And so when the -- and you understood that the warrant required the arrest to be made without unnecessary delay; is that right?
A. Yes.
Q. And this interrogation also delayed the time until you told Ms. Mo that she was under arrest, correct?
A. Yes.
Q. Do you have any handwritten notes of the events of June 25th through July 1st?
A. No, I do not.
Q. If you take a look at Exhibit A, this 302 relating to the interrogation, when did you prepare this?
A. I prepared it fairly quickly.
Q. It indicates "Date drafted," July 3 in the bottom right-hand corner.
A. Oh, correct.
Q. Where were you on July 3?
A. I was in L.A.
Q. Did you prepare this while you were in Los Angeles?
A. Yes.
Q. And did you prepare it while listening to the tape recording?
A. I started to, but you can see that the date of entry, that's the date that it was actually entered into our case file system, so during that period is when I would have worked on the entire

document.

Q. Who transcribed the audio?

A. I did.

Q. And did you do that in Los Angeles?

A. I did perhaps part of it in Los Angeles, and the majority of it was at the office, in our Des Moines office here.

Q. Now, during this interrogation there were a number of -- there was a lot of background noise which made it difficult to speak back and forth separate and apart from the people who were around you, correct?

A. Yes.

Q. That included flight announcements, for example?

A. Yes.

Q. So if I represent to you, for example, that on page 11 of 21, near the bottom of the page, that there is a flight announcement that was pretty loud in the background, would you have any reason to dispute that?

A. No.

MR. LINCENBERG: And, Your Honor, for the record, that's at minute 13, 15 seconds. Rather than play it, in the interest of time, I'm just going to point out some of these times for the record.

BY MR. LINCENBERG:

Q. There was noise from other kids in the area, correct?

A. I don't specifically remember children, but I remember noise

from other passengers.
Q. And there was noise from Ms. Mo's children, correct?
A. Her daughter. Her son just sat there and didn't say anything.
Q. Her daughter was very distracting during the interrogation; isn't that true?
A. Parts of it, she was very distracting; other parts she just was being held quietly.
Q. In fact, in parts of it, for example, on page 12 of 21, which I'll represent there's a period beginning at 13 minutes and 45 seconds on to 14 minutes and 30 seconds where there's a lot of noise from children, you note that the daughter is squeezing Ms. Mo's nostrils during part of this interview?
A. Yes.
Q. And from your perception of that, was that distracting?
A. Yes. It was distracting for her ability to speak.
Q. Was it your observation that during much of this interrogation Ms. Mo was trying to do multiple tasks at the same time, such as comforting her daughter, keeping an eye on her child, trying to understand the questions, and so forth?
A. Yes.
Q. And at lower on page 12 of 21, which I'll represent is at minute 15 and 10 seconds, child starts to whine and cry; isn't that right?
A. I'm assuming that's on the tape. I don't have it reflected

here in this summary of that interview.
Q. Agent Betten, isn't it true that part of the reason you terminated your interrogation when you did was because there was such a constant series of distractions that you decided to give up the interrogation?
A. No.
Q. What led you to stop the interrogation?
A. As I testified on direct, we were simply out of time, primarily, and the fact that she stated, once we confronted her with an inconsistency in her chat about having knowledge of the farmland in Iowa, that we should talk to her lawyers or her brother's lawyers. At that point the combination of being out of time and as she's arguably asserting the right to counsel, we decided to terminate it at that point.
Q. Now, the flight was scheduled to depart at approximately 2:10 p.m.; is that correct?
A. I'm not sure what time the flight was scheduled that day.
Q. Had the flight begun boarding?
A. I believe they had been making boarding announcements and the airport liaison agent kept motioning me that we need to wrap it up because we had some logistics to handle with the children and the unaccompanied minor issues.
Q. You completed your interrogation at about 12:30 p.m., correct?
A. I thought it was about 12:35, but it was right around that

time period, or 12:30. That's correct.
Q. Now, if you go back to --
A. I'm sorry. I'm sorry. It was 12:35.
Q. Now, if you go back to page 2 of Exhibit A, you see where Officer Becerril asks Ms. Mo if she speaks English?
A. Yes.
Q. Do you see that on the bottom it says, "You speak English -- a little bit?" Do you see that?
A. Yes.
Q. Now, did you direct Officer Becerril to use the words "a little bit"?
A. No.
Q. Now, at that time where were you?
A. I was probably standing a foot or two away from her or Officer Becerril. I don't believe that Mo Yun realized I was part of the interview at that point. I was standing close enough to hear, but I was several feet away.
Q. And it's your testimony -- is it your testimony from listening to the transcript that the words "uh-huh" are enunciated?
A. I would have to listen to it again. That's -- that's what I have down.
Q. Isn't it true that throughout the entire interrogation there were a number of times when Ms. Mo would say, "Uhm," "Uh," comments like that?

A. Yes. And, again, I think you're confusing this. I have at the beginning of this a summary of the interview. It's not a verbatim transcript, so it doesn't reflect all the noises, it doesn't reflect the uhms. It's just kind of an aid to the interview.
Q. This is not intended to be a verbatim transcript?
A. That's correct. That's correct.
Q. Okay. So I believe your answer was yes, that throughout the interview Ms. Mo was frequently making a sound sort of like "Uhm"?
A. I don't know if I'd say frequently. It was several times during the interview.
Q. Okay. And is it also true that throughout the interview you saw her sort of looking at you and nodding her head as she was trying to understand the questions?
A. Yes.
Q. Now, on page 3 of the transcript, there is some questioning by Officer Esguerra about some e-mail addresses. Do you see that?
A. Yes.
Q. And was this a handwritten sheet of e-mail addresses that you prepared?
A. The e-mail addresses were handwritten on a -- I believe it was a form printout.
Q. Did you write those out?

A. Yes.
Q. Did you keep that sheet of paper?
A. Yes. I believe it was turned over to both counsels in discovery already.
Q. Now, on the next page, page 4 of 21, you note that Ms. Mo indicated that she had used others in the past but not now. Do you see that? The third line from the top.
A. Page 4 of 21?
Q. Page 4 of 21, the third line from the top, it says, "Mo: Yeah." And then a bracket, "Agent note: Mo indicated she used the others in the past but not now." Do you see that?
A. Yes.
Q. When did she state that?
A. She did not.
Q. Okay. On page --
A. The agent notes indicates that -- I think it implies that it was verbal. She was pointing at them, shaking her head.
Q. On page 4 of 21, the same page, this is where you're introduced, correct?
A. Yes.
Q. Did you ever identify yourself as an FBI agent?
A. No.
Q. Was that intentional?
A. I don't believe it was. I think it was just oversight and that I wanted it to appear that -- I identified myself as an

agent in charge of her investigation, so I think it was implied, but I don't believe we went into it with the intent not to identify myself as FBI.
Q. So you think that it was implied that you worked for a different agency from the other agents who were standing there?
A. I don't -- I don't know what she would have thought of, but I can tell you that it was not part of the plan going in that I was not going to identify myself.
MR. LINCENBERG: Your Honor, may I have a moment?
THE COURT: Yes.
BY MR. LINCENBERG:
Q. Agent Betten, do you speak any foreign languages?
A. No.
MR. LINCENBERG: Thank you, Your Honor. Nothing further.
THE COURT: Redirect?
MR. KRICKBAUM: No, Your Honor.
THE COURT: Okay. You are excused, Agent.
(Witness excused.)
THE COURT: We are going to go ahead and take our lunch break. It is 12:35. If everybody would be back in the courtroom at 1:30, please.
Mr. Krickbaum, who is up next?
MR. KRICKBAUM: Judge, it's Officer Esguerra, and that

will be our final witness for this motion.

THE COURT: Okay.

(Recess at 12:35 p.m. until 1:34 p.m.)

AFTERNOON SESSION (1:34 p.m.)

(In open court, with Defendant Mo Yun present and Defendant Mo Hailong present via telephone.)

THE COURT: Mr. Krickbaum, you can call your next witness.

MR. KRICKBAUM: Thank you, Your Honor. The Government calls Gerome Esguerra.

GEROME ESGUERRA, GOVERNMENT'S WITNESS, SWORN

THE DEPUTY CLERK: Thank you. Please have a seat.

DIRECT EXAMINATION

BY MR. KRICKBAUM:

Q. Good afternoon, Officer.

A. Good afternoon.

Q. Can you please tell us your name and spell it for the record.

A. My name is Gerome Esguerra. First name is spelled Gerome, G-e-r-o-m-e. Last name, Esguerra, E-s-g-u-e-r-r-a.

Q. What do you do for a living, sir?

A. I'm a Customs and Border Protection officer.

Q. How long have you worked for Customs and Border Protection?

A. I got hired in December 2007. I graduated academy in April of 2008.

Q. And where are you assigned?

A. LAX.

Q. What are your general responsibilities there?

A. I'm part of the CTR team. We talk to passengers all day. We help out other agencies if they have special requests, for instance, talking to specific passengers or whatnot.
Q. What does CTR stand for?
A. It's counter-terrorism response team.
Q. I want to talk to you about July 1st of 2014. Were you working that day?
A. I believe so, yes.
Q. Were you given an assignment related to a woman named Mo Yun?
A. Yes.
Q. And what was your assignment?
A. To identify her.
Q. Did you end up identifying her that day?
A. That's correct.
Q. Did you initially see her in the terminal at LAX?
A. Yes.
Q. What terminal was that?
A. Terminal 2.
Q. Can you tell us, where was Mo Yun when you first saw her in Terminal 2?
A. We first saw her buying something from a store, and then she went to go sit down or she went to go to the benches with her kids.
Q. So she had children with her in the airport?

A. That's correct.
Q. Two children?
A. Yes.
Q. And you said she went to go to sit down. Where did she go sit down?
A. By the gates or where she was going to board the plane.
Q. The departure gate?
A. The departure gate, yes.
Q. Now, did she go sit down in the gate area before you approached her?
A. I don't remember.
Q. All right.
A. I don't remember if she was sitting down or standing up when I first approached her.
Q. Was she already in the seating area at the gate when you approached her?
A. Yes.
Q. And when you approached her, did you speak to her?
A. Yes.
Q. What did you say?
A. First we -- I asked her if I could ask her some questions, and then I identified myself and also the person that I was with, which was Ed Becerril.
Q. You identified Officer Becerril as well?
A. Yes.

Q. Or he identified himself?
A. He identified himself. I'm sorry.
Q. Okay. And when you asked Mo Yun whether you could ask her some questions, what was her response?
A. She said okay or yes.
Q. When you and Officer Becerril initially approached her, was it just the two of you or were there other people present?
A. There are other people present.
Q. Who else was there?
A. Another FBI agent. There's a couple more, but I don't quite remember.
Q. Okay. When you approached Mo Yun in the seating area, you said you didn't remember whether she was sitting or standing, but she was near the seats; is that fair to say?
A. Yes.
Q. Did you move her to another place at that point?
A. No.
Q. Did you and Officer Becerril and Agent Betten end up having a conversation with her in the gate area?
A. Yes.
Q. And did that conversation occur in the same place where you initially approached her?
A. Yes.
Q. Have you listened to a recording of a portion of that conversation in preparation for testifying today?

A. Yes.
Q. And the initial conversation that you just described where you went up and identified yourself and asked if you could ask her questions, is that part on the recording?
A. The part where I asked her if I could ask her some questions wasn't in the recording.
Q. And about approximately, if you remember, how long did you initially speak to her before that recording starts?
A. Maybe 10 seconds, 15 seconds. It's really not that long.
Q. And once the recording starts, you and Officer Becerril ask her some questions about her visa and her passport; is that true?
A. Yes.
Q. And what was your role beyond that?
A. My role was basically just to identify her --
Q. At some point did --
A. -- to initiate contact.
Q. I'm sorry?
A. Just to initiate contact.
Q. At some point did FBI Agent Betten start to question her?
A. After, afterwards.
Q. After you initially contacted her?
A. Yes.
Q. And what was your role in that questioning?
A. I asked her about her visa application and also verify some

e-mail addresses that she used.

Q. Once Agent Betten started to question her, what was your role at that point?

A. Just being the presence, really. I was just standing there.

MR. KRICKBAUM: Nothing further, Your Honor.

THE COURT: Thank you, Mr. Krickbaum.

Mr. Lincenberg.

MR. LINCENBERG: Thank you.

Your Honor, may I approach the witness?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. LINCENBERG:

Q. Officer Esguerra --

A. Yes.

Q. -- I'm showing you what has been marked as Exhibit C in our hearing today, and what we have here is a depiction of a diagram.

A. Okay.

Q. Okay. And if I told you, for example, that GW here stands for glass window, and this box, CA, is the China Air gate, this is north, south, would you say that that description is what you recall that boarding area to look like?

A. I don't remember where the actual China Air gate is.

Q. Okay. Let me show you, you have in front of you, Government Exhibit 1 --

A. Okay.
Q. -- which is a photo of the boarding area, and this, I'll represent to you, is a photo that was supplied by Officer Becerril, photo taken last week, that the seating may have changed, but in terms of the area, does that help you refresh your recall of what that area looked like?
A. Yes. But like you said, the seating is -- seems different.
Q. Right. Okay. And you recall that you interrogated Ms. Mo near the windows over here?
A. I -- I did not interrogate her.
Q. When you asked questions of Ms. Mo, was it near the window over here?
A. Yes. Around that area, yes.
Q. And when I say "over here," I'm pointing to the window area near these poles in the left of the center of the photograph; is that correct?
A. Around that area, yes.
Q. Okay. And your testimony today is that the first point that you had any contact with Ms. Mo was after she was already seated in this area?
A. I don't remember if she was sitting down or she was still standing up.
Q. Okay. But whether it was seated or standing, you're saying the first contact that you had with her was in that location; is that your testimony?

A. Around that area, yes.
Q. All right. Now, in this diagram I'll represent to you that where there's a highlight and it has an X that Officer Becerril recalled Ms. Mo first being approached right near the Hudson News here. Do you recall that?
A. I don't remember.
Q. Do you recall that you had spotted Ms. Mo as she was leaving the Hudson News and approached her as she was over near the Hudson News, which is in this concourse area?
A. I first identified her when she was at the store. I'm not sure what the name of the store was.
Q. Okay. But you recall that you first approached her in this area near the Hudson News?
A. I don't remember.
Q. Okay.
A. I don't remember.
Q. It's been a year, and --
A. Yeah.
Q. -- you speak with a lot of people in the airport --
A. Every day.
Q. -- during this past year; is that right?
A. That's correct.
Q. Okay. And so you don't recall one way or the other as we sit here today where it was that you first approached her; is that fair?

A. That's fair.
Q. Okay. You indicated that your assignment was to identify her.
A. Yes.
Q. Okay. Now, you were part of a pre -- a planning meeting prior to your walking out into the airport terminal, correct?
A. They provided me with a quick briefing.
Q. And that was where you were assigned the task of identifying her; is that right?
A. Yes.
Q. Okay. And in that meeting did Agent Betten -- was he speaking during that meeting?
A. Yes.
Q. All right. Did Agent Betten appear to be the FBI agent in charge of the investigation?
A. Yes.
Q. All right. And he was giving a briefing to you and others who were there as to your assignments when Ms. Mo would enter the airport, correct?
A. Yes.
Q. All right. And did he also tell you that in addition to identifying her, he wanted you to ask her questions about her work at a company called DBN?
A. Yes.
Q. Okay. That was separate and apart from the identification

function that you were performing, correct?
A. Yes.
Q. Now, this incident which took place a year ago, I take it you also don't have a memory of everything that was discussed, correct?
A. That's correct.
Q. When you listen to a portion of the recording that the Government provided to you, that refreshed your memory as to what was on the recording, correct?
A. A little bit.
Q. As to what was not in the recording, you don't have a specific recall of what was discussed, correct?
A. That's correct.
Q. Okay. And at that time you were armed, correct?
A. Yes.
Q. You had both a baton and a gun, correct?
A. Yes.
Q. They were plainly visible, correct?
A. Yes.
Q. And there were times when you were a part of three officers who were standing in front of Ms. Mo when you began speaking to her at one point in time, correct?
A. I don't remember.
Q. Let me break it down.
A. All right.

Q. Initially, you were the first person who approached her --
A. Yes.
Q. -- as you recall, correct?
A. Yes.
Q. Okay. And there was a time when you were joined by Agent Betten and Officer Becerril, correct?
A. Yes.
Q. The three of you were lined up in front of Ms. Mo when you were speaking to her, correct?
A. Yes.
Q. All right. And behind her were seats and two children, correct?
A. Yes.
Q. And behind you was the window, correct?
A. Yes.
Q. Officer, can you just give us a physical description for the record of your approximate height and weight?
A. 5-9, 165.
Q. Did you ever tell Ms. Mo that she was free to leave?
A. No.
Q. Did you ever tell her that it was up to Ms. Mo whether or not she wanted to speak with you, that that was completely her choice?
A. I don't remember.
MR. LINCENBERG: Nothing further, Your Honor.

THE COURT: Redirect?
MR. KRICKBAUM: No, Your Honor.
THE COURT: Okay. Thank you, Officer. You may step down.
(Witness excused.)
THE COURT: Mr. Krickbaum, you may call your next witness.
MR. GRIESS: Your Honor, we're going to move to the traffic stop portion at this time, if that's okay.
THE COURT: Yes. Thank you.
MR. GRIESS: The Government is going to call Deputy Robert Burnett.
THE DEPUTY CLERK: Please raise your right hand.
ROBERT DALE BURNETT, GOVERNMENT'S WITNESS, SWORN
THE DEPUTY CLERK: Thank you. Please have a seat.

DIRECT EXAMINATION

BY MR. GRIESS:
Q. Please state your name, spell your last name for the record.
A. Robert Dale Burnett, B-u-r-n-e-t-t.
Q. Are you employed?
A. Yes.
Q. How so?
A. With the Polk County Sheriff's Office.
Q. How long have you been with Polk County?
A. Eighteen years.

Q. How are you currently assigned within Polk County?
A. I'm assigned to patrol division on the day shift.
Q. How long have you had that particular role?
A. On patrol?
Q. Yes.
A. Ten years.
Q. Have you had other roles within the sheriff's office?
A. Yes.
Q. What were those?
A. I was a civilian jailer to start off with, and then I became a deputy, and then I worked at the jail for a few more years, and then I went to full-time SWAT team for three years and then to patrol.
Q. I want to take you back to September 6, 2011. Were you working as a patrol officer at that time?
A. Yes, sir.
Q. Do you recall being on patrol the morning of September 6, 2011, at 9:50 a.m.?
A. Yes, sir.
Q. Do you recall being dispatched to a location within Polk County, Iowa?
A. I don't know if I was actually dispatched to it, but I heard a trip come out around the area that I was working.
Q. What does that mean?
A. The trip was I was assigned to the city of Bondurant. We

contract law enforcement through them, and a trip came out that was just outside of my city, and since I was close, I went to it.
Q. When you say a trip, what exactly do you mean?
A. Another deputy got a call for a service, and that's what we call a trip, you get sent to do something, and it was close to my area so I went.
Q. Is a trip another way to say dispatched or directed to go to a certain area for a complaint?
A. Yes, sir.
MR. GRIESS: Your Honor, may I approach?
THE COURT: You may.
BY MR. GRIESS:
Q. I'm going to hand you what's been marked as Government Exhibit Nos. 3 and 4. Take a look at 3 first and tell me if you know what that is.
A. Looks like a trip log from our dispatch center.
Q. Would you have had access to any of the information in Exhibit 3 at the time you were sent on the trip or the time that you went to the trip?
A. Yes. I would have had everything on here.
Q. Is that something that shows up on the monitors in your vehicle?
A. Yeah. We have mobile data units, laptops in our cars that tell us all the information on the trip that we're going to.

Q. So specifically with this trip on September 6th, 2011, at approximately 9:50 a.m., what were you told by dispatch?
A. They gave the address, Southeast -- or Northeast 70th Ave and Northeast 96th Street, basically, south of here, walking westbound, there's an Asian male wearing a suit walking through the cornfield. He was dropped off here -- he was dropped off there. And this is the secondhand call from an Altoona police officer, and it gave a license plate number.
Q. License plate number of what?
A. The vehicle that dropped him off.
Q. What was that license plate number?
A. Looks like 71 -- actually, I can't read it.
Q. Do you need reading glasses or it --
A. Yeah. And I don't have them with me.
Q. It's kind of small.
A. Yeah. 715 William Young Boy, maybe.
Q. Thank you. Thank you.
A. And I think they gave us a description of the vehicle that dropped him off too at the time, but --
Q. Okay.
A. Because they usually run the plate if they get a license plate and then they'll give a description of the vehicle, our dispatch center will.
Q. And again, this is the area of Northeast 70th Avenue and Northeast 96th Street?

A. Yes, sir.
Q. Is that in Polk County Iowa?
A. Yes, sir.
Q. Take a look at Government Exhibit No. 4, if you would, please. What is that?
A. It's a picture of that intersection with farmhouse and farm field.
Q. Did you go to that intersection?
A. Yes.
MR. GRIESS: Your Honor, may I approach one more time?
THE COURT: You may.
BY MR. GRIESS:
Q. I want to have you -- you indicated you were coming from Bondurant?
A. Yes.
Q. Could you mark the direction with an X of where you were coming from, the direction of Bondurant.
A. This one here.
Q. So you were eastbound on Northeast 70th Avenue; is that accurate?
A. Yes.
Q. Okay. What did you did once you arrived at the intersection of Northeast 70th Avenue and Northeast 96th Street?
A. Started driving towards the farmhouse.
Q. Southbound?

A. Yes.
Q. Okay. And once you arrived at the farmhouse, what did you see?
A. I noted somebody standing out there in the farm field.
Q. Could you make an X in the approximate location where you saw, observed someone standing?
A. It was right about down there.
Q. Okay. Approximately how many yards off of the road, if you know?
A. Fifty, seventy-five. I don't know exactly how far it is off the roadway.
Q. Thank you. Sorry. You can speak into the microphone.
So once you arrived there, did you -- what did you do?
A. Right about here --
Q. You're indicating at, it looks like, the edge of --
A. Right off the grassy area.
Q. Okay.
A. There's like a farm driveway that drives back.
Q. Is that a paved driveway or just a dirt road?
A. It was grass. I mean, there's a culvert in the ground so you didn't have to go through the ditch, but it was kind of a farm entrance.
Q. And you marked an X where you indicated you saw the individual standing. What did you notice about the individual at that time?

A. That he fit the description of the call that went out that he was wearing a suit and tie.
Q. Okay. Did you drive out to him --
A. Yes.
Q. -- on that road?
A. Yes, I did.
Q. Draw a line indicating, if you would, how you went out to the road on Exhibit 4 or out to the individual.
A. Straight west and then kind of curved around, started heading towards him.
Q. Did you get out of your vehicle and make contact with him at that time?
A. I don't know if I actually talked to him. Another deputy was with me at the time in his car, and he actually got out and started talking to the person.
Q. Okay. I think that's all the questions I have for the exhibit. Thank you.
As you got closer to the individual as you indicated on the map, did you notice anything additional about him?
A. That he was an Asian male, just like the trip said, that he was dressed up in a suit and tie and walking in the cornfield or right on the edge of it.
Q. Who was with you? You indicated there was another deputy that was there. Who was that?
A. Deputy Dale Petersen.

Q. Is it Peters or Petersen?
A. Petersen.
Q. Petersen? Is Deputy Petersen now retired?
A. Yes.
THE COURT: Is Petersen spelled with an o-n or an e-n?
Oh, I didn't mean that to be --
THE WITNESS: I think e-n. P-e-t-e-r-s-e-n, I think.
THE COURT: I didn't mean to trick you there.
THE WITNESS: I'm really not sure.
THE COURT: Sorry, Mr. Griess. Go ahead.
MR. GRIESS: Thank you.
BY MR. GRIESS:
Q. What, if anything, was growing in that field at the time?
A. Corn was growing in the back part of the field, and I think it was soybeans that were in the front part.
Q. When you say the front part, are you referring to the part that borders the road?
A. Yes.
Q. And where was the man you observed in the field in relationship to where the corn was?
A. Like in the first row or two of the corn.
Q. Now, when you arrived was there any vehicle in the area that would have been associated with this individual?
A. I didn't see a vehicle.
Q. Now, in addition to you and Deputy Petersen, were there any

other deputies that were dispatched to the area that you're aware of?
A. Yes. Deputy Cass Bollman.
Q. Did you observe Deputy Bollman arrive at the scene?
A. I don't know if I actually seen him. I heard him on the radio.
Q. What did you hear when Deputy Bollman arrived?
A. He was going out on a traffic stop.
Q. Did you know anything about that traffic stop, what it related to?
A. I assumed the trip we were on.
Q. Did you or Deputy Bollman identify the person out in the field who you had contact with?
A. Deputy Bollman did.
Q. During the time you've been with Polk County, how many years have you been assigned to patrol in the county areas as opposed to Bondurant, approximately, or cities?
A. Well, we get moved around a lot, so, I mean, you can be working a contract one day, like a Bondurant, and then you could be regular patrol the next day. So probably eight years out of the ten I've been on patrol, I've been not actually assigned to the contract for the city.
Q. Is a significant amount of the area that you patrol rural or surrounded by farm fields?
A. Yes.

Q. Is it common for you to see individuals in the middle of these farm fields?
A. Not just walking around in the middle of a cornfield or in the fields, no.
Q. What do you mean by that?
A. You'll see them out there on the tractors and farm equipment, but not just walking around and...
Q. Is it common to see individuals wearing a suit and tie in these farm fields?
A. No.
Q. Have you ever seen that before or since?
A. No.
MR. GRIESS: That's all the questions I have.
THE COURT: Thank you, Mr. Griess.
Mr. Lincenberg, is this one you as well?
MR. LINCENBERG: I have no questions.
THE COURT: Oh, I'm sorry. Mr. Weinhardt. Switched sides there.
MR. WEINHARDT: Thank you, Your Honor.
THE COURT: Just one moment before you begin.
Mr. Griess, did you intend to introduce 3 and 4?
MR. GRIESS: I do, Your Honor. Move 3 and 4.
THE COURT: Any objections, Mr. Weinhardt?
MR. WEINHARDT: No objection, Your Honor.
THE COURT: Government Exhibits 3 and 4 will admitted.

(Government Exhibit Nos. 3 and 4 were offered and received in evidence.)

THE COURT: Go ahead, Mr. Weinhardt.

CROSS-EXAMINATION

BY MR. WEINHARDT:

Q. Deputy Burnett, did you prepare any report based on your activities that day?

A. No, sir.

Q. Have you reviewed any documents to try to refresh your recollection of what happened that day, other than Exhibits 3 and 4 that have already been shown to you?

A. I seen Deputy Bollman's report. Other than that, nothing.

Q. Let me show that to you, if you may.

MR. WEINHARDT: If I may approach the witness, Your Honor.

THE COURT: Yes.

BY MR. WEINHARDT:

Q. I'm showing you what's been marked as Defense Exhibit A. Tell me if you recognize that.

A. That's the report, the field interrogation report that Deputy Bollman filled out.

Q. And when was the first time that you saw that report? Was it back at around the time this event happened or was it much more recently?

A. More recent.

Q. Other than this report and Exhibits 3 and 4, is there anything else that you have looked at to try to refresh your recollections about the events of that day?
A. No, sir.
Q. Did you take any notes or anything like that based upon your contacts that day?
A. No, sir.
Q. Does your vehicle or -- strike that.
At the time was your vehicle equipped with a dashboard camera?
A. Yes.
Q. Was the dashboard camera operative at the time of these events?
A. No. It was operable, but I didn't turn it on. It turns on when you activate your lights.
Q. Other than Exhibit 3, is there any other record of dispatch communications between you and the dispatcher regarding when you responded, what you did, any of that sort of thing?
A. No, I don't believe so.
Q. Before this incident or on that day, were you aware of any federal law enforcement investigation that had anything to do with the people you contacted that day?
A. No.
Q. Now, you received this trip, this thing in Government's Exhibit No. 3; is that correct?

A. Yeah. Like I said, I don't -- I never got tripped to it. I just happened to be close proximity of it, so I pulled it up on my screen and went to it.

Q. Would it be somewhat like a cab driver or something hearing that a fare is in a certain place and you're one of the cabs in the vicinity and so you decide to go there? In other words, nobody commanded you to go there; you volunteered?

A. Yes.

Q. And you understood that there was a secondhand report made from an Altoona police officer; is that right?

A. Yeah. Because it was written in the -- it showed it on my screen, who called it in.

Q. And let me ask a little bit more about Exhibit 3. Did you also hear anything said over the radio about this or did you just see what we see visually in Exhibit 3?

A. No. It was dispatched over the radio.

Q. Do you recall what was said over the radio?

A. Just what it says here under the "Remarks."

Q. Okay.

A. Same thing I said earlier.

MR. WEINHARDT: Kyle, could we have the ELMO?

THE DEPUTY CLERK: Sure.

BY MR. WEINHARDT:

Q. Do you see in front of you on the screen the "Remarks" section of Exhibit 3?

A. Yes.
Q. And so you see there where it says, "South of here walking westbound there is a Asian," Asian misspelled, "male wearing a suit walking through the farm field. He was dropped off here. This is a secondhand call from AL257." Is that right?
A. Yes.
Q. So that's all the information that you had available to you when you went to the scene, correct?
A. Well, they gave the intersection, 70th and 96th Street, and I think they gave us the plate number too of the vehicle that dropped him off.
Q. That would be the 715 WYB NB?
A. Yes.
Q. What does the NB tell you at the end of that plate number?
A. I'm not sure what that meant. Either northbound or he was driving northbound from there.
Q. What does the AL257 tell you with regard to the secondhand call?
A. Altoona 257. It's an Altoona police officer's radio number.
Q. Do you know who AL257 is?
A. Yes.
Q. Who is AL257?
A. Melanie Tufts.
Q. Did you know at the time who AL257 was as you were responding to this trip or did you find that out subsequently?

A. No. I knew who it was when we got the trip.
Q. Is the location at 70th and 96th anywhere close to Altoona?
A. Yes.
Q. Is it within the patrol radius of an Altoona police officer?
A. No.
Q. So would the officer, AL257, have been responding to something that occurred on duty or off duty?
A. I think she was working. I think somebody called her and told her about it.
Q. All right. Is that ---
THE COURT: I'm sorry. Could you hold on just a minute.
Could you spell Melanie Tufts' last name for us? I know you love these questions.
THE WITNESS: Tufts is T-u-f-t-s.
THE COURT: Thank you.
Go ahead, Mr. Weinhardt.
MR. WEINHARDT: Thank you, Your Honor.
BY MR. WEINHARDT:
Q. So is that what secondhand means to you, that someone made a report to Officer Tufts and then Officer Tufts made a report to your dispatcher?
A. Yes.
Q. All right. Do you know anything about the person who made the report to Officer Tufts?

A. No.
Q. Do you know anything about how that person acquired any of the information that is in this "Remarks" section of the trip log?
A. No.
Q. When you got to the field, you saw this individual standing in the middle of the field; is that right?
A. Yeah. Yes.
MR. WEINHARDT: And, Your Honor, may I retrieve the Exhibit 4 so I can put the one that's marked on the ELMO?
THE COURT: You may.
BY MR. WEINHARDT:
Q. So if I understand correctly, Deputy, you were on 70th Avenue, up in this direction where my finger is receding to; in other words, up here, right?
A. Yes.
Q. And then you drive along 96th Street to this location and you see the individual dressed in a suit and tie where this X is?
A. Yes.
Q. Then you drive to where there is a dirt road, cross this culvert, although there's a built-up area so you don't have to drive down into the culvert, right?
A. Yes, sir.
Q. Okay. So you cross the culvert, drive along this dirt road,

and then you turn right and go out into the field to where the individual is?
A. Yes.
Q. Now, this is in early September; is that correct?
A. Yes.
Q. And the place where you've marked with the X, is that where you say corn was growing?
A. Yes. It was kind of divided. From the grass to the road is where I think the soybeans were at, and then from the grass, it would be west of there was where the corn was at.
Q. Well, I guess here's what I'm getting at: By September 6th, if he's standing in the field of growing corn, the corn is up this high on him or higher, isn't it?
A. I don't know. He was in the first row or two, so I could see him.
Q. Well, was he standing in growing corn or was he standing in an area that had already been harvested?
A. I don't remember.
Q. As you drove along the road, were you able to see him as you drove along 96th Street here?
A. Yes.
Q. So you looked -- the way that my pen is pointing, you looked to the right as you were driving along and you saw this individual standing there?
A. Yes.

Q. So he's not concealed by cornstalks?
A. No, he's not concealed.
Q. So this area between the X and 96th Street, is that five, six, seven feet high in growing corn or is that mowed to the ground?
A. No. I believe that was soybeans. There wasn't corn in that part of the field.
Q. And was it corn right at the beginning where the X is; is that your recollection?
A. Yes.
Q. All right. This was at about 9:50 in the morning; is that correct?
A. Yes.
Q. So do you remember the weather conditions?
A. No.
Q. Broad daylight, though, right?
A. Yes.
Q. This man is open and obvious in the field, he can be seen from a long way away?
A. Yes.
Q. And he's in a suit and tie?
A. Yes.
Q. Have you ever seen anybody in a suit and tie before in a field?
A. No.

Q. The individual that you saw in the field in the suit and tie, I believe you told us that either you or Deputy Peterson had a conversation with him but you're not sure who; is that correct?
A. Deputy Peterson talked to him.
Q. Did you overhear the conversation?
A. Part of it.
Q. Did the man speak good English?
A. Truthfully, the only part I remember is Deputy Petersen was telling him he knew other farmers in the area if he wanted to go look at more cornfields.
Q. All right. And did Deputy Petersen offer any particular names or phone numbers of farmers that this individual could contact?
A. He threw out a couple names, and I couldn't tell you who they were at the time.
Q. Did he hand out any phone numbers?
A. I don't know. When he started talking to him, I decided I should probably get back to the area I was assigned to and I left.
Q. You didn't think that Deputy Petersen was in any danger or that this was an incident that required two deputies to handle?
A. Well, there was already two deputies assigned to it, so I thought he would be fine if I left.
Q. All right. When you saw the individual in the field, was he

carrying anything with him?
A. I don't think so.
Q. No briefcase, no binoculars, nothing like that?
A. I don't think so.
Q. Did he have any object in his hands or sticking out of his pockets or anything like that?
A. Not that I remember.
Q. Was he in the process, that you could see, of taking anything from the field?
A. Not that I seen.
Q. Was he doing anything to damage anything in the field?
A. Not that I seen or I was aware of.
Q. Did you see him do anything that suggested he was placing foreign objects in the field?
A. No.
Q. Was he notified in some way by the landowner that he either couldn't come onto that field or that he was required to leave?
A. No.
Q. Was he doing anything to interfere with the conduct of farming in that field?
A. No.
Q. Was he doing anything illegal at all?
A. Besides trespassing, no.
Q. Well, let's set aside trespassing for the moment because we're going to get into a legal discussion about what that

means.
A. Okay.
Q. Other than trespassing, was he doing anything illegal at all?
A. Not that I could see.
Q. You left the scene before the incident was concluded so you didn't know, at least that day, how it wound up; is that correct?
A. Correct.
Q. As you now look back at this, are you aware of whether anyone was placed under arrest that day?
A. I don't believe anybody was arrested.
Q. And no one was issued a citation?
A. I don't believe so.
Q. No one was given any kind of written warnings of any sort?
A. I don't believe so.
MR. WEINHARDT: If I may have a moment, Your Honor, I may be finished.
THE COURT: Yes.
BY MR. WEINHARDT:
Q. You told us that Deputy Bollman was involved in stopping a vehicle that was connected to this incident. You didn't witness any part of that; is that right?
A. I drove by it on the way back to Bondurant, but he was fine so I didn't stop.

MR. WEINHARDT: Okay. Nothing further, Your Honor. Thank you very much.

THE COURT: Thank you.

Mr. Griess, any redirect?

MR. GRIESS: No.

THE COURT: Thank you, Officer.

(Witness excused.)

THE COURT: Mr. Weinhardt, would you like to admit Defendant's Exhibit A?

MR. WEINHARDT: I would, Your Honor. Thank you very much.

MR. GRIESS: Your Honor, before that, if I could just have some clarification. It looks like this, Defendant's Exhibit A, page 1, is actually page 1 of the field interrogation report. Pages 2 and 3 are actually a separate report. So I would just ask that page 2 of the interrogation report be inserted and then I can clarify beyond that with my next witness what exactly they are.

THE COURT: Does that make sense?

MR. WEINHARDT: It's the way we got it, and so I've admitted what I have. If they can clear it up or supplement, because it does oddly stop in the middle, we'd appreciate that.

THE COURT: Okay. Then we'll admit Defendant's Exhibit A, and we'll call it MH-A, probably, just for purposes of our record to keep it separate from Ms. Yun's A that's

already there.

(Defendant Mo Hailong Exhibit A was offered and received in evidence.)

THE COURT: Mr. Griess, you may call your next witness.

MR. GRIESS: Thank you, Your Honor. The Government calls Deputy Cass Bowman or Bollman, excuse me.

CASS BOLLMAN, GOVERNMENT'S WITNESS, SWORN

THE DEPUTY CLERK: Thank you. Please have a seat.

DIRECT EXAMINATION

BY MR. GRIESS:

Q. Please state your full name, spell your last name for the record.

A. Cass Bollman, B-o-l-l-m-a-n.

Q. Are you employed?

A. I am.

Q. How so?

A. Detective with the Polk County Sheriff's Office.

Q. How long have you been a detective with the Polk County Sheriff's Office?

A. About eight months.

Q. How long have you been with the Polk County Sheriff's Office in total?

A. Twenty-three years.

Q. Have you been assigned in various capacities, obviously?

A. I have.
Q. Can you describe what those are?
A. I've worked in the jail, patrol division, obviously detective, field training officer, hostage negotiator, patrol rifle team.
Q. So you've worn a number of different hats in your time at Polk County?
A. I have.
Q. I'm going to direct your attention to September 6, 2011. Do you recall for at least part of the time that included that date working as a patrol officer?
A. Yes.
Q. And specifically on that day, September 6, 2011, do you recall in the morning hours, particularly 9:50 a.m. or approximately 9:50 a.m., working as patrol in a certain area of Polk County?
A. I do.
Q. Do you recall being dispatched to anywhere in particular on that date and time?
A. Yes. I was dispatched to the -- looks like the 6900 block of Northeast 96th Street on a suspicious subject.
MR. GRIESS: Your Honor, may I approach?
THE COURT: You may.
BY MR. GRIESS:
Q. Actually, is Government Exhibit No. 3 in front of you there?

A. Yes.
Q. Take a look at that and tell me if you know what this is.
A. It looks like a print-off from our dispatch system.
Q. Would you have had access to this information, physical access to this information, on the date in question?
A. Yes.
Q. It would have shown up on the monitors that are contained in the squad cars?
A. Correct.
Q. So what specifically were you advised to do on this date and time?
A. The "Remarks" state south of the given location, walking westbound, there is an Asian male wearing a suit walking through the farm field. He was dropped off here, and this was secondhand from an Altoona -- off-duty Altoona Police Officer.
Q. In addition to that, there was a location given, 70th/96th. Is that an intersection?
A. It is.
Q. And then there's a notation, "LIC/715WYB." Do you know what that is?
A. That's license plate, probably.
Q. And then there's an NB. Do you know what that pertains to?
A. I would assume maybe a Nebraska license plate.
Q. Okay. Based upon this information, did you go to this location?

A. Yes.
Q. What, if anything, did you see when you arrived?
A. When I arrived, there was a male out in the farm field.
Q. Take a look --
MR. GRIESS: Your Honor, may I approach?
THE COURT: Yes.
MR. WEINHARDT: If I may approach also, Your Honor, if we're going to make --
THE COURT: Yes.
BY MR. GRIESS:
Q. Show you what's been marked as 4-1. Do you recognize that?
A. I do.
Q. What is that?
A. That would be a overlook of the farm field where the subject was.
Q. Do you recall what direction you arrived at the location from or where you came from?
A. I would have either come from across 70th or down 96th Street. I do not recall exactly which way.
Q. So if I understand correctly, you came from either the west or the south?
A. Correct.
Q. Do you recall where you were when you observed the individual on the farm field?
A. I would have been on 96th Street, right in here.

Q. Okay. Why don't you draw an X where it was you were when you first saw the person in the farm field approximately.

A. Approximately, maybe here.

THE COURT: Stop. Sorry. Stop. The interpretation equipment has failed.

MR. BIRD: Thank you, Your Honor.

THE COURT: It appears to be working again.

Ms. Hu, do we need to get you more batteries? I've seen you change a couple times today.

INTERPRETER HU: We have plenty here.

THE COURT: You have plenty?

INTERPRETER HU: Yes.

THE COURT: Okay. And I'm sorry, Mr. Griess. You had asked the witness, "Why don't you draw an X where it was you were when you first saw the person in the farm field approximately."

And, Deputy Bollman, you were in the middle of doing that when I interrupted you.

MR. BIRD: Thank you, Your Honor.

MR. GRIESS: Thank you, Your Honor.

BY MR. GRIESS:

Q. So you've drawn an X on an area of Northeast 96th Street, correct?

A. Correct.

Q. Is that assuming you're going northbound or -- excuse me --

southbound at the time?
A. Yes, I believe I was.
Q. Okay. So let's draw a Z, if you would, in the area where approximately you saw the individual standing in the farm field.
A. (Witness complied.)
Q. Okay. Now, do you recall what, if anything, was growing in this particular farm field at the time?
A. I do. It was a split field. The portion closest to 96th Street was a bean field. Behind that was a cornfield.
Q. Okay. I'm going to give you a different pen that's not quite as thick and ask you to draw a line that divided the crops that were growing in the field that time, approximately.
A. (Witness complied.)
Q. Okay. I think that --
MR. GRIESS: Is that good enough for you?
MR. WEINHARDT: Yes.
BY MR. GRIESS:
Q. Okay. So you've drawn a line going north-south, which appears to correspond to the green area at the back end of the property growing -- that's located facing Northeast 96th Street, correct?
A. Correct.
Q. You have drawn that essentially through the location where you observed the person standing that day; is that accurate?
A. Yes.

Q. Was the person standing in the bean field or the cornfield?
A. Basically, he would have been right at the border of the two fields, right there.
Q. Do you know approximately how far within the field from 96th Street that was?
A. It could have been 200 yards. I'm not sure.
Q. Okay. What, if anything, did you recognize about the person at that time when you first saw him?
A. Nothing, really. He was too far away and the field covered most of him.
Q. What did you do after you arrived at the location?
A. I believe I pulled into the driveway of the farmhouse in that grassy area there.
Q. Okay. Did you get out?
A. I did not.
MR. GRIESS: I think that's all I have with this.
THE COURT: Mr. Griess, did you want to offer 4-1?
MR. GRIESS: I do, Your Honor.
MR. WEINHARDT: No objection.
THE COURT: Government's Exhibit 4-1 is admitted.
(Government Exhibit No. 4-1 was offered and received in evidence.)
BY MR. GRIESS:
Q. So the information that you had when you arrived at the scene from dispatch indicated that the person or the individual

in the field had been dropped off, correct?
A. Correct.
Q. Did you observe any vehicles in the area when you first arrived that would have dropped that individual off?
A. No.
Q. After you stopped in the farmhouse driveway, what did you do?
A. I was waiting while the other two deputies made contact with the subject in the field.
Q. Who were the other two deputies?
A. Deputies Burnett and Petersen.
Q. Did you go out into the field and make contact with the person in the field?
A. I did not.
Q. What happened next?
A. While I was parked in the driveway, a vehicle that matched the description that we were given either from dispatch or maybe from the farmer there, I'm not sure where, we saw that vehicle approach either from the south or the east, I don't remember which direction.
Q. When you saw the vehicle approach, what did you do?
A. I stopped it.
MR. GRIESS: Your Honor, I need to approach one last time.
THE COURT: Go ahead.

BY MR. GRIESS:
Q. Can you put a Y on the location where you stopped the vehicle.
A. From what I recall, I believe we were north of 70th on 96th Street, right there.
Q. Now, you indicated that the vehicle came from what possible direction? You said -- and just mark them with a 1 and 2.
A. Either from the south or from the east.
Q. And just so we're clear, put a B in the location where you were when you made -- first made the observation of the vehicle approaching.
A. Sat about right there.
Q. So you're indicating there that the vehicle came either from the east on Northeast 70th Avenue or from the south on Northeast 96th?
A. Correct.
Q. If it was coming from Northeast 70th Avenue, to get to the place where you stopped it, it would have had to turn north on Northeast 70th Avenue, correct?
A. Correct.
Q. If it had approached from the south on Northeast 96th, it would have had to have proceeded past your location and north of Northeast 70th Avenue where you made the stop, correct?
A. Correct.
Q. Either way, that vehicle did not stop at the location where

the man was in the field; is that accurate?
A. Correct.
Q. Do you recall how you made the identification of the vehicle that day?
A. You mean by the license plate or --
Q. Yes. Did you receive further description of the vehicle other than the license plate?
A. Because I don't remember exactly how it is that we got that it was an SUV or if that license plate -- maybe dispatch may have ran that license plate and it came back to an SUV. I don't recall that.
Q. Okay. Either way, it was a gray SUV that you stopped?
A. Yes.
Q. And did you indicate that in your report?
A. I did.
Q. And you don't recall -- if I'm correct, you don't recall if it was based upon the license plate or the color and make of the vehicle?
A. That's correct.
Q. But based upon one of those two things, you stopped the vehicle?
A. Yes.
Q. Why did you stop the vehicle?
A. Why?
Q. Correct.

A. Because it matched the description of the vehicle that had dropped off the subject that we were investigating.
Q. And why were you investigating that subject?
A. As being suspicious in the field.
Q. Why is it suspicious for a man to be in a field?
A. The fact that a man is in the field isn't suspicious in itself. The fact that he was dropped off and the vehicle left and that he was wearing a suit, to be in a farm field, that was out of place.
Q. At the time you decided to make the traffic stop, were you aware of the ethnicity of the man who was standing in the farm field?
A. Not that I remember.
Q. After you stopped the vehicle, were you able to identify the occupants of the vehicle?
A. I did.
Q. Did you identify the driver?
A. Yes.
Q. Did you indicate in your police report who that driver was?
A. I did.
Q. Who was that individual?
A. That would have been Mo Hailong -- Hailong.
Q. Does your report also contain the other -- the names of the other two individuals that were with him?
A. I believe it does, yes.

Q. Did you, as part of the initial early period of the traffic stop, seek to identify those individuals?
A. I did.
Q. Did you ask them what they were doing in the area?
A. I did.
Q. What, if anything, did the driver of that vehicle tell you?
A. He indicated to me that he was -- there was a passenger in the vehicle as well as the driver. He said that he was showing him around and the subjects out in the field around fields or farm fields to help improve their farming practices in China.
Q. At some point in time were you joined by one or both of the officers who were in the field?
A. Yes.
Q. Approximately how long after the traffic stop, if you know?
A. Ten, fifteen minutes, maybe.
Q. At that point in time, was there further discussion about what the individuals were doing in the area?
A. Yes.
Q. Was there a discussion about other locations they may want to visit?
A. There was.
Q. Was that a consensual discussion?
A. Yes.
Q. Were they detained in any way?
A. No.

Q. I want to show you what's been marked there in front of you as Defendant's Exhibit A. Do you recognize that?
A. I do.
Q. What is that?
A. This is a copy of my report that I completed that day.
Q. At least the first page?
A. Yes.
Q. And what is the second page? Is that your report?
A. No, it's not.
Q. How about the third?
A. No, it's not mine.
Q. The second page actually appears to be the report written by Detective William Gaspar. Do you know William Gaspar?
A. I do.
Q. Who is he?
A. He's a detective with the sheriff's office.
Q. So this would have been another report written by a Polk County Sheriff's Detective?
A. Yes.
Q. I'm going to hand you -- and we can supplement the record in a moment, but I'm going to hand you a document. I'm going to call this A-1. Do you recognize A-1?
A. I do.
Q. What is that?
A. That would be the second page of my report.

Q. The second part of your report?
A. Correct.
Q. Okay.
MR. WEINHARDT: No objection to A-1, Your Honor.
THE COURT: Just for purposes of clarity in the record, is it okay if we just make that the second page of A?
MR. GRIESS: Absolutely. And I'd ask, Your Honor, at the break that we make a copy and insert it, if that's all right.
THE COURT: We'll do that. For now go ahead.
MR. GRIESS: Thank you.
MR. WEINHARDT: I would ask, Your Honor, for record purposes that the remainder of A still be there. I will have questions for the officer about that.
THE COURT: Okay.
MR. GRIESS: No objection.
THE COURT: So what the Government has marked as A-1 will become a part of original MH-A, but we won't remove anything that's already part of MH-A.
Go ahead, Mr. Griess.
MR. GRIESS: Thank you.
BY MR. GRIESS:
Q. Is it common, Deputy, to see individuals standing in the middle of cornfields?
A. It's common to see farmers in farm fields.

Q. What made this incident suspicious to you?
A. Mostly the way he was dropped off and then the vehicle left and the way he was dressed.
MR. GRIESS: That's all I have, Your Honor.
THE COURT: Thank you, Mr. Griess.
Mr. Weinhardt.
MR. WEINHARDT: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WEINHARDT:
Q. Is there anything about my clothing that suggests criminal activity?
A. No, sir.
Q. If I were standing in a farm field at the edge of where corn stops and beans start, would my clothing suggest criminal activity?
A. It would suggest you're out of place.
Q. And that's not my question. My question is would my clothing, if I were standing at the edge of where the corn stops and beans start near 70th and 96th in Polk County, would that suggest criminal activity?
A. Probably not.
Q. I'd like to have you take a look at Defense Exhibit A, including the page that we've added to it. The first page of A and then the page that is A-1, those are your reports; is that correct?

A. Correct.
Q. And so that's what you prepared on the date of the incident?
A. I believe it was that afternoon, yes.
Q. In addition to generating this report, did you prepare any notes or anything like that to refresh your recollection about what happened that day?
A. No.
Q. In preparation for your testimony, did you refer to or review anything other than your two-page report?
A. Just the two-page report and the information that -- from the dispatch printout.
Q. And that would be Government's Exhibit 3?
A. Yes.
Q. Now, could you take a look at Exhibit A the way that it actually is marked. The second and third pages are something that are not part of your report, but you recognize, for example, Detective Gaspar's name; is that correct?
A. Yes.
Q. Do you recognize what those two pages are?
A. On Detective Gaspar's page, I think it really looks like it would probably be maybe a driver's license of Mo Hailong from Boca Raton, Florida, as well as a -- maybe an intel report from Deputy Gaspar.
Q. An intel report, you say?
A. Yes.

Q. What is an intel report?
A. If I remember correctly, at that time he worked for this bureau. His name, it says LEIN Region 5 Fusion Office. That's an intel organization that gathers information from law enforcement and disperses it, and so that would have been, when he received a copy of my report, through different channels or whatever, he might have put that together to put that out to other law enforcement agencies.
Q. Can you tell us what the acronym LEIN, L-E-I-N, stands for?
A. No. I don't know.
Q. Was Detective Gaspar involved in any of the actual contacts with the individuals driving the car, the man in the field that day?
A. No.
Q. Did you talk to him at all about your activities that day?
A. To Detective Gaspar?
Q. Yes.
A. No.
Q. Do you know whether Deputy Petersen or Deputy Burnett talked to him about their activities that day?
A. I would not know it.
Q. Is the material, then, that Detective Gaspar wrote, starting with the words, "Hailong claimed he was assisting Wang and Shaoming," is that all material that he just wrote secondhand from your report or other sources?

A. I would assume so.
Q. Was your vehicle equipped with a dashboard camera?
A. It was.
Q. Was the camera activated at any point during the vehicle stop that you made?
A. I would assume that it was.
Q. Was the recording made by that camera preserved?
A. I would assume it was.
Q. Is it available to us today?
A. I do not know where it's at.
Q. What normally would you do following an incident where you stopped a vehicle or otherwise activated the camera in order to procure that recording? What would you do to get it?
A. We've changed systems a couple of times since then. If it was a disc type, if I had an incident I felt we needed to keep the recording of, I would have preserved that disc and put it into a -- basically a closet to be added to a library. I can't tell you whether or not I did that on this incident.
Q. Sometime between the day of this incident and right now you learned that federal law enforcement was interested in this event, correct?
A. Correct.
Q. You had no idea before this incident that federal law enforcement had any interest in these individuals; is that true?
A. Correct.

Q. When was it that you first learned since then that federal law enforcement had an interest in this matter?
A. I really don't know when I first heard.
Q. Back in 2012 or this year or somewhere in the middle?
A. Probably someplace in the middle.
Q. To your knowledge, though, the only law enforcement personnel who had any contact with this matter on that day are you, Deputy Burnett, and Deputy Petersen, correct?
A. Correct.
Q. If you look at Government's Exhibit 3, and I'm showing it to you on the ELMO, this is a printout of what you saw on your laptop computer in your vehicle; is that correct?
A. It has the information on it. The format would have been different in our car, but yes.
Q. All right. And then in addition to the material that is written here, there was also an oral dispatch that went out over the radio; is that correct?
A. Correct.
Q. Did the material that you heard on the oral dispatch differ at all from what is written here?
A. It may have.
Q. Do you remember anything about it?
A. I do not.
Q. So the best that we have to go on in terms of what you were advised is what's written on Exhibit 3?

A. Correct.
Q. And Exhibit 3 tells you that this is a secondhand report to an Altoona police officer; is that right?
A. It's a -- it says, "Secondhand call from AL257," which is the Altoona officer.
Q. You don't know anything about who it was who made the report to the Altoona officer?
A. No. I don't know if she saw this or somebody called her and told her. I do not -- I do not know that.
Q. All right. Let's talk a little bit about the individual in the field. I'm showing you right now part of Exhibit 4, which is much like Exhibit 4-1 that you wrote on, but this is one that Deputy Burnett did earlier. But the X here, that's roughly where you saw the man walking in the field; is that right?
A. Yes.
Q. And right here, where this black line starts, and I'll represent to you that that's where Deputy Burnett told us that he drove into the field, that's roughly the area where you stopped, correct?
A. I would have either been in that driveway there or the actual driveway to the residence, which would be just a little bit further south.
Q. This little white line that goes into the house; is that right?
A. Right.

Q. Okay. But in either event, that area and on 96th Street, that's as close as you ever got to the man in the field; is that right?
A. Until they brought him back to the vehicle that I had stopped, yes.
Q. Okay. But as far as whatever he was doing in the field, your only observations of that were for whatever this distance between 96th Street and the X is?
A. Right.
Q. And you said that he was standing at the border of where soybeans ended and growing corn began; is that right?
A. Correct.
Q. Corn's not harvested yet?
A. No.
Q. How tall is it?
A. It was fairly tall. I mean, it would have been over his head, if I remember correctly.
Q. Since he is standing on the edge of that field, though, even though it's taller than his head, he's open and obvious, you can see him from the road?
A. Correct.
Q. In fact, all the way from the road, you can see that he's dressed in a suit?
A. That, I don't recall.
Q. Was it that you only saw that he was in a suit when they

brought him to you later on? Is that how it happened?
A. Correct.
Q. Now, you made the decision to stop the vehicle because the vehicle matched the description of one that was said to have dropped this man off?
A. Correct.
Q. And the man was unusual because he was standing in a farm field and he was dressed in a suit?
A. Correct.
Q. Now, if you couldn't see from the road whether or not he was dressed in a suit, how would you have known that the suit is a reason to pull this car over?
A. That was the information that was given to us in the trip.
Q. Ah, I see. So vehicle dropped off the individual, the individual was in the middle of a farm field, he's in a suit. Anything else or is that the reasons for the stop?
A. Yeah, that's basically the reason for the stop. The vehicle is associated with him.
Q. All right. When you pulled the vehicle over, did the vehicle do anything evasive or troublesome or did the vehicle pull right over for you?
A. They just pulled right over.
Q. When you approached the vehicle, what did you find?
A. Two subjects in the car.
Q. And tell me what happened. What did you say to them, what

did they say to you?
A. I don't remember the exact conversation. It would have been basically I would have explained to them why I stopped them. That would have been where we had the conversation with the driver about what they were there for, why they were at the field and why the subject was in the field.
Q. And that driver was Mo Hailong; is that correct?
A. That's what I indicated, yes.
Q. And you have indicated on your report that there were three individuals: Mo Hailong; Wang Lei, W-a-n-g next word L-e-i; and Li Shaoming, L-i, next word S-h-a-o-m-i-n-g. Is that correct?
A. Correct.
Q. And Mo Hailong was the driver. Which was the passenger in the SUV and which was the man in the field?
A. I don't recall.
Q. Do you recall physically differences in appearance between the passenger and the man in the field?
A. I really don't recall.
Q. Like was one of them taller than the other, was one of them older than the other, was one of them wearing glasses and the other not?
A. No. The passenger that was in the vehicle never exited the vehicle, so he was sitting the entire time, and I really don't remember.
Q. When you spoke with the driver, Mo Hailong, were you able to

converse with him in English?
A. Yes.
Q. Were you able to understand him when he was talking to you?
A. Yes.
Q. Did he appear to be able to understand what you were saying?
A. Yes.
Q. Do you attempt any conversation with the passenger in the vehicle?
A. I don't believe we did.
Q. And what about the man from the field, did you attempt any conversation with him?
A. I did not.
Q. Did you overhear any conversation with him and another deputy?
A. I don't remember if Deputy Peterson was trying to speak with him or not, but by the time they got there, it was a very short time. I took down their information. I didn't -- like I say, I didn't carry on a conversation with them.
Q. Let me put it this way: Were you able to make any determination about whether the passenger spoke good English or not?
A. From what I remember, I believe that Mo indicated that the other two did not speak good English.
Q. Okay. And so that's what Mo said. I guess what I'm asking first is just from interactions with the passenger himself, did

you have any sense of whether he could speak good English?
A. No.
Q. And from the interaction or what you overheard with the man in the field, did you have any sense of whether he could speak good English?
A. I believe, if I remember correctly, it would have been very broken.
Q. Now, what Mr. Mo, the driver, tells you is that the two men with him are from China?
A. Correct.
Q. And that they are working there on how to improve crops in China?
A. Correct.
Q. And that he's driving them around the Midwest in order to look at farms so that they can gather that knowledge about agriculture?
A. Correct.
Q. And he said that they had flown to Chicago in August and that they had been in the Des Moines area for about two days?
A. I don't have my second page of that report.
Q. I think we'll provide one, a copy of that for you.
A. Thanks. Right. Mo advised that they had flown into Chicago in August to look at farm fields and had been in the Des Moines area for two days, that's correct.
Q. Do you recall whether there was any discussion about whether

the individuals were affiliated with any university or any seed company?
A. I don't remember that conversation.
Q. Take a look at Exhibit A and take a look at that second page with the material that was written by Deputy Gaspar.
A. Yep.
Q. Read that to yourself and tell me if that refreshes your recollection about whether there was any discussion about that.
A. Okay. So what was the question again?
Q. Do you recall whether there was any discussion about whether these gentlemen were affiliated with either a university or a seed company?
A. I still don't recall if we had that conversation.
Q. Do you recall those men being somewhat surprised that law enforcement would pay any attention to the fact that one of them was walking in a field?
A. I don't remember that.
Q. Do you recall them saying to you that in China farmers welcome you if you want to come and look at their crops?
A. I don't recall that either.
Q. Did any of them say that they had been welcomed onto other American farms previously?
A. I don't recall that.
Q. Did you have a conversation with any of them about whether it would be preferable to ask permission of the farmer before

going onto his field?
A. I don't know if we did, but that sounds like something I probably would have advised.
Q. All right. Do you recall anyone suggesting to any of them the names of farmers whose farms they could go look at if they wanted to?
A. Deputy Petersen gave them some different farmers' names to maybe contact to look at their fields.
Q. Do you recall whether Deputy Petersen gave them phone numbers of those farmers?
A. He may have. I don't remember.
Q. In the whole of this encounter, did Mo Hailong say anything to you that appeared to you to be untruthful?
A. Not that I know of.
Q. Was he cooperative with you at all times?
A. Yes.
Q. Did any of the others say anything to you that was untruthful?
A. No.
Q. Did any of the others appear uncooperative in any point?
A. No.
Q. No one was placed under arrest?
A. Correct.
Q. No one was issued a citation?
A. Correct.

Q. No one was issued any written warning?
A. Correct.
MR. WEINHARDT: If I may have just one more moment, Your Honor.
THE COURT: Yes.
BY MR. WEINHARDT:
Q. After the discussion that we've talked about, were the gentlemen then free to leave?
A. They were.
Q. And did they depart from that location?
A. They did.
Q. Did you follow them?
A. No.
Q. Do you have any idea what direction they went?
A. No.
MR. WEINHARDT: No further questions, Your Honor.
THE COURT: Thank you, Mr. Weinhardt.
Redirect, Mr. Griess?
MR. GRIESS: Just to clarify a couple of points.

REDIRECT EXAMINATION

BY MR. GRIESS:
Q. When you first arrived at the scene, was the vehicle that you had been told dropped off the individual in the farm field in the area?
A. No, it was not.

Q. You later saw that vehicle, correct?
A. Correct.
Q. And that matched the description of the vehicle that you had been given of the individual that dropped the individual off in the field?
A. Correct.
Q. When you saw that vehicle, was it coming toward the individual who was in the farm field?
A. It would have been roughly coming towards it, either from the east or from the south.
Q. But it turned and went north rather than coming down the street towards the individual in the farm field; is that accurate?
A. Right. Yes.
Q. Did that contribute to your suspicion?
A. Yes.
Q. And did you make the stop after that point?
A. Yes.

MR. GRIESS: That's all I have, Your Honor.

THE COURT: Any recross, Mr. Weinhardt?

MR. WEINHARDT: No, Your Honor. Thank you.

THE COURT: Thank you, Deputy. You can step down.

(Witness excused.)

THE COURT: Let's go ahead and take an afternoon break.

I will advise Mr. Weinhardt, if it's helpful to you, that LEIN stands for Law Enforcement Intelligence Network.

MR. WEINHARDT: I kind of thought it did, but --

THE COURT: It's administered under the Iowa Department of Public Safety, and, having attended enough of those meetings in my day, I can tell you that it's basically an information-gathering system used by the state of Iowa intelligence community.

Okay. Let's go ahead and take a 20-minute break, so I'll see everybody at 3:15. Thank you.

(Recess at 2:55 p.m. until 3:16 p.m.)

(Conference held in chambers with counsel for the Government and counsel for Defendant Mo Hailong reported but not transcribed.)

(In open court, with Defendant Mo Yun present and Defendant Mo Hailong present via telephone.)

THE COURT: Thank you. You can be seated.

We lost Mr. Griess.

MR. KRICKBAUM: I'll find him, Your Honor.

THE COURT: You can go ahead and call your next witness.

MR. GRIESS: The Government calls Angel Lorenzo.

MR. LINCENBERG: Your Honor, may I make a quick statement for the record?

THE COURT: You may.

MR. LINCENBERG: Your Honor, I just wanted to object for the record. A hearing or a discussion was held in chambers. I don't know what it was about, and counsel for Mo Yun were excluded from the discussion, and I'm not sure why.

This is a charge where we've objected to be joined in any conspiracy. All of this evidence after 2011, 2012, we think is irrelevant to anything to do with our client, we filed a severance motion, and so forth, but we've been forced to join with the Government arguing that all of this evidence in 2011 and 2012 is sometimes all -- is somehow also evidence against our client.

If the proceeding had anything to do with this case or evidence in this case, I feel that we should have the right to be present.

THE COURT: Your objection is noted.

Go ahead, Mr. Griess, and call your next witness.

MR. GRIESS: Thank you, Your Honor. The Government calls Angel Lorenzo.

THE COURT: Go ahead and step forward, Agent. And we'll have you step up to the witness stand, and the clerk will swear you in.

THE DEPUTY CLERK: Please raise your right hand.

ANGEL LORENZO, GOVERNMENT'S WITNESS, SWORN

THE DEPUTY CLERK: Thank you. Please have a seat.

DIRECT EXAMINATION

BY MR. GRIESS:

Q. Please state your full name, spell your last name for the record.

A. Angel Lorenzo, L-o-r-e-n-z-o.

Q. Are you employed?

A. Yes, sir.

Q. How so?

A. By the Chicago Police Department.

Q. How long have you been employed with the Chicago Police Department?

A. A little over 25 years.

Q. In what capacity are you currently assigned to the Chicago Police Department?

A. I'm a detective assigned to the Joint Terrorism Task Force.

Q. How long -- I'm sorry. How long have you been with the Joint Terrorism Task Force?

A. Approximately eight years.

Q. Prior to that time were you assigned in different ways for the Chicago Police Department?

A. Yes, sir.

Q. How so?

A. I was a detective assigned to field assignments and case reviews, and prior to that was a patrol officer assigned to various specialized units and patrol.

Q. I want to direct your attention to May 4, 2012. Were you a member of the Joint Terrorism Task Force in Chicago at that time?
A. Yes, sir.
Q. Do you recall being asked to assist in another investigation on that date?
A. Yes, sir.
Q. Tell the Court what happened.
A. I was approached by FBI agent supervisor from a different squad who requested our assistance in surveillance that they were conducting in the Chicago area.
Q. What, if anything, did you know about that surveillance at that time?
A. Very little, other than they had individuals that they were following and that they requested if we could assist them in possibly identifying them if the opportunity arose.
Q. Specifically, how were you going to go about identifying the individuals that were being watched?
A. As police officers, we were going to utilize a police squad car unmarked in the capacity as a police officer, if the opportunity came, to conduct a traffic stop and identify the individual or individuals that were in the vehicle.
Q. What do you mean if the opportunity came?
A. Well, we were only going to stop the vehicle if there was some type of violation that we could enforce or stop the -- have

the cause to stop them for.
Q. Are you familiar with the traffic laws based upon your experience as a patrol officer in Chicago?
A. Yes, sir.
Q. Do you recall approximately the time of day when you were asked to become involved in this surveillance?
A. I cannot recall. It was during the daytime. I don't recall what time of the day it was.
Q. Where were you at when you were asked to get involved?
A. I was in the FBI office in Chicago.
Q. When you were asked to get involved, what did you do?
A. When we were asked to get involved, we made arrangements to obtain a police squad car. We also obtained the information as to where we were supposed to meet the units that were already on the street.
Q. What did you do once you obtained the squad car?
A. Once we obtained the squad car, we called the agents or bureau employees that were out on the street following the individuals, their location, so we can rendezvous with them and basically be part of their moving surveillance.
Q. Were you able to do that?
A. Yes, sir.
Q. Do you recall approximately where you made contact with those individuals or those officers?
A. Well, we were in cellular or telephonic contact with them

from the beginning, but when we made physical contact, which we were partaking in the surveillance, it was -- I don't recall exactly, but in the vicinity of O'Hare Airport, near a rental car agency.

MR. GRIESS: Your Honor, may I approach?

THE COURT: You may.

BY MR. GRIESS:

Q. I'm going to hand you what's been marked as Government Exhibit No. 5 and ask if you recognize that.

A. Yes.

Q. What is that?

A. This is the general intersection of Montrose Avenue and Cumberland Avenue in Chicago.

Q. Is this interview -- excuse me -- is this intersection of note to where you made the traffic stop or of a traffic stop that you made with regard to this particular day?

A. Yes, sir.

Q. Tell me what you saw.

A. Well, at this time we were partaking in the surveillance, a roving surveillance, a moving surveillance. We had kind of fallen in with the surveillance team, and as we were approaching the intersection of Montrose and Cumberland, we were heading southbound on Cumberland Avenue approaching Montrose when we saw the SUV that the person -- the subjects of interest were in violate the traffic signal at the intersection of Montrose and

Cumberland.
Q. I'm going to have you mark -- I'm going to have you mark with an arrow the direction of travel that the vehicle you were following was traveling in.
A. Okay. Just make sure get my bearings here.
So the direction basically, arrow going in that direction.
Q. And that's southbound?
A. Yes, sir.
Q. Where was your vehicle in relationship to that vehicle?
A. Just either one to two cars behind their vehicle.
Q. Okay. Specifically, what did you observe as you arrived or as the subject vehicle arrived at the intersection?
A. So as we were approaching that intersection, the traffic signal light had changed to red.
Q. And what happened after the traffic signal turned to red?
A. As the traffic signal light changed to red, their -- the vehicle that we were following broke the intersection after the light had already changed to red and proceeded through the intersection.
Q. Is that a traffic violation?
A. Yeah. That's a violation of traffic light, yes, sir.
Q. Did you stop the subject vehicle based upon that traffic violation?
A. Yes, sir.

Q. What happened when you stopped the vehicle?
A. We were able to curb the vehicle south of that intersection on Cumberland Avenue. The vehicle curbed, pulled over to the shoulder on the right. We exited our vehicle. We identified ourselves. We requested -- I requested -- I was the officer that was driving so therefore I was the enforcement officer. I requested the driver's license of the driver and vehicle registration.
Q. Did you have another officer who was with you in the car that day?
A. Yes, sir.
Q. Who was that officer?
A. That was Officer Alex Reina.
Q. Where did Officer Reina go as you approached the driver's-side door?
A. Officer Reina was a passenger in my vehicle so therefore he would be the backup/enforcement officer. His job was to make sure that we were all safe for the traffic stop, a common practice that we do, so he was on the passenger side of the vehicle that we stopped.
THE COURT: Can you spell Officer Reina's last name for me?
THE WITNESS: R-e-i-n-a, I think. I'm not sure.
THE COURT: Thank you.
Go ahead.

MR. GRIESS: Thank you, Your Honor.
BY MR. GRIESS:
Q. Who did you speak with on the inside of this vehicle?
A. I spoke initially to the driver of the vehicle.
Q. Do you recall how many other individuals were in the vehicle?
A. There were four -- I recall four people in the vehicle, two in the front and two in the back seat.
Q. Did you obtain identifying information for all the individuals in the vehicle?
A. Yes, sir.
Q. What did you do with the information after you obtained it?
A. We basically transferred it to the surveillance officers, basically passed the information on to the persons that were working that assignment.
Q. Is that what you were asked to do?
A. Basically, yes, sir.
Q. Did you make any reports or notes or anything of that nature in regard to this traffic stop?
A. I did not.
Q. Did you issue a ticket or citation of any kind for running a red light?
A. No. We basically just gave a verbal warning.
Q. Did you make any report of the traffic stop itself?
A. No, sir, I did not.

Q. In Chicago, when you made this traffic stop that day, did you report to dispatch that you were doing that?
A. I did not.
Q. Why not?
A. We don't always -- we don't have to report to dispatch that we're making a traffic stop.
Q. You weren't working as a patrol officer that day?
A. I was not working as a patrol officer, no.
Q. Just so we're clear, you were asked to make this traffic stop as part of a surveillance operation that was ongoing?
A. Yes, sir.
Q. Did you have any knowledge of the type of investigation it was?
A. No.
Q. Did you have any subsequent knowledge with this case or this investigation that you know of?
A. At this point?
Q. Yes.
A. Based on open source newspaper reporting. Is that what you're asking me?
Q. No. Let me back up. Did you have any further involvement in this investigation?
A. Oh, absolutely no. No. My involvement with this matter was just that traffic and that day of surveillance/traffic stop.
Q. So you observed the subject vehicle run a red light, you

stopped the vehicle, you identified the occupants, and that's all?

A. That is it, yes, sir.

MR. GRIESS: If I can have one moment, Your Honor.

THE COURT: You may.

BY MR. GRIESS:

Q. And whatever information you obtained that day as far as what you were asked to do as far as the identity of the occupants of that vehicle, you passed that on specifically to the surveillance team?

A. Yes, sir.

MR. GRIESS: That's all the questions I have.

THE COURT: Thank you, Mr. Griess.

Mr. Weinhardt, cross-examination.

MR. WEINHARDT: Thank you, Your Honor.

If I may approach, I'd like to put the diagram on the ELMO.

THE COURT: You may.

And, Mr. Griess, was it your intention to admit Government Exhibit 5?

MR. GRIESS: Yes, Your Honor.

MR. WEINHARDT: And we would not object, Your Honor.

THE COURT: Government Exhibit 5 is admitted.

(Government Exhibit No. 5 was offered and received in evidence.)

CROSS-EXAMINATION

BY MR. WEINHARDT:

Q. Shall I call you Officer Lorenzo, Agent Lorenzo?

A. Detective.

Q. Detective Lorenzo, thank you very much.

Did your duties at the time of this stop include traffic enforcement?

A. Being a police officer slash, those are my duties as well, but at that time my -- I'm a task force officer. I'm a task force officer at that time, so multiple titles.

Q. Well, let me put it this way: You spent a fair number of years as a Chicago police officer doing patrol work, correct?

A. Some years, yes.

Q. And when you did that, you wrote a fair number of traffic citations?

A. In my time I did.

Q. During your time on the JTTF, how many traffic citations would you write a month?

A. I wouldn't recall, but not many.

Q. One a month?

A. Maybe not.

Q. Maybe not that many?

A. No.

Q. All right. The vehicle that you were in was an unmarked vehicle. It was a Chicago PD vehicle?

A. It was a Chicago police car, yes, sir.
Q. And did it have internal lights that you could use to signal to other people?
A. It had oscillating lights and siren.
Q. Did you use both the lights and the siren to pull over this vehicle?
A. Yes, sir.
Q. Now, setting aside how many citations you might write in a month during your JTTF work, how many traffic stops of all sorts, including verbal warnings, et cetera, would you make in a month, typically?
A. Well, because I have numerous duties, some of them require me to work exclusively for the Chicago Police Department and sometimes I work exclusively for JTTF, so average stop a month, I would say, traffic stop, maybe five to ten at the most.
Q. All right. And you were with Officer Reina that day, correct?
A. Yes, sir.
Q. Officer Reina was in the vehicle with you and approached the vehicle that you stopped?
A. Yes, sir.
Q. Other than the two of you, was there any other witness to either the stop itself or the events surrounding the vehicle after he was stopped?
A. Well, the other witnesses would be anybody that was driving

along the street at that time in addition to the surveillance team, in addition to the occupants of the vehicle.

Q. And I asked an incomplete question. What I'm really trying to get at is other than you and Officer Reina, were there any other law enforcement witnesses to the act of your stopping that vehicle and the events that day?

A. Well, I will presume that the surveillance team was watching us when we conducted the traffic stop.

Q. When you're presuming that, do you know that?

A. Well, I could not know that for certain because I was in my squad car and they were probably watching me from their covert vehicles in the area. So I'm only presuming because I was not in the car with them, sir.

Q. And you told the prosecutor that you generated no report of this incident, correct?

A. That is correct, sir.

Q. And that you took no notes of the incident?

A. That is correct.

Q. Did you have any document that you were able to look at before your testimony today to refresh your events -- I'm sorry -- to refresh your recollection of the events?

A. I looked at this -- I believe I looked at this map here, and I might have -- I'm not sure what else I might have looked at. Might have been the document. I don't recall what it was. But I definitely looked at this map because I was trying to get my

bearings as to the location of where we conducted the traffic stop.
Q. Did you talk to anyone in an attempt to refresh your recollection, someone else with knowledge of the event?
A. The only person that I spoke to regarding the events was the AUSA.
Q. Did the squad car that you were operating that day have a dashboard camera?
A. Did not.
Q. And I think you told us that you did not call this stop in to dispatch; is that correct?
A. That's correct, sir.
Q. So there would be no record of any dispatch communications that would tell us when, where, why, how, any of the things about the stop?
A. No. That's not a customary procedure that we use in Chicago. We're not required to let the dispatch know of all our traffic stops.
Q. Do you know whether the agents working on this surveillance who summoned your assistance, whether they had a GPS monitor tracking that vehicle that you stopped?
A. I have no knowledge.
Q. Where were you when the car first came to your attention?
A. Visually or by being told that this is the car we're looking at?

LORENZO - CROSS


Q. I guess on a map, what spot were you in when you first made visual contact with the target vehicle?
A. Well, I believe we were much further north on Cumberland. I'm trying to -- I don't exactly recollect if I actually jumped into the surveillance at the -- near O'Hare, near the rental company. I don't recall. But it was considerably earlier than when we initiated the traffic stop.
Q. Can you give me a ballpark; a mile away, two miles away, three miles away?
A. It could have been a couple of miles.
Q. Couple of miles?
A. When we started jumping in. Because, again, we were summoned from the FBI office, and this was an ongoing, so we basically had to kind of rendezvous with them.
Q. Was it on Cumberland Avenue when you first made visual contact with the target vehicle?
A. I think it was -- I'm going to say it was near the rental -- the rental company location where I believe they picked up the car. But I don't know if we were -- had fallen into the surveillance group. We were still doing catch-up, but I believe we had visual of the vehicle at one time at that time, but we weren't situated to follow at that time.
Q. Can you describe the target vehicle, make and model?
A. I cannot, other than it was an SUV.
Q. How many minutes did you follow it before the stop?

A. Well, I'm going to say anywhere from 10 to 15 minutes. We were kind of in that following pattern or trying to catch up because we weren't the -- we didn't have eyes, as the term used, on that vehicle from the beginning so we were listening to either -- I'm not sure. I think we were on the phone or my partner was. I don't recall that. So we were probably following them -- I can solidly say we were definitely following them on Cumberland Avenue.

Q. Okay. And I guess what I would like is your best estimate of how long you had eyes on the vehicle before you stopped it.

A. Probably, I don't know, I'd have to approximate anywhere from five to ten minutes when we had solid eyes.

Q. Okay. Were there other times that year where you were asked to assist surveillance by stopping a vehicle to identify passengers?

A. I'd be guessing. Possibly, because we -- we've done that before. But you're saying that year. I don't know. We do traffic stops not related to that. We do traffics initiated on our own related to the JTTF. We were assisting a different group. So sometimes related to cases that I'm assigned I might do a traffic stop, so I wouldn't be able to give you an approximate. Sometimes I do a street interview where the person that I want to talk to is right in front of me on foot. So I don't recall how many traffic stops I do in a year related to JTTF duties.

Q. All right. Well, what would you call a traffic stop where the purpose of the stop is really not simply to enforce the traffic laws but to learn something about the people in the vehicle as you did on this day? Can we agree on some name for what kind of a stop that is?
A. Traffic stop.
Q. How about if I call it an investigatory stop, would that work for you?
A. It's not a term that I really use, but you can use that term. It's part of an investigation, so you can, but if I do a traffic stop, it's a traffic stop for whatever purpose is served. Whether I'm going to write the person citation, give them a verbal warning, or it's related to an investigation that I'm participating in, I use the term traffic stop.
Q. Well, that last category, that third category, where you're not writing a citation, you're not giving a verbal warning, but it's actually related to an investigation, you're stopping the vehicle because it violated a traffic law but also because you want to know something about the people in that vehicle, can we agree for today we'll call that an investigatory stop?
A. Well, sir, you can call it that, but, again, the term I use, you're asking me what I would do, and that's still a traffic stop to me. They're all part of an investigation because if I do a traffic stop, it's still an investigation in the terms that you want to use. I'm still doing a police action; therefore,

I'm investigating if this person's licensed or not, you know, all of the above. So at the end of the day, if you want to encompass it, it is an investigation, but the term that I regularly use is a traffic stop.

Q. How many traffic stops a year do you do where the purpose of the stop is to learn something about the people inside the vehicle and not simply to enforce a traffic law?

A. Well, sir, again, that's, you know, you're saying this and I'm saying that. All traffic stops that I will conduct I would identify as an investigation and to identify the individual, because as I stop you, for example, for a traffic violation, I have to identify you to make sure you're properly licensed, insured, and your vehicle is properly registered.

So my whole purpose when I do a traffic stop is to identify the individual based on the violation of the traffic. It's not based on that they're -- the subject might be a wanted homicide offender. That might turn up after the fact. The purpose of all my stops is to identify the individual based on the fact that they're operating that vehicle.

Q. Let me put it this way: You testified on direct that you were to follow this vehicle and if you had the opportunity --

A. Uh-huh.

Q. -- you were to pull it over and learn the identity of the people inside, right?

A. Yes. That was the request, yes, sir.

Q. And the opportunity would present itself if they violated a traffic law?
A. Well, yes. That's how I would stop them under, yes. I would stop them if they committed a traffic violation, yes, sir.
Q. Have you followed vehicles in the past or since then where you were going to pull them over if you had the opportunity but they didn't give you the opportunity, they got to their destination and never violated the law?
A. Well, sir, if I'm going to follow proper procedure and I'm going to stop somebody randomly without any probable cause, then I wouldn't bother because then there's no -- that would serve no purpose in an investigation. So if I'm going to stop someone, as you say, for an investigation for the purpose of just identifying them, I still have to have my requirements by the law to stop that individual. I can't randomly pick you off the street and stop you just because I feel like it.
Q. I understand that. What I'm asking is have you ever had an occasion where you got a request just like the one that you got from the FBI on that day --
A. Uh-huh.
Q. -- but you didn't stop the vehicle because they didn't violate any traffic laws? Has that ever happened to you?
A. That I can recall, no, sir.
Q. Now, if we look at the diagram, you drew an arrow right here, and that's pointing south; is that correct?

A. That's correct, sir.
Q. And you were behind the target vehicle, this SUV?
A. Yes, sir.
Q. Where were you when you saw the light change from yellow to red? How far away from the intersection were you?
A. I'd be guessing, but we were very close to the intersection. I honestly cannot tell you with certainty how far away we were from the intersection. We were basically the next vehicle was getting ready to go through the intersection.
Q. Where was the target vehicle at the moment that the light changed from yellow to red?
A. The target vehicle at the moment that the light changed from yellow to red had not approached the crosswalk, and that's how I make my determination that the person violated the traffic signal because when he broke the crosswalk, the light had already changed to red and had been red for a split second or two.
Q. So was he 10 feet, 20 feet, 100 feet? Give me your best estimate.
A. From the crosswalk?
Q. Yeah. From the crosswalk at the point where the light changed.
A. Again, this is -- it's only a guess; 10 to 15 feet from the crosswalk.
Q. At what speed was he going?

A. I don't recall.
Q. Within the speed limit, though?
A. If he was over it, not by much. It was pretty much the flow of traffic.
Q. You did not issue him a ticket?
A. I did not, sir.
Q. Why did you not issue him a ticket?
A. Because I'm not required to issue anyone a ticket. It's subject to my encounter. I can give a verbal warning, I can give a ticket, and I don't have to give a ticket. There's no requirement for me to issue a citation.
Q. I understand that there's no requirement, but who decided whether to issue a ticket that day; you or someone else?
A. I decided not to issue a ticket.
Q. Why did you not issue a ticket?
A. Because once we discussed the traffic violation, I was able to ascertain that the person was licensed, had identification, the vehicle was probably -- properly registered. I was -- I was comfortable with the verbal warning, in addition to the fact that I had all the identifiers and the person was, for the most part, authorized to drive a vehicle and had the proper licensing, had the insurance, and the rental agreement with him.
Q. Was there -- strike that.
Did you run the individual's name, DOB, social in order to find out if he had any record of traffic offenses or

whether he was wanted or anything of that sort?
A. No, I did not.
Q. Why was it that you obtained the identity of the other occupants in the car?
A. We asked to -- if they would give us their identification. They volunteered to. And basically, it was still part of the same request of identifying the occupants of the vehicle.
Q. Let me go back to the light changing red. You say that the light changed red when the target vehicle was maybe 10 or 15 feet short of the crosswalk. Just to complete the thought, the target vehicle, nonetheless, crossed the crosswalk and went all the way through the intersection; is that right?
A. The target vehicle went through the intersection, yes, sir.
Q. So you then went through the intersection against the red light as well to pull it over, right?
A. After activating my emergency equipment, yes, sir.
Q. Did you come close to any vehicles striking you? Was there any safety hazard?
A. No, sir.
Q. The cross traffic had not started yet?
A. No. Well, when he broke, the cross traffic had not entered the intersection.
Q. Just to be clear, it was a request made to you from the FBI that you get the identities of the other individuals in the car?
A. It was a request from the FBI or members of the FBI to

attempt to identify the occupants of the vehicle that they were following, sir, yes.
Q. When you obtained that identifying information, how did you communicate it and to whom?
A. I don't recall whom we passed it to. We -- I believe I recall, because we used radios and telephones, I believe that the information was relayed over the telephone, and it would traditionally go to a team leader. Usually there's a team leader. I don't recall who the team leader that day of the surveillance team, but it was passed on to them and they received the information, and that was that.
Q. As you gathered the information from the occupants of the car, was any of it written down anywhere?
A. I'm sorry?
Q. When you gathered the information identifying the occupants of the car, was it written down anywhere?
A. We might have scratched it on a piece of paper, and then we passed that on to the agent or one of the agents that was on the surveillance team.
Q. As you sit here today, can you tell me the name of any of the four people in the car?
A. I wouldn't recall.
Q. Do you recall the ethnicity of any or all of the people in the car?
A. I believe that the ethnicity of the occupants of the vehicle

were of Asian descent.
Q. Did you engage in a conversation with any of them other than the driver?
A. I recall only speaking primarily to the driver.
Q. Was the driver cooperative with you?
A. He argued the traffic stop for the violation of the red light, but after that we were fine. We were engaging in normal conversation.
Q. He told you that he thought the light was yellow when he entered the intersection; is that right?
A. Recall him saying that, yes, sir.
Q. And you told him no, it was red?
A. And I explained to him how I decided that, "No, you went through it when red," back and forth, which is a common thing when anybody that doesn't want to receive a ticket.
Q. You've had that conversation dozens of times with people you pulled over in red light violations, haven't you?
A. Many people like to argue the fact that they did not break a traffic law because they don't want to receive a citation.
Q. Other than the conversation about whether or not the light was yellow or red when he entered the intersection, he was completely cooperative with you?
A. He was cooperative, yes, sir.
Q. Polite?
A. Yes. From what I recall.

Q. Did he say anything to you at any point that you believed was untrue?
A. Not that I can recall.
Q. After the encounter when the target vehicle pulls away, did you continue to follow or monitor the vehicle at all?
A. No.
Q. Is there anything else that you did with relation to this case that day other than what you've told us about?
A. No.
Q. So I just want to make sure that I understand this correctly. Somewhere near the airport and Cumberland Avenue, you first placed eyes on this vehicle. Your request from the FBI is to monitor the vehicle for a traffic violation and pull it over to learn the identity of the people in the car if you can, and within ten minutes the driver violates the law and you're able to pull him over; is that accurate?
A. So the request was to attempt to identify the individuals of that vehicle, and within ten minutes of me having eyes on it -- no, I'm not certain about that. Might have been a little longer. Ten minutes is because I told you that I believe I saw the car initially near the rental agency and then later we were able to fall into the -- basically the trail or the line of vehicles that were following them, which I don't know all the cars that were following, how many individuals were in. And then after being on that 10 to 15 minutes later, we were able to

see the driver of that vehicle commit a traffic violation and initiate a traffic stop based on that violation.

Q. So from the point at which you fall in line behind the vehicle, have eyes on the vehicle, you're capable of monitoring the vehicle's traffic compliance, within 10 or 15 minutes you find a violation and pull the vehicle over?

A. Well, it went about 10 to 15 minutes, if that's the correct time. He violated a traffic law, yes, sir.

MR. WEINHARDT: I have no further questions.

THE COURT: Any redirect, Mr. Griess?

MR. GRIESS: One moment, Your Honor.

I have nothing further, Your Honor.

THE COURT: Detective, you can step down. Thank you.

THE WITNESS: Thank you, ma'am.

(Witness excused.)

THE COURT: Does the Government have any additional evidence they'd like to offer in connection with the suppression hearing motions that we're taking up this week?

MR. GRIESS: No, Your Honor.

THE COURT: Mr. Weinhardt, do you have any evidence you'd like to offer?

MR. WEINHARDT: We do, Your Honor. We would like to call Chicago Police Officer Alex Reina.

THE DEPUTY CLERK: Please raise your right hand.

ALEXANDER REINA, GOVERNMENT'S WITNESS, SWORN

THE DEPUTY CLERK: Thank you. Please have a seat.

DIRECT EXAMINATION

BY MR. WEINHARDT:

Q. Officer Reina, good afternoon.

A. Good afternoon.

Q. You were employed with the Chicago Police Department; is that correct?

A. Yes.

Q. I would like to talk to you about an event that occurred on May 4th of 2012. Were you employed with the Chicago PD at that time?

A. Yes, I was.

Q. What was your assignment at that time?

A. I was assigned to the FBI's Joint Terrorism Task Force.

Q. How long had you been a Chicago police officer in May of 2012?

A. About 22 years.

Q. And can you describe for us briefly your career path through the Chicago PD up to that point?

A. Sure. After the academy, I was assigned to the Tenth District, which is the regular city district, for about ten years, for a few years. And then I was detailed to a special project called the Terrorist Target Index, and after that, was doing that for a few years, and that's when I was tapped to go to the Joint Terrorism Task Force.

Q. How long had you been on the Joint Terrorism Task Force by 2012?
A. Approximately six years.
Q. We've heard testimony from Officer Angel Lorenzo. Was he one of your co-workers on the task force at that time?
A. Yes, sir.
Q. You two know each other well?
A. Yes.
Q. I'd like to talk to you about a particular event on the 4th of May of 2012 having to do with surveillance and a traffic stop. Do you remember that event?
A. Yes, I do.
Q. Can you tell me, just as a general matter, what do you recall that you and Officer Lorenzo were directed to do that day?
A. We were both at the office and an agent came -- came to us and asked if we were available to attempt to stop a car with some subjects in it for to see if we can gain some -- identify them.
Q. And did you proceed to do that?
A. Yes.
Q. What sort of vehicle did you operate in order to do that?
A. A Chicago police unmarked squad car.
Q. Who was driving that car, you or Officer Lorenzo?
A. Officer Lorenzo.

Q. And where was it that you made contact with what I'll call the target vehicle?
A. We left the building and drove the highway. We ended up finally seeing them, sighting them on Cumberland Avenue in Chicago.
Q. I'll fast-forward ahead a little bit. As I understand it, the stop was made at the intersection of Cumberland and Montrose. Does that square with your recollection?
A. To the best of my recollection, yes.
Q. Where on Cumberland relative to Montrose did you make contact with the target vehicle, north or south?
A. I think it was south, south of Montrose on Cumberland.
Q. And how far away from Montrose was it when you made contact with the target vehicle?
A. When I made contact with the vehicle?
Q. Well, I'm sorry. When you first acquired a visual on the vehicle --
A. Oh.
Q. -- and were able to follow it so that you could continuously monitor it, how far from Montrose were you when that first happened?
A. I don't recall. It was -- it was further before Montrose somewhat.
Q. Just ballpark, a mile, two miles, eight miles?
A. Again, I wasn't driving, I was busy on the phone, so I want

to say like a mile, something like that.
Q. When you say you were busy on the phone, tell us who you were talking to and what about.
A. I was attempting to communicate with the FBI's MST, mobile surveillance team. They were the -- that was the unit that was going to guide us to the target vehicle.
Q. Do you recall the make and model of the target vehicle?
A. No. I don't recall ever seeing them -- oh, I'm sorry. The target vehicle? I thought you meant --
Q. Not the MST, but the target vehicle.
A. Not the MST. I remember it being an SUV, a bigger car or SUV. That's all I know.
Q. All right. So once you and Officer Lorenzo got a visual on the target vehicle, can you tell us what happened from there?
A. We continued our visual. We observed them cross against a red light on Montrose Avenue.
Q. How long was it from the point where you got a visual and you were able to monitor their traffic behavior to the point where you pulled the vehicle over? How many minutes?
A. From the point that I initially saw them a mile back? We were following --
Q. Right. Exactly.
A. I don't know. About a mile.
Q. So about a mile. And how long did it take to go that mile before you saw the traffic violation?

A. It took a little bit because there was traffic. A number of minutes.

Q. Under ten?

A. Under ten, yeah, I would think so.

Q. Let's talk about the actual stop. I'm going to show you an aerial photograph.

MR. WEINHARDT: If I may approach, Your Honor.

THE COURT: Yes.

MR. WEINHARDT: Jason, do you want to --

BY MR. WEINHARDT:

Q. I'm showing what we'll mark as Exhibit 5-1, and can you tell me where the vehicle that you stopped was -- and I'll tell you that north is me and south is you.

A. Okay. South is me?

Q. Yes. So can you tell me where the vehicle that you stopped was when you pulled it over and where you were when you engaged the vehicle and what direction you were?

A. Well, I recall them going southbound away from the airport, so then I'm assuming now that it maybe wasn't Cumberland, I'm assuming that they were coming this direction going southbound.

Q. Okay.

A. That's my recollection.

Q. Okay. Well, I simply want your best recollection. Can you draw an arrow for me showing the direction of travel that they were going?

A. Sure. They were going south.
Q. And were you also going southbound?
A. Yes. We were behind them.
Q. Can you tell me where their vehicle was -- well, strike that.
Did you see the light turn from yellow to red?
A. Yes.
Q. Can you tell me where the target vehicle was -- draw a little rectangle for me, if you will --
A. Uh-huh.
Q. -- at the point where the light turned from yellow to red?
A. It would be there.
Q. It was in the intersection when the light turned from yellow to red?
A. Yes.
Q. Okay. Now, once you saw the light turn from yellow to red, did Officer --
A. No. It was in the intersection when the light was red.
Q. Oh, it was in the intersection, yeah. Okay. What I want to know is at the moment when it turned from yellow to red, is that --
A. Oh.
Q. -- where it was when you --
A. No. It was a little -- it was a little bit passed the stop line, as I recall. There's a stop line right here. When it

turned from yellow to red, it was passed the stop line entering the intersection already.
Q. Okay. Now so let me put it this way: I'm going to draw a little dotted line that would sort of be --
A. The stop line.
Q. -- hopefully the crosswalk.
A. Crosswalk, okay.
Q. Okay. And it was past the crosswalk but in the intersection when the light turned from yellow to red; is that correct?
A. Correct. Correct.
Q. I got it. Once that happened, did Officer Lorenzo activate his flashing lights and siren and that sort of thing?
A. Yes, he did.
Q. And then pulled the vehicle over?
A. Yes.
Q. All right. Tell me what happened once he did that.
A. The target vehicle pulled over when it was safe to do so. Officer Lorenzo got out of his -- stopped his vehicle behind the target vehicle, Officer Lorenzo exited his vehicle -- the vehicle and walked towards the target vehicle, as did I.

I was what we call cover officer. I was the officer that was to the right. Since I was the passenger, it would be normal for me to exit my car and walk towards the target vehicle to the right.

Officer Lorenzo engaged in conversation with the driver, and at that time I was the cover officer. For safety reasons, I just kept my visual on the passengers in the vehicle.
Q. Did you converse with any of the people in the vehicle?
A. Very briefly. When Officer Lorenzo asked for identification, I asked the passenger for his identification as well.
Q. Did you write it down?
A. Yes.
Q. Did you also obtain identification information for the other individuals in the car?
A. You know, I don't recall taking identification from the third passenger, but it would be safe to assume that I did because he was on my side.
Q. Do you know whether Officer Lorenzo took identifying information from the passenger behind the driver?
A. Yes, I would think so.
Q. Was any citation issued to the driver?
A. No.
Q. Why was no citation issued to the driver?
A. Illinois is they call a -- what do you call -- it's a state where we don't have to issue tickets if we don't -- if we don't feel the need to. The car was -- the target vehicle wasn't blatant in disregarding the red light so we felt that just a verbal warning would suffice.

Q. All right. When you obtained the identifying information from the people in the car, did you communicate that to other people?
A. Yes.
Q. How did you communicate that?
A. Through a phone.
Q. Just orally read it to them?
A. Yes.
Q. What was the demeanor of the people in the vehicle?
A. They seemed friendly. I didn't -- I don't recall seeing or experiencing any -- any anger or anything like that.
Q. Did you have any difficulty communicating with any of them in the English language?
A. I recall just my interaction with them was minimal because I just asked them for his identification. I may have asked one or two things, I don't recall. But so while I do remember that there was an accent in their speech, it did not -- it did not hinder me in any way to get my information.
Q. Did any of the individuals in the vehicle say anything that you found to be untrue?
A. No, I don't recall.
Q. Would you characterize them as being cooperative with your stop?
A. Yes.
Q. Did the driver in your hearing contend that the -- that he

had complied with the law, that he had not violated the red light law?

A. Yes, I do recall.

Q. And he told you the light was yellow and not red?

A. Correct.

Q. Was that a conversation with you or a conversation with Agent or Officer Lorenzo that he had?

A. That was with Officer Lorenzo.

Q. After this encounter, did you continue to follow the vehicle at all?

A. No.

Q. In your duties on the Joint Terrorism Task Force, how many traffic citations would you issue in a year?

A. I don't recall writing any traffic citations.

Q. If in your duties with the JTTF you made a traffic stop, it wasn't because you were enforcing the traffic laws, it was because you were interested in, for example, learning the identity of the people in the vehicle or something of that sort; is that accurate?

A. That's correct.

Q. And you've done that on other occasions besides this one; isn't that true?

A. Yes.

Q. Sometimes with a partner who's the driver of the police vehicle, sometimes you've done it yourself?

A. Yes.
Q. Have there ever been any occasions where you were tasked to do something like this, make a stop of a vehicle upon learning that they had violated the traffic laws, and you never stopped it because they never wound up violating a law?
A. That's correct.
Q. Was that kind of frustrating when that would happen?
A. Yes. Yes, it is.
Q. How many times, just in percentage, how many times would it be that you would be tasked with doing an investigatory stop like this of a vehicle and you wound up not making a stop because they didn't violate the traffic law?
A. Well, we -- I haven't been -- myself personally, I haven't been tasked to perform this very many times. I would say about four times total while I've been with the JTTF, so I would think maybe once while we were following a vehicle that we did not stop them for because there was no -- no infractions.
MR. WEINHARDT: Thank you. I may be done, Your Honor. Let me check my notes.
I have no further questions.
THE COURT: Was it your intention to offer what's been marked as Exhibit 5-1?
MR. WEINHARDT: I apologize. Yes, Your Honor, I would offer Exhibit 5-1.
MR. GRIESS: No objection.

THE COURT: Are we going to make that a Government Exhibit 5-1, then?

MR. GRIESS: It doesn't make any difference. Yes. So that the numbering is not messed up, that's fine.

THE COURT: We'll call it Government Exhibit 5-1, and that's then admitted.

(Government Exhibit No. 5-1 was offered and received in evidence.)

THE COURT: Also, Officer, can you spell your first and last name for us?

THE WITNESS: Sure. Yes, ma'am. Alexander, A-l-e-x-a-n-d-e-r, Reina, R-e-i-n-a.

THE COURT: Thank you.

Mr. Griess, are you handling this particular witness?

MR. GRIESS: I am. Thank you, Your Honor.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MR. GRIESS:

Q. Officer Reina, did you observe a traffic violation on this day in question, May 4, 2012?

A. Yes, I did.

Q. What violation?

A. Running a red light, disregarding a red light.

Q. And my understanding of your testimony was at the time they entered the intersection, the red light had turned; is that

accurate?
A. Correct.
MR. GRIESS: That's all I have, Your Honor.
THE COURT: Any recross, Mr. Weinhardt?
MR. WEINHARDT: No, Your Honor. Thank you very much.
THE COURT: Okay. Thank you, Officer. You can step down.
(Witness excused.)
THE COURT: Any additional witnesses, Mr. Weinhardt?
MR. WEINHARDT: No, Your Honor. None for the defense.
THE COURT: Mr. Lincenberg, any witnesses on behalf of Mo Yun?
MR. LINCENBERG: No, Your Honor.
THE COURT: Then that ends, I guess, the evidentiary portion of the suppression hearing. Let's talk about what happens next.
The parties have requested argument on the various issues that we have before us. Would you like to begin those arguments today? Do you want to come back tomorrow? What's your preference?
Mr. Griess or Mr. Krickbaum?
MR. KRICKBAUM: My preference, Judge, would be to argue the motions that you heard today. I think we can finish at least one of them, if not both.
THE COURT: Mr. Weinhardt, Mr. Lincenberg?

MR. WEINHARDT: Mr. Lincenberg went first, so I'll give him --

THE COURT: That was a nice dodge. That was well played.

MR. LINCENBERG: Your Honor, we'll go with the Court's pleasure. What time is the Court going to?

THE COURT: We need to be out of here by no later than 5 or else we get into overtime issues with our marshals and our court security staff, and our translators would have a particularly long day as well.

MR. LINCENBERG: It's really whatever the Court pleases. It's been a long day for everybody, but we're prepared to march forward today or go tomorrow morning.

THE COURT: How lengthy of an argument do you anticipate?

MR. KRICKBAUM: I have at this point less than five minutes of argument, maybe five minutes.

THE COURT: Okay. Mr. Lincenberg?

MR. LINCENBERG: I'm going to be much lengthier. I'll tell the Court what I plan to do with my argument, basically break it down to three parts: one, summarize the factual points that we think were garnered in the hearing today that are relevant; two, discuss those in terms of broader finding of fact; and, three, discuss those in terms of applying them to the law. And if I had to guess, I would maybe say a

half-hour.

THE COURT: Okay. Then we're going to break for now and argue in the morning, break with evidence and argument. There are a couple things I want to wrap up before we're done today, just administrative or what I'll occasionally call housekeeping kinds of matters.

There was a Defendant's Exhibit C that came in through Ms. Yun that was one of those hand-drawn tablet drawings that we need to get copies to everybody on.

Do we have an original, Mr. Chrismer, as part of our record?

Okay. Then did you already get copies to counsel?

All right. I'll remove that from my list.

I have admitted today during the hearing Defendant Mo Yun's Exhibits A, C, D, E, F, and G, with A, D, and E being sealed. I have admitted on Mr. Mo's behalf an A, Defendant's Exhibit A or an MH-A as we called it, which includes what was Government Exhibit A-1, as well as the original Defendant's Exhibit A, and then I have Government Exhibits 1, 2, 3, 4, 4-1, 5, and 5-1.

Does anybody have anything different than that?

MR. GRIESS: No, Your Honor.

MR. LINCENBERG: No, Your Honor.

THE COURT: We have H. Did Mo Yun identify H as well?

MR. LINCENBERG: We marked it for identification. It

was the June 27th, 2007, transcript. We don't need it to be admitted.

MR. GRIESS: Okay.

THE COURT: Okay. Then that resolves the exhibits.

Did the Government get a chance to talk about whether or not you would like me to seal Government Exhibit 290-2, which contains the names of some of the essentially unindicted potential conspirators, or do you want to work to redact that and refile it?

MR. KRICKBAUM: We would request that you simply seal it.

THE COURT: That's the easier route, certainly. I'll go ahead and seal, then, Government Exhibit 290-2.

Do, if you can, glance through your responses and see if I missed any. That issue didn't hit me until I was towards the tail end of my review of documents, and so it may have come up sooner and just not registered with me.

Okay. Going back to last week, the parties provided me with a stipulated protective order. Earlier today that was filed at Docket 359 in this particular case. I did make a few changes to it; two that are, I guess, arguably substantive, and the rest were typographical corrections.

We corrected throughout the misspelling of the word acknowledgment, and we also corrected the numbering of paragraphs. There were some duplicate paragraph numbers in

there that we corrected and then made those changes.

I then also added one particular footnote and I added one particular requirement regarding counsel who are not of record in this case. I've got a red line version of that for each of the parties to see. And in particular, there were changes to paragraph 1, which is the addition of a footnote, and paragraph 6a, subpart (ii) or double small letter i on page 8.

So there are the red line versions. I'll have Mr. Chrismer hand those out.

Otherwise, the substance of your order was left exactly as it was submitted to me.

Anything else we need to take up today?

MR. GRIESS: Your Honor, we'll work with Mr. Chrismer to make the correction to the defendant's exhibit as far as adding that page as soon as we're done today.

THE COURT: Okay. Anything else before tomorrow? Any additional witnesses expected? It's all argument tomorrow, correct?

MR. BIRD: Right. Can we just get some sense, Your Honor, of the order of argument for tomorrow?

THE COURT: We will start with the issues that had evidence on them, then we'll turn to the active suppression matters, which would be all but, basically, the James or the Franks allegations, and then at the conclusion I'll allow

argument or whatever record you wish to make with respect to the alleged Franks violations and the James hearing requests.

As far as time limits, just reasonable. Succinct, if possible. I've read everything, you know, I've heard the testimony. Certainly most of these issues are not overly complex.

I can tell you from a familiarity standpoint or an interest standpoint, I am most interested in, of course, the custody issue surrounding Ms. Yun's statement, I think that's one of the more complicated legal issues that we're faced with, and the essentially foundation kinds of issues that may arise in connection with the cut-and-paste IM messages. I think that's the secondary most complicated issue.

I don't see the traffic stop as particularly controversial here, either one of them, frankly, but I'll hear argument on that. We've resolved -- most of the rest of these can be resolved on paper, and I'll hear argument on whether or not there's probable cause and whether it's stale and all the various arguments that have been raised. I'm interested in the thoughts regarding those particular issues.

But to me, the two that I see as the most difficult are those two, and those are both ones that affect Mo Yun primarily -- or, I'm sorry, Ms. Mo.

Anything else to talk about today?

MR. GRIESS: No, Your Honor.

MR. WEINHARDT: No, Your Honor.

THE COURT: Okay. Then I'll see everybody here at 9 o'clock in the morning. Thank you.

(Recess at 4:19 p.m. until 9:00 a.m., Wednesday, May 20, 2015.)

C E R T I F I C A T E

I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28, United States Code, Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated at Des Moines, Iowa, this 5th day of June, 2015.

/s/ Kelli M. Mulcahy
Kelli M. Mulcahy, CSR No. 941, RMR, CRR
Federal Official Court Reporter