IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | |
| vs. | Case No. 4:13-cr-00147 |
| MO HAILONG and MO YUN, Defendants. | HEARING TRANSCRIPT<br>Volume II |

Courtroom, First Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Wednesday, May 20, 2015
9:00 a.m.

BEFORE: THE HONORABLE STEPHANIE M. ROSE, Judge.

KELLI M. MULCAHY, CSR, RMR, CRR
United States Courthouse
123 East Walnut Street, Room 115
Des Moines, Iowa 50309

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JASON T. GRIESS, ESQ.<br>MARC KRICKBAUM, ESQ.<br>Assistant U.S. Attorneys<br>U.S. Courthouse Annex<br>110 East Court Avenue, Suite 286<br>Des Moines, Iowa 50309-5053 |
| | MATTHEW R. WALCZEWSKI, ESQ.<br>United States Department of Justice<br>600 East Street North West<br>Washington, D.C. 20004 |
| For Defendant Mo Hailong: | MARK E. WEINHARDT, ESQ.<br>HOLLY M. LOGAN, ESQ.<br>Weinhardt & Logan, P.C.<br>2600 Grand Avenue, Suite 450<br>Des Moines, Iowa 50312 |
| | MARK E. BECK, ESQ.<br>Mark Beck Law, P.C.<br>350 West Colorado Boulevard, Suite 200<br>Pasadena, California 91105 |
| For Defendant Mo Yun: | LEON F. SPIES, ESQ.<br>Mellon Spies & Pavelich<br>312 East College Street, Suite 216<br>Iowa City, Iowa 52240 |
| | TERRY W. BIRD, ESQ.<br>GARY S. LINCENBERG, ESQ.<br>DAVID H. CHAO, ESQ.<br>Bird Marella, P.C.<br>1875 Century Park East, 23rd Floor<br>Los Angeles, California 90067-2561 |
| Also Present: | JANE HU and CHAN PING CURTIS<br>Interpreters |
| Also Present: (Via telephone) | PHILIP HILDER, ESQ. |

P R O C E E D I N G S

(In open court with Defendant Mo Yun present.)

THE COURT: Thank you. You can be seated.

We are back in the matter of the United States vs. Mo Hailong and Mo Yun. It's Case No. 4:13-cr-00147.

Joining us again on behalf Mr. Mo are Holly Logan, Mark Beck and Mark Weinhardt; on behalf of Ms. Mo, Gary Lincenberg, Terry Bird, Leon Spies, and David Chao. Ms. Mo joins us personally. And the United States is represented by Assistant United States Attorney Marc Krickbaum and Department of Justice trial attorney Matt Walczweski.

We are also joined by our interpreters, the same interpreters as we had yesterday, Jane Hu and Chan Ping Curtis.

And if the clerk will swear in our interpreters.

JANE HU and CHAN PING CURTIS, INTERPRETERS, SWORN

THE COURT: Thank you.

We are here for purposes this morning of oral argument on a variety of motions to suppress. Anything we need to take up before we begin those arguments?

MR. KRICKBAUM: No, Your Honor.

THE COURT: Mr. Krickbaum, are you arguing all of the issues?

MR. KRICKBAUM: I am, Your Honor. Well, I should say there's at least one matter that Mr. Griess is going to handle relating to the instant message chats of Mo Yun and Mo Hailong.

I anticipate we probably won't get to that first thing this morning, so he plans on joining us later.

THE COURT: Okay. Let's go ahead and take up, then, essentially, the order in which we heard evidence, and that's, then, Ms. Mo's statements at LAX airport.

Would you like to present argument on that, Mr. Krickbaum?

MR. KRICKBAUM: Yes, Your Honor. Thank you.

Judge, I think the evidence that you heard yesterday shows that Mo Yun was not under arrest or the functional equivalent of arrest at the airport on July 1st of 2014. And I guess I'll start with what I think is one of the most important facts here, which is that at the conclusion of this interview, Agent Betten told the defendant that she was under arrest and that she was not free to leave. That was the first time she was told that, and her reaction upon hearing this news was shock and disbelief.

And admittedly, Mo Yun was dealing with a lot of information at that point and was in an extremely unenviable situation, but I think for purposes of this motion it's important to know that when she's told she can't leave, she is stunned to hear that news.

And looking at the transcript that we discussed yesterday on page 14, this is using page 14 of 21, she asks, after she's told she's under arrest, she asks, "I have been

arrested?" Incredulous.

The agents and officers assure her multiple times that she has been arrested and she's not free to leave. She says on page 15, "I have to stay here right now?" as if for the first time she's realizing that.

Again the agents and officers tell her she's under arrest, and again on page 15 she says, "Can I go back to China and we can talk to our lawyer?" Again, they assure her that, no, she is not free to leave, and on page 16 she asks, "How can I leave now? How can I leave?"

And repeatedly throughout those pages of the transcripts the agents tell her that she cannot leave, and she replies over and over telling them, "No, no, no." And the reason that Mo Yun had those reactions when she was told she was under arrest is that she had every intention of getting on that airplane and every intention of walking away from the agents and officers at the end of their conversation.

Now, Mo Yun's subjective understanding of what was happening in that interaction is not controlling because the legal question is what would a reasonable person under the circumstances believe. But in our view, Mo Yun's actual belief that she was free to leave was reasonable because this was a consensual encounter between the police and a member of the public in a public place.

The encounter was consensual, and I think the evidence

yesterday shows that. Officer Esguerra, who was the third witness to testify yesterday, was the first person to approach Mo Yun at the airport, and he testified that he identified himself and asked her something to the effect of, "Can we ask you some questions?" and she agreed. That is a consensual encounter.

Now, Officer Becerril, who was a step or two behind, did not hear that initial conversation, and Agent Betten didn't capture it on the recording because he joined a few seconds later, and so that very initial interaction isn't captured by the recording, but Officer Esguerra's testimony, I think is credible on that point.

He did testify that he couldn't remember with certainty every specific word that he said that wasn't recorded, but I think his testimony is corroborated by Agent Betten's testimony, and Agent Betten testified that before they approached Mo Yun they had a briefing, and the plan that day was very clear; the officers who were going to approach her, the plan was that they were going to ask her whether they could speak to her, whether they could ask her questions.

That was their plan going in, and I think Mr. Lincenberg, I think, would have the Court believe that Agent Betten hatched this elaborate plan to get Mo Yun, but I think you'd have to conclude on Mr. Lincenberg's version that the plan broke down at its very first step, that they didn't ask her what

they had planned to ask her, which was, "Can we ask you some questions?" And I don't think that's a reasonable inference from the evidence you heard.

So the encounter was consensual because when the police approach somebody in a public place and say, "Can we talk to you?" and that person agrees, that is generally considered a consensual encounter. And I would point the Court's attention to the Supreme Court's decision in Florida v. Royer. The cite is 460 U.S. 491. It's a 1983 case, and it's a case that is quoted extensively and relied on in the Eighth Circuit's decision in Stephenson. We cited Stephenson in our brief, but the full cite to Stephenson is 924 F.2d 753. It's a 1991 Eighth Circuit decision.

What the Supreme Court said in Florida v. Royer, as quoted in Stephenson, is law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he's willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer without more convert the encounter into a seizure requiring some level of objective justification.

And in Stephenson, the Eighth Circuit case that's relied on Florida v. Royer, the factual scenario in that case is

that a group of people got off of an airplane and they were immediately questioned in an airport terminal by DEA agents and Port Authority police and the agents approached the group and they asked if the group would be willing to answer a few questions and the group agreed to do so. The Eighth Circuit held that the group was not in custody in that circumstance and that Miranda doesn't apply.

In addition to being consensual, this encounter was very much in public. Airport terminals are public places. This particular airport terminal was very crowded with numerous members of the public, fellow passengers. An airport terminal is essentially a shopping mall that you have to buy a ticket to get in, and if you're lucky, you get to escape when your flight leaves.

But that is a public place, and it certainly was not a place that was police dominated. There were far more civilians and passengers in that terminal that day than there were police officers or agents.

Now, I think there was slightly different testimony about where the officers initially had their encounter with Mo Yun, whether she had already picked out her spot in the seating area or whether she was moving toward that area, but even if you assume that they initially approached her while she was still moving toward that area, Officer Becerril's testimony was that they approached her and she kept walking the way she was going.

She kept moving in the direction she was already moving, and the police did not impede that.

And I think what is very clear from this testimony is the police did not move her, they did not force her to go anywhere. They did not corner her, as Mo Yun's brief states. They sat in the only area of the gate seating where there were open seats, and there were people all around them, people that were so close that Agent Betten considered the fact that all these people would be able to hear their conversation.

And when the police take someone into custody or the equivalent of custody, they don't take them to a crowded airport gate and plop them down in order to interview them there. I've never seen a custodial situation or a situation that is equivalent to custody or associated with custody where the police decide they're going to conduct their interview with screaming children and fellow passengers on all sides.

And when the police interview someone who's in custody or the equivalent of custody, they don't let that person keep her cell phone. They don't let her sit down and stand up as she pleases. They don't let her hold her 5-year-old child in her arms. That is not a degree of restraint that is associated with being in custody.

Mo Yun makes much of the fact that she was arrested at the end of this encounter, and of course she was, but I think the law is clear on this point, that a policeman's unarticulated

plan has no bearing on whether a suspect was in custody. The Supreme Court said that in Berkemer v. McCarty, which we cited in our brief.

The fact that no one announced this plan to Mo Yun at the beginning of the encounter makes it irrelevant to the question of whether she was in custody because the issue is what a reasonable person in her circumstance would have believed, and a reasonable person in her circumstance did not know about the arrest warrant.

Another factor for the Court to consider is whether the officers used deceptive tactics, and, of course, they did here. That is one factor for the Court to consider. It is by no means controlling.

I would say this: The deceptive tactics that were used were the exact opposite of strong-arm tactics. To the extent that they were deceiving her, what they were doing was not telling her that there was a warrant for her arrest and that at the end of this conversation she was not going to walk away. They hid that from her. They made it appear like their questions to her were routine, when, in fact, they had ulterior motives, but, of course, the police can have ulterior motives when questioning people and the police can deceive people.

And I think the sort of deception that was used here is inherent any time the police have a warrant for someone's arrest and they approach that person and attempt to interview

them before arresting them. If Mr. Lincenberg has a warrant for my arrest and he comes up to me but he wants to see whether he can get me to talk before arresting me and he doesn't tell me he's got a warrant for my arrest and he starts to chat me up, he's deceived me, and police officers deceive people in these circumstances.

But it cannot be, and I'm aware of no case holding that officers can't do that, that when officers have an arrest warrant they have to march up to the person and announce immediately, "You're under arrest," that they cannot attempt to have a consensual interview beforehand. If that were true, there would have been no reason for the Supreme Court to note that the unarticulated plan, including a plan of arrest, doesn't control whether someone's in custody.

There's the language issue, which I'll address briefly. It's certainly true and we don't dispute that it is more difficult and more challenging to speak in a foreign language than to speak in your native tongue, but the fact of the matter is that Mo Yun speaks English and understands English.

First of all, the chats that we admitted as Government Exhibit 2 are chats between Mo Yun and her brother in which they are communicating exclusively with one another. Both of them are native Mandarin speakers, and in a number of chats they chose to communicate with each other in English. It's pretty

telling. I mean, when you talk to your brother using IM chats and you choose to use English, I don't think I need to say much more about that. It means that you understand English.

THE COURT: Wouldn't you agree, though, that there is a difference between writing in a foreign language and understanding, perhaps, what you hear in a foreign language and speaking that foreign language?

MR. KRICKBAUM: I do agree. I agree with that, Judge. There's no doubt about that.

THE COURT: And in times of stress wouldn't you agree those skills become even more critical?

MR. KRICKBAUM: I agree. But --

THE COURT: And in looking at the airport cases you have, do you have a single case where the person is sitting at a gate and their plane is boarding and police say or the Court says that's not -- you know, the person's reasonably free to leave at that point?

MR. KRICKBAUM: I don't know that there's a case that's that specific. I don't have one to cite to the Court.

THE COURT: Don't you think that's important whether somebody's getting off a plane versus on a plane?

MR. KRICKBAUM: I don't think it's important here, Your Honor, because I think --

THE COURT: How? How is that? If you're at a taxi stand and they're leaving the airport, that's a very different

thing than sitting at a gate that's boarding your flight. You're not free to leave that area, and the police officers knew that here.

MR. KRICKBAUM: I disagree, Judge, because I think it's clear from the evidence that Mo Yun fully planned to walk away and get on the airplane. I mean, in between then she could have gone to Starbucks or back to Hudson News. She didn't. But there is no question that she had every intention of walking down that jetway and getting on the airplane at the end of that interview. In my view, there's no doubt about it.

Because when she's told over and over again that she can't do that, her response is shock, as if -- as if she's just assimilating that information for the first time. And it's not because she didn't understand English; it's because she was planning on getting on that airplane.

THE COURT: Don't you think also that a critical fact here is the fact that the ruse used is we need to talk to you about your visa application and whether you've been truthful in your visa application?

This is not a U.S. citizen. This is a woman from another country who's only in our country -- whose only lawful ability to stay in our country is her visa, and she knows darn good and well, as anybody who comes into our country from another country understands, that those questions are not permissive, those are mandatory questions. If you're stopped by

Customs and they ask you questions, you don't opt out of that and think you're staying in our country, do you?

MR. KRICKBAUM: Well, certainly that's true when you're entering, you know. When you're about to leave, I mean, I can understand that Mo Yun may have wanted to preserve her ability to come back, but if there were visa problems, I don't think they would have prevented her from leaving, which it's clear that she had every intention of doing.

THE COURT: But the question is would a reasonable person in her situation feel free to leave. And it's not escape, it's not feel free to escape, you know, is there an escape plan.

MR. KRICKBAUM: Certainly.

THE COURT: It's feel free to walk away from that encounter. And here, depending on -- I won't call them versions, because I do find the officers credible and I do find that they've testified truthfully. I think there are some differences in how the approach happened here, but it's clear the approach was initiated by police and they either approached her when she was seated with her children in her gate area minutes from when her plane is going to be boarding or they follow her from a newsstand, a news kiosk, all the way over to where she's going to sit down.

We've got at least four officers with this one woman, one of whom is in uniform wearing a gun and baton, approaching

this woman, who is a citizen not of any country but of China, that has some of the worst human rights violations out there, and in which you, as a citizen, do not challenge the Government. If the Government says to you, "You'll answer our questions," you'll answer their questions.

And you're asking her immigration questions, and you didn't say, "May we?" The transcript doesn't say, "Is it okay if we talk to you?" It says, "We need," that's the word, "need" to ask you some questions. And it's clear in listening to the recording, whether this is a verbatim transcript or not, that's in the recording.

MR. KRICKBAUM: Yes. I agree.

THE COURT: "We need to ask you" questions about your visa application, and then the follow-up question, "Is everything in here true?" implication being, "Did you lie to us?" And then they start asking her questions.

I understand here that the Government made the strategic choice, a calculated risk, not to give her her Miranda rights, hoping that whatever she told you was worth the risk that you might lose against her whatever she told you, but how do you argue under those circumstances that she would have felt reasonably free to leave?

MR. KRICKBAUM: Well, there's a few factual issues and then legal issues. And some of these factual issues may not be determinative to the Court, but I don't think the evidence

showed that they followed her from, you know, a long distance, from the initial Hudson News to the gate area. My recollection of the testimony was that it was a few steps and that the time when she went from the kiosk area to the gate area was a matter of seconds. So that's my memory of the testimony, and the Court's memory may differ.

I don't think it can be true that people who come here from countries with, let me say, more authoritarian regimes than ours, that we should assume that they can't have consensual encounters with the police in the United States.

In other words, while it may well be true that if authorities in China approach you you can't say no or it's generally assumed you can't say no, but I don't think that that means that we should assume that anyone who comes here from a foreign country whose laws are different from ours can't say no to the police in the United States.

And I guess I'm not sure there's anything I can say to convince the Court on this point other than to go back to what I started with, which is as a matter of fact, in my view, she did feel free to leave because she was about to leave. I think she couldn't have expressed more clearly that that's what she was fully planning on doing after these guys finished asking her the questions that they had to ask her, and in our view, her actual belief was not unreasonable.

But I understand the Court's concerns. I don't know,

you know, if there's much more I can say, Your Honor, beyond what I said.

THE COURT: Thank you, Mr. Krickbaum.

MR. KRICKBAUM: Thank you, Judge.

THE COURT: Mr. Lincenberg.

MR. LINCENBERG: Your Honor, Mr. Krickbaum opened his argument by saying that the question was whether or not Mo Yun, Ms. Mo, was under arrest. The question is not whether Ms. Mo was under formal arrest. The question, as stated in U.S. vs. Griffin, is as follows: That custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way.

That's the standard, quote-unquote, from Griffin, and it's pretty telling about the difference in the approach here between the Government's argument and the defense argument in that Mr. Krickbaum has tried to always focus on when our client was told that she's under formal arrest, but that's not what is at issue in this case.

This is a case where, as the Court found, Officer Becerril testified truthfully and he testified that there was never a question that Ms. Mo was in custody and not free to leave from the time that the interrogation started.

Now, in a situation where the agent admits that and where our client is saddled with no luggage, children hanging around her neck, about to leave, trying to leave the country, in

a secure portion of the airport where she has no realistic freedom of movement, and, as the Court points out, knows that she has got to answer these questions, particularly when it's Customs and Border Patrol folks who come up to her if she wants to ever have a chance of being able to leave, it is clear that she is deprived of freedom of action in a very significant way.

And under these circumstances the Government has the burden to prove that a reasonable person in Ms. Mo's situation would have considered her freedom of action restricted in any significant way. They have come woefully far from meeting that burden.

Your Honor, this began on June 30th, July 1st of 2014, when agents obtained a warrant that ordered an arrest without unnecessary delay, and Agent Betten truthfully testified that his interrogation was unnecessary and that it caused delay.

On July 1st, the place of interrogation was in the most intimidating spot that the agents could have found to interrogate her before actually handcuffing her; within the security zone of an international departure gate area, a zone where the agents were permitted to enter only because of their law enforcement role, where they clearly had the upper hand.

The first approach to Ms. Mo, there is some inconsistent testimony on where it occurred. I'm not sure how material it is, but Officer Becerril laid out in his diagram that where Ms. Mo was approached was in the hallway, the

concourse area, and I would submit the evidence is clear that she was led over to an area where there would be -- whether it's for control of the situation or privacy, it's clear why they would want to have her not in the middle of this crowded seating area.

And they took her over to a window. Three much larger male agents in deep voices with a gun showing and the baton showing then stood in front of her with seats behind her. She was physically constrained. And Agent Betten even testified that they were probably even closer in Ms. Mo's face than they would have ordinarily been because of the background noise. She, faced with walls in front of her, posts to the left, agents in front of her, a daughter hanging around her neck and seats behind her, had no place to go.

The conditions of interrogation were pressured. The atmosphere was obviously harried and hurried, and the FBI knew that English was not her first language. They intentionally did not make an interpreter available to gain an advantage, and knowing that she was in a foreign country, operating in a foreign language, they nevertheless proceeded.

They knew that she would be focused in primary part on the care and custody and well-being of her 5- and 12-year-old children. They knew that her children's visa was about to expire. They knew that she had checked three pieces of luggage. A reasonable person in that situation would understand that

their luggage was already loaded on the plane. They knew that she had no residence or hotel room in the United States anymore.

There was an interference with her ability to avoid this intimidating, coercive atmosphere. The first was by the deception and the ruses that they created in stopping to ask her about her visa and immigration issues.

As the Court notes, Officer Becerril said, "We just have some questions that we need to ask you." Okay. Now, there's some inconsistency in the testimony as to whether prior to tape-recording she was asked a similar question. I don't think it's of any consequence because the courts made clear that what is important is not whether somebody's polite when somebody like a CBP officer comes up and says, "Do you mind if we ask you some questions," it's whether or not she's advised that this is voluntary and the like.

But nevertheless, it is a little bit telling to the hearing that the Government has Officer Esguerra get on the stand and say we asked her a similar type of question before she was on tape, and on cross-examination Officer Esguerra truthfully said, "Honestly, I don't recall anything about this," nor is it reasonable that he really would remember what was off tape from an interrogation, a brief encounter for him that occurred a year earlier, with hundreds of different interrogations in between then and now, another hundreds, if not thousands, before then, that I'm sure all swim together, to some

degree, in his head. There was nothing that would cause this to stand out as being of any significance to him.

The Court heard testimony that it wasn't until a week ago that tape recordings were played where these officers were contacted to go back in in an effort to try to refresh their recollection.

With regard to the question about whether or not she speaks a little bit of English, again, I don't think this is of major consequence. There's no dispute that our client speaks some English. There's no dispute that she writes in some English. But as the Court pointed out and as our expert pointed out, Professor Caldwell-Harris, the vast differences between verbal and written and when somebody is multitasking and there's extensive interference, that this breaks down the ability to answer questions and understand what's going on and puts much more stress and pressure on the person.

I'd respectfully submit that the reason why the officer said, "You speak English -- a little bit" was also preplanned. It made sense from the Government's point of view because they knew that if they had asked Ms. Mo, "Would you prefer to be speaking with us in English or Mandarin?" that Ms. Mo would have said, "Mandarin."

If they said, "Ms. Mo, are you fluent in English?" it's likely that Ms. Mo would have said, "No, I'm not fluent in English. I'm most fluent in Mandarin." That was a pre-planned

thing to do, and it allowed them to try to make a record, to try to be able to save an impermissible interrogation.

But even the answer -- "a little bit" was not responded to with an answer of yes. Although Agent Betten testified initially that Ms. Mo answered yes, the Court can see that there's no word "Yes" that appears on the recording. I played the recording of that portion in open court to demonstrate that repeatedly.

Even in the transcript they write "Uh-huh," and, in fact, if the Court carefully scours the -- which the Court has indicated that Your Honor has listened to the transcript. I didn't want to replay the entire tape in court, but there's numerous occasions where our client says, "Uhm," in a manner like that, and that's a type of way of responding to people in authority. You say something verbal to show that you're engaged and show deference. It's a way of sometimes speaking between people when they're looking at each other and they say, "Uh-huh, uh-huh," or something of the sort.

When I asked one of the officers, the officers also pointed out that Ms. Mo nodded affirmatively, and when I pointed out wasn't it the case that during the entire interrogation Ms. Mo's head was going up and down regularly in what can be described as an affirmative nod, they agreed, and that that occurred even when she was saying, "No," or, "Maybe."

This is the sign of somebody trying to listen to the

questions. And there are frequent announcements blaring in the background about flights, children crying, and noise from the passengers. It does not suggest that Ms. Mo is consenting to going along or that she wants to be interviewed or in the English language.

And also note that this transcript was prepared by Agent Betten, who admitted that at the time that that statement was made he was not even in Ms. Mo's presence. It's unclear how far away he was from her. It appeared to be a few feet. We can tell by listening to the tape recording that he was far enough away that you could not hear on the tape recording any audible answer, and it just goes to demonstrate both the intimidation and how language played a role here in making this a more intimidating atmosphere. And I pointed out several examples during the cross-examination of where this takes place.

There's also examples in the transcript of where we see that language is a problem repeatedly. Questions as basic as where, at page 8 of the FBI 302 transcript, Exhibit A, where Agent Betten says, "Did you know Dr. Li Shaoming," and Ms. Mo says, "No, no. I know him, of course I know him, but I do not know him."

And the Government, if this came into evidence, might try to suggest, well, that just goes to show that she's being dilatory, but it's pretty clear from listening to the tape that this is a person who is trying to pick out words and what do

they mean, know or this or that. They know that Ms. Mo knows him, and yet you see this difficulty in this loud atmosphere in a foreign tongue with all of these different tasks going through her mind that she's trying to understand the question.

At page 9 of the transcript, there's the question, "Are you familiar with the seed breeding industry and how that works?" And there's a brief pause, I would submit, suggestive of Ms. Mo trying to, "Familiar with?" or whatever, and the response in the transcript is, "Not for me." It's a non sequitur to the question.

And then Agent Betten comes back and says, okay, you're not familiar. You say you're not familiar with seed breeding, and there's this disconnect which is hampered by the language issues.

And yet despite this confusion and misinterpretation that continues throughout the transcript, at no point does Agent Betten suggest, "Would you like an interpreter?" At no point does he say, "There's an interpreter present who could help out." This is, of course, all compounded by the interference with the children and the background noise, and so forth.

Now, it is telling that only after the terminal interrogation ends does Agent Betten suddenly offer Mandarin translations, and what he offers is the Miranda warning in Mandarin. We have a copy of it. We did not introduce it as an exhibit because it's clear in the record in the transcript he

states, "I'm offering you this in Mandarin." And the consular rights form in Mandarin. And it's telling that you can see from the transcript that Ms. Mo reads this in Mandarin.

And why would Agent Betten, who is of the view that Ms. Mo speaks this perfect English, that she writes extensively and chats with her brother, and so forth, if it wasn't clear that Ms. Mo would have a better understanding and much more comfortable in her native tongue?

The post-interrogation tapes which were submitted under seal but were not the subject of much of the hearing yesterday also show Ms. Mo's lack of understanding of her rights here. At the audio tape which is -- I think it's DSE-21, which is the one that is six minutes and seven seconds long, at 10 seconds into the tape, and this is referenced also in the transcript which we filed as Exhibit A, when Agent Betten says, "Now, you're being charged," and Ms. Mo says -- responds by saying, "So I'm guilty?" which demonstrates that on the most basic of rights, the most basic of explanations, Ms. Mo is perhaps conflating the feeling that she probably grew up with when one is stopped by authorities in China and a lack of understanding of what Agent Betten is actually saying.

Even after Agent Betten reads her rights and asks if she understands them, she does not seem to understand. Instead, starting to read the written advisory in Mandarin, and at one minute and 30 seconds and then one minute and 50 seconds into

the tape, after reading her rights in Mandarin, she asks to speak to a lawyer, which also demonstrates that had she been advised or had this proceeding taken place without deception, in Mandarin, what would have occurred. And I think the agents knew that there was a good chance of that so they thought they'd take a chance.

Agent Betten freely testifies on the stand, he admits, and it's an agent note in the Exhibit A, the transcript, that Ms. Mo was -- that her ability to speak was frequently interfered with and it made it more difficult for him to even hear her answers clearly.

Now, the analysis for determining custody at least begins with Griffin. The Government, in their papers and today in oral argument, seem to avoid the Griffin analysis, and they avoid it by citing to some cases which say that the Griffin analysis is not the end of the road. These are guidelines to assist us. It doesn't mean that you don't look at the totality of circumstances, and there's no dispute that we should look at the totality of circumstances. But every court follows the Griffin custody analysis, and it provides a good guideline for taking us through the issues that the Court needs to decide.

The first question, what were the circumstances surrounding the interrogation, and the second, given these circumstances, would a reasonable person have believed she was at liberty to terminate the interrogation and leave or be

deprived of freedom of action in any significant way, in the wording of Griffin.

Griffin lays out six factors, and the Court says that the first three are important because they could tend to mitigate against custody if present. The Eighth Circuit states that the first factor is really the most important, whether or not the agents told Ms. Mo that she was not under arrest, whether they told her that she was free to leave or asked them to leave or that -- or told Ms. Mo that the questioning was voluntary.

And there's no dispute that the agents did none of these things, and courts point out that this is important. Courts that go both ways in determinations of custody in the various cases, such as Ali and Griffin, note that this is, quote, the most effective way for the Government to demonstrate that they are meeting their burden. This is something that is known to the agents because it's basic that it's the most effective way to do it, and yet Factor 1 undisputedly cuts in favor of the defense.

With regard to Factor 2, Factor 2 is whether a person would believe she had complete freedom of movement during interrogation. Here there are cases which make clear that freedom of movement goes to a variety of factors, including psychological restraints.

The Jorgensen case discusses that, which is cited in

Griffin, as does the Martin case, and it is pretty clear that Ms. Mo or a reasonable person in her shoes would have felt constrained from walking away from Immigration officers, from three agents with guns displayed in front of her, who have her in the corner of the exit terminal where she is going to have to satisfy them and knows that she can't leave unless they permit her to leave.

Factor 3 is, the way it's phrased in Griffin, who initiated the contact, and it's clear and undisputed that Ms. Mo did not initiate the contact. There's cases discussing whether or not the person themselves arranged for the questioning, which, of course, did not take place here.

Now, the Government tries to pick up on some language which says you can also look at whether somebody acquiesced in the questioning, and the courts make clear that acquiescence is not merely being polite, that that doesn't constitute a mitigating circumstance. The Griffin case self-cites to Dockery, which says there's no contact where the suspect initiated -- there's no custody because the suspect had initiated the interview there. They point to the Beckwith case, where there was no custody because the suspect had invited agents into their home.

These are the arguments that assistant U.S. Attorneys make where the facts are such that the person initiated the contact. They can't make -- they can't ignore that in a

situation like here, like we have here.

So with regard to these first three Griffin factors, we see that none of them are present for the Government in order to mitigate the custody. I would also add that while deceptive tactics fits into Factor 4, it's also relevant to Factor 3 because you have to look at whether or not somebody is acquiescing in a real situation or whether it's under a false premise.

The fourth through sixth factors in Griffin are suggestive of custody if they're present. Factor 4 looks at the tactics that were used, and we asked the question whether the agents used deceptive tactics. There's no dispute that the agents used deceptive tactics here.

Now, counsel makes the argument that well, agents sometimes use deceptive tactics, there's case law that says that agents can use various ruses at times. And we're not here to dispute that broader question today, nor are the courts who enter into this analysis. The analysis, though, is whether or not a person is in custody, how it affects the question of custody when such deceptive tactics are used.

We have a different situation here if, at the beginning of the interrogation, Agent Betten said, "Now, Ms. Mo, we're investigating this case. We want to ask you about the corn breeding. You're free to leave," or "We're going to be arresting you, but we'd like to discuss this with you," and if

they then, after that point, said, "And, by the way, one of the reasons is because we want to gather evidence that's favorable to your brother, Mo Hailong."

We'd have a deceptive tactic, but the courts would probably view that differently because it's in the context of Ms. Mo already being told she's in custody. As to the question of whether or not she's in custody, the admission that several deceptive tactics were used is an aggravating factor.

The fifth factor is whether the interrogation was police dominated, and a number of courts point to this as being a particularly important factor.

On the airport point, which I don't think I need to belabor because I've recognized the Court's comments on it, but even the Government's argument in their brief is that this is just not inherently custodial, being in an airport. Whether or not it's inherently custodial doesn't really get to the question that we have.

And when we pointed out that the Government's cases were all cases where somebody was exiting the airport at the taxi stand outside and the like, the Government did not refute that and in oral argument today concede as much.

The sixth factor is whether Ms. Mo was arrested when the interrogation was over. Obviously, she was, and courts point out that as being an important factor in the analysis.

So, Your Honor, the Government clearly has failed to

meet their burden of proof that Ms. Mo was not in custody, and we would ask the Court to suppress the interrogation that took place at LAX.

THE COURT: Thank you, Mr. Lincenberg.

Mr. Chrismer, if you'll get Mr. Mo on the phone.

(Discussion off the record.)

(Defendant Mo Hailong joined the hearing via telephone.)

THE COURT: Okay. Ordinarily, I would issue written rulings on motions to suppress, but we are dealing with such a large number of motions to suppress and we are dealing with time constraints such that to the extent I am comfortable and able to do so, I intend to rule from the bench on as many as possible of these motions.

So with respect to Defendant Mo Yun's motion to suppress statements made at Los Angeles International Airport filed at Docket 242, I am granting the motion to suppress, and here's why. I am not granting it on any analysis that there was a violation of the Court's order to present Ms. Mo without unnecessarily delay. I don't reach that particular issue here. Instead, what I do find is that the only issue here is custody.

And the standard, of course, is whether objectively a reasonable person in Ms. Mo's situation would have felt free to leave, and looking at the Griffin factors, and certainly I broadcast this in my questioning of Mr. Krickbaum, I do find

that those favors in totality weigh against the Government's argument and weigh in favor of the finding that Ms. Mo was effectively in custody at the time of the questioning.

Although I do find credible the testimony of Officer Esguerra, the supervisory Officer Becerril and Special Agent Betten on their testimony, I find that testimony establishes the following facts: Ms. Mo did not initiate the contact in this case, the agents did; Ms. Mo was never told she was free to go; she was never told that questioning was voluntary.

Ms. Mo was either followed by officers or approached once she was stationary, and where she was ultimately located was a place where her freedom was restrained in the sense of we have numerous officers standing around one woman with her two small children in an airport at a gate with her flight boarding at any moment. Ms. Mo did not have unrestrained freedom of movement, as I indicated, because of the timing of this particular approach of her.

Deceptive tactics were used. The interrogation was police dominated in the sense of we have four police officers and one, I would indicate on the record, very petite woman surrounded by four male officers, one of whom is in uniform wearing his gun and his baton.

It was pre-planned that no interpreter would be used here. The interpreter was available, was female, and could have been used but was not provided, which I think adds to the

atmosphere of police domination here. That is probably the one agent-type person with whom Ms. Mo might have connected emotionally, and that person was not used.

Adding to this police-dominated situation is the fact that these questions were from an Immigration officer and were styled as being in connection with her immigration documents, that being her visa application, which is the only thing that gave her legal authority to be in the United States. And clearly she understood, as any reasonable person facing Customs officers as a foreign visitor would, that she had to answer those questions, particularly when they were worded as we "need" to ask you questions about your visa application.

Obviously, she was placed under arrest at the conclusion of the interactions, and I just don't think here that we can divorce the context of the interactions here from the nature of the airport, that it's an outgoing flight, that it's an outgoing flight to a foreign country and we have a foreign visitor here who's been approached.

Given the totality of all of those circumstances, I do find that Ms. Mo was in custody and therefore was entitled to have her Miranda rights read to her before she was interrogated.

So let's move on, then, to the questions relating to the traffic stops. Mr. Krickbaum, are you arguing these as well?

MR. KRICKBAUM: Yes, Your Honor.

THE COURT: Go ahead.

MR. KRICKBAUM: And with the Court's permission, I'll address both stops in my argument, and I'm going to be reasonably brief.

I'll start with the cornfield sighting. As you heard yesterday, Your Honor, the Polk County Sheriff's Office received a call of a suspicious person being dropped off in the cornfield. This person was reported to be wearing a suit. When deputies arrived, they saw a suspicious person wearing a suit in a cornfield. The car that had been reported to have dropped this person off was not in the immediate area.

Deputy Bollman, the second witness to testify, then testified that the car returned to the area but it didn't stop where you would expect it to in order to pick up the man in the field; instead, it took a different route.

Taking all of this together, there was reasonable suspicion for a Terry stop in these circumstances. A person being dropped off in a cornfield in a suit is suspicious. There was reasonable suspicion to believe that this person could have been doing any number of things in violation of the law.

There was reasonable suspicion that he could have been trespassing in the field. There was reasonable suspicion to believe he could have been putting something in the field that didn't belong there, that he was hiding evidence in the field, that he was hiding himself in the field. There was reasonable

suspicion to believe he could have been taking something from the field, stealing something from the field.

The bar for reasonable suspicion is not a high one, and it was met in this case. That's really I have to say about the field sighting, unless the Court has additional questions.

THE COURT: I did have one question, and perhaps you don't know or perhaps we're not sure, but the tip that was called in from Altoona officer, I think it was 297, was that tip from the farmer whose land Mr. Mo left somebody in or somebody else or we don't know?

MR. KRICKBAUM: My understanding, Your Honor, is I believe it was from the brother of the field owner. I cannot tell the Court that for certain, but that is my belief and understanding.

THE COURT: And this is private land, clearly, correct?

MR. KRICKBAUM: It is. So if there aren't any other questions from the Court on the field sighting, the traffic stop in Chicago, here I'll be more brief.

Two Chicago police officers testified that they saw this SUV run a red light and then they pulled the car over. They had probable cause for the stop based on traffic violation, and they certainly had reasonable suspicion for the stop based on the same traffic violation. There's been no contrary testimony to the testimony of the two officers that the car ran

the red light.

I really don't have anything else to add.

THE COURT: Thank you, Mr. Krickbaum.

MR. KRICKBAUM: Thank you, Your Honor.

THE COURT: Mr. Lincenberg, is this one -- I'm sorry. Mr. Weinhardt.

MR. WEINHARDT: This one is mine, Your Honor.

Kyle, could I have the ELMO?

Your Honor, in each case, I think that the conduct that has been demonstrated by the testimony in yesterday's proceedings needs to be clearly held up against the governing law, and when that is done, the picture I think looks substantially different than what is presented by the Government.

The Government in this proceeding has to prove by a preponderance of the evidence in this courtroom that there was reasonable suspicion that in each case a crime had been committed, and I don't think that the Government is able to make that showing in either case.

Let me first talk in the same order that Mr. Krickbaum did about the stop near Bondurant, Iowa. There are two different problems with this search or with this stop, first because the tip is anonymous and uncorroborated and secondly because there is not probable cause that a crime was committed.

First, with regard to the anonymous tip, the answer to

the Court's question is first and foremost there is nothing whatsoever in yesterday's record with regard to who the anonymous informant was. We know that a tip came in secondhand through this Altoona police officer, but we have no idea who that anonymous informant was.

Secondly, it really doesn't matter today whether we have some suspicion about whether this was a landowner or a neighbor or a passerby or whatever. What matters is what evidence was in the possession of the officer at the time, and we've heard the testimony and we've seen Government's Exhibit 3, which is the sum total of everything that the officer had, and it is a secondhand anonymous tip.

That makes this case just like the Florida versus J.L. case from the U.S. Supreme Court that we've cited. Now, maybe there's a little bit more corroborating detail about who the person is and where. So, for example, in this case, there's a license plate, although in Florida vs. J.L., indeed there was the information about the bus stop and the description of the individual being in the striped shirt and all of that checked out.

THE COURT: I know you talk as fast as I do, but I've got to slow you down a little bit for both the interpreter and the court reporter.

MR. WEINHARDT: Apologies to Kelli and everyone else. I'll try to do better about that, Your Honor. It's my high

school and college debating coming back.

THE COURT: While I have you interrupted, one of the officers saw this man in the field. Isn't that different than an anonymous tip that's not corroborated in any way?

MR. WEINHARDT: Not -- well, I need to get to the second part of my argument because what he saw was not in any way suggestive of criminal activity.

THE COURT: He's trespassing on private land. That's criminal activity.

MR. WEINHARDT: No, he's not.

THE COURT: Why? He's in another man's field. How is that not trespassing?

MR. WEINHARDT: Let me, Your Honor, hand up, if I may, and put on the ELMO the statute.

Trespassing in Iowa requires more than presence on a place where you are not authorized to be. Trespassing in Iowa and many states requires unauthorized presence plus. There has to be something in addition to the unauthorized presence to constitute the crime of trespassing.

Now, the trespassing statute has more subsections than those four, but I have, just as the Government did in its resistance brief, cited for the Court the ones that are even conceivably applicable here, and the plus factors that I have put down are the ones that are in yellow.

So, for example, with intent to commit some other

public offense than trespass; to remove, use, alter, et cetera, something -- you take some object from the land, put some object on the land -- to hunt where you're not supposed to hunt; to refuse to leave when you've been told to leave, or to enter onto the land when you're told you cannot enter onto the land or to do something that interferes with the lawful use of the land.

And No. 4, by the way, is just another version of No. 1. It's just the remaining on versus entering on version of No. 1.

Now, when I spoke to Deputy Burnett yesterday, I asked him all of those questions. I'm not sure I explicitly asked him if the man on the land was hunting, but I did ask him whether he had any objects in his hands that would be indicative of hunting. The point is I went through item by item all of the plus factors highlighted in yellow on that document and he had no evidence to suggest that any one of those plus factors was there.

There's nothing whatsoever that would suggest that he was engaged in the plus factor element of trespass. Was he unauthorizedly on the land? Yes. But that by itself is not a crime under Iowa law.

THE COURT: Isn't that what the officers are entitled to investigate? You have him dropped off. Why? You have him in a suit and tie. Why? You have them approaching in a weird direction to pick him back up. Why? You have somebody stomping

through farmland which undoubtedly has the capacity of damaging those plants. Why? He could have been doing anything from urinating to dumping a body, but the police are entitled to figure that out.

Now, the call came in and there was testimony from Officer Bollman, that's why I asked the follow-up question of Mr. Krickbaum, that a farmer, the farmer described the car. So if that's true and that's what the testimony was, that the farmer described the car that left this man, then that farmer is essentially saying, "Somebody's on my property that I don't want on my property." Aren't the police entitled, under a reasonable suspicion standard, which is pretty darn low, to investigate that?

MR. WEINHARDT: Even conceding that the police are entitled to find out what is the man doing on the land before the vehicle was stopped -- and, remember, we're moving to suppress the vehicle stop. We're not moving to suppress the encounter in the middle of the field because that wasn't Mo Hailong in the middle of the field.

By the time of the vehicle encounter, Petersen and Burnett had come up and found the man in the suit in the field and they now knew there wasn't a body there, they knew that there wasn't hunting going on. They knew that there weren't any of those plus factors.

And so if the Court is going to take the next step and

say, "Well, was there further investigation warranted," even if so, that investigation didn't prove the existence of a plus factor, it disproved the existence of any plus factors. And so the absence of those at the time of the car stop means that there was no reasonable suspicion for the car stop. Moreover, Mo Hailong, the driver, wasn't the one in the field.

THE COURT: Understand. But he's the person who dropped the guy off and was coming back by an odd route to come pick him back up, and isn't part of investigating what happened getting the other sides of the story? So the man in the field tells them one thing. Aren't they entitled to ask for the same explanation from everybody else to see if they're consistent? Of course they are.

MR. WEINHARDT: I don't -- I believe that that is absolutely consistent with curiosity. It's not consistent with the Terry case or its progeny because at that point the officers were in possession of no evidence that this man in the field had done anything criminal. They could ask him to leave and he does leave, but I think at that point all that happens is he walks to the road and Mo Hailong is entitled to come by and pick him up. I don't think at that point that he has -- that there is reasonable suspicion that Mo Hailong has done anything criminal.

Are they, are the police, curious? Sure, they're curious. There is an odd individual in the middle of a field dressed like this. That absolutely suggests reasonable

suspicion that he was about to commit commerce, but it doesn't suggest reasonable suspicion that he was about to commit a crime, and once the information in the present -- in the possession of the police is denuded of the suggestion of criminal activity, then Mo Hailong is entitled to pick up his passenger and go on his way.

THE COURT: Okay.

MR. WEINHARDT: Next, the Illinois stop. As a legal matter, I get Whren vs. United States, and I understand that a pretextual stop by itself is not bad, but it does animate the Court's understanding of the facts that this was a flagrantly pretextual stop.

This had nothing whatsoever to do with traffic enforcement, but rather these officers who testified yesterday were on a mission to stop this car for reasons unrelated to traffic enforcement and find out the identity of all of the people in the car. And they stopped it amazingly quickly. If one believes Lorenzo, it was within 10 or 15 minutes; if one believes Reina, it was even less than that. But with luck like that, these guys ought to be in Las Vegas, because amazingly, very quickly after they're putting eyes on this car, they claim that there was a red light violation.

In fact, Your Honor, there was not, I submit, under the more credible testimony, a red light violation. This is Government's Exhibit 5-1, which is the exhibit that Officer

Reina wrote on, and I asked him to draw a rectangle, draw a box where Mo Hailong's vehicle was at the moment that the light changed from yellow to red, and he drew the box in the middle of the intersection. In other words, Mo Hailong entered the intersection on the yellow.

Now, I have for the Court and the parties a couple of sources of what the Illinois law is about this. I have both the governing statute, which is, I think, 11 sub 306 of the traffic code, as well as the DMV guide that tells people what the rules are about red lights. And what both of those say is that the red light rule prevents one from entering the intersection against a red light; it does not prevent one from being in an intersection when the light turns red.

Now, just as a matter of history, in 1989, when I was only ten months on the job, I asked a jury to convict someone of first-degree murder. That's how rough a town Rockford, Illinois was and how much turnover there was in the State's Attorney's Office. But for a few tough weeks at the beginning of my tenure, I prosecuted traffic cases, and I still have my 1988 Illinois Vehicle Code, which has not materially changed. I never thought I would have a chance to use this in court again, but here it is.

And what the code makes clear is that if you're facing a steady circular red signal alone, you "shall stop at a clearly marked stop line, but if there is no such stop line, before

entering the crosswalk on the near side of the intersection, or if there is no such crosswalk, then before entering the intersection, and shall remain standing until an indication to proceed is shown."

A yellow light, by contrast, is merely a warning that a red light is coming. It is legal to enter the intersection on the yellow light.

Now, Officer Reina testified that he entered on the yellow light, Officer Lorenzo testified he entered on the red light, which means now the Court has to decide. Conceding that it is the Government's burden to prove who is right by the preponderance of the evidence, the Court has to decide which of the two officers it believes.

Now, just on the preponderance of the evidence standard and the Government's burden, I would say the tie goes to the defendant, but there are ample reasons why the Court should prefer Agent Reina's testified -- or testimony.

First of all, the Court could perceive how motivated a witness Agent Lorenzo was. He fought me about everything. He's the classic hard-nosed Chicago police officer who I got to know versions of many, many years ago. If you sent to central casting for a tough Chicago cop, they would send you Angel Lorenzo.

But think back to how aggressively he tried not to answer questions. I simply wanted to know in those types of

stops that are like this one, an investigatory stop, how often do you get your man and how often do you fail. He wasn't going to answer that question for me, and we could be still talking to him today right now and he wouldn't be answering that question, whereas Officer Reina was willing to offer up the answer exactly, you know, on the first try even.

And by the way, Reina misunderstood the law. He thought he was testifying to a red light violation also and he was wrong. But even he, thinking that being in the intersection when the light turns red, he said it was a close call, and so if it was a close call in his mind, compared to the actual law, then it is not a close call at all.

THE COURT: Mr. Weinhardt, I don't read this as saying you can be in the intersection or cross into the intersection when it's yellow. It doesn't say that. It says you can't cross once it's red.

MR. WEINHARDT: Right.

THE COURT: And this one says that when the yellow line is shown, green light allowing into the intersection is terminated, which means you can't go into the intersection once the light's yellow.

MR. WEINHARDT: I don't read that the same way at all, Your Honor. There is not -- reading these collectively, it is not the law, and I don't believe that the statutes say one may not enter on a yellow light. Quite the opposite, if one may not

enter on a yellow light, then the statutory language that makes it clear that one may not enter on a red light would be absolutely superfluous. Instead, the "may not enter" language is absent from the yellow light standard statute, and it is present in the red light statute.

THE COURT: It says "related green movement is being terminated."

MR. WEINHARDT: Sure. Yes.

THE COURT: Okay. Green is what allows you to go into the intersection, right?

MR. WEINHARDT: As does yellow.

THE COURT: All right.

MR. WEINHARDT: They talk about three colors. There's only one of those colors where the statute says you can't enter the intersection, and that's the red one. And it says in two or three different ways that it is the entry to the intersection that matters, not being in the intersection.

I think as between the two officers it's clear what actually happened. And, by the way, in deciding whom to prefer between Reina and Lorenzo, I circle back to the pretext argument. They were trying to figure out a way to stop this car and they were trying to figure out a way to stop is it as quickly as possible because, after all, they were pulled away from something else they were doing and sent on this errand. They wanted to get the errand done.

So I think Reina is the more credible version of the testimony, and I think the statute is clear. If you couldn't enter on a yellow light, then one of the two officers might have said so, experienced Chicago police officers, and the yellow light statute would say so. It's only the red light statute that says so.

THE COURT: Didn't both officers effectively say so when both of them, experienced patrol officers, said a violation was committed?

MR. WEINHARDT: Both of them said a violation was committed. Lorenzo is just factually wrong about what happened, and Reina, I submit, is wrong about the law. And not wrong in a reasonable way. I think the statute is plain.

THE COURT: Okay. With respect to the motion to suppress relating to the vehicle stops, I do find by a preponderance of the evidence that the United States has established that there was a reasonable suspicion, essentially, that criminal activity was afoot or that a crime had been committed, that they were entitled to investigate with respect to the September 6th of 2011 incident near the Bondurant farm.

I find credible the testimony of both Deputy Burnett and Deputy Bollman. I find that there was a combination of facts that would lead -- that were known to the officers that would lead an officer to investigate whether there was a crime that had been committed, including the fact that we have an

adult man dressed in a suit and tie dropped off for unknown reasons on private land that's now walked quite far into that private land for unknown reasons; that this was not usual activity; that he was dropped off and then a car returned to pick him up coming at an unusual route to return to pick him up, not the most direct route to pick him up; that we have a call from a farmer indicating that there's suspicious activity occurring and a description of the car that left this man.

All of those things, I think, are sufficient to establish reasonable suspicion to allow the officers to conduct their investigation, which includes talking to the man they find in the field as well as the person who dropped him off in the field.

As to the May 4th of 2012 traffic stop, I do find credible the testimony of Detective Lorenzo that there was a traffic violation that occurred; that is, that Mr. Mo violated the yellow light/red light rules that govern there in Chicago, and that therefore there was good reason to pull over his vehicle and obtain identification, as they're allowed to do under the law, from all the folks in the car.

Let's move on to the next issue, which I guess we have our options on at this point because evidence is concluded. Let me look through my notes quick and see which one to take up next.

Just formally for the record too, then, I will deny

the defendant's motion at Docket 234, which was those traffic stops.

Okay. Let's talk next, then, about Docket 253, which is the motion to suppress warrant searches with the various issues relating to the GPS tracking, the cell phone, the Yahoo e-mail account, the iCloud account, and the residence and office in Boca Raton.

Mr. Krickbaum, are you arguing these as well?

MR. KRICKBAUM: I am, Your Honor.

THE COURT: Go ahead.

MR. WEINHARDT: Your Honor, if I may suggest, we briefed these somewhat in pieces by location, and I'd ask that we argue them by location. The home and office, of course, is by far the biggest one that received the most attention. I think it makes sense to talk about the home/office issues first and then talk about the other individual ones.

As I think we have it now, there are three others that are still out there -- the Yahoo e-mail, the cell phone tracking and the iCloud -- so I think it would make sense to get the big one out of the way first because it has a number of probable cause things that have to do with the others, and if we only talk about the home and office first we can have to not repeat those discussions when we get to the others.

MR. KRICKBAUM: I agree with that, Judge. I have by far the most to say about the home and office. I was planning

on addressing the other three together, but I also think it's probably fruitful to separate out the home and office because that is the big one.

THE COURT: Okay. Go ahead and we'll take argument, then, first on the issues relating to the search of Mr. Mo's home and office in Boca Raton.

MR. KRICKBAUM: Thank you, Judge.

And I'll start with some just general observations about Fourth Amendment doctrine and note that over and over again the Supreme Court has expressed a strong preference in favor of search warrants. And part of that preference is that the reviewing court must give substantial deference to the magistrate judge's finding of probable cause, and another part of that preference is that the reviewing court should only suppress evidence as a last resort because we want police officers to get search warrants, and when they get them and they follow them, as a general matter, the evidence should not be suppressed.

And I think if you put those principles together, the answer is reasonably clear, with respect to the home and office, there was probable cause to search those locations, there was probable cause to believe that evidence of various crimes was there at the time of the search, and, in addition, the FBI relied on those search warrants in good faith.

I'll start with the probable cause issue, and I want

to first address, I think, the defendant's mistaken definition of probable cause, which popped up for the first time in the reply brief. Mo Hailong argues that in this case probable cause doesn't mean a fair probability, which is what the Supreme Court has said it means over and over again; instead, he says that a sort of probable cause plus standard applies and that it's a preponderance of the evidence. That is wrong.

The defendant says that in this type of case, and it's the type of case where the police observe a certain type of activity and it's not immediately obvious whether that activity is innocent or criminal, and he says that in those circumstances it's probable cause plus, it has to be a preponderance of the evidence.

I don't think you have to look very far to reject that. You can look no farther than the Supreme Court's decision in Illinois v. Gates, which is one of the seminal cases defining probable cause. Illinois v. Gates was a case where the police observed activity and the entire question was was it criminal activity or innocent activity.

The police got a tip that a group of people were engaged in drug trafficking, and they took a number of investigative steps to try and corroborate that tip. They saw one of the subjects take a trip to Florida under suspicious circumstances.

But the whole question was were these people breaking

the law or not. There was no dispute about the group of people involved and who they were; the question was were they dealing drugs or doing something that wasn't against the law, and the Supreme Court was incredibly clear in saying the probable cause standard is a fair probability in that circumstance. It is not beyond a reasonable doubt. It is not a preponderance of the evidence. The Government doesn't even have to make a prima facie showing; it is a fair probability.

And the cases that the defendant cites for this probable cause plus standard are mostly state court cases. There's a smattering of federal court cases, most of which are decades old and involve very different circumstances, such as when the police have a warrantless arrest and search of a person, but there are no Supreme Court decisions that support this view and there are, to our knowledge, no Eighth Circuit decisions that support this view, and I think that explains why the defendant cites none.

So once we are working with the proper definition of probable cause, I don't think it is difficult to conclude that there was a fair probability of criminal activity here. There was a fair probability that there was a conspiracy to steal trade secrets.

And I guess I'll jump right to the dramatic episodes near the end of the search warrant affidavit, but before I get to that I want to make clear what the legal standard is.

The affidavit alleged a number of violations of the Economic Espionage Act, one of which was a conspiracy, and in a conspiracy case the Government doesn't have to show probable cause to believe that the material in question was actually a trade secret, what matters is whether the defendants believed it was a trade secret.

And the Courts have explained what that means. The defendants have to believe that this information that they're stealing was proprietary and that it was being taken for the economic benefit of someone other than the owner. And we cited the case law in support of that proposition in our brief, the Liu case, L-i-u, from the Fifth Circuit, and the Hsu case, H-s-u, from the Third Circuit.

Now, there's plenty of evidence that the defendants did that, and jumping to what happened in August and September of 2012, a number of the defendant's co-conspirators, who were DBN employees, drove around in fields across Illinois. They identified inbred corn seed. They stole that corn seed out of cornfields. While they were doing it, they provided a play-by-play account that they were committing serious crimes, that they were stealing intellectual property.

And I think it is not necessary that these co-conspirators, you know, when they were in the car doing these things, they didn't have to lean into the microphone and say, "Now we are going to go steal trade secrets," although they came

awfully close to actually doing that, remarkably close.

And the defendant was in the thick of all of that. He was in the thick of it because he was part of the conspiracy to smuggle these trade secrets out of the country and out of the state of Illinois. As these men are getting ready to drive to the airport, they talk about how they're going to smuggle this stuff, how they're going to divide it up, how the defendant's going to carry some and these other guys are going to carry some.

And the defendant instructs one of his subordinates to clean the rental car thoroughly, and he doesn't do it because he's a neat freak; he tells him in the translation contained in the affidavit that they have to get rid of any clues. Now, that's the language that someone uses when they're part of a criminal conspiracy.

And after they discuss dividing it up, they do divide it up and they smuggle it. Several of them smuggle it out of the country, including hidden in bags of microwave -- boxes, I should say, of microwave popcorn.

And the defendant in his reply brief says, "Well, maybe they were putting it in microwave popcorn boxes because they were worried about Chinese customs," which I suppose is possible, although, of course, eliminating possible innocent explanations has no -- that's not the issue when you're determining probable cause. That's not even the issue when

reviewing a jury verdict when the standard is beyond a reasonable doubt.

The affidavit certainly did not have to remove all possible innocent explanations, but even that innocent explanation, I think, falls flat when you consider that one of these co-conspirators had corn seed stuffed underneath the seat of his car as he's attempting to travel from Vermont to Canada. So it wasn't Chinese customs.

And the point about Chinese customs, according to the defendant, is that China is very rigorous about not letting genetically modified corn into the country and so this GM issue was really why they're putting stuff in microwave popcorn boxes. I don't think that explains the Canadian border incident, but even if it did, the affidavit wasn't required to rule out all innocent possibilities.

If you back up from the events of August and September of 2012, you have evidence that the defendant in May of 2011 is in a remote cornfield in Iowa that grows inbred Pioneer seed. This was the subject of much dispute about whether it was the defendant or not. I'm not going to wade into that dispute right now, but I think what is clear is that two Chinese men were in or around the field, one was in the field on his hands and knees, one was in a white SUV that, according to rental records, was rented by the defendant.

That field contained Pioneer inbred seed that,

according to Pioneer, was a trade secret that wouldn't even be on the market for a couple of years, and when these men are confronted by Pioneer's field manager, they drive off in a hurry. Essentially, they flee.

But even putting aside that field sighting, a few months after that incident, in September of 2011, the defendant is near another cornfield, this is the one near Bondurant that we discussed a few moments ago. That field contains inbred seed grown by Monsanto. Not even the farmer growing that corn knew what was in the field because Monsanto kept it from him because it was proprietary.

And in between those incidents in May and September of 2011 and the smuggling of the corn seed out of the country in September of 2012, in between there there are a number of events, and I'm not going to march through them, but among other things, the defendant is driving around using what I can only describe as aggressive counter-surveillance techniques that are documented in detail in the affidavit.

Those are not the actions and behavior of someone who was worried about being sued for patent infringement, those are the actions of someone who was trying to avoid being detected by law enforcement. And he's also showing up at Pioneer facilities and he's lying about his name and his identity when he does so.

And so based on all of this, the magistrate judge was entitled to conclude that there was a fair probability that

these guys had agreed to steal trade secrets, to steal something that they believed was proprietary, and something that they believed they were taking for the economic benefit of someone other than the owner.

I'll talk briefly about the interstate transportation of stolen property offense, which is also one of the subject offenses in this affidavit, and I think there was also probable cause for that offense because, to begin with, there was probable cause to think that the defendant smuggled inbred corn seed from Illinois to Florida on September 30th of 2012 at the same time that his co-conspirators were smuggling inbred corn seed or attempting to do so to China and to Canada because before that trip to the airport the defendants, as I said, talked about how they were going to divide this seed up.

And they specifically talked about how the defendant was going to carry some, and that's outlined in paragraph 37 of the affidavit, and every other passenger was found to have been carrying concealed corn seed on that trip. The passengers who went to China had their luggage searched by Customs and Border Patrol. The passenger who tried to go to Canada, the same.

The defendant was traveling domestically, so his luggage wasn't searched, but there's certainly a fair probability that he was carrying the same stuff that every other guy with him on that day was carrying.

Leaving that aside, there was, in addition, probable

cause to believe that the defendant was involved in a conspiracy to transport stolen goods across national borders just based on the fact that he was a part of this group of people that was smuggling and trying to smuggle inbred corn seed from the United States to China. That's why he told his subordinate to clean the car and not to leave any clues.

There's probable cause to believe that that inbred corn seed was stolen. There's probable cause to believe that it was worth more than $5,000. The affidavit explains that according to Pioneer officials the theft of just one line of such inbred seed would be an extremely significant economic loss to this multi-billion-dollar company.

So that is the probable cause determination. And I'll talk about good faith at the end, but this was plenty and more than enough to believe -- to establish a fair probability that a crime had been committed here, and certainly a reasonable person could conclude that, and that magistrate judge's conclusion on that is worthy of deference.

I'll move on to the staleness issue and the issue about whether there was PC to believe there was evidence at the time of the search at these locations. Now, this, I think, is a little bit closer because of the 14-month gap, but I don't think it's much closer, and the reason is that the Eighth Circuit has been very clear that the lapse of time is least important when the crime is continuing in nature and the nature of the property

is such that it's not likely to be destroyed or to disappear. The Court has said that many times. One of those times was in the Gleich case that we cited in our brief.

This was a crime that was continuing in nature. The affidavit set forth conspiracy that started in May of 2011 and extended to September of 2012, almost a year and a half. It involved multiple conspirators who were operating in the United States and involved a large corporation, foreign corporation, DBN, that was at the heart of this conspiracy. It involved activities in, I think, six different states as part of the conspiracy, three different countries, the U.S., China and Canada. It involved victims who were two of the largest agricultural companies in the United States.

This conspiracy was vast in almost any way that you can measure it. It was large in its scope, and there was a fair probability that not every single piece of evidence of that conspiracy had disappeared from the defendant's house and his office at the time of the search.

And the second part that I mentioned earlier is also satisfied, which is the property is not likely to be destroyed. We are talking here primarily about DBN business records and electronic evidence, computer files. In fact, I think the majority of what the FBI actually seized relevant to the search came in the form of computer evidence.

Computer evidence by its very nature is not subject to

the kind of staleness claims that something like cocaine or money, the sorts of things that don't tend to stick around, that tend to disappear or be used or moved. That's not true of computer evidence, in part because files tend to stay on computers for a very long time, until they are deleted, and even if they're deleted the FBI often can recover all of them or parts of them. And even if the FBI can't recover them, the fact that certain documents have been deleted is often itself evidence of a crime, so this sort of evidence is really immune to a challenge of staleness, as is business records.

And the business records weren't just relevant to possible tax offenses here, as Defendant suggests. At the center of this conspiracy is this company, DBN. I mean, everything revolves around DBN. That is the company for which these trade secrets are being stolen. All of the conspirators are executives or officials or employees of DBN, and so DBN's business records are, by their very nature, evidence that could be expected to be found at DBN's office, at the defendant's house. And those too are documents that are immune to challenges of staleness because the whole point of creating a business record is to keep the business record.

That's all I'll say on the staleness issue, unless the Court has specific questions about it.

THE COURT: No, I don't. Thank you.

MR. KRICKBAUM: My last two topics will be a little

bit briefer, I promise. The computer search, and this relates to the whole issue of whether there needed to be a computer search protocol, and so on.

And I think at this point the defense has filed somewhere north of 130 pages of briefs on the home and office searches, and I still don't know what this computer search protocol is supposed to consist of. I still don't know what the FBI was supposed to have done differently. What was the protocol supposed to be? What should the limits have been?

THE COURT: I think the closest analysis I can think of is almost like a minimization technique in a wiretap, and as I said last week, Eighth Circuit doesn't recognize that, doesn't expect that, and I don't find that that was necessary in this case.

MR. KRICKBAUM: And so I'll just only speak very briefly on the topic further, which is that there was lots of evidence in this case that these defendants were concealing their criminal activity. They're using aliases, they're using counter-surveillance techniques, they're smuggling corn seeds in microwave popcorn boxes.

It is trivially easy to change the file name of a computer file if what you want to do is hide what you're doing and to conceal evidence, and so the FBI was entitled to look through every file on the computer to determine whether it contained evidence of a crime. And that is true as a matter of

first impression, but it is certainly true in light of the Eighth Circuit's precedent which the Court has referenced.

There are two smaller points related to the computer search. The first one relates to the lack of a date range. The Eighth Circuit has said very little about date ranges, particularly very little about date ranges being required for search warrants. And I still think we have this issue that the defense has not pointed to a single piece of evidence that was seized that they say was too old.

The FBI can, you know, seize relevant evidence on Defendant's computers dating back, if my memory serves, to about 2006. Given the vast nature of that conspiracy that I've already outlined, there was a fair probability that relevant evidence would be found back to that range, but more to the point, the defense hasn't suggested what date limit should have been included.

Finally on that point, on the last point related to computers, there is a provision of the warrant which allows the FBI to seize communications with Chinese entities. I'll just assume for the purposes of this argument that that was too broad.

I'm not aware of any document or communication that the Government seized or plans to use at trial that we'll offer only because it's communication between Mo Hailong and the Chinese entity. And, of course, there is longstanding precedent

in the Eighth Circuit that even if portions of the search warrant are overbroad, the Court should not suppress evidence that was seized pursuant to proper provisions of the warrant.

I will end with good faith, which I think makes this in many ways even an easier decision than it otherwise would be. In this case the FBI got search warrants and they complied with them. That is exactly what we want law enforcement agents to do.

The doctrine is the Court should only suppress evidence based on those warrants if the warrant was so lacking in probable cause that belief in its existence was entirely unreasonable. There is nothing close to that that is true here. It was not entirely unreasonable to believe that evidence or to believe that these defendants, this defendant and others, committed a crime.

It was not entirely unreasonable to think that evidence of those crimes would be found at the house and the office at the time of the search. It was not entirely unreasonable to think that evidence of the crime would date back as far as 2006. It was not entirely unreasonable to look at the files on the computer to determine if they contained evidence of a crime.

The agents operated in good faith here. They relied on the warrant, and that reliance was objectively reasonable, and so the Court should not, in our view, get anywhere near the

last resort of suppressing evidence here.

Thank you, Judge.

THE COURT: Thank you, Mr. Krickbaum.

We're going to take a quick break before we come back for arguments from Mr. Weinhardt.

I assume you're arguing that.

So it is 10:45 now. If everybody would be back by 11.

Thank you.

(Recess at 10:45 a.m. until 11:01 a.m.)

THE COURT: Thank you. You can be seated.

Okay. Mr. Weinhardt, argument on Docket 253 as it relates to the office and residence of Mr. Mo.

MR. WEINHARDT: I'm going to make sure my computer doesn't slide off and fall on my feet.

Your Honor, to begin with, we do not believe that the affidavit from Agent Militello evidences probable cause to believe that the crime of trade secret theft or conspiracy to steal trade secrets was shown. The affidavit conflates theft of trade secrets with the much broader concept of theft or misappropriation of intellectual property. In fact, to say that it conflates those two concepts really gives it too much credit.

As the Court knows, the affidavit says the words "trade secrets," I believe, twice and only once in the context of anything substantive. Otherwise, it relentlessly uses the concept of intellectual property instead of trade secrets. And

it is plain that there is only one item of intellectual property misappropriation that is a crime, and that is a theft of a trade secret.

The best evidence that we have to offer to the Court about this is the Government's own manual. The Department of Justice, as we have cited to in our briefing, has a training book that tells prosecutors how to handle intellectual property matters, and that book says patent infringement, PVPA violations and so forth, are not crimes and so forth, and it cautions prosecutors to investigate to make sure they are talking about trade secrets and not other kinds of intellectual property before they embark on investigations or prosecutions.

THE COURT: Aren't there a couple problems with that argument, though? For one, the Government's investigating a conspiracy to steal trade secrets, which has been -- oh, we've got to have at least 200 pages of briefing on this from Judge Pratt's prior order, but it doesn't require the Government to show that they actually stole trade secrets, only that they thought they were stealing trade secrets. So that's one problem.

The second problem is the affidavit very clearly says conspiracy to steal trade secrets. It cites correctly the statute that relates to that, and aren't we -- can't I assume that this judge understood what that crime entailed and what probable cause to support that crime would be?

Even if you're arguing that the agent conflated IP generally with trade secrets, aren't I entitled to assume that a federal judge who looked at that understood what the law required and made a finding?

MR. WEINHARDT: The Court has asked, I think, three different questions. Let me take them in sequence.

First, as to the question of the conspiracy not requiring proof of actual trade secrets, the conspiracy charge requires proof that Mo Hailong and the co-conspirators, but particularly Mo Hailong, because this is his house, that he believed that what was being taken was a trade secret; not that he believed, as Mr. Krickbaum said in his argument, that what was being taken was proprietary, not that he believed that it was intellectual property, but that he believed it was a trade secret.

And the cases on this point are, I think, very clear. I think there might be one outlier, but overwhelmingly the cases say that the mental state that has to be proven is that the defendant believed the statutory definition in 1839 is met, that it is actually a trade secret with all the bells and whistles that inhere in that concept. And a patent, as the Court knows and as we've discussed, is the absolute opposite of that. It is the antithesis of a trade secret. And so as to the mental state that this affidavit must demonstrate, it must demonstrate a belief in trade secrets, not protected stuff.

That then takes me to what I think is the Court's second question, which is isn't the fact that it said trade secret at the very beginning enough to sort of subsume what is then labeled as intellectual property throughout the rest of the affidavit, and the answer is no.

The reason is trade secret is one circle inside a much larger circle. Imagine this as a Venn diagram, and the large circle is white, but the little trade secret circle in the middle is red. Every time this affidavit says "intellectual property," every time it talks about something protected, proprietary, important, valuable, worth a lot of money that isn't identified as a trade secret, that means that it's in the white zone of the circle and not in the red zone.

The affidavit had to establish probable cause of a conspiracy to steal what is in the red zone and it had to establish probable cause that these people believed that these things were in the red zone.

And so now to what I think is the third question, which is can't I assume that the magistrate judge understood the difference. That, Your Honor, is, I believe, exactly the problem, and I think that's why this warrant is not entitled to deference because the fundamental problem with this is a legal mistake.

So the magistrate who understands the law would look at the statute, look at the affidavit, and say to Militello,

"Look, you haven't come to me with evidence that would indicate theft of trade secrets. You've come to me with evidence that would indicate something in the big white circle, not the little red circle. Go back and do your homework."

And what particularly aggravates this is this isn't the exigent circumstance in which there was a tip from an informant or a controlled buy and you've got to go get the warrant and race back to the house before they flush the drugs down the toilet.

This is a situation in which the last item of probable cause of any consequence supporting this warrant, in fact, with one minor exception, I think I can say a least, the last item of any evidence supporting this warrant occurs 14 months before the warrant is applied for.

In their briefing they say that they were just waiting to see if other alleged co-conspirators were coming into the United States. They had more than a year to get this warrant right. The case agent in this case, we heard yesterday, is a lawyer, and so this is something that could be carefully and deliberately worked out on the part of the Government, and it wasn't. And so I think both at the magistrate level and at the level of the affiant and the agents with whom he was working, I think that aggravates the situation, not resolves the situation.

I also think with regard to whether or not the crime has properly been identified that one of the Government's own

cases is actually very telling, and that is the Summage, S-u-m-m-a-g-e, case. Because the Government says, well, okay, we didn't say trade secrets, but we meant trade secrets, and you knew what we meant, and as long as the conduct that is identified in the warrant application has criminal applications, the fact that you didn't say the crime doesn't matter.

Well, in Summage, it was a child porn case, but Summage was just an awful state of facts involving an individual of extremely low mental functioning who was tricked into going into a house and then paid in order to have sex in front of a camera. One could imagine, and the Summage court had no trouble finding, obvious statutory violations that were attached to that.

This is exactly the opposite. Other than 1832, there is no crime -- well, I will talk about this interstate theft thing and, if necessary, this tax thing in a little bit. But other than those, at the heart of this warrant, there is nothing but 1832 that is a conceivable criminal implication of anything that has been described here, and so it is the exact opposite of Summage.

Instead, to continue the analogy, the case that I would commend to the Court that I think is spot on to this situation is a Fourth Circuit case, if I may hand up a copy, United States vs. Doyle.

THE COURT: And while I have you paused, I just remind

you to slow down, please.

MR. WEINHARDT: Doyle, Your Honor, is also a child pornography case in which the affidavit described troubling things about photographs of nude children and I think maybe contained in a different context the word "pornography" but did not actually describe something that fits in the context of the statute. And the Fourth Circuit, you'll see, goes to great lengths and very carefully parses the warrant application and finds that while it describes suspicious or maybe troubling facts, it did not describe a crime.

That is exactly the sort of situation that we have here. And I'm going to come back to Doyle when I talk about good faith because the Doyle court found that the good faith exception did not apply.

THE COURT: This is essentially, at least Doyle is, a child erotica kind of situation versus child pornography, but the Eighth Circuit has a case directly on point that essentially rejects this reasoning and says if it could be either and there's a little bit more that makes it criminal versus not criminal, that's enough.

MR. WEINHARDT: I think, though, there is not the little bit more in this case. I don't believe that there is any evidence, not a shred of evidence, that indicates that Mr. Mo or his co-conspirators had in their head the statutory definition of trade secrets, and that's why, conceding that the Eighth

Circuit has distinguished Doyle in a case where there was more evidence than Doyle, I think --

THE COURT: There was slightly more.

MR. WEINHARDT: Right.

THE COURT: But here isn't there slightly more in the sense of you've got them lying about what they're doing, you've got them sneaking around, you've got them repackaging in hidden containers corn to be shipped back?

Now, there might be an IP theft explanation for that or there might be a trade secret explanation for that, but where it could be either, isn't the judge entitled to find that that's probable cause to investigate that issue? And that's among other factors here that indicate there's a problem, but isn't that -- I mean, probable cause is not a real high standard. Isn't that enough?

MR. WEINHARDT: No, I don't think so, for a couple of different reasons. One is because -- and I won't go through the factual description here, but the Court no doubt remembers our kind of counter-version of the facts, the patent infringement but not criminal version of the facts that we laid out in the reply brief. All of this is entirely consistent with that, number one.

And number two, I would submit that while -- and we do get a little bit into the question of what probable cause means here, but Illinois vs. Gates, as Mr. Krickbaum discussed, is the

wrong analogy when you're talking about drug activity. There's not a question about whether or not drug activity is a crime.

When you're talking about commercial activity of this that is equally innocently explained as criminal activity, that's where courts all over the place, and lots and lots and lots, and the current commentators -- I mean, Professor Lafave was aware of Illinois v. Gates, he's written about it extensively.

That's where, while I think the United States Supreme Court has not squarely addressed that question, in a situation like this where the conduct is not obviously criminal like in a drug case, I think that is the law, and so I do think, first of all, the tie goes to the defendant in those cases.

Secondly, the Court, I think, made a relevant point that the magistrate is entitled to and indeed should consider when evaluating the probable cause in this case -- and the Court made that point in the context of the LAX motion -- which is we do have cultural differences here in terms of how people interpret the Government and how people interpret what sort of obligations they may have or may not have.

And these are people from a country in which the Government is something much more to be feared, and so I think some of the -- you know, for descriptions on this car-taped conversation, the alleged counter-surveillance driving, things which, by the way, will, I think, be explained very differently

at the time of trial but were inside the four corners of the warrant, but I think that the Court now and the magistrate at the time then is not just allowed to consider but I think obligated to consider these are strangers in a strange land who I think have different perceptions and different fears and different concerns.

I also want to put a lot of everything in this in context, which is that the vast, vast majority, maybe everything in this warrant, that has to do with actual seeds is seeds that were purchased. There's evidence that Mr. Mo purchased seeds at various times in various places and purchased them in large amounts and then there's evidence that he shipped them in large amounts.

So when he's shipping these giant Fed Ex packages to Florida or to China or whatever, those can't be something that somebody dug out of a field one seed by one seed or an ear of corn or something like that. The only way you get that much corn is you bought it in a bag.

Quite to the contrary, I don't believe that there is evidence in this record that would indicate that they knowingly dug up anything that was -- that they knew was an inbred as opposed to being a purchased seed. And the Government --

THE COURT: What about the seeds in the Subway napkin, the dirty seeds? What about those?

MR. WEINHARDT: Well, we don't know --

THE COURT: Those weren't purchased, presumably, right?

MR. WEINHARDT: Actually, I don't think that we know that. They're collecting as many different ones as they can, and we know that purchasing is a substantial amount of what they obtained.

I guess here's my point: A lot of everything, particularly regarding the shipments, has to do with purchased seeds. The Government -- and I re-read this carefully this week -- the Government cannot bring itself to say, because it isn't, that purchasing seed and doing anything with that purchased seed is a crime.

Now, notwithstanding the fact that it is not criminal, there are these agreements that people are supposed to sign, although no evidence that our client was ever presented with them, but there are things on the bags. There are patent numbers on the bag tags, and so forth, and so the people know that there is civilly protected intellectual property associated with this.

And so I think what the affidavit proves is that they are acting in a way that may be subjecting them to civil liability. They may have a different appreciation based upon cultural differences as to what that means. They certainly want to avoid it.

And I also think that the GMO explanation is the

cogent and persuasive one about why they were handling it on the way out of the country as they were. And Canada doesn't wash as a counter-explanation for that because the seeds aren't going to be planted and grown in Canada, they're going back to China, and so it is all of the -- it is all of the same character in terms of how the seeds are being handled and what is being done with them.

Let me just look at my notes and see if there's anything else I want to say about the trade secrets issue before I move on to the interstate theft.

With regard to the interstate theft issue, Your Honor, there is no evidence -- even if there is evidence of interstate shipment, there is certainly no evidence of market value in excess of $5,000. And we know what the market value is. It's either the market value of whatever you pulled out of a seed, even -- or out of a field.

Let's say they stole an ear of corn. What's an ear of corn against $5 a bushel? Maybe ten cents. Or it was purchased and the purchased bag costs more because it's seed not just field corn; however, there's no evidence as to how much more it costs in the affidavit.

Now, there's this statement that, well, but if it's an inbred seed that contains intellectual property it's worth much more than that, but there isn't any evidence that indicates that any of these were stolen inbred seeds having that high value.

Maybe we'll get something like that when the Government makes its expert disclosure, but that was not in the affidavit.

Indeed, in these two field incidents, it happens that the seed companies claim, Monsanto in Bondurant and Pioneer near Tama, that these were fields in which production of hybrids was being done and so that there were inbreds in these seeds, but there is not the first item of evidence that our clients knew that, that they understood that they were in a field with anything different from something ordinary, ordinary field corn.

THE COURT: Are you saying that an element of interstate transportation of stolen goods is that they know the value is more than $5,000?

MR. WEINHARDT: No. What I'm saying is --

THE COURT: Because that's not the standard.

MR. WEINHARDT: No, no. I understand that. And that's actually -- if anything, that's a left out argument on my previous division of this, just to respond to the field encounters thing. But, no, I understand that they don't need to know that the seeds -- or the truckload of bacon, Marc -- was --

THE COURT: That was just cruel.

MR. KRICKBAUM: It was.

MR. WEINHARDT: -- was worth more than $5,000, but it is market value.

And to transplant an analogy from our reply brief, the market value is what people would actually pay for it and so

it's just like our analogy, which I didn't think of, of somebody going into a house and stealing a bottle of Coke. The bottle of Coke indeed has an exceptionally valuable trade secret in it, but no one would pay that value in the supermarket for it. They would pay what the bottle of Coke is.

There is no evidence in this case that elevates any of the seeds that were seized here above the bottle of Coke analogy, and so that's why I think the interstate transportation thing falls down.

Let me ask candidly -- I can talk about this tax business if the Government is still supporting it. Mr. Krickbaum didn't talk about it. And if the Court wants to hear my argument, I will. If the Court is disposed to uphold the warrant on that basis, I don't think that it should, I also think it's borderline frivolous --

THE COURT: I certainly read all the briefings on it. What may be in my mind borderline frivolous, although I don't find that it is, is this issue is whether he's trying to steal other persons' tax returns that have similar e-mail addresses. I agree that's questionable.

But he did file a false tax return listing his incorporation wrongly so he didn't have to file a tax return in, what was it, 2011. That's technically tax fraud. Now, I don't think that probably formed a big chunk of why this judge issued this warrant, but technically it's a legal violation, and the

Government may have found evidence of that when they searched his house. True?

MR. WEINHARDT: Well, let me back up. I think the Court made a factual description of what's in the affidavit that goes too far.

So let's set aside the incredibly obvious issue about the Robert Mo e-mail address. I tried to get mweinhardt@gmail.com. It was already taken. Imagine how many people with Robert Mo-whatever. And we found a list of them; Robert Mondavi wine. So setting that one aside.

On the issue of evasion by filing a false return, what is in the affidavit in a single paragraph is an e-mail exchange about whether or not Kings Nower should be incorporated in December '11 or January of '12. The accountant, not Mr. Mo, the accountant decides we're going to incorporate in '12.

They talk about certain unnamed forms. It does not identify tax returns. There is some form of some sort. The reasonable inference from that is that those are incorporation documents, not a tax return. They talk about these unnamed forms. She tells Robert to sign them and he does.

Now, there are two statutes that the Government invokes with respect to this, but pertinent to both of them, there is no evidence that Kings Nower owed any tax for the few days that it existed in 2011, there is no evidence that Kings Nower was actually required to file a return for those few days

in 2011, and both of those would be elements of the offense.

And then finally, there is no evidence that if there was a failure to file it was a willful act of Mr. Mo because, remember, tax crimes are different and have this elevated standard. You have to know what you're doing is wrong, and professional advice is a defense to that, and professional advice dominates this e-mail exchange in -- I believe it's paragraph 53 of the affidavit.

Moreover, if that one tax offense were the only thing that justified this search, then I think the overbreadth and scope problems with this warrant would be insurmountable. Even if there were -- even if you could read the law on overbreadth to say, well, you just trim it back to the part that is supported by probable cause, even if that were true, if all of the PC in the warrant is valid, if all it is is this tax thing, I think that that is such a flagrant violation that then that requires suppression of the entirety of it, I think, for example, like the Marvin case that we cited in our reply brief or like the Mandalapu case that Judge Pratt decided a few years ago.

The next thing I'll talk about is the lack of probable cause of a nexus to Mr. Mo; in other words, mostly the staleness problem. The Government puts tons of facts in its brief that are outside the factual period that are discussed in the search warrant affidavit, and all of those are fruits of the search.

The Government -- excuse me -- what the Court needs to do is to take all of that out of its head and simply look at what is within the four corners of the warrant.

Now, maybe there is evidence that this conspiracy -- if you get over the hurdles that I've already argued about probable cause, maybe there is evidence that this conspiracy started sometime before April of 2011, which is the first event in the probable cause affidavit, but there's just nothing that says that this conspiracy continued for 14 months after September of '12, which is the last event.

And what matters is not the nexus to this group of people; what matters is the nexus to Robert's house. The two connections to Robert's house are 19 and 26 months old respectively at the time of the warrant application, and those two items of nexus are shipments of purchased corn, which I have argued previously aren't criminal at all.

Now, this is a case where we know even just from reading the four corners of the warrant that the surveillance of Mr. Mo was intense, it was ongoing. They're physically watching him, they're watching the places he goes. They're reading his e-mails, they're listening to his cell phone calls. If there were other evidence of a crime after December 30th of 2012, Magistrate Brannon sure would have heard it. They simply didn't have it.

As a matter of fact, of what we know -- and

concededly, this is outside of the record, but in December of 2012, the FBI in Florida asked to stop surveillance of Mr. Mo's house because they said there's nothing going on here.

The Gleich case cited by the Government does not help because while there was sort of musing or dicta about ongoing criminal events in that case, that wasn't how the case got decided. The case got decided in Gleich because they found a camera or there was evidence that there was a camera spotted seven days before the search and they assumed, well, in that intervening seven days the camera isn't going to be gone and we expect that the camera is going to be a place where we're going to find incriminating evidence.

It may be that computerized evidence or business records hang around for weeks or for even months, but this, Your Honor, is a situation where we're asked to sort of suspend the passage of time for a matter of years. The Government is essentially, I think Mr. Krickbaum used the word, "immune."

It is not consistent with the framers' intent that any kind of evidence, including business records or things in a computer, are entirely immune from staleness analysis, and so I think if there is a place where staleness analysis applies, it is to this case.

THE COURT: What about the fact that the search warrant references events that are happening in June of 2013, in March of 2013? That's not even a year away from the search.

And certainly you can anticipate when you're talking about the filing of tax returns and other things that those records are going to be maintained for a period of years, if not certainly a year, and here we're talking about six months or less.

MR. WEINHARDT: It has to be evidence of a crime. The fact that there was a tax return filed by a business that may or may not have anything to do with this I don't think is sufficient evidence that fruits of a crime or instrumentalities of a crime will be found in his house.

What I think the Court has to look at is is there a connection to the house that is in any way criminal, and I think you have to go back at least 19 months before you get to that.

THE COURT: Except in particular paragraph 54, and this is in connection with the conspiracy to steal trade secrets, talks about as recently as June of 2013 that Mr. Mo continued to coordinate activities at farming operations at the Monee farm. I mean, there is stuff well beyond 2012 in this affidavit.

Now, I know, and I do -- and I should say to you I very much appreciate your charts at 11 and 12 that you attached, which are sort of summary charts of the problems that you've identified in the search warrant applications, and I don't disagree that there are some minor or even less than minor errors that are contained in these search warrant applications.

But my job is not to line by line, you know, dispute

or allow an innocent explanation. It's not to pick apart this whatever it is, 30-some page, affidavit and, you know, find what I can find that might be exculpatory or helpful in those statements; it's to see whether or not the totality of what's left, even if you take out all the things you say are in error, assuming arguendo we do that, whether there's still probable cause, and there is. There just is.

Now, do you have good arguments that I think a jury might find compelling? Sure, you do. But that's not my job right now. My job is to see whether or not this judge, faced with this affidavit, with all the corrections you've asked for, still would have found probable cause that there was evidence in these locations of the particular crimes, and there's four of them named. I just don't know how you get around that. You can continue arguing, but ultimately I don't know how you get around that.

MR. WEINHARDT: Respectfully, Your Honor, I think for various of the reasons that I've advocated, I disagree, and I don't think, most importantly because this is an affidavit about things that are odd, civilly actionable, concerning, maybe weird, but I don't think it's an affidavit of criminal evidence.

I do want to talk, however, about the electronic stored information because there are right ways and wrong ways for the Government to search that material, and this was done in the wrong way. And if any part of this warrant is vulnerable

and that I think the Court should carefully analyze before making its decision, it is this one, because it is so close to what the framers intended when they wrote the Fourth Amendment.

The computer is like your house, maybe containing even more private information than your house. The Supreme Court told us that in Riley. But we know that -- and to clear up any unclarity, we are not contending that Riley changed the law about this, but Riley said that one little computer -- I don't have my cell phone, but one little computer is like the stuff in your house.

This search had to do with 20 different devices, many of them really big devices in terms of storage capacity. We know that those devices contained enormous amounts of information and that they contained enormous amounts of irrelevant and personal information. Now, we assumed that as a matter of law because the Riley case says that, but it is also factually the case here, and I will talk for a moment why the facts in my supplemental declaration about this are relevant under the Eighth Circuit's approach to this.

But what was seized from Mr. Mo's home and office constitutes a terabyte of information, 1.5 million discrete documents, 100,000 unique documents. When you dedupe everything and you just look at the documents with common file extensions, the Word documents, the pdfs, the Excels, the texts, the photographs, you get 100,000 unique documents.

And what do those documents contain? They contain personal and family photographs. They contain the schoolwork files for the children, family videos, video games, the music that they listen to, their household and financial files, their personal family communications. Two of these repositories of electronic information belonged to his wife. There's no indication that there's anything evidentiary in them.

Now, I want to talk, at the risk of going to first principles with the Court, I want to talk about what a search warrant is intended to do, because it's intended to do two things. We act like -- and if I could have the ELMO.

THE COURT: You can. Can you tell me what this word is you used? Was it dedupe?

MR. WEINHARDT: I'm sorry. Deduped, d-e-d-u-p-e-d. Those of us who do lots of civil litigation and have to produce -- let me put it this way: Judge Bremer's heard this word a ton because when you're producing lots of documents in civil litigation and you're producing them in electronic form, e-mails repeat each other over and over and over again, so what you do is you run these programs to get rid of all the duplicates. That's what I'm talking about.

THE COURT: Deduped, okay.

MR. WEINHARDT: So when you dedupe the 1.5 million documents and get rid of the, you know, metadata and all that sort of stuff, you get 100,000 documents that really matter.

We act like the key thing that a warrant does is ensure that there is probable cause to make an intrusion into a private place, but it really has two equally important functions, and this is what the Court said when it threw out evidence in a murder case in Coolidge vs. New Hampshire.

It talked about the two distinct constitutional protections served by the warrant requirement. "First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity.

"The second distinct objective is that those searches deemed necessary should be as limited as possible. Here the specific evil is that the 'general warrant' abhorred by the colonists" -- a-b-h-o-r-r-e-d, Kelli -- "and the problem is not that the intrusion per se but of a general exploratory rummaging in a person's belongings. The warrant accomplishes this second objective by requiring a 'particular description' of the things to be seized."

Here, there is no --

MR. LINCENBERG: I'm sorry. Excuse me, Your Honor. I think we had a break in the translation.

THE COURT: Okay.

INTERPRETER HU: We have to look at the monitor. It's

just hard to follow.

MR. WEINHARDT: Oh, sorry.

THE COURT: And, Mr. Weinhardt, can you touch the top left corner of the screen there. That will get rid of that red mark.

All right. Try the other corner.

MR. WEINHARDT: Oh, this?

THE COURT: There you go. Thank you.

Okay. Go ahead. And I think what you were saying --

MR. WEINHARDT: Is --

THE COURT: -- that the specific evil that the colonists were concerned about was the general warrant and the particularity with which something must be described.

MR. WEINHARDT: Right. And here there is no particularity requirement whatsoever.

If the Court looks at the way that the warrant is constructed, it lists substantive categories of evidence that are being sought: seeds and seed packaging or documents related to them; documents having to do with communications with China, we'll talk about that one in more detail in a moment; records of shipments of seed products; records reflecting generic labeling; tax returns, et cetera. And then here, all computers, digital storage devices, removable media, portable hard drives, jump drives, compact discs which could contain any of the items enumerated above.

What it does not say is when you look at them, you must look for these things, and the law requires a whole lot more than that. In this case it could be a protocol, it could be a taint team, it could be minimization, but it could simply be a list of what it is that they're supposed to look for in the electronic documents and what they are not supposed to look for in the electronic documents.

And there are Eighth Circuit cases that uphold searches because there was such a list. The Gleich case cited by the Government is one such case. I would also point the Court to United States v. Hager, H-a-g-e-r, 710 F.3d at 830, where the computer search was supposed to look for sexually aggressive images.

What was supposed to happen here was that there was supposed to be something -- it doesn't have to be a fancy protocol, but there had to be something -- to tell the agents what to look for within the scope of the electronically stored information.

And, now, here's why I say that this is fact bound. And I know that the Court has made a decision not to take evidence on this motion, and that was the Government's choice, they didn't want evidence about it, and the Court has correctly made the assumption that the Government will be presumed to have searched absolutely everything that it possibly could have.

But what that means, Your Honor, I think, is that

absent evidence from the Government to the contrary, that means that there were careful analyses of the kids' report cards and the videos of family events and everything like that, that all of that was watched, that all of that was looked at. That is the exploratory rummaging that is prohibited by the Fourth Amendment.

And the one polestar case on the limits of ESI searching cited by the Government, the Cartier case, is not to the contrary. Cartier very explicitly -- first of all, Cartier had an evidentiary hearing, and secondly, the Cartier case very explicitly said we don't find that the absence of a protocol was a problem on the facts of this case and so we will not make a blanket rule that you have to have a protocol, and we are not asking this Court to construct any such blanket rule.

What we are saying is that where there are such large amounts of private information and where the Government is absolutely unfettered in its ability to look at all of it that that transgresses the Fourth Amendment and turns this into the sort of general warrant that we are entitled to complete suppression of.

THE COURT: When you are looking at this in the context of container law, you know, agents have the right to look in any container that might conceal evidence that they're authorized to search and seize, right, and in drug cases, that can be a container the size of a pill because it might have

drugs in it.

When you are looking for documents and you're directed to look for them in any electronic format that could contain the specific kinds of documents that you've been directed to find, how were the agents supposed to go about doing this unless they are opening and going, "Photos, don't care. Report card, don't care. Ooh, e-mail with DBN, care about that one. We'll set that one aside"? How were they supposed to do that? And under container law, which is very well established, isn't that exactly what they're allowed to do is read everything?

And even if, let's assume, this was 1.5 terabytes of real paper, they walked into a warehouse and there was 1.5 terabytes of paper, wouldn't they have the right to look at every single sheet of that paper as they were searching for the things that the warrant authorized them to find and seize, and isn't that what they do when electronically they have to do the same thing?

MR. WEINHARDT: First of all, I think container law is very well established with regard to containers, but I think the analogy between a suitcase, a car trunk, a pill, or something like that, breaks down when it is applied to electronic storage devices.

Quite to the contrary, what I think is -- and I think the cases support this -- a computer is like a building, and so there are places within the building that you can go or not go

and you can determine whether there are particular file extensions or types of file extensions that you should or should not look at.

Or you can do things, if they are -- let's assume that they are paper. What you would do is scan all that paper and then term-search it, and so you would search for "corn" and "DBN" and a hundred other names and extensions and concepts, and so forth, so that you extract out those things that even have a passing possibility of being relevant, but you don't look at all 1.5 million.

And, indeed, when searches are done of business premises, that is how those things are done. Holly and I are doing one with Mr. Deegan right now. They don't actually have to or want to, nor, we submit, should they, look at every piece of paper in the fund of information. An entire business or an entire house, we submit, is not a container and --

THE COURT: But they can't. Should they? Do they want to? Can they practically? Those are different questions. But the law allows them to seize a phone book if they want to seize a phone book, if it's covered under the terms of the warrant, and sometimes --

MR. WEINHARDT: The law --

THE COURT: -- they do.

But the fact of the matter is how are the agents supposed to get to this information? You have had a ton of

cases, I've had a ton of cases, everybody in this room has had a ton of cases. I have yet to see a case where the criminals, the accused criminals, labeled something in a file, "Child pornography. Do not look." It doesn't happen that way. They have to search through everything to find the evidence that they're entitled to search for. How do you do that?

Now, I understand ESI was in no way ever contemplated by the framers of the Constitution. I get that we're moving into a new world here. But the fact is I have not yet seen you articulate, nor can I conceive, and I've got a lot of experience in this area, how these agents would have gone about doing this differently than they did. And even if we could conceive of that, isn't it still reasonable for the judge to have said they could do it the way they did it?

I know you don't like it and I understand that, but in practical terms, it's not unconstitutional that they did it this way.

MR. WEINHARDT: I think that it is. And the reason is that what is on a computer in the home setting strikes at the very heart of what people consider private.

And so I will suggest a couple of things, but I think it is first and foremost incumbent upon the Government, not us, to explain what was done in order to present -- prevent there from having been interception, searching and retention of private things that have nothing to do with this case. So

first, I think the burden is on them, and I do think that to look at this stuff willy-nilly contravenes the Constitution.

Secondly, what I would say is they could use search terms as I described, they could use a taint team or some sort of minimization team or something as I described. But minimally, the warrant had to say what it was that they were looking for because the Court is describing a process by which the agents say, "This has got to do with DBN, this doesn't, this has to do with DBN, this doesn't."

But under the assumed version of the facts here, we don't know that they did that. For all we know, what they did is, "This has to do with DBN. This might have to do with some other crime and we'll come back to that one. This has to do with DBN. This may have to do with something else that we're just interested in learning about, could be an immigration problem or something like that that we need to look into." You know, Mr. Mo is not a citizen.

And so the problem with this is that there isn't even the definition of what they are supposed to look for, so even absent -- although I would say in this case on these facts what should have happened is a protocol or a minimization team, but even absent that, the agents had to have a list of what they were allowed to include and what they had to set aside when they saw it. This warrant doesn't even have that list. That's what makes this warrant constitutionally defective. That's what

makes this warrant the computer equivalent of saying you can look at anything in the house.

With respect to overbreadth, Mr. Krickbaum talked about the Chinese entities issue and essentially confesses error, which he didn't do in their briefing. And in the briefing, which maybe was even more telling, the Government said, "Well, let's just pretend that the stuff in the red box isn't there," of course, and that, "The stuff in the red box isn't supported by the probable cause affidavit, so we can pretend that that's not there."

Of course, when Mr. Mo is served with a warrant, he's not served with the probable cause affidavit, and the probable cause affidavit doesn't limit what the agents can do. This document is what says what the scope of the warrant is. That's the first problem.

But the second problem is the warrant means what it says, and so the agents, no doubt, relied upon it. And I do believe that when a warrant is sufficiently overbroad, it crosses a line.

Again, this is like the Marvin case. It crosses a line from being you can excise the wrong stuff and include the right stuff to saying it's a general warrant and you should suppress everything.

But if the Government is going to confess error, I suspect that we will disagree with the Government on whether

things that were seized in this all trace back to other language or whether there were things that were seized and sought to be used as evidence trace back to what's in the red box. And so minimally, I'd ask the Court to grant our motion regarding what's in the red box and let us take up at the time of motions in limine whether or not any of the fruits that the Government seeks to introduce at trial are things that only come from that part of the warrant that is plainly overbroad.

That's the scope about entities and persons. With regard to the date, the warrant has no date restriction whatsoever. There is not a scintilla of evidence suggesting that anything conspiratorial happened before April of 2011. That is the big bang as far as the evidence in this case. Nothing predates it.

In fact, the search reveals documents from '06, '07, '08. 10 percent of the -- I told the Court there were 100,000 unique documents. More than 10 percent of them are from 2007. That's in paragraph 6 of the supplemental declaration.

The probable cause for those things predating the scope of the conspiracy and the warrant is, "Well, maybe." Maybe there's something, you know, maybe they started this criminal enterprise sooner than what we were able to find.

Now, "maybe" makes sense in January of 2011, might make sense in fall of 2010. But with no evidence whatsoever to support this, "maybe" has to cut off someplace. I would say,

giving this a very broad reading, "maybe" cuts off at two years. But if you get to '08, '07, '06, we're talking about things for which the Government simply has no probable cause to support it whatsoever.

Finally, we argue that the execution of the warrant exceeded the reasonable scope of the warrant, and I think the parties in their briefing have reasonably laid out their respective positions and we've, I think, established that the record is that the Government searched everywhere it could go and did everything that it could do in an unbridled fashion with these documents.

I simply want to clarify this is not about a right of return of the evidence, and that's not what the Ganias or Ganias case from the Seventh Circuit is talking about, but rather it is talking about is the examination of this material an unconstitutional intrusion and what's the remedy for that unconstitutional intrusion.

And, as we indicate in the cases cited in our reply brief, just as in the Ganias, when the unconstitutional intrusion is bad enough, which on our submitted facts we submit that it is, that the remedy is total suppression, which is what Judge Pratt did in the Mandalapu case and what should happen here.

THE COURT: Can you spell the case you're using?

MR. WEINHARDT: Ganias, I believe, is G-a-n-i-a-s.

It's a Second Circuit case from 2014 and it's cited in our briefing. The Mandalapu, M-a-n-d-a-l-a-p-u, case, is -- actually, it's not reported on Westlaw, and we attached it to my supplemental declaration as an exhibit.

THE COURT: And for the purposes of the record, that's a Southern District of Iowa case, 4:09-cr-00004.

MR. WEINHARDT: Now, if I may talk a little bit about good faith. There are four exceptions to the good faith exception. The first is if there was a Franks violation. That's essentially kryptonite that wipes the good faith exception away.

I know we're going to talk later today about Franks. We do stand not just for the purposes of good faith but for all purposes on the assertion that there was a Franks problem here.

The second is that the magistrate abandoned his judicial role or her. It was his in the case of the warrant here. We don't make that contention there.

But we do make a contention under 3 and 4, whether the affidavit was so lacking in probable cause or the facial issues with regard to the warrant.

First, with regard to No. 3, I won't reargue in detail my contention that the warrant application does not state a crime, but here's why that problem, the use of intellectual property, the big white circle instead of the little red circle, is not amenable to good faith.

We don't believe that where there is no exigency, where the Government had over a year to get it right, where there are federal prosecutors, you have to assume, involved in this, where the case agent is a lawyer and where law enforcement is presumed to know the law, that where they make a legal mistake as plain as we submit the one is here that that does not amount to good faith.

Leon says, and this is at page 919, and it's Footnote 20, Leon says, "The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits." A reasonable knowledge of what the law prohibits where you're dealing with one statute, trade secret theft, I think easily includes the obligation to describe facts that violate that statute as opposed to facts that might but might explain all sorts of other things as well.

Particularly here, where the legal error violates the Government's own manual on how to prosecute intellectual property crimes -- and we got into this in talking about deference to the magistrate before, but, Your Honor, I think it is an aggravating, not mitigating, factor that the magistrate is a lawyer. The magistrate had the ability -- and, again, no exigency -- the magistrate had the ability to look up the law and send them home to redo this the right way, and they simply didn't do that.

THE COURT: Would you agree with me that the affidavit

is substantially the same on every one of the searches that are involved in this case?

MR. WEINHARDT: We actually have a chart about that, although we haven't given it to the Court, but, yes, the guts of these things are substantially the same.

THE COURT: So I would have to find, essentially, that three separate judges, looking at the exact same affidavit, and me, looking at the exact same, all of us are wrong that there's probable cause there on the four corners of that document?

MR. WEINHARDT: That's what we're arguing. I understand --

THE COURT: And, I mean, the next step is and that that error is so plain that four federal judges missed it but the agents who were executing these search warrants should not have. That's a pretty tough hill to climb; wouldn't you agree?

MR. WEINHARDT: No. And I'll tell the Court why. And I don't mean to be cavalier about this. But this isn't an 841 drug case. It's not a mail fraud case. It's not even the Lacey Act. This is an unusual statute that calls for the, you know, really, learning from the ground up of, "Oh, I haven't seen one of these before. I better figure out what the law is and compare the allegations in the affidavit to that law."

And when that happens, I think that that imposes a different obligation, and I don't think that that obligation was

met in this case. And I mean to be respectful to all of the judges involved. With the exception of Judge Brannon, I know them all. I know that there's a lot of diligence that goes into this. But I also believe to my core that this affidavit didn't describe a crime. It described facts that constitute maybe civil wrongs, but it didn't describe a crime, and that was the thing that should have been changed.

I do want to point out two other cases to the Court with regard to this issue. And I will allow that when the Court said no Franks hearing we went back and did a little bit more homework on good faith. One of them is a case from Colorado, the Gutierrez case. And it's not actually an EDI case, but it is somewhat similar in that it is a case involving the search of a very large number of business documents, and it presents the exact sort of how do you sort the good from the bad, how do you sort the wheat from the chaff issues here.

Admittedly, it is a state case, but under governing law -- so unlike Iowa, for example, the Supreme Court of Colorado uses Leon. But nonetheless, in a Leon analysis, the Colorado Supreme Court determined that in just willy-nilly examining all of this enormous amount of business records, that going beyond the scope of the warrant in the way that they did was not in good faith.

THE COURT: And for purposes of the record here, we're talking about People vs. Gutierrez, G-u-t-i-e-r-r-e-z, and it's

found at 222 Pacific, I think that stands for, 3d at 925, and it's a 2009 Supreme Court of Colorado case.

Go ahead.

MR. WEINHARDT: The other case that I would commend to the Court is actually a case that the Government cited in its resistance to the car stops motion, and that is United States vs. Washington at 455 F.3d 824. It is an Eighth Circuit case. It was not a search warrant case, as the Court can divine, because it was cited by the Government but in the case of the car stops issue; however, it is, I think, completely analogous in terms of what the Eighth Circuit would do with a legal problem like this.

Here's what happened in Washington: A police officer pulls over a car that's got a big crack across the windshield and he pulls the car over because he believes that under Nebraska law that crack in the windshield obstructs the driver's view in some way that contravenes Nebraska law. He is wrong about that. It doesn't violate Nebraska law. But there is nonetheless -- the Eighth Circuit had adopted it at that point, many circuits had not -- a rule that says if it was a reasonable mistake of law, we will nonetheless say that it was a good stop.

Recently the U.S. Supreme Court adopted that rule as a constitutional matter in Heien, H-e-i-e-n, vs. North Carolina, which is at 135 Supreme Court 530.

Now, Heien came out the other way because the statutes

in North Carolina about what you have to have in terms of lamps on the back of your car are incredibly confusing, but what was not confusing was that there is not a statute in Nebraska that criminalizes having a big crack across the windshield and there was not any confusion about that. That was plain. And for a plain legal error of this sort, the Eighth Circuit said we're not going to cut the officer slack about this. That goes beyond the scope of reasonableness.

The problem here is that same sort of factual claim of illegality when it is not supported by the law, and we think that Washington would stand for the proposition that the Eighth Circuit, using this same kind of analysis, would say this is outside the scope of reasonability and thus outside the scope of good faith.

Now, everything that I have said here concerns the third exception to the good faith exception. I'd like to quickly just point out also that on the ESI problem, I believe there is also a facial problem with the warrant. The Court will recall how I walked the Court through the substantive categories of the warrant, this kind of document, that kind of seed, whatever, and then there is the computer catch-all with absolutely no restriction whatsoever.

So the fact that these officers could watch the family birthday videos, that they could read the kids' report cards, and that there's nothing in the warrant that stops them, and

that factually we assume that that is what they did, that goes beyond the bounds of good faith. The officers had to know they could not go that far.

THE COURT: You don't think the instruction that says, "those types of computer media devices that contain any of the items enumerated above," gives them instructions on what they're looking for in those items?

MR. WEINHARDT: It defines the computer devices but it doesn't say that their searching is limited to those items above. What that phrase does, we believe, is simply defines what constitutes a computer device. It does not say, as the warrant in Gleich or Hager plainly did, you then, in the computer, may look for these things.

THE COURT: Okay. How much do you have on Franks, considering you've already argued an hour just on this one piece of this one motion?

MR. WEINHARDT: Well, I guess -- and I understand this is verbose, but it's also doing kind of the big motion for us, not only in terms of all of the substance of it, but it's really important in terms of the evidence in the case.

I assumed, perhaps wrongly, as we were discussing scheduling yesterday, that we were going to talk about James and Franks briefly at the end of today's proceedings because those weren't really live issues but we were really making a record. And so to be candid, I was going to, at lunch, try to trim down

my Franks presentation as much as possible to make it quick and relatively painless.

THE COURT: Okay. Then have you wrapped up on these particular home and office?

MR. WEINHARDT: Yes. So in other words, my comments on the home and office warrant are complete.

THE COURT: Okay. Then let's go ahead and take our lunch break and we'll come back and move on. We'll finally let Mo Yun's people speak again, and we'll move on. Well, I guess, yes, we've got cut-and-paste ahead of us, as well as the rest of the searches contained in Docket 253.

So we'll take up as a group sort of the electronic issues in 253, and then we'll turn to cut-and-paste, and then we'll make final records on Franks and James.

MR. WEINHARDT: And because I think they're somewhat distinct, if people would rather turn to cut-and-paste and then Marc and I come back to Yahoo, iCloud, and cell phones, I can --

THE COURT: No.

MR. WEINHARDT: Okay.

THE COURT: Let's wrap up 253. I think it is in many ways less complicated, although certainly more active than the cut-and-paste issue is.

So let's go ahead and take an hour for lunch. If everybody could be back a little after 1, five after 1, we'll get started again.

Kelli, do you have any questions of the lawyers while they're here?

Okay. I'll see everybody in an hour.

(Recess at 12:06 p.m. until 1:09 p.m.)

AFTERNOON SESSION (1:09 p.m.)

(In open court with Defendant Mo Yun personally present and Defendant Mo Hailong present via telephone.)

THE COURT: We are back on the record in the matter of United States vs. Mo Hailong and Mo Yun.

Do we still have Mr. Mo on the phone?

Okay. Then we're ready to continue with arguments.

Mr. Krickbaum or Mr. Griess, argument with respect to the remaining searches that are part of Docket 253.

MR. KRICKBAUM: Thank you, Your Honor.

And I'll start with the Yahoo e-mail search. And there's actually an issue I want to address at the outset, which is it will relate to -- and this is a search for which I'll be using some initials. This is the issue that you addressed yesterday.

Defendants' filings in their briefs in support of their motion to suppress name the person that Defendant claims is a CHS, and whether that person is a CHS or not, I don't see any need for that name to be used in court today, and we would ask that Defendant's filings either be redacted or placed under seal with respect to the CHS, the claimed CHS's name, for the same reason.

THE COURT: Do you know which particular documents those are?

MR. KRICKBAUM: I do, Your Honor. It's 253,

Attachment 3 is the initial brief, and then 329 is the reply.

THE COURT: Mr. Weinhardt, any objection to sealing those items?

MR. WEINHARDT: We do not have an objection to sealing them, Your Honor.

THE COURT: Is it 253-3 or is it Attachment 3 to Mr. Weinhardt's affidavit?

MR. KRICKBAUM: It's 253-3.

THE COURT: All right. Then 253-3 and 329 will be sealed.

Thank you for alerting me to that, Mr. Krickbaum.

MR. KRICKBAUM: Thank you, Judge.

On the merits of this motion, the only challenge that I think we are discussing today is whether or not there was probable cause for the search. There was, and I will just outline in brief summary what I think it consists of.

First, the affidavit established or certainly created probable cause to establish that the defendant was part of a conspiracy to steal trade secrets and that at the heart of that conspiracy and the intended beneficiary of that conspiracy was the defendant's employer, DBN. I've already talked about that. I will not rehearse the reasons to believe such a conspiracy existed.

Second, several other DBN officials and executives were involved in the conspiracy with defendant, two who are

mentioned in the affidavit; Wang Lei, that's W-a-n-g L-e-i and Dr. Li Shaoming, L-i S-h-a-o-m-i-n-g.

Defendant and these two men were together in numerous -- on numerous occasions, according to the affidavit, both in China at various meetings as well as in the United States at various locations.

Third, there was probable cause to believe that Defendant communicated with his co-conspirators, including Wang Lei and Li Shaoming, electronically. And this is really an inference to be based on the information in the affidavit that these men must have communicated electronically.

They were at many times separated by an ocean and by a 12-hour time difference. They were arranging various interactions together, including specific meetings with American companies in Beijing, specific visits to Pioneer and other locations in the United States, and so it was a reasonable inference that they were talking to each other electronically, including by e-mail.

Fourth, the defendant used his Yahoo e-mail account to engage in DBN business related to corn. And the specific information about that in the affidavit is the e-mail that the defendant had with an individual we will call L.Z., an employee at Stine Seed Company. That was a December 2011 e-mail involving seed being shipped to Guyana.

And for purposes of my argument, I will assume that

that e-mail and the business transaction it discusses were entirely legitimate transactions, there was nothing criminal about the transaction discussed in that December 2011 e-mail.

We also know, and this is the fifth point, that in addition to L.Z. communicating with Defendant, L.Z. also communicated with someone I will call L.D., who was a Pioneer employee. The affidavit spells out a particular e-mail in June of 2011. This e-mail was not involving legitimate business dealings. In this e-mail L.Z. told L.D. that L.Z. had donor genes and regulatory sequences of a particular line of Stine corn seed. She said that the information she had was marked confidential and she offered to show it to L.D.

L.D. was an employee at Pioneer, a different seed company, and according to the affidavit sets forth that, according to the CHS, this was a proprietary, inbred line of Stine corn seed and L.Z. should not have had access to that information.

The final point that I will emphasize is that the defendant, while he was not a party to that e-mail, he was in contact with both L.Z. and L.D. I've already talked about one of his communications with L.Z. That's the e-mail I mentioned earlier, the one that involved legitimate business transactions. He had extensive interactions with L.D. as well, that is Defendant did. He was sponsored by L.D. when the defendant visited Pioneer headquarters with Dr. Li Shaoming in

approximately September of 2011, and there were dozens of phone calls between the defendant and L.Z. as well as L.D. from March to November of 2011.

So what does this mean? The FBI believed -- and the investigation was concerning whether the defendant was conspiring with company insiders to obtain trade secrets from some of these companies, and the defendant's claim in his motion is that the FBI had to have in hand a dirty e-mail from the defendant's Yahoo e-mail account in order to have probable cause to search that account, and we disagree with that as a matter of law.

I think it's reasonably clear that the Eighth Circuit does not require direct evidence linking the place to be searched and the crime. There has to be a connection between the two, of course. There has to be a nexus, but the law, I believe, is clear that judges can draw reasonable inferences to establish that connection.

The Eighth Circuit has said that more than once. I'll cite the Court one case, which is United States against Anderson, that's s-o-n. It's 574 F.3d 484, page 490, and that's in 2009, Eighth Circuit case.

So the Eighth Circuit has recognized, for example, that drug traffickers are likely to have tools of the drug trade in their home. People who sexually exploit children are likely to have computers and Internet access in their homes. The

Eighth Circuit recognized those things in United States vs. Paton, P-a-t-o-n, 535 F.3d 829, page 836. That's a 2008 decision. And just as those sorts of criminals are likely to have such evidence of their crimes in their homes, a person who engages in corporate espionage on behalf of his employer, as Defendant did, that sort of person is likely to have e-mails about his crime on e-mail accounts that he uses to conduct company business.

And we know that Mo Hailong used his Yahoo account to conduct DBN business related to corn seed because that's what his e-mail with L.Z. was about. It was not necessary, in our view, for there to be a criminal e-mail that the FBI had in hand. All that was necessary is to know that Defendant is engaging in a conspiracy, he's likely to be communicating electronically as part of that conspiracy, the conspiracy's entire purpose is to benefit DBN, and he uses this e-mail account to conduct DBN business.

Now, that, in our view, is sufficient to establish the low bar of a fair probability to believe that evidence of a crime would be found on the e-mail account.

That is all that I have on that one.

THE COURT: Can you speak to the concern that the defendant raises about the fact that the warrant authorized the search of items back to January of 2010 and the defendant says you seized and have turned over as part of discovery things back

to 2003?

MR. KRICKBAUM: I cannot in this forum, Your Honor. I think that will be addressed with the Court in other filings.

THE COURT: Okay. Thank you, Mr. Krickbaum.

MR. KRICKBAUM: Thank you.

THE COURT: Mr. Weinhardt.

MR. WEINHARDT: What is notable, I think, to start with is what the Government concedes. This starts out with an attempt in the warrant application to establish directly that there was criminal involvement in this Yahoo account, and the Government has backed away now from that and essentially has conceded that there is no evidence of criminal communication on that Yahoo account.

There was this one e-mail that was attempted to be relied upon in the search warrant affidavit. The Government does not now defend that e-mail as evidence of a crime, apparently conceding the evidence that we have introduced, both internally within the probable cause affidavit as well as the additional e-mails that we have introduced, put this into context that establishes that communication was legitimate.

And so, really, the question is whether or not this extended chain of inferences as a legal matter is enough to allow the Government to seize the contents of the e-mail account anyway. I would direct the Court to the authorities that we cite at page 3 of our reply brief, which is Document 329, the

Guo Wu case and the Bynum case, and the Government's own manual having to do with these kinds of seizures which requires, and I quote, that at a minimum the Government must establish a connection between the e-mail account and a suspected crime.

The Bynum case from Minnesota was, I think, directly on point to this situation. And I haven't had a chance to look at the Anderson and Paton cases that Mr. Krickbaum cited, but I think just from the way he talks about them, the Bynum case is much more directly on point. It talks about a cell phone rather than an e-mail account, but it talks about is there not just evidence that the defendant communicated using this method or this place or this device but is there evidence that the defendant communicated criminally using this device. That's what all the authorities that we cite to the Court require.

THE COURT: Would you spell for the record the Guo Wu case and the Bynum case?

MR. WEINHARDT: Okay. G-u-o next word W-u, and the Bynum case is B-y-n-u-m.

THE COURT: Thank you.

MR. WEINHARDT: I would point out, just with regard to the steps in the argument that the Government makes, that the communication between L.Z. and L.D. that is one of the steps in the analysis is not one that has been shown to be connected to our client in any way, shape or form and that our client's communications with L.D. are not shown to be criminal in any

way, shape or form.

And so every one of, I think, the six steps sort of dances around the issue but none of them addresses or solves the issue of is there a connection between the probable cause of criminality and the place to be searched, the place being the Yahoo e-mail account.

Mr. Mo had other e-mail accounts, at least two of them that are shown by the record. Now, it is certainly possible that people used different e-mail accounts for different purposes. I do. Lots of people do. And so that's why the law requires a criminal nexus, not just merely a communication nexus for that.

The one other thing that I will say about this is that conspicuously absent in the Government's argument on this motion is any claim that the good faith exception protects what the agents did here, and whether intentional or inadvertent, that's a concession that the Government must make.

Because in telling the Court, "Let's assume that the one e-mail that Agent Betten wrote about in the probable cause affidavit is an innocent e-mail, is not evidence of a crime," the Government is conceding a Franks violation when it says that because it is the evidence outside the record that we introduced in support of this motion that establishes beyond a doubt that that was an innocent and not a criminal communication, and, as the cases we have cited on the home/office warrant say, if

there's a Franks violation, good faith does not apply.

THE COURT: There's a difference, though, between saying the officers made the mistake in how they interpreted this and saying it's a Franks violation.

MR. WEINHARDT: Well, it's not a mistake in interpretation. What the Franks violation is is that Agent Betten had two different forms of information that told him this was an innocent e-mail that he withheld from the magistrate.

The first was his communication with the CHS three months before he wrote the affidavit in which the CHS said, "Oh, we are doing legitimate business with DBN." The second is a series of e-mails from L.Z.'s computer, which is the same fund of e-mails that they got the one allegedly incriminating e-mail on, and those e-mails in time both predate and post-date the allegedly incriminating e-mail.

We've put nine of them into the record. We had -- because of a translation issue, I think we had to make a filing last night or today to complete the record, but those were all equally known to the Government as the one incriminating e-mail. They're all in a chain of communications among the parties and they reach up to highly placed individuals within that subject company explaining that this was legitimate transaction.

So, no, it's not a misinterpretation. It is, as the Jacobs case said, the withholding of information that would change the magistrate's view of the affidavit had the magistrate

known it.

THE COURT: Okay. Let's move on to the next issue, which is the iCloud account.

Mr. Krickbaum.

MR. KRICKBAUM: Thank you, Judge.

And I want to say for the record very briefly on the last motion -- I don't have additional argument -- I do want to say, on behalf of Agent Betten, we are not conceding a Franks violation, but it is accurate to say that my argument proceeded under the assumption that that was a legitimate transaction and that probable cause is not based on any claim that that e-mail was criminal.

THE COURT: At what point did you determine that legitimate? I mean, there has to be some translation done to figure that out, there has to be some context done, and even certainly in a number of criminal contexts, even though you have somebody who says, "Oh, no, no, no, they're just friends," that doesn't necessarily mean that's the end of the criminal inquiry, or they say, "No, no, no, we just partied at that house, we don't store our drugs there," well, you're not necessarily going to take the word of somebody else about what's going on.

And even looking through the documents filed last night, which I appreciate having the English translation of, you know, there's specific exclusionary provisions in those contracts that say, "You shall not do DNA testing," you shall

not do some of the things that are, in fact, happening here, and so I'm not entirely convinced that those are not problematic e-mails. But if you've made that decision, at what point did you make that decision?

MR. KRICKBAUM: I don't know the answer to that as to when they determined, you know, made a determination at a minimum that this did not involve a leak of -- you know, these were not communications about stealing trade secrets. I think that's probably a better way to phrase it as opposed to saying they were completely innocent.

But these were legitimate transactions in that Stine Seed Company knew about them. She wasn't -- L.Z. was not engaging in any kind of off-the-books, black market, secretive deals with DBN that involved, you know, giving away the secrets of the company.

I don't know when we made that determination, Judge. I will say that the affidavit does contain information from the CHS that Agent Betten had at the time that that e-mail might well relate to legitimate transactions because Stine Seed was doing business with DBN at the time, so that is contained in the affidavit.

I don't think I have anything else to add on that.

THE COURT: Okay. Thank you. Sorry to interrupt you.

MR. KRICKBAUM: That's okay.

On the iCloud, there are two issues I want to address.

The first is that there was probable cause for this search warrant. I will be reasonably brief in talking about this.

The FBI had specific information that Defendant had electronic communications with his co-conspirators about this conspiracy. Some of those electronic communications were found in the initial review of the defendant's computers and hard drives that were found at his office.

The FBI also had specific information that the defendant used an IM service called QQ and that he used that on his iPhone, likely to communicate with DBN colleagues in China.

THE COURT: And is that the letter Q twice?

MR. KRICKBAUM: Yes. The letter Q twice.

And that information is information the FBI received from a DBN employee. The FBI did not find any -- they did find Defendant's iPhone during the searches, but they did not find any data on that phone, and there's been, I think, some controversy about whether the phone was wiped.

I can tell the Court what my understanding of that is, which is that initially the agents were not able to get into the phone because it was password protected. They later found the password in a notebook, it was handwritten in a notebook that was seized from the defendant's house. They used the password to get on the phone and the phone had no data on it. I don't believe that the computer examiner wrote a supplemental report to say that there was nothing on the phone, but we expect that

one will be created to record that.

But that sort of addresses this issue about whether it was wiped. I don't think much of consequence hangs on that. The point is that there weren't any chats on the iPhone; in fact, there was nothing on the iPhone.

In addition, the FBI knew that the defendant had an iCloud account, and the point of an iCloud account is to store data from Apple devices such as an iPhone. From this it was reasonable for both the magistrate and the FBI to conclude that there was a fair probability that this iCloud account would contain evidence of a conspiracy, it would contain communications, chats between Defendant and his colleagues in DBN. And, of course, we know that the defendant was conspiring with many of those same colleagues to steal the trade secrets of American corn companies.

That judgment of probable cause is, of course, entitled to deference, and the agents were entitled to rely on it in good faith. We are certainly asserting the good faith exception with respect to this search. The finding of probable cause was not entirely unreasonable.

The second point I want to make is that the FBI complied with the warrant, and the issue here is whether the FBI was required to return or destroy information on the iCloud account that was not -- that they were not authorized to seize.

The warrant required Apple to provide the FBI with the

contents of the iCloud account. It did not contain any specific requirement that the FBI return or destroy what Apple gave it. If that is what the warrant had meant, it would have had to have been much more specific than it was.

So there's a number of practical problems that arise if you're trying to claim that the FBI was supposed to destroy nonresponsive information. When were they supposed to do that? At what point? How long could they search the account and determine whether information was responsive or nonresponsive? What were they supposed to do with the nonresponsive information they found? Were they supposed to destroy it? Delete it? Return it?

None of those questions are answered by the warrant. The warrant gives the FBI no instructions about how they were supposed to effect this supposed destruction.

Was the FBI or was the Government supposed to give the defendant in discovery what it got from Apple or was the Government supposed to give the defendant tampered with information? In other words, was the Government supposed to delete nonresponsive information and then only give that to the defendant?

How, if the FBI was required to delete information that Apple gave it, was the Government supposed to authenticate what it received from Apple in the first place if the Government didn't retain a copy of what Apple gave it in the first place

because the Government had to delete or destroy parts of it?

The warrant gives no instructions or guidance on any of those issues, and I think that's because a fair reading of the warrant is that it didn't require the FBI to delete or destroy what Apple gave it. And we would certainly rely on the good faith exception here as well.

You know, I am not aware of any instance in my experience with e-mail search warrants where the investigating agency has destroyed what Google or Apple or Microsoft gives the agency, and that includes cases in this district, that includes cases I've litigated against Mr. Weinhardt.

I think Mr. Weinhardt made a brief reference to our bacon matter. That case went to trial. It involved e-mail evidence that was admitted at trial, and there was never a contention from anyone that in that case the USDA was supposed to delete what Google had provided as part of an e-mail search warrant.

And so if this is something that the warrant required, that's news to us, and I think the good faith exception would cover any inadvertent error by the Government there.

The last point I would make, and I think this point maybe I should have started with because I think it's decisive, the Eighth Circuit's case law is very clear that even if the FBI wasn't supposed to keep this nonresponsive information, the Court should not suppress information that the FBI lawfully

seized pursuant to proper portions of the search warrant, and that, of course, is the only information the Government would seek to introduce at trial. So I think that decides this issue independent of anything else I have said.

THE COURT: With respect to the retention of evidence, has the Government created in any way documents that would indicate when the breadth of the material was searched and what was sort of set aside as nonresponsive and what was maintained?

MR. KRICKBAUM: I can't talk about that in any detail, Judge. I just don't know the answer. I have not been directly involved in viewing that material. We can get you the answer, but I don't have it standing here.

THE COURT: It seems like if there is an issue there with respect to maintaining nonresponsive information, part of that concern can be cured by resolving for the defendants that that's not being researched every month or two when you've got some new theories of your case or new evidence.

MR. KRICKBAUM: Well, that I can answer. We're not doing that.

THE COURT: Do you have anything that documents the last time somebody opened that or the only time somebody opened that, something of that nature?

MR. KRICKBAUM: I don't have it as I stand here.

THE COURT: I think it would be helpful if something like that is created. Almost regardless of the ruling here, it

would be helpful.

MR. KRICKBAUM: Yes. We will do that, Your Honor.

THE COURT: Mr. Weinhardt.

MR. WEINHARDT: The probable cause chain of reasoning, as I understand it, is that our client probably had communications on a different device; that is, a phone. We don't know, but he probably had communications on that phone. Those communications probably included chat activity as a subset of all communications. Mr. Mo probably then backed up those communications to another device or storage facility. He probably used a different application, that being this QQ program, to do that. And those communications that he probably had on his phone, probably did so through chat, probably backed up and probably did so through the QQ program, he probably communicated about criminal stuff in those communications.

I think the description of that chain of logic is enough to explain why it lacks probable cause. Those are simply way too many inferences, and too many inferences whether viewed through the conventional search warrant lens or through the good faith lens of can the agent reasonably believe that there is probable cause with that many different leaps. That's probable cause.

With regard to the ESI issue, the iCloud service and what it enables and what you can store there is immense. It is not like simply your Gmail account, nor is Mr. Mo bound by what

our client in the bacon case was willing to litigate in terms of ESI seizure.

But just as a legal matter, the iCloud and the scope of what is in it is dramatically different, and so I would simply say with regard to the ESI arguments on the iCloud, they are the same issues with regard to particularity and scope -- perhaps not overbreadth, but at least with regard to particularity and scope, they are the same issues that we argued this morning on the home/office warrant.

When the Government says that the warrant had no instructions whatsoever on how to manage this data, that's precisely the problem, and it is the absence of any means to accomplish the separation of the wheat from the chaff, to borrow an analogy from a different crop, that is the problem and the thing that renders this constitutionally infirm.

THE COURT: Thank you.

Let's talk about the phone.

MR. KRICKBAUM: Judge, in the case of the phone, there is no dispute that this search warrant was lawful. There is no dispute that there was probable cause for the search. The issue is whether this evidence which was lawfully obtained at the time should be suppressed because of something that happened later or, in this case, something that did not happen later, which is the Government's failure to give Defendant timely notice of the monitoring of his phone.

And we concede that the notice in this case was not timely, there was no question about that. However, getting evidence suppressed on this ground is an uphill battle, and the defendant has to show either that he was prejudiced by the late notice or that the Government acted in bad faith, and we believe he cannot make either of those showings.

The prejudice question is a pretty straightforward one. The Eighth Circuit has said that if the search would have occurred, even if the Government had provided proper notice, then there is no prejudice. That's the Turner case cited in our brief. It's 781 F.3d 374. It's a 2015 decision from the Eighth Circuit.

In this case the search occurred in April of 2012 and the defendant was not to receive notice until after that date, in fact it was extended seven times, until January of 2014. So, of course, the search would have occurred even if notice had been given, and the legality of the search is not in dispute, so there's no prejudice to the defendant.

I'll also note that he was given notice in time to file his motion to suppress. He filed his motion to suppress, and that did not include any sort of a challenge to the probable cause that supported the search.

There also was not bad faith. And here I don't have much to say other than this was a mistake. This was notice that we should have given and that we didn't give, not because we

were intending to deprive Mr. Mo of notice that we knew where his phone was.

And I think in looking at whether the Government acted in bad faith, it's helpful to look at, you know, the mountain of other electronic evidence we did disclose as quickly as we were able, including the actual recorded phone calls on his phone.

I mean, we turned over to Mr. Mo the fact that we were intercepting the content of his telephone calls. We did that in this case long ago. There just was no reason for us to suppress from him that we knew where his phone was when he was having those calls. It was not part of any grand design by the Government, and it certainly is not something that we did in bad faith.

The Turner case that I cited earlier was one in which the Eighth Circuit noted that the violations of Rule 41 were not single and they were not minor and yet the court still found no bad faith, and we submit that there is likewise no bad faith here.

THE COURT: When did you disclose?

MR. KRICKBAUM: I believe this was January of --

THE COURT: 2015?

MR. KRICKBAUM: -- 2015.

THE COURT: So a year late?

MR. KRICKBAUM: Yes, Your Honor.

THE COURT: What happened? You just forgot?

MR. KRICKBAUM: Well, we just forgot may be the most accurate to say it, Judge. I think that this -- this is a case in which there was a massive amount of electronic evidence. Much of it was classified at one time. In some cases there was both classified and unclassified evidence that was intermingled, and I think this particular monitoring got lost in the mountain of other material that we were disclosing.

THE COURT: When did you turn over the recorded phone calls themselves from the same phone?

MR. KRICKBAUM: If I can just have a moment, Judge, to check on that.

THE COURT: Yes.

MR. WEINHARDT: I have a timeline that lays all that out for the Court, Your Honor.

THE COURT: Is that your Exhibit 11?

MR. WEINHARDT: No. I've prepared something.

THE COURT: You've got a new one?

MR. WEINHARDT: Yes.

THE COURT: Okay.

MR. WEINHARDT: That's hopefully simpler.

THE COURT: Okay. Then do you know the answer off the top of your head?

MR. WEINHARDT: Yes. The answer is that they disclosed the recordings to us, at least the first ones, October 14th of 2014, and they produced the information revealing cell

phone GPS data on January 15th of 2015.

THE COURT: Okay. And the disclosure of the recordings themselves, was that essentially when you got access to the search warrants and the extension requests and all of that material, or how was disclosure made in January of 2015? Or was it just underlying data or --

MR. WEINHARDT: It came in a large quantity of all sorts of other discovery, and as we were plowing through it, we found, "Hey, there are recordings here that appear to be from a phone."

Someone from my team is now telling me that the cheat sheet that another on my team prepared -- if I may have a moment.

THE COURT: No. Take it. You can confer with Government too, if you need to.

MR. WEINHARDT: I've cleared this up. It was in October that we received the recordings, the audio intercepts. It was on January 15th that we both received the information regarding the existence of the GPS tracking and we received the history of extension requests and all that sort of stuff.

So the timeline I'm going to give the Court a cheat sheet of, but we laid out in our motion papers we learned all that at the end of January of this year.

THE COURT: Thank you.

I don't have any other questions, Mr. Krickbaum,

unless you have anything else you'd like to --

MR. KRICKBAUM: I do not. Thank you, Your Honor.

THE COURT: Mr. Weinhardt.

MR. WEINHARDT: So now to satisfy the Court's curiosity, here it is. It's got some abbreviations and things in it. Essentially, it is the work product cheat sheet that we prepared in getting ready for this argument, but it lays out in very quick fashion the timeline of the events here and has highlighted in yellow the ones that I think are material for the Court's analysis.

So I think we are only talking about remedy, not about whether or not there is a rule violation. We do believe that advising someone of the existence of a warrant so that they can, in the words of the Chadwick case, that's 433 U.S. at 9, determine the lawful authority of the executing officer's need to search and the limits of his power to search, we do think that that is a constitutional dimension and not merely a rule dimension and that under the Chadwick and progeny cases there would be suppression warranted.

But even if that's not the case, what I want to say about the rule base, the Rule 41 base issue, is that it is not necessary that we show prejudice, although kind of in a context of all the discovery problems and so forth in this case, we would like to know a lot earlier than we're learning about some of these things, but if the Government acts either intentionally

or recklessly, that is a basis for suppression.

So I guess I don't want to use the term "bad faith" because I don't know whether bad faith is supposed to only connote we did it to you on purpose or whether it also connotes recklessness.

The cases say, and particularly, for example, the Biere case, B-i-e-r-e, 21 F.3d 811, it's an Eighth Circuit case in, I believe, 1994, says that recklessness is enough to warrant suppression.

I would submit that there is recklessness where, number one, the Government plainly knows of its obligation to either notify or extend because the Government extended seven times before it stopped extending; that, number two, where the Government does not contend that there was any reason for the failure to notify, there has not been any declaration, affidavit or excuse offered; and that, number three, where there have been other similar issues. So the Government has not contested the Honda CR-V motion, but there was a similar pattern of failure of notice in that case as well.

And so where the Government knows it has an obligation, complies with the obligation, and then just stops and more than a year goes by or about a year goes by and it's deep into the case, well after indictment, that we first find out about those things, I would say that that's at least reckless and that, under the cases, I think is a basis to

suppress.

THE COURT: Mr. Weinhardt, I'm looking at your timeline here, and you cite to your omnibus declaration at Exhibit 39. I'm not tracking where that is. Was that attached to a particular filing?

MR. WEINHARDT: Yes.

THE COURT: I'm not finding it in the notebook under 39, which is where I thought it would be. Can you help me with that?

MR. WEINHARDT: And I know it's electronically filed. Here's what happened that I think may be the issue, Your Honor, is we filed one really big declaration in support of all the warrant motions and it had 51 exhibits attached to it.

THE COURT: Correct.

MR. WEINHARDT: 1 through 26 were in one notebook -- or 1 through 25 were in one notebook and I think 26 through 51 were supposed to be in a second one. I'm not sure we got that second notebook to the Court. Exhibit 39 is in the electronic filing, I believe --

THE COURT: Okay.

MR. WEINHARDT: -- but I'm not sure we got that second notebook to the Court with Exhibit 39 because I didn't find it when I was getting ready for this myself.

THE COURT: Yeah. I do have a 39, but it's a DEA 302 to Mr. Roger Santos at the LER Group.

MR. WEINHARDT: That wouldn't be the one.

THE COURT: I assume not, but okay. I'll look, then, at the electronic attachments to your omnibus.

MR. WEINHARDT: And we'll check at our end, Your Honor, and try to get the right documents to the Court.

THE COURT: While we're talking about that, would you like this to become an exhibit?

MR. WEINHARDT: I don't think that's necessary. If the Court wants a super-complete record, that's fine. It's just sort of an aid, sort of like my quotations from the Coolidge case.

THE COURT: Okay. Mr. Krickbaum, this is a complicated issue. Anything with respect to the timeline that you would, I guess, dispute?

MR. KRICKBAUM: Judge, I don't have anything to dispute at this time, having just received this, and I haven't been on the case for most of the time that this timeline was created, so I can't tell you right now as I sit here.

THE COURT: Can you give me a sense how much data, you know, you did turn over? I know there's been an enormous amount of discovery in this case, and my sense in looking at the briefings of everybody is that it sort of trickled out or, you know, in stages arrived as it's either unclassified or as it's located or as it's finally sorted and copied and all of those things.

When you're looking at prejudice and when you're looking at bad faith or recklessness, the context matters as in terms of was this the very last thing you turned over or was this, you know, two of ten things you turned over.

Did they have lots more that they -- in an open file discovery that they aren't technically entitled to anyway under Rule 16 such that that mitigates, to some sense, the prejudice because they had so much other data that you didn't have to give them, things of that nature? Do you have anything there that might be helpful to me to look at?

MR. KRICKBAUM: Judge, we have a written summary of the discovery that we've produced, and that is contained at the beginning of our filing in response to the motion to compel. I'm sorry, I don't have the docket number offhand. But that contains a summary of what we produced, when we produced it, focusing on the fact that we produced the core material going to the heart of the allegations in the indictment as soon as we could, as early as we could. As you know, much of the information had to be declassified, which is why it came out in spurts, that we turned it over as soon as we were able to.

I do believe it to be the case that we've turned over materials often far in excess of our Rule 16 obligations, that we've turned over material early. Now, of course, the parties have had many arguments about discovery, and I know that there's another side to this story, but in terms of laying out our

production, I think that filing is the best place for the Court to look.

THE COURT: I'll look there. One additional question, and I don't know that it drives the decision or not, I don't think it can drive the decision or not, but I'm interested in nonetheless. For instance, in looking at Mo Yun's statements at LAX, I didn't see anything there that I saw as particularly inculpatory anyway. Now, that's not the issue. The issue is whether the statements should have been taken.

What's in here that you're worried about and is it something that we can parse out, in a motion in limine setting, if there's a particular location that you're worried about when we've got a better context for how much that really matters, or is it just the idea under Rule 41 that you were entitled to this at a certain time and you didn't get it and so those 1600 pings, or whatever it was, doesn't matter wherever he was because the Government shouldn't be able to use it at all, or some combination thereof?

MR. WEINHARDT: Well, first, we're entitled to the last thing that the Court said. That said, I think on our team we can take a look at that, and if this is something that can be resolved between the parties without the Court needing to make a resolution of the issue, we can work on trying to do that.

But we are interested, I guess, in not only vindicating Mr. Mo's rights with regard to each and every Fourth

Amendment search or seizure, but also because we think when we, you know, accompany this with the Honda CR-V situation and the other things that have happened in discovery and so forth, it is a pattern, we believe.

And Mr. Krickbaum's right, we have lots of contentions back and forth about discovery, but we believe that there has been a troubling pattern, and so part of the motivation for filing the motion is we're trying to call to the Court's attention what we think is ongoing.

THE COURT: And is that a pattern that you see consistent with, you know, recklessness or bad faith on the part of these agents or officers or AUSAs or is it what I see as a small office trying to deal with a giant case with a ton of moving parts and they're just not getting everything 100 percent right?

Now, as a matter of law, are you entitled for it to be right? Of course, your client is entitled to that. But when I'm trying to craft whether or not I think they need to be sanctioned for what they've done, I have to consider the context in which these things are happening.

And this is a small district, a small office, a small number of people. You guys have what collectively -- I think there were 27 lawyers here for the motion to compel. You've got teams of people working on this. This is one part of their small plate. Does that matter or should it matter?

MR. WEINHARDT: First of all, in terms of what Mr. Mo is entitled to under Rule 41 and under the Fourth Amendment, I don't want to be hardhearted about this, and we get along very well in lots of cases, but I don't think that it matters. I do think that the Government is held to a compliance with the rules. That's number one.

Number two, I understand the difficulties with a small office dealing with a case of this magnitude. That's part of the reason why the five lawyers at Weinhardt and Logan aren't doing this alone.

But I also think that there is another dimension to this, and in part because of the classification and that sort of stuff, we simply don't know the degree to which it is an issue. But part of what we understand and infer, both from communications and just behavior that we see, is that not everything is being run or decided in this small office, but some of it is being decided one time zone to the east of here.

So the Court wasn't on the case at this point, but last fall, in October, when we came to argue motions, we showed up, and four lawyers, including Mr. Klinefeldt himself, showed up in front of Judge Pratt to say, "We've been told we can't say a word today."

Those kinds of things make us at least wonder or make us concerned that part of the discovery problems in this case have to do with the left hand and the right hand being in

communication with each other about what gets declassified when and those sorts of things, and, you know, that's a situation where, if there's a resource imbalance, it's not tilting in our favor.

THE COURT: Thank you, Mr. Weinhardt.

Okay. With respect to the search warrant searches, I can resolve those in part and I think I have to reserve ruling on those in part, frankly, until we know more about what's going on, because I do see some of these issues as intertwined with what inevitably is coming down the pike under the FISA or compel discovery kinds of litigation that's still being held open.

With respect to whether or not these warrants establish probable cause for the places that are being searched, I find that they do. In particular, I find that the warrant that allowed the search of Mr. Hailong's residence in Boca Raton had probable cause based on the four corners of the document that I have seen; that to the extent there were some errors, and I think the Government concedes there were some errors in that warrant, that even if I found those were flagrant, deliberate omissions or deliberate misstatements and those were pulled from the warrant, I still find that the warrant itself would establish probable cause after those redactions.

I find that the search warrant was not stale based upon the evidence presented, in part based on the nature of evidence that was being gathered, which was largely electronic

or business records, which are maintained much longer.

I find that there were crimes being investigated and that the probable cause extends to tax fraud as well as the interstate transportation of stolen goods, as well as a conspiracy to steal trade secrets.

I don't find that the search warrant was overly broad or that it lacked particularity. I do think the issue surrounding, you know, seizing any evidence of communications with Chinese entities is problematic, so I reserve that issue to be taken up in motion in limine matters.

And so if there's a particular document with communication that the Government intends to use at trial and that arrives in your offices as a Government exhibit, then we'll take up whether that should nonetheless be excluded from trial because of that problematic language, as I see it, that was contained within the warrant.

Finally, I don't find that the search warrant itself is unlawfully executed. I think the agents did what they're allowed to do under Eighth Circuit law, current governing law, in conducting these searches. And ultimately, even if the warrant were for some reason found to be defective under Franks or otherwise, I find that good faith -- Franks wouldn't pull it out, but I find that these officers who were executing the warrant were in good faith relying on that warrant under Leon, and I don't find here that there was such a problematic search

warrant or such a problematic probable cause determination within that search warrant that the officers would have lost their productions that they have under Leon bad faith.

I make the same findings and the same legal conclusions as to the search of the office.

The Yahoo account I think is difficult to resolve right now with respect to the timing of how that material was provided. Mr. Krickbaum has advised me that he can't answer fully the question of the old e-mails versus the newer e-mails.

As to anything that post-dates the January 2010 authorization, I find that the motion to suppress should be denied. I do find, again, that there's probable cause established by that affidavit. I, for same reasons I found earlier with respect to any Franks allegations, dismiss those.

That the search was beyond the scope of what was authorized, which is the third ground raised in 253 as it relates to this, I think is still an issue we have to resolve.

So I deny in part but defer in part the decision on the Yahoo account until I know more about when and why the scope of that warrant appears to have been exceeded, or if there was an earlier warrant, we need to know that to explain those earlier e-mail accounts.

As to the iCloud account, I find again that the warrant established probable cause and deny any kinds of Franks, essentially, allegations, and I find here, again, that the

search warrant was executed in a lawful manner and make the same findings with respect to Leon good faith as to all of those searches.

I will, however, reserve ruling and handle as motions in limine any evidence, as I said, that appears to fall under that very broad Chinese entity language on any of these searches, as well as anything that appears to fall in the Yahoo account outside the scope of the time limit that was allowed.

Let's turn to -- oh, I'm sorry, on the GPS tracking of the phone, I reserve ruling on that issue entirely until I know more about what was happening and why in that case.

So let's turn to the cut-and-paste issue with respect to Mo Yun's motion, and that is Docket 245, entitled, "Motion In Limine To Exclude...Excerpts Of Instant Message Conversations Based On Failure To Meet The McMillan Authentication Test."

Mr. Griess, is this one yours or are you --

MR. GRIESS: Yes, Your Honor.

THE COURT: Okay. Go ahead.

MR. GRIESS: First of all, Your Honor, just let me say that I think that, obviously, the question here is one of authenticity, and we believe that the proof of private custody of these IM chats, together with the detail of those chats, are strong circumstantial evidence of the authenticity of these documents and that there's nothing further that needs to be done to authenticate them.

I think the law has been more than provided in the brief, and we'd rely on that. There's obviously some facts that I think the Court needs to take into account in making these decisions.

First of all, with regard to the proof of the private custody rather than the Government custody or Government creation of these chats, these were documents that were saved on Mo Hailong's computer that were seized as a result of the search warrant that the Court was just dealing with at his office in Boca Raton. The speakers in those chats were identified by their Chinese characters for both Mo Yun and Hailong. Many of the chats are identified by date as well.

In addition to that, the circumstances of those chats more -- again, more than establish their authenticity. There's discussion about the purchase of corn seed, about the purchase of farmland. There's discussion about DBN, which, of course, is the company that both of these defendants worked for. There's discussion about other employees of DBN. There's discussion about the type of business that DBN was involved in, including animal breeding and disease. There's discussion about Pioneer and Monsanto. There's discussion about personal matters that would impact both Mo Hailong and Mo Yun, including mention of, quote, our uncle, unquote.

One of the e-mail addresses that's utilized as part of these or surrounding these chats is MoYun@dbn.cn; cn, of course,

being the moniker for China, the Internet moniker for China.

I think a big part of this question involves whether or not strict application of McMillan rules are required in this case, and I think clearly they are not. And I think one of the cases that both parties have focused on is the O'Connell case, United States vs. O'Connell, an Eighth Circuit case that was issued in 1988.

The defense argues that O'Connell stands for the proposition that the McMillan factors must be applied to private recordings in a practical light to assure the reliability of the recorded material. The quote that at least in part is talking about it is as follows from O'Connell: "When the facts demonstrate that the recording was made by a defendant, we believe the considerations underlying the McMillan test should be applied in a practical light to assure the reliability of the recorded material."

But what's most important is the very next sentence: "We do not believe, however, that under such circumstances mechanical or wooden application of the McMillan requirements is necessary." So the Court here is recognizing that you just don't do a tick-off, step by step of the requirements set forth in McMillan.

The Court continues that, "Private use of recording equipment has become widespread, and the products of such devices can have the same significance as the products of a pen

or typewriter, which might also be seized with a search warrant and offered into evidence. All require a sufficient showing of authenticity to be admissible, but this does not mean that a recording found in a defendant's possession should be subject to the same requirements we apply when a Government agent or informant initiates a conversation knowing that it is to be recorded," i.e., the McMillan requirements.

I think clearly the O'Connell court and the Eighth Circuit has recognized that there is not to be a strict McMillan analysis when deciding the authenticity of this particular type of evidence. In fact, what's required is looking at the totality of the circumstances and making a decision and making the decision with regard to whether or not there's a rational basis for the party's complaining -- or the party's claim, rather, the Government's claim in this case, that the document is what they are asserted to be.

If you look further at O'Connell's analysis, they talk about a number of factors that they do consider, and they do -- they do factor in the McMillan test. They involve some of the same factors, but they're analyzed much differently than you would do if it were a Government informant or a Government agent that was making the recordings.

The first thing they talk about is whether or not there's sufficient circumstantial evidence of the authenticity and correctness of the recording. In O'Connell they highlighted

and focused on the fact that the recording machine upon which the recordings were located was in O'Connell's Florida warehouse.

In this case, those same recordings -- the IM recordings, rather, were found in Mo's, the Defendant Mo Hailong's, Florida business. The Court goes on to say, "it is not necessary for the Government to verify the accuracy of every part of a recording," and that the substance of the communication may in itself be enough to make prima facie proof. That's exactly what we have in what I just talked about in terms of the facts that are present in these IM chats. There is more than enough substance in the chats to make a finding that they are, in fact, authentic.

Secondly, the Court talks about the integrity of the recordings, and much is made by the defense of the integrity of these recordings. But the Court says, "We do not believe the Government should be required to prove directly the pre-seizure integrity of a tape found in the defendant's possession." These are not tapes like they were in Jackson that the Government made and then inadvertently deleted, which led to their exclusion. That is not the case here.

These are cut-and-paste chats that encompass a wide range of conversations that both involve the business and personal life of these two individuals. There's no reason to question their integrity. They were saved by Mo Hailong, and

given all the circumstances that are contained within and where they were located, there's more than enough evidence of the fact that they're authentic.

Thirdly, whether the speakers are adequately identified. And in that case we're dealing with voice identification, which, of course, is not an issue here. But what is really not at issue is who was speaking there because they're identified both by name and by e-mail address and by the business they work for, and on and on and on. There's more than enough evidence to establish that the speakers are who they are.

Finally, the Court focuses on the fact that McMillan requires a showing that the conversation elicited was made voluntarily and in good faith without any kind of inducement. And what the Court says is, "When private conversations are involved," as opposed to Government- or informant-initiated conversations, "we believe a simple showing of voluntariness will ordinarily be sufficient."

In this case, there's no evidence to suggest that these were conversations -- these IM chats are anything other than voluntary. There's no Government inducement involved. There's no Government involvement whatsoever. This is just evidence found in the defendant's possession, and as such the circumstances which we've more than enumerated, both today and in the brief, establish that they are what they claim to be.

Everything else that the defendant argues with regard

to authenticity, all the questions they have and the lack of metadata, that all goes to the weight of the evidence, and that is the jury's domain. We'd ask the Court to deny this motion.

THE COURT: Thank you, Mr. Griess.

Mr. Lincenberg.

MR. LINCENBERG: Thank you, Your Honor.

Your Honor, what Mr. Griess ignores about the O'Connell holding, which is really the only case that the Government relies on to suggest that McMillan should not apply here, is the fact that O'Connell was not in the same shoes as Mo Yun. O'Connell was in the same shoes as Mo Hailong.

And that distinction is all the difference in why O'Connell has no bearing in this case, and it makes sense that the analysis would be different because courts regularly look to the fact that when something is seized from your home or your computer that there is a greater indicia of a connection between that item and you and that you have the opportunity to provide testimony on the document and any gaps in the excerpts, and so forth.

Mo Yun does not have that opportunity because the apparent custodian, the apparent person who created these excerpts, was Mo Hailong, who is somebody who is unavailable to us in this trial as a witness.

And, in fact, when Mr. Griess was making his argument, he kept referring to and quoting from language in O'Connell

which talks about the defendant, and the O'Connell court emphasized that at the heart of its ruling was that this was a recording device which was in the home of the defendant.

Now, the court in O'Connell clearly did apply the McMillan factors to that case. The court said there are some differences in the analysis when we're dealing with a recording which is seized from the person who was challenging it. That's true. And the court said that there's some differences in how we apply that analysis in that type of situation versus where it's a Government recording. We don't deny that either.

And that would be a very different argument we'd be having here today if I was representing Mo Hailong and I was trying to challenge this on the basis of authentication. In fact, the court in O'Connell cited to the McMillan case at least five or six times in discussing these factors, in that case holding in favor of the Government.

The other thing that was present in the O'Connell case, which the Government ignores here, is that the integrity of the recordings was established by the testimony of an agent, and that is something that is being challenged here as well and which I'll get into as the next part of our argument.

So what we have at the core here is we have Word documents which are being portrayed by the Government in this case as if they were not Word documents, as if they were Internet chats, recordings that took place. And the Jackson

case clearly states that the heightened burden for authentication that was established in the McMillan case applies to these type of Internet chats.

What we also have here is an expert who comes to the conclusion that evidence as to the origination of the files of interest here are inconclusive.

THE COURT: Is this Mr. Polus?

MR. LINCENBERG: No. Actually, that's the Government's expert --

THE COURT: Okay.

MR. LINCENBERG: -- who came to that conclusion, Matthew Grant, which was set forth in the October 14th, 2014, declaration -- or 302, which is attached as Exhibit B to our reply brief.

To support that and add more depth to it, we submitted declarations both of Peter Shakow, my partner, who analyzed the documents and pointed out the various gaps, as well as a declaration of a defense computer forensic analyst, Mr. Polus.

And what Mr. Shakow's declaration pointed out, which is set forth in our brief, are numerous problems in suggesting that these are recordings, such as date and file names haven't been created and added to the cut-and-pasted documents. Some of the files contain dates of only a month and year, others don't contain the year but only a month, others contain no date information at all.

And, of course, the Government expert who tried to determine what the actual dates of the chats are found no conclusive evidence of that, so even the dates we have are simply dates which apparently Mo Hailong put on these documents at some point or another for whatever motive he had at that time.

Second, there are several excerpts that are merely partial versions of longer excerpts saved under different names, and we provided some examples of that, including one where there's two different versions of the same document.

Now, we can only imagine that if we found occasions where there are two different versions of the same document that eight years ago, when this was taking place, if it was taking place eight years ago, that Mo Hailong may have had different versions and some he saved and some he later deleted and some he may have inserted for whatever recordkeeping purposes he was trying to serve.

Third, we have documents where there are hyperlinks to outside Web sites which are broken, and many are unavailable or dead even when typed directly into an Internet browser. These are very important in this case.

For example, in Overt Act 30 there is a reference to a September 17th, 2007, alleged Internet chat, and this is where the Government in the indictment quotes information from this cut-and-paste excerpt of Hailong apparently saying -- talking

about taking pictures and picking ears of corn and needing caution to drive somewhere unseen.

Now, on that same excerpt, you have shortly before it a discussion about visiting Purdue, visiting the University of Illinois, visiting or talking about a visit with a guy from Monsanto. After Hailong makes that statement, there's no response in this cut-and-paste stuff that's going on. That doesn't mean that there's no response in time, but you would read it as if there's no response until a couple lines down, again, there seems to be this completely disconnected discussion about Purdue.edu/turf Web sites.

And what was on those links could be critical to an understanding of whether this cut-and-paste makes sense, and we don't have any way to look at this. And the age of this is part of the problem as well and part of why it's so important to have proper authentication when you're looking to introduce an eight-year-old document.

Fourth, we give an example of attachments that appear to have been embedded within the original instant messages which are unavailable. Now, as we all know from common experience, oftentimes Internet messages or e-mails are very brief and the substance of what's being discussed is in the attachment, and yet we give an example which has a file name that appears to reference a date of March 2 -- of, I guess -- well, I guess October 30th of 2007, where the attachment is not there.

There are blank areas and unusual spacing in numerous excerpts. There are numerous excerpts that appear to start in the middle of a discussion, and there are offline communications referenced in a number of excerpts that are not available.

When Mr. Polus, our expert, looked at this, he came to the obvious conclusion, which is quite consistent with the Government computer scientist's conclusion, only Mr. Polus explained it in greater detail, of why this means that this is simply unreliable. And if I can find his declaration, he notes, for example, a few other things that were not picked up on either by my partner or by the Government scientist.

He went back and did an analysis of what type of Microsoft instant messaging applications were available, and in paragraph 7 of his declaration he speaks about how they changed over the years and the like, and he then says, you know, if this time frame is right, this one, Windows Live Messenger and MSN Messenger may have been in use. Both of them, frankly, had options to indefinitely save conversation histories by going to the options menu, and so forth and so on.

And so there could have been -- there may be cases in the future where there are seizures where you have actual copies of the live Internet chats in the proper format with the metadata. That's not the case here.

At paragraph 12, Mr. Polus concludes that the validity and reliability of these documents are lacking due in part to

the following five points: that the true source PC of these documents is unavailable and therefore we cannot use original hard drive metadata and original operating system files to provide supporting evidence; that the RTF files lack additional metadata to help identify authors, modifiers and versions; the conversation excerpts are not properly date/time stamped and not generated through a systematic process such as the built-in logging feature of Windows Live Messenger; the RTF files are inconsistently formatted, which indicates selective copying or later editing; the RTF files appear to have been created not by any systematic process, which would have helped ensure accuracy of the content, but by a manual process, which carries with it inherent potential for inaccuracy. None of that is disputed.

And Mr. Griess' argument as to other ways that we sometimes look to under Rule 901 to determine authenticity is simply irrelevant, just as the three cases they cite in their brief do not have to do with recordings. There's no dispute that for regular documents under Rule 901 there is a lower burden that the Government has to establish for authentication.

Your Honor, there's a fourth expert who supports the testimony of both the Government's expert, my partner Mr. Shakow, and the defense expert Mr. Polus, and that's the excerpt -- that's the expert who testified in the Jackson case, Kevin Peden, P-e-d-e-n, who, at page 869 and 870 of U.S. vs. Jackson, testified as a computer forensic expert.

Now, recall that in the Jackson case we had an undercover person who was recording online conversations between himself posing as a 14-year-old girl and the defendant, which were held to be inadmissible, and among other things, what the forensic expert in that case testified to, which the Court found compelling, was that when he is doing an analysis, he always produces a bit-stream image of the hard drive, which was the forensic copy of the hard drive and is the best way to confirm the chat. There are other ways to accurately save computer chats, would include -- which would include a screen capture where a log file is saved to the hard drive, found in unallocated space, or use of the ypager log found in Yahoo.

"He also testified that there were third-party software programs available in 2001 that would accurately save the online chats, and the basic 'print screen' and 'file-print' options would likewise have captured the entire chat."

He testified that the cut-and-paste method employed by Mr. Margritz was the least effective way to capture the chat log. He testified at great length regarding the errors that he believed existed in that case, including operating errors, missing offline messages, selective cut-and-paste where lines were separated from each other, the timing of the message wasn't possible, and so forth.

So there's four different experts who support our position in this case. And remember that it is the Government's

burden here to authenticate, so, in short, this is a very straightforward motion.

There is an Eighth Circuit case in McMillan which sets forth factors. There is no case cited by the Government which deals with a situation where you have a defendant who is not the person who is maintaining or saving or knowing how these alterations may have taken place, and we have application of the McMillan rule to online chats. This motion should be granted.

THE COURT: Thank you, Mr. Lincenberg.

Mr. Griess, do you want to respond to any of that?

MR. GRIESS: Just briefly, Your Honor.

The Jackson case involves Government recordings, recordings that the Government created. It is inapplicable to this case. Yes, they were IM chats, but they were not created by the defendant, as they were here.

Most of Mr. Lincenberg's arguments go directly to questions that are in the jury's province. They are not questions that the Court needs to decide to determine authenticity. Chats themselves as far as the location of where they were found and the circumstances that they were found more than establishes authenticity, and we'd ask the Court to deny the motion.

THE COURT: Thank you, Mr. Griess.

This is one that I intend to take under advisement. I think it's a very complicated issue, I think in part because

we're dealing with technology that just doesn't have a good fit with case law that's developed. So you can certainly imagine, and I imagine all of us can find cases, where some sibling kept select letters or cards from another sibling and, you know, they have them cobbled together in real paper, and we could look at that, or text messages from one phone to another, and we could look at that.

But here I think we have, unfortunately, several layers of issues to get through. We have the basic McMillan issue. We have some Bruton issues, I think. I think we have some 403. You know, even if the Government could arguably authenticate this, I think there's still a pretty significant danger of unfair prejudice to Ms. Mo when we don't know exactly when and how this was created.

Although it's not the Government's fault, in a situation like this, I think you almost need one-half of this conversation to explain the context in which these were gathered, and here the Government has neither half because both people are defendants in this case and neither one of them is cooperating and neither one of them at this point has indicated any desire to do so.

So I think the Government is doing everything it can do. I don't find there's any problem with the way the Government's proceeding. I think we're just in uncharted territory, and, unfortunately, I think that puts the Government

in a pretty difficult position as far as these messages go.

If the parties want to tackle any of those three issues with any additional briefs, of course, I'll read them, but there's hundreds of pages already out there. If anybody comes up with a magical case that helps us, I'd look at that.

I assume that there isn't information here, Mr. Griess, that -- maybe there is -- even could authenticate that this is for certain her e-mail. I mean, do you have anybody who says she and she alone uses this e-mail address or she and she alone would be under this name?

I mean, certainly my family has an e-mail account and e-mail from my e-mail address could be my children, me, my husband, or anybody who is a guest in my house. Things of that nature are problematic, I think, when we're talking about not having the underlying metadata to corroborate that there were even these exchanges.

We don't have, you know, the back story on any of this, and I think, through no fault of your own, I don't know that you can get that because it appears that that half of the story is told in China.

Do you have anything like that, anyone who can say, yes, she used that e-mail, that's her e-mail address?

MR. GRIESS: Your Honor, that's a question I'd like to have some time to answer due to the evidence in the case.

THE COURT: Whatever corroborating information you

might have that's available to me would be helpful. And this just may be one that we have to defer until a little later. Part of my concern -- and, again, I may know only a small part of this story, but part of my concern with the timing is it looks to me like most of the Government's case hangs on these issues, as well as the admissions that I have now suppressed. If there isn't more against her and I'm going to keep this out, I think we need to resolve that sooner rather than later because you may not have a case left against her.

MR. GRIESS: True, Your Honor.

THE COURT: Okay. So we'll circle back to that one, but if you could get me any new briefs on that in the next ten days, I'll look at those issues at that time.

And, Ms. Mo, I'll make a quick decision on that matter.

Let's turn, then, to what we have left in front of us, which is any additional record the parties would like to make on the James and Franks issues.

Mr. Weinhardt, anything else you'd like to add there?

MR. WEINHARDT: Your Honor, I don't have anything beyond what is in the papers on the Franks issue.

On the James issue, I would only say this: There is not a dispute between the parties as to what the law is, and the law is this Court can do anything it wants. And so within this Court's discretion, our position simply is to the degree that

there are co-conspirator statements that are so significant to the Government's case that it would be impossible to, sorry for the pun, unring the bell if the jury hears them, that we should have a conversation in advance of trial about the admissibility of those statements.

I'll testify as an expert witness here, because Ms. Brashers-Krug and I had a case in the Tenth Circuit where we had a James hearing. It was a big complex immigration fraud case. The hearing took a couple of hours. And this wasn't limited to certain key incendiary statements. This was the Government gave us notice of every statement in the case that it contended was a co-conspirator statement, gave us a list, and then through the testimony of the case agent, hearsay admissible, the Government sought to demonstrate the admissibility of those things.

And so here let's just take for example the in-car conversation, and the fanfare that the Government is going to attach to that conversation between two people not named Mo will be deafening. It will be so in opening statement, it will be so when the evidence comes in, it will be so in closing argument.

It is going to be impossible for the jury to forget, even if this Court concludes that they can't -- the Government cannot establish that, number one, both of the participants in that conversation were participants in a conspiracy; number two, that that's the same conspiracy that Mr. Mo was involved in;

and, number three, that those statements were made in furtherance of that conspiracy.

It seems to us that at least for co-conspirator statements that are of that sort of blockbuster nature we ought to have the ability to test the admissibility of them in a relatively truncated proceeding in advance of trial so that we don't find ourselves in a really uncomfortable position four or five weeks in in front of a jury.

That may not be by any means the only one, and the Court, I think, in earlier discussion about this allowed that perhaps it would make sense for us to get a list of just the key ones that the Government seeks to introduce that we could test.

And in a sense I'm just asking for a motion in limine proceeding in advance of trial but a motion in limine at which the evidence supporting the admissibility could be testified -- or could be tested through evidence and not simply kind of speculation from each side about whether or not -- or about what the facts are going to be at trial.

That's really all we're asking for, so my bottom line is, I think, this is really a modest request. I know how absolutely ingrained the Bell procedure is in this circuit, and so asking for a deviation from it seems like a big deal. I don't think this is a big deal and so would only ask that the Court open a little crack in the door and think about, for those potentially dispositive or the Government will claim dispositive

conversations, that we have the ability to vet them carefully before we let the jury hear them.

THE COURT: And are those largely the conversations that are contained in the indictment itself?

MR. WEINHARDT: Those are the most important ones -- well, I'm not sure what the Government considers the most important ones, but --

THE COURT: But the one you're talking about certainly --

MR. WEINHARDT: Certainly the one that's quoted in the complaint, in the indictment, in the search warrant affidavits, yeah, that one for sure.

THE COURT: Okay. Thank you, Mr. Weinhardt. I'll consider that issue. I don't think here there is a way to have a nice, neat, succinct, concise hearing on that.

MR. BIRD: Your Honor, could I have a moment to echo much of what Mr. Weinhardt said then maybe put a little meat on those bones?

THE COURT: Sure.

MR. BIRD: Your Honor said on Friday, when we addressed initially the putting this on the record, you said there may be some mechanism by way of the Government disclosing at least the key statements it anticipates. I think it helps to look at the record as it now stands and as it relates to my client.

And with the Court's permission, I have --

THE COURT: Yes.

MR. BIRD: -- a demonstrative, a number of demonstratives for the Court. May I approach?

THE COURT: Yes.

Mr. Weinhardt, do you see the little tiny binder?

MR. WEINHARDT: What?

THE COURT: Do you see this little tiny binder? Do you see your binder?

MR. WEINHARDT: Yes, I do. Point taken.

MR. BIRD: Actually, we borrowed that from Mr. Weinhardt's earlier presentation, Your Honor.

THE COURT: Oh, now --

MR. BIRD: So he gets credit for it.

THE COURT: Go ahead.

MR. BIRD: We also understand that Bell is well ingrained, but I think, as this Court has creatively addressed, the fact is that this case is different from the vast majority of cases in which Bell might be applied, and I think it helps to look, if you would, under the tab "Excerpts." What we've done is to set out each and every one of the either co-conspirator statements or what they claim to be direct evidence, independent evidence, that the Government addresses in its reply to our motion.

What the Court will see is that there are 13 different

excerpts, statements, whatever. Of those 13, there are only 3 which the Government points to as independent evidence relating to a comment or statement, part of these excerpts that Mr. Lincenberg just addressed to the Court.

Of the 13, 6 of them involve co-conspirator statements in which Mo Yun was not a participant. Of the 13, 4 of them deal with either discussions in 2006. And remember that the superseding indictment makes it clear that the alleged conspiracy doesn't start until January of 2007. And those three that Mr. Krickbaum addressed in his brief had to do with actions which had nothing to do with the conspiracy and which, as we pointed out in our reply, were not in furtherance of the conspiracy, would not be independent evidence. They involved registering DBN, setting up a computer for Hailong. Those are not acts in furtherance of any alleged conspiracy.

The fourth one had to do with an August 2007 statement in which the defendant writes about being involved in the biotechnical business. Has nothing to do with any act in furtherance of the conspiracy.

So the point I'm trying to make here, Your Honor, and I'm prepared to go into in even more detail, is that the entirety of the Government's proffer as to independent evidence can be considered in an hour, in two hours.

So when Mr. Weinhardt says -- and when the Court alluded to the possibility of a mechanism, and we talked about

this last Friday, I think what we're suggesting is exactly that. By the time we get to August, assuming that Mo Yun gets to August, the Government will have filed its witness list, it will have filed its exhibit list, we will have had Rule 15 testimony, we will have filed our own witness list and exhibit list, we will have had motions in limine. This case will be much clearer to this Court.

I can understand why the Court at this point, having been thrown into the maelstrom, would say, you know what, it makes sense to me to apply a procedure which has been used for 39 years in this circuit, but as the Court also understands and addressed, especially in the way we dealt with the motions to quash, there are creative ways which are permitted under Bell, which are permitted under Bourjaily, to address this issue.

The thinness of the evidence against my client, the absence, the dearth of any independent evidence -- and I can go through these 13 and show what you I'm talking about, and we've addressed them in our brief already, the absolute prejudice. And when Mr. Weinhardt says that the bell cannot be unrung, imagine how someone who was absolutely finished with this company in late 2008 or 2009 is going to be prejudiced when the jury hears, if it does, about conversations in cars in 2011, 2012, or people digging in fields in 2011 and 2012, when she hasn't had anything to do with any of this for five or six years. Imagine how we unring that bell.

And so what we're suggesting today, Mr. Weinhardt and I, is that we wait until we're closer to trial, and let's see if the Government can come up with more than, I suggest, 3, even at its greatest it's 13, different excerpts. If they can't, then Your Honor can consider this very simply, and it's going to avoid the necessity of Your Honor ordering a mistrial after a one- or two-month trial for my client, who will be sitting there for the most part -- I'd say 98 to 99 percent of the evidence that's going to come into this trial will have nothing to do with her, nothing.

THE COURT: I don't think that I have foreclosed -- I can say I have not foreclosed the idea that we may need to do something along these lines, less so for Mo Hailong than for your client because I do see the Government's case resting much heavier on your client on this kind of evidence.

However, I don't know enough now to make an educated decision about how to proceed. What I would suggest is we do exactly what you said, we wait until we're a little closer to trial and you give me some concrete information; what statements are you worried about -- maybe it's these 13 -- what witnesses do you think you need to talk to to get at whatever you need, or are there a dozen questions that you need answers to or you need help locating in the vast discovery materials that might answer this one way or another.

But it could be -- and the Government's entitled to

put on six weeks of evidence if they have to, because conspiracies are built, you know, like a mile-long chain of paper clips, one little paper clip at a time, and that may be what it takes before I can make a decision about whether they've established a conspiracy and whether your client was a member of it and whether these statements were in furtherance of that conspiracy.

Now, a bigger issue for your client that I see, based, again, upon knowing the tip of the iceberg that the rest of you all know, is an issue of multiple conspiracies and whether or not there may be here multiple conspiracies and if, assuming she's even in the conspiracy, whether she's in the same conspiracy that's still going on in '11 to '13 or whether she's withdrawn or in some way removed herself such that we have to instruct a jury on that question. And I think that is another issue we've got to tackle as a group at some point that I haven't seen covered, at least in full substantiveness, up to this point in the case.

MR. BIRD: Fair enough, Your Honor. Let me just try to put some fine points on our discussion.

If the Court, and it doesn't have to happen today but at some point soon, can say by way of the scheduling orders that Your Honor's issued that by a date certain, and I'm suggesting right now sometime in August when all of these things have to be filed, the Government should be required, respectfully, I

suggest, that they produce to the Court and to us its full list of independent evidence as it relates to these co-conspirator statements.

They've come up with 13. I'm going to predict that they don't come up with a lot more, if any. But if they come up with 100 or 200 and Your Honor says, "Okay, I need six weeks to figure it out," that's one thing, but if we're dealing with 13, we can do that in an hour or two. Your Honor doesn't need a lot more --

THE COURT: We can't do anything in an hour or two. I mean, let's be realistic.

MR. BIRD: Okay. Maybe three hours, Your Honor.

THE COURT: And I don't say that to be cruel, just there's way too much here --

MR. BIRD: And, actually, we all deserve that.

But let me just give you one example of how we need to focus this. We've talked about translations and how important those are. I noticed in the response, the resistance to our motion, that the Government made a critical and crucial concession.

They didn't say it in writing, but it's there for the Court to see because in their resistance they discussed Overt Act 27, and if you look at No. 4 on my chart, excerpt chart, you'll see what I'm talking about.

And with the Court's permission, I will approach and

hand the Court a copy of the superseding indictment so it's handy. I am assuming everyone else here has a superseding indictment handy, but I'm happy to share mine with the Government if they need it.

In the superseding indictment, at Overt Act 27, in the original -- in the original superseding indictment that was returned in early July and after the arrest at LAX, the Government alleged that on or about January 16, Defendant Li Shaoming -- I'm going to leave a couple words out -- addressed Defendant Mo Hailong, also known as Robert Mo, that Mo Yun is in charge of the specifics from the home country side.

Very dramatic, and they cling to that, that position, but here's the concession that they've made. In their resistance, in their resistance, it now reads as follows: "From the perspective of the current breeding in China, it is of great significance to collect the latest and best U.S. hybrid corn seeds. Mo Yun...will be the one to be in charge of," and then they insert this, open paren, "or responsible for, or taking care of," closed paren.

Now, I'm going to use a Chinese word that I've talked to the translator about. The word is fu ze.

THE COURT: You're going to have it spell it.

MR. BIRD: F-u in pinyin, which is the Englishized version of Mandarin -- it's f-u z-e. It's fourth tone and then third tone, fu ze.

Right? Thank you.

Fu ze means -- can mean two or three different things depending upon how it's used, but it clearly connotes the possibility of taking care of, which is a whole different level of responsibility than being in charge of.

Now, the Government is acknowledging, since it's had its most recent linguist translations, that, in fact, there is quite a bit of ambiguity in the very Mandarin characters that they initially interpreted. Now they're acknowledging that the kind of ambiguity with which they charged my client exists in their own translations. We need to know what the Government's position is about these kinds of allegations.

So one of the things I would ask the Court to do is to say to the Government we need your translations, we need to have your witness lists, you need to have all of this in so that we and the Court knows what my client, Mo Yun, is really being charged with.

THE COURT: I have ordered that.

MR. BIRD: And then once we have those translations -- thank you, Your Honor, for reminding me.

THE COURT: We've had three hearings about that.

MR. BIRD: Yeah, I know. And once we have those, then we can have a meaningful discussion about whether there is independent evidence, and it won't take six weeks to do it.

THE COURT: I agree. And I think at this point the

Government is hamstrung a little bit, again, not of the localized control, but because they're still addressing, you know, all the things they are not yet allowed to speak of. And I don't know yet, nor do I think any of you, how much that background is going to impact what we do know, nor do we know what we don't know yet, I guess, in that sense.

So why don't we set this into our to talk about it later pile, and we'll take it up at that time. If we can come to some way to truly expeditiously address these things, we'll try and do that. But I also recognize that in any conspiracy case, especially one this complicated, it just may not be feasible to make those decisions or fair to the Government to expect that they can make that showing in an afternoon or even a week.

MR. BIRD: I understand, Your Honor. It is a dilemma. Is it something that we should address to the Court formally in some form?

THE COURT: As you're working through evidence that you're receiving and working towards trial together, I would say start keeping a list of what particular issues you're concerned about, particular conversations or documents, what witnesses you think you need to address that or I would need to make those kinds of decisions, and at some point as we get closer to trial, and I'm sure we'll be getting together every two or three weeks would be my guess, we'll start talking about what we do next and

what our next steps are.

Do you want your indictment back?

MR. BIRD: Yeah.

THE COURT: Okay.

MR. BIRD: May I approach, Your Honor?

THE COURT: Yes. Certainly.

And is this mine to keep, a new binder?

MR. BIRD: Absolutely.

THE COURT: Thank you. That's very well done. I'll hold on to that.

Okay. Let's talk about a few other things here. I don't know who everybody is here in our courtroom, so just before we leave for the day I just need an attorney from each of your groups just to officially make a record who the initials are -- I know who they are, but I want to make sure we have it in the record somewhere who L.D. and who L.Z. are. I'm not going to do that in an open courtroom.

I also want to make a little bit of an additional record about the meeting we had yesterday in chambers with Mr. Mo's attorneys and the Government. That was an issue relating to potential Giglio on a potential witness in this case. I ultimately, having heard that information, find that it is not Giglio material, meaning that it is not material that would be something that affects the credibility of any Government witness, and as such, privacy interests of that

particular person trump knowledge generally in the public of what was discussed, and so I am going to continue to hold under seal that matter.

MR. LINCENBERG: Your Honor.

THE COURT: Go ahead.

MR. LINCENBERG: May I make this simple request as a follow-up? We understand that the attorneys from the Mo Hailong team were advised they were not permitted to discuss that with us. We don't plan to talk about it publicly, but can the Court retract that so we can discuss it?

THE COURT: You can, as long as it doesn't go beyond your teams, and I'll leave it at that.

One last issue we have left to resolve today, and then I'll throw it open to the group, was the issue of realtime for trial or getting sort of a translator for you -- not a translator but a transcription for you, Mr. Spies.

How have you been doing in this particular courtroom? And if you don't know yet, that's fine. What do you think you might need and how can we help accommodate that?

MR. SPIES: Your Honor, I think the acoustics have been excellent so far, with the rare exception of Mr. Griess standing too tall above the microphone or Mr. Krickbaum standing too far away.

MR. KRICKBAUM: Too short.

MR. SPIES: I think if the Court applies the lash to

Government counsel, I'll be okay. I really do.

THE COURT: I can threaten them with lavaliere mikes. That usually encourages, you know, staying near a mike.

MR. SPIES: I've seen it in action.

THE COURT: As that changes, let us know as we have additional hearings, but certainly we'll do whatever we need to to help you or anybody else on your teams that might need help with hearing.

MR. SPIES: I appreciate that.

THE COURT: Mr. Griess or Mr. Krickbaum, anything else to talk about today?

MR. KRICKBAUM: No, Your Honor.

THE COURT: Mr. Weinhardt or your team?

MR. WEINHARDT: Your Honor, the Court's had plenty of me this week, so I'm reluctant to say anything, but I do want to make one request. I go back to the days when there were fewer than half as many courtrooms in this building as there are now, and in those days occasionally for long trials if the large courtroom upstairs was open for even part of a trial, we used that even if we had to finish it in what is now Judge Gritzner's courtroom.

I heard what the Court said about there being construction and that sort of stuff, but it is going to be awfully crowded in here once we get a jury and so forth, and so if that's even a partial option, we'd make that request.

THE COURT: We'll see. Some of the issues we have are technology and certain lines were accidentally cut at one point so they don't exist upstairs. Part of it is acoustics.

Part of it is trying to imagine moving things up and down every day for us and for you, in part because I have control over this courtroom. I can put cages against the wall, if you all need them, to store things through trial. We can stack our boxes everywhere and leave them for two months. I don't have the luxury of doing that in the community ceremonial courtroom where they hold immigration and naturalization and other things.

So in practical terms, I think we're going to be here, but I hear what you're saying, and we'll have to see how it goes. If we're just simply standing on top of each other, we'll have to figure something out.

Anything else?

MR. GRIESS: No, Your Honor.

MR. KRICKBAUM: No, Your Honor.

THE COURT: Our extreme thanks to our interpreters. I know we are a challenge as a group, both with our speed and with the complexity of what we're talking about. We very much appreciate your help. Thank you for being here.

If one of you could stay and help try and educate me on how to pronounce some of these names before trial, that would be great so that I humiliate myself slightly less than I

otherwise would.

Anything else to talk about today? I guess I didn't ask Mr. Lincenberg or Mr. Bird.

MR. LINCENBERG: No. Thank you.

MR. BIRD: No. Thank you, Your Honor. We appreciate Your Honor's diligence over the last few days. It's been impressive.

THE COURT: We'll have fun.

If I can borrow one member of the team and the court reporter just to talk about the initial people, and then we are adjourned. Thank you.

(Proceedings concluded at 2:58 p.m.)

C E R T I F I C A T E

I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28, United States Code, Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated at Des Moines, Iowa, this 5th day of June, 2015.

/s/ Kelli M. Mulcahy
Kelli M. Mulcahy, CSR No. 941, RMR, CRR
Federal Official Court Reporter