IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                           :
      Plaintiff,           :
                           :
vs.                        :        Case No. 4:13-cr-00147
                           :
MO HAILONG,                :    SENTENCING HEARING TRANSCRIPT
                           :
      Defendant.           :            Volume I
- - - - - - - - - - - - - -X



                         Courtroom, First Floor
                         U.S. Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa
                         Monday, October 3, 2016
                         9:00 a.m.



BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Judge.









                 KELLI M. MULCAHY, CSR, RMR, CRR
                    United States Courthouse
                 123 East Walnut Street, Room 115
                     Des Moines, Iowa 50309

APPEARANCES:

For the Plaintiff:        JASON T. GRIESS, ESQ.
                          Assistant U.S. Attorney
                          U.S. Courthouse Annex
                          110 East Court Avenue, Suite 286
                          Des Moines, Iowa  50309-5053

                          MATTHEW R. WALCZEWSKI, ESQ.
                          United States Department of Justice
                          600 East Street North West
                          Washington, D.C.  20004

For the Defendant:        MARK E. WEINHARDT, ESQ.
                          HOLLY M. LOGAN, ESQ.
                          Weinhardt & Logan, P.C.
                          2600 Grand Avenue, Suite 450
                          Des Moines, Iowa  50312

                          MARK E. BECK, ESQ.
                          Mark Beck Law, P.C.
                          350 West Colorado Boulevard, Suite 200
                          Pasadena, California  91105

1          P R O C E E D I N G S

2          (In open court with the defendant present.)

3          THE COURT:  Thank you.  You may be seated.

4          We are here today in the matter of United States vs.

5    Mo Hailong.  It's Case No. 4:13-cr-147.  The probation office is

6    represented by Stacy Dietch.  The United States Attorney's

7    Office is represented by Jason Griess, Marc Krickbaum, and --

8    I'm sorry.  It's Matthew Walczewski, correct?

9          MR. WALCZEWSKI:  Correct, Your Honor.  Thank you.

10          THE COURT:  And we're also joined by Deb DeGraff on

11    behalf of the United States, who I assume will be helping with

12    some technology issues during today's hearing.

13          We are also joined on behalf of the defendant by

14    Attorneys Mark Beck, Mark Weinhardt, Holly Logan.  And, of

15    course, Mr. Mo is also personally present.  And we have Lori

16    Kreutzman as well to help with some technology issues on behalf

17    of defense counsel.

18          Mr. Mo, do you recall being in court on January 27th

19    of 2016 and pleading guilty to Count 1 of a two-count fourth

20    superseding indictment that was filed against you in December of

21    2015?

22          THE DEFENDANT:  Yes, I recall, Your Honor.

23          THE COURT:  And that offense that you pled guilty to

24    was conspiracy to steal trade secrets; is that correct?

25          THE DEFENDANT:  Yes, correct.

4

1          THE COURT:  And do you recall that this offense is

2  punishable, in the absence of your binding plea agreement, by up

3  to ten years in prison, a fine of up to $250,000, a term of

4  supervised release of up to three years, and a $100 special

5  assessment?

6          THE DEFENDANT:  Yes.

7          THE COURT:  And you understand you're here today to be

8  sentenced?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Okay.  Thank you, Mr. Mo.

11          I have received and read the Presentence Investigation

12  Report.  The most recent report is dated August 5th of 2016, and

13  it's filed at Docket 633 in the records of the Court.

14          I have also read and considered all of the arguments

15  contained in the sentencing memorandums, motions, and exhibits

16  that have been filed by the parties at Dockets 639, 640, 641,

17  643, 644, 645, 646, 649, and 650.  I note by way of summary that

18  the sentencing memorandums and motions in this case totaled more

19  than 200 pages and the exhibits themselves accounted for another

20  probably 2500 pages of materials.

21          In addition to those memorandums, motions, and

22  exhibits, I have read the letters of support, and there were

23  many of them that I received, from Mr. Mo's friends and family,

24  associates and physicians, as well as the written allocution by

25  Mr. Mo himself.

5

1          Based on the parties' sentencing submissions, it

2   appears that we have a large number of objections to the

3   Presentence Investigation Report that we'll need to resolve.

4   This includes 65 objections to paragraphs of -- or objections to

5   65 paragraphs of the presentence report filed by the Government

6   and objections to 101 paragraphs of the presentence report filed

7   by the defendant.

8          We also need to resolve three guideline issues,

9   including the appropriate loss amount for purposes of

10   calculating a base offense level under 2B1.1, a determination of

11   whether or not the conspiracy was committed through

12   sophisticated means under 2B1.1(b)(10)(C), and a determination

13   of whether an aggravated role adjustment should be applied in

14   the case under 3B1.1.  Next we'll have to tackle the restitution

15   issue for the victim seed companies in this case, Pioneer and

16   Monsanto.  And we'll also ultimately have to determine

17   appropriate sentence under 18 U.S.C. 3553(a).

18          As I previously advised the parties, I will agree to

19   adopt and accept the Rule 11(c)(1)(C) plea agreement in this

20   case and so I will not impose a sentence of imprisonment of

21   greater than five years, as was agreed upon by the parties.

22   Where within the range of 0 months' to 60 months' imprisonment

23   Mr. Mo should be sentenced to remains an open question, as does,

24   as near as I can tell, all other aspects of the sentence to be

25   imposed, including supervised release or probation conditions,

1  fine, and things of that nature.

2         Mr. Griess, did you have a chance to review the

3  presentence report on behalf of the United States?

4         MR. GRIESS:  I did, Your Honor.

5         THE COURT:  And other than those matters that I have

6  just outlined that appear to still be open issues, are there any

7  other disputed facts or contested guideline matters I need to

8  resolve from the Government's perspective?

9         MR. GRIESS:  No, Your Honor.

10        THE COURT:  Thank you.

11        And, Mr. Weinhardt, did you have a chance to review

12  the presentence report with your client?

13        MR. WEINHARDT:  Yes, Your Honor.

14        THE COURT:  And can you briefly outline how you

15  accomplished that?

16        MR. WEINHARDT:  Your Honor, that has been done both

17  through electronic transmission, because Mr. Mo has spent most

18  of his time in Florida and has been in telephonic and e-mail

19  communications with us, but then I also visited him in Florida

20  where we went over the draft presentence report.  And then after

21  the final report was received, that was transmitted to him

22  electronically, and then he and I discussed it face to face

23  yesterday in preparation for today's hearing.

24        THE COURT:  And other than the issues I have outlined,

25  anything else from Mr. Mo's perspective that I would need to

1   resolve today?

2          MR. WEINHARDT:  Your Honor, I believe that the Court

3   has correctly outlined all of the issues that need to be

4   resolved in the sentencing.

5          THE COURT:  Thank you, Mr. Weinhardt.

6          Mr. Mo, did you have plenty of time to review your

7   presentence report with your lawyers?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Were they able to answer any questions you

10  may have had about the report?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Have you been happy with them as your

13  lawyers in this case?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  Okay.  Good.

16         Then at this point I want to make some preliminary

17  rulings for the parties.  I have, as I outlined, reviewed all of

18  the materials in this case, and I have, of course, been the

19  judge assigned to this case for the past 18 months and so I've

20  had extensive exposure to a fair amount of evidence in this case

21  because of the vast level of litigation that has happened.

22         We, as the parties recall, litigated 22 suppression

23  motions.  There were 50 different subparts to motions in limine

24  that were filed that we litigated.  There's been extensive

25  litigation over discovery.  There's been FISA and classified

1   disputes.  And so I have had and have reviewed over the course

2   of the last 18 months huge volumes of discovery in this

3   particular case, and in preparing for this hearing I reviewed,

4   of course, closely all of the matters filed by the defendant and

5   the Government.

6        I am able to make some rulings based upon this

7   information that are legal, essentially, rulings as opposed to

8   factual rulings.  In doing that, I'm hoping that giving you this

9   preliminary outline helps us focus in on the issues that are

10  really still fighting issues in the case, and so I'll go over

11  those rulings now.

12       As to the objections to the presentence report, I can

13  rule on some of those now.  As I noted earlier, the defendant

14  has lodged objections to 101 paragraphs of the Government's

15  offense conduct statement which is contained within the final

16  Presentence Investigation Report.  I am overruling at this time

17  the vast majority of those objections.

18       Specifically, I am overruling any objection that is

19  lodged based upon the grounds that the particular paragraph is

20  vague, ambiguous, irrelevant, misleading, that it is factually

21  incomplete, because in reviewing each and every one of those

22  objections, I did find later that the information the defendant

23  complained of as being incomplete in a particular paragraph

24  certainly appears in later paragraphs of the Presentence

25  Investigation Report and so is contained in the presentence

1   report.

2          I overrule any objections based on objections to the

3   legal conclusions to be drawn from the facts alleged, such as

4   whether the defendant and his co-conspirators' activities of

5   chasing the self or reverse engineering is relevant conduct in

6   this criminal case.  That's a legal decision that I'll make.

7          I also overrule all of the objections to the

8   recordings based upon the recordings being snippets or

9   conversations taken out of context.  I have reviewed the full

10  body of those particular recordings and conversations.

11          Further, except as to the objections to presentence

12  report -- and here's the active ones that remain -- paragraphs

13  18, 22, 26, 28, and 35 through 38, I am overruling the

14  defendant's objections to the factual inaccuracy of those

15  paragraphs based upon the fact that I have reviewed material and

16  I believe those paragraphs to have been accurate based on

17  evidence that we've taken in this case.

18          In making that decision I am not relying on any

19  classified materials, I am not relying on any FISA materials

20  that were not ultimately provided to the defendant or ultimately

21  presented in open court.  I am only making those decisions based

22  on what's been available to the defendant.

23          But, again, we have had extensive pretrial litigation

24  in this case, and so much of that evidence has been presented to

25  me, and in that pretrial litigation I did find the Government's

1   witnesses who testified, each and every one of them, to be

2   credible and to have presented relevant and accurate information

3   based upon everything that I've seen, and so I do overrule all

4   of those particular paragraphs.

5          As to those particular paragraphs, those are ones that

6   are largely focused on the value, of course, of the seeds and

7   the germplasm and the time that was involved in creating those

8   inbred seed lines by the victim seed companies, and so we'll

9   leave that open for discussion.

10          As to the Government's objections to the defendant's

11   offense conduct statement, I am going to overrule all of those

12   objections, basically for the reasons the defendant has

13   outlined.  The defendant made kind of en masse objections to

14   each and every paragraph but didn't provide any grounds for

15   those objections, didn't tell me what the problems were with

16   those objections, and under Eighth Circuit case law, that means

17   they have to be overruled.

18          Now, to the extent there is a conflict between the

19   Government's offense conduct statement and the defendant's

20   offense conduct statement, I'll do what I do in any case where

21   there's a conflict, and I'll decide which version I find to be

22   more credible, and that may depend on which party has the burden

23   of persuasion or which party has the burden of evidence in that

24   particular case or on that particular point.

25          As to the legal issues that have been presented, I

1  also have some preliminary rulings.  For aggravated role, even

2  if each and every fact the Government has alleged about Mr. Mo

3  is established to be true, I just can't find legally that

4  there's support here for an aggravated role adjustment in

5  Mr. Mo's case.

6         It's clear to me in reading everything that has been

7  presented in this case and in all of the evidence that's

8  previously been before the Court that Mr. Mo, every action he

9  took in this case was being directed.  He, in fact -- and I

10 don't say this to be disparaging towards Mr. Mo, but his

11 co-conspirators spent a whole lot of time in these recordings

12 basically mocking and criticizing Mr. Mo.

13        His concerns, which are articulated over and over

14 again in recordings and in e-mails back with the folks in China,

15 are ignored.  He possessed, evidently, very little ability to

16 say no and very little ability to decline the requests of his

17 very powerful brother-in-law back in China.

18        But there's no evidence that he was the decision-maker

19 or the organizer of what occurred either in China or the United

20 States, and so unless there is evidence that the Government has

21 not shared with me yet, and I don't know what that might look

22 like, I can't find in this case that an aggravated role

23 adjustment applies.

24        Similarly, and on the flip side, even if every fact

25 the defendant has alleged is true, this is clearly a

1  sophisticated criminal act.  There were clearly sophisticated

2  means being used by this organization.  And that's under either

3  the 2012 or the 2015 guidelines.

4        This is an offense that spanned many, many years and

5  at least two countries.  The co-conspirators, without dispute,

6  traveled to Canada to avoid detection, at least in part.

7  Without dispute the co-conspirators used both domestic and

8  international air travel to avoid detection.

9        Farmland was purchased in another state to perpetuate

10  this ruse of legitimacy and to provide cover for certain

11  activities.  Encrypted communications were being used by these

12  parties.  Fictional cover stories were created to cover the

13  purpose of their appearance in certain farm fields.  Evidence

14  was stored and collected in various states.  And, in fact, here

15  so complicated and sophisticated was this crime that the

16  Government had to resort to FISA to track down and to

17  investigate this group.

18        In short, under no legal analysis I can find is there

19  less than a preponderance of the evidence that this was a

20  sophisticated operation of the type 2B1.1(b)(10)(C) intended to

21  punish.

22        With respect to intended loss -- and I think that is,

23  I think, where the fighting dispute is for relevant conduct

24  analysis is intended loss as opposed to actual loss -- this has

25  been the big one since Mr. Mo pled is this issue of loss because

1   it does drive the guidelines so heavily.

2          The parties have given me more paperwork than I've

3   seen in any other case on loss; all of the scientific analysis,

4   all of the financial analysis.  The parties have very divergent

5   views of what the loss was in this case.  The defendant alleges

6   there was zero loss.  The Government alleges there was more than

7   $550 million of loss.  The defendant voraciously objects to the

8   defendant's -- or the Government's version of events.  The

9   Government just as voraciously objects to the defendant's

10  versions of events.  We have motions to exclude evidence that

11  have been filed Friday afternoon in Docket 650 regarding the

12  timing of the Government's disclosure of certain loss evidence.

13         So I want to make some preliminary findings and then

14  let the parties adjust accordingly.

15         First, the defendant's claims, and this is my legal

16  conclusion, that his co-conspirators' efforts to chase the self,

17  to commit patent infringement, and to violate the seed bag

18  contracts were not illegal is, in my view, irrelevant.  Those

19  are still things that are part of relevant conduct, in my

20  opinion.

21         Accepting -- even if I accept that argument that the

22  defendant has made that those things themselves were all legal,

23  that the patent infringement was legal because it's not illegal,

24  that the violation of the bag contracts was legal because it's a

25  civil matter, that the chasing of the self or reverse

1  engineering is a legal act, those still have to be viewed in the

2  context of the greater conspiracy to steal trade secrets, just

3  as in a more simple meth manufacturing conspiracy case there are

4  certain things that are purchased that are legal and certain

5  things that are stolen.

6        For instance, a co-conspirator can walk into a Walmart

7  and purchase lithium batteries legally, they can purchase

8  pseudoephedrine to a certain extent legally, and then often they

9  go steal the anhydrous ammonia, but those actions of purchasing

10 the lithium batteries, purchasing the pseudoephedrine are

11 clearly relevant conduct because they are paired with the stolen

12 anhydrous ammonia and they are part and parcel with the

13 conspiracy to manufacture methamphetamine.

14        And that is, in my opinion, what we have here.  The

15 female inbred seeds that the defendant managed to commercially

16 purchase and mail back to China and that were ultimately

17 reverse-engineered or that they did this chasing the self

18 process to try and find the -- among those commercially

19 available hybrid seeds, the .5 percent of the inbred female

20 seeds are, in my view, every bit as relevant as the theft of the

21 male inbred seeds.

22        The evidence shows that China was -- and I say China

23 because they refer to it as the "home country" in their

24 conversations.  The evidence shows China was uninterested in the

25 unpaired male seeds.  They wanted to know what males were paired

1  with what females.

2         And this is borne out explicitly in a conversation,

3  and here I'm citing the Government Exhibit 1.42, in which Mr. Mo

4  is discussing the need for coupled pairs, and he is told by his

5  co-conspirator back in China, quote, the home country only cares

6  about the value of the breeds produced by grouping and coupling

7  when it comes to parent related transactions.  They consider the

8  parent good only if the breeds from grouping and coupling are

9  good.

10        In this very same conversation, the defendant and his

11 co-conspirators reject the idea of pairing their own female

12 seeds with American male seeds because they risked them -- that

13 these pairings won't be as good as the Americans' pairing is

14 just too much for them to bear, and so they talk about the risk

15 of trying out their luck and having it not pan out for them.

16        And so it becomes quite clear that the female seed

17 lines, however they were achieved, whether commercially or

18 through patent infringement or through chasing the self or

19 reverse engineering, are equally important to this criminal

20 organization as the male lines, and it's crystal clear that DBN

21 needed to find and locate the males and females together to

22 understand what the groupings and pairings were.

23        So because of those things, I find that all of the

24 activities where they've stolen unique seed lines are relevant

25 conduct in this case regardless of the underlying legal status

1   of those seeds because it is the pairing of them that is part of

2   the trade secret analysis in this case.

3          Second, even if I were to sanction here the

4   Government's arguably untimely production of loss evidence and

5   grant the Government's -- I'm sorry -- the defendant's request

6   to set aside all of that loss evidence that has been produced

7   after June 1st, I still think there is undisputed evidence that

8   overwhelmingly establishes an enormous loss in this case.

9          For instance, as noted in PSR paragraph 62 -- and this

10  is undisputed facts; the legal conclusion the defendants dispute

11  but undisputed facts -- that during a 2010 conversation between

12  Mr. Mo and DBN breeder Che or Che, it's C-h-e, Defendant tells

13  Che in a discussion about China's weak male parent seeds that

14  U.S. seed companies are willing to sell one parent for $1

15  million, meaning a female or male inbred seed line.

16         After this conversation the co-conspirators -- and

17  they reject that idea as too costly to them.  And so after this

18  conversation the conspirators begin traveling throughout the

19  Midwest stealing corn seed.

20         And then in August of 2012, as described in

21  presentence report paragraph 92, Che discusses with another

22  conspirator, Yin, that they believe they have successfully

23  stolen about 150 distinct inbred seed lines, and after those

24  seeds arrive in China, Dr. Li reports to the defendant that the

25  co-conspirators have been able to steal between 120 and 130

1   different varieties of inbred seeds.

2          And then further discussion happening in PSR paragraph

3   74 is that the defendant and two of his co-conspirators managed

4   to steal 200 unique varieties of corn from Pioneer and Monsanto

5   in the fall of 2011.

6          Now, Mr. Mo had reported to his boss that these unique

7   seed lines could be purchased by his company for a million

8   dollars each.  DBN had rejected that option as too costly to

9   them and then had commented that they wanted to, and I quote

10  here, use the foreigners' technology to beat them and to, quote,

11  buy China here time to research and develop their own products

12  before having to acquire those seed lines through other means.

13  That's found, again, at Government Exhibit 1.42.

14         Now, I'm not certain, it seems unlikely to me, that

15  Monsanto and Pioneer would actually have sold those seed lines

16  for a million dollars each.  I think it's highly unlikely that

17  would occur.  But the conversation is compelling in that it does

18  amply demonstrate what the intentions of this group were and

19  that the intended loss to Pioneer and Monsanto were, in their

20  view, a million dollars for every one of these seed lines that

21  they managed to acquire.

22         And we know that they managed to acquire, based on

23  these undisputed paragraphs alone, 320 seed lines during this

24  period of time, and if each one of those seed lines is worth a

25  million dollars, we have a loss of $320 million, and that's

1    before we even talk about research and development costs to

2    Monsanto or Pioneer, historical or specific.  It's before we

3    talk about the sales potential for those.  It's before we talk

4    about any of the loss Pioneer and Monsanto incurred in defending

5    this case and in responding to discovery in this case.

6            A $320 million loss under either of the guidelines,

7    whether it's 2012, 2013, or 2015 that we're using, corresponds

8    to a base offense level of 28 -- or an increase of 28 levels.

9    If you put that with our initial base offense level of 6 and you

10   include the sophisticated means enhancement and then you

11   subtract three levels for acceptance of responsibility, we're

12   talking about a total offense level of 33, and at a criminal

13   history category of I, this creates or would create an advisory

14   guideline range of 135 to 168 months' imprisonment, although

15   that would cap at 120 months because of the statutory penalties

16   available here, and that is more than twice what the parties

17   agreed to as part of the 11(c)(1)(C) sentence of 60 months'

18   imprisonment.

19           So in short, we can spend a whole lot of time talking

20   with the seed companies about what their R&D costs were and what

21   the market value of these stolen seed lines were or we can rely

22   on what the defendants said about what they were trying to do in

23   their own conversations that were recorded in this case or

24   captured in this case by various surveillance means, and we can

25   trust that they meant what they said, that they intended a loss

1   to Pioneer and Monsanto of a million dollars per seed line they

2   managed to steal.  We know they managed to steal at least 320 of

3   those seed lines based upon just those two recorded

4   conversations or transactions that we have.

5          Now, $320 million in intended loss under a relevant

6   conduct analysis is quite different than what's owed in

7   restitution because, of course, the restitution goes to actual

8   loss and it goes only to actual loss for the instant offense of

9   conviction and not to the greater relevant conduct for the

10  conspiracy itself.

11         I absolutely do believe that Pioneer and Monsanto are

12  entitled to recoup their legal fees and costs entitled in this

13  particular case, but I also agree with Mr. Weinhardt or the

14  defense team's claim that I don't have before me yet sufficient

15  evidence to make that decision.  I have some broad stroke

16  information about what they spent, but I need much more detailed

17  information about how that time is allocated.  Was it in court?

18  Was it travel costs?  Was it copying costs?  Was it responding

19  to discovery requests by the Government or the defendant?  Was

20  it grand jury testimony?  I need to know more about what that

21  is.

22         So we'll have to make a decision about whether or not

23  we want to take that evidence and then have a restitution

24  hearing sometime down the road that comports with the 60-day

25  notice requirements or whether we want to proceed now with some

1  information about that and the defendant wants to waive that

2  60-day period.  I don't think he does based upon the litigation

3  we've seen.  But, again, we'll have to tackle that issue at some

4  point in the next couple days.

5          So in summary, I would suggest that we focus our

6  efforts on variance matters.  I would suggest that we focus on

7  the actual restitution matters that are left before us.  I see

8  those as the major fighting issues that remain.

9          But, of course, the parties are entitled to present

10  evidence, if you want to, to try and change my mind about these

11  issues.  I do ask that you don't simply repeat the legal

12  arguments you've made.  I've read all of those.  I understand

13  what you're saying.  I've done the research.  And so I don't

14  think we need additional information by way of argument, but if

15  you have testimony or evidence that you think is necessary

16  either to create a more robust record or because you think my

17  conclusions are wrong and new evidence would change my mind,

18  then we can do that.

19          So I would suggest we take now about a 20-minute break

20  and let you talk with your witnesses, let you talk with each

21  other, and formulate a plan for how we go forward with the rest

22  of our morning and the rest of our day.

23          Anything that you need from me before we take that

24  break?  Any other questions that you have?

25          MR. GRIESS:  No, Your Honor.

1           THE COURT:  Mr. Griess?

2           Mr. Weinhardt?

3           MR. WEINHARDT:  No, I don't think so, Your Honor.

4           THE COURT:  Okay.  Then let's go ahead and take a

5    20-minute break.  We'll be back here at 9:50.  Thanks.

6           (Recess at 9:30 a.m. until 10:05 a.m.)

7           THE COURT:  Okay.  Then we are back on the record in

8    the matter of United States vs. Mo Hailong.  The parties have

9    had a chance to talk both with their own teams of attorneys and

10   witnesses and agents as well as with each other about how to

11   proceed and have come up with a proposal.

12          Mr. Weinhardt, would you like to outline what that

13   proposal is?

14          MR. WEINHARDT:  Yes, Your Honor.  In light of the

15   legal rulings that the Court gave to the parties this morning,

16   both sides are willing at this point to spare the Court from any

17   further evidence presentation regarding offense conduct.

18          There are still, in light of the Court's rulings, some

19   guidelines issues that the parties wish to discuss, but the

20   parties would propose that they give a stipulated guideline

21   range to the Court by e-mail this afternoon.

22          When I say stipulated, I wanted to make sure that for

23   record purposes it is a stipulation as constrained by the

24   Court's legal rulings.  We're still --

25          THE COURT:  Sure.

1      MR. WEINHARDT:  -- maintaining all of the positions

2   that we've urged in our briefs about what we think the right

3   guideline calculation ought to be.

4          But subject to the Court's rulings, we would propose

5   to the Court a stipulated guideline range.  That, then, really

6   for both sides, eliminates the remainder of the evidentiary

7   presentation that we had proposed for today.  We would propose

8   that we then move to the evidentiary presentation from the

9   parties regarding variance.  We're not able to do that today

10  because we didn't anticipate we would save this time.  Our

11  witness, Mr. Wise from the former BOP medical service, is not

12  available until tomorrow, but we would anticipate presenting his

13  testimony tomorrow.

14          THE COURT:  And is there a time that works best for

15  that?

16          MR. WEINHARDT:  Because he gets here somewhat later in

17  the day today, if we didn't have to start right at 9 a.m. but

18  could maybe be like at 10:30 so that we would have some time

19  with him in the morning, that would be helpful.

20          THE COURT:  That would be fine with me.

21          Does that work for you, Mr. Griess?

22          MR. GRIESS:  It does.

23          THE COURT:  Okay.  So we will reconvene tomorrow

24  morning at 10:30.

25          Mr. Weinhardt, continue with your summary.

1          MR. WEINHARDT:  Our other live witness on the variance

2    issue is Dr. Romanoff, and Dr. Romanoff, as we told the Court in

3    chambers, is observant, and it's Rosh Hashanah, and he cannot be

4    here until late tomorrow night, and so we would anticipate

5    calling him on Wednesday morning.  Again, a little time that

6    morning would be helpful, and I think that we would still have

7    ample time thereafter to get the case argued and have the Court

8    issue its determination, if it's willing, in the afternoon.  So,

9    again, maybe 10 or 10:30 start on Wednesday would be what we

10   would request.

11          THE COURT:  10:30 would be fine with me on Wednesday.

12          Does that work for you, Mr. Griess?

13          MR. GRIESS:  It does.

14          THE COURT:  And based upon our discussions earlier

15   today, it's likely we will take Dr. Romanoff's testimony in a

16   sealed courtroom, given the nature of the testimony that is

17   going to be presented and the privacy interests that it raises.

18          So to the extent anybody who is here in the audience

19   was interested in coming back, Wednesday will likely be a closed

20   session, at least during his testimony.

21          Did the parties discuss -- and I apologize, I should

22   have brought this up when you were back in chambers a few

23   moments ago.  Did you have any discussion about restitution?  In

24   other words, are you preparing or will you be presenting

25   additional evidence about, in particular, the attorneys' fees?

1            MR. GRIESS:  Your Honor, no, we didn't discuss that,

2  but I anticipate that is something we can discuss this afternoon

3  and include in our communication back to the Court today.

4            THE COURT:  Okay.  Then, Mr. Weinhardt, you can --

5            MR. WEINHARDT:  That's what we'd like to do.  We're

6  not prepared to a make a decision at this point.

7            THE COURT:  We'll push that one to the side for now.

8  I will go ahead and accept the proposal of the parties.  I

9  appreciate your willingness to work with each other and, of

10  course, to narrow the issues before the Court.  I think those

11  are all reasonable decisions in light of what's been decided.

12            Given that the Government is no longer proposing

13  offering this morning or today the testimony of the seed

14  companies on loss, I will deny as moot the motion filed at 650,

15  which is the motion to exclude that testimony, given that it's

16  now no longer going to be presented to the Court.

17            Anything else to take care of today, then?

18            MR. WEINHARDT:  Nothing for the defense, Your Honor.

19  Thank you.

20            THE COURT:  Mr. Griess?

21            MR. GRIESS:  No, Your Honor.

22            THE COURT:  Okay.  Then I'll see everybody at 10:30

23  tomorrow.  Thank you.

24            (Recess at 10:10 a.m. until 10:30 a.m., Tuesday,

25  October 3, 2016.)

1          C E R T I F I C A T E

2          I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3  the State of Iowa and Federal Official Realtime Court Reporter

4  in and for the United States District Court for the Southern

5  District of Iowa, do hereby certify, pursuant to Title 28,

6  United States Code, Section 753, that the foregoing is a true

7  and correct transcript of the stenographically reported

8  proceedings held in the above-entitled matter and that the

9  transcript page format is in conformance with the regulations of

10  the Judicial Conference of the United States.

11          Dated at Des Moines, Iowa, this 26th day of October,

12  2016.

13

14

15                    /s/ Kelli M. Mulcahy_____
                     Kelli M. Mulcahy, CSR, RMR, CRR
16                    Federal Official Court Reporter

17

18

19

20

21

22

23

24

25