IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,　:
　　　　　　　　　　　　　　　:
　　　　Plaintiff,　　　　　:
　　　　　　　　　　　　　　　:
vs.　　　　　　　　　　　　 :　　　　Case No. 4:13-cr-00147
　　　　　　　　　　　　　　　:
MO HAILONG,　　　　　　　　 :　　SENTENCING HEARING TRANSCRIPT
　　　　　　　　　　　　　　　:
　　　　Defendant.　　　　　:　　　　　　Volume II
- - - - - - - - - - - - - -X




　　　　　　　　　　　　Courtroom, First Floor
　　　　　　　　　　　　U.S. Courthouse
　　　　　　　　　　　　123 East Walnut Street
　　　　　　　　　　　　Des Moines, Iowa
　　　　　　　　　　　　Tuesday, October 4, 2016
　　　　　　　　　　　　10:30 a.m.



BEFORE:　THE HONORABLE STEPHANIE M. ROSE, Judge.

　　　　　　KELLI M. MULCAHY, CSR, RMR, CRR
　　　　　　　　United States Courthouse
　　　　　123 East Walnut Street, Room 115
　　　　　　　Des Moines, Iowa 50309

APPEARANCES:

For the Plaintiff:          JASON T. GRIESS, ESQ.
                            Assistant U.S. Attorney
                            U.S. Courthouse Annex
                            110 East Court Avenue, Suite 286
                            Des Moines, Iowa  50309-5053

                            MATTHEW R. WALCZEWSKI, ESQ.
                            United States Department of Justice
                            600 East Street North West
                            Washington, D.C.  20004

For the Defendant:          MARK E. WEINHARDT, ESQ.
                            HOLLY M. LOGAN, ESQ.
                            Weinhardt & Logan, P.C.
                            2600 Grand Avenue, Suite 450
                            Des Moines, Iowa  50312

                            MARK E. BECK, ESQ.
                            Mark Beck Law, P.C.
                            350 West Colorado Boulevard, Suite 200
                            Pasadena, California  91105

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

For the Defendant:

Philip Steven Wise         30     48     63
                     (Logan) (Griess) (Logan)

Dejka Araujo            67     73
(Via telephone)    (Weinhardt)(Griess)


E X H I B I T S

| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 60 - Harvey report | 79 | 79 |

| DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 6 - Wise report | 32 | 32 |

1                        P R O C E E D I N G S

2              (In open court with the defendant present.)

3              THE COURT:  Thank you.  You can be seated.

4              We are back in the matter of United States vs. Mo

5    Hailong.  We have joining us Mr. Mo, as well as his attorneys,

6    and the United States returns with the same attorneys as we had

7    yesterday, and the probation office remains represented by Stacy

8    Dietch.

9              I did receive your e-mail message last night.  Thank

10   you for that.  That would be the same range, I think, that I had

11   calculated at the end of our hearing yesterday morning.

12             Otherwise, I don't think we have anything new to talk

13   about today, unless the parties have anything more.

14             MR. GRIESS:  No, Your Honor.  Thank you.

15             MR. WEINHARDT:  Not other than the evidence we intend

16   to present today.

17             THE COURT:  Okay.  Go ahead with that, Mr. Weinhardt.

18             MS. LOGAN:  Thank you, Your Honor.  The defense calls

19   Philip Wise.

20             THE COURT:  Okay.

21             THE DEPUTY CLERK:  Please raise your right hand.

22             PHILIP STEVEN WISE, DEFENDANT'S WITNESS, SWORN

23             THE DEPUTY CLERK:  Thank you.  Please have a seat.

24             THE WITNESS:  Thank you.

25

1    DIRECT EXAMINATION

2    BY MS. LOGAN:

3    Q.  Mr. Wise, please state your full name for the Court.

4    A.  Philip Steven Wise.

5    Q.  And please tell the Court your professional background and

6    qualifications.

7    A.  I worked for the Federal Bureau of Prisons for about 25

8    years.  Started at United States Penitentiary at Atlanta, moved

9    on to a number of other positions with the agency in a lot of

10   different institutions and settings, ultimately was the warden

11   at the federal prison camp for women at Alderson, West Virginia;

12   then the warden at the Federal Medical Center at Rochester,

13   Minnesota; and retired in 2002 as the assistant director with

14   responsibility for health services.

15          Subsequent to that, I worked for a firm that provided

16   medical specialty care for prison inmates, mostly for Bureau of

17   Prisons inmates, and after that I started consulting with

18   attorneys.

19   Q.  I want to go back just a little bit.  What time period when

20   you were within the BOP did you start getting involved with the

21   medical side of the BOP?

22   A.  In the 1990s, I was the executive associate warden at the

23   Federal Medical Center at Lexington, Kentucky, and there I had

24   responsibility for management of the health services in that

25   medical center.

1  Q.  Okay.  And have you kept up with current BOP regulations and

2  rules since your retirement?

3  A.  Yes, ma'am.  I monitor their policies.  They do change

4  policies periodically, and those are published, and I monitor

5  those.  I keep up particularly the ones relating to health

6  services.  I also monitor testimony from BOP officials, both in

7  court and in front of regulatory bodies.  I review reports by

8  some of those regulatory and monitoring bodies, including the

9  Inspector General of the Department of Justice.  I also am in

10 contact with people at the Bureau of Prisons about particular

11 matters periodically.

12 Q.  How did you get involved with this case?

13 A.  I was contacted by someone from Mr. Beck's office and asked

14 if I would look at the medical requirements and how those would

15 probably be managed if Mr. Mo were placed in the Bureau of

16 Prisons.

17 Q.  And you drafted a report in this case?

18 A.  Yes, ma'am.

19 Q.  Do you have a copy of that report in front of you?

20 A.  I do.

21      MS. LOGAN:  And, Your Honor, that is Defense Exhibit

22 6.  We would move at this time that it be admitted into

23 evidence.

24      MR. GRIESS:  No objection.

25      THE COURT:  Defendant's Exhibit 6 is admitted.

1                   (Defendant's Exhibit No. 6 was

2                       offered and received in evidence.)

3    BY MS. LOGAN:

4    Q.  Mr. Wise, what documents did you review to prepare your

5    expert report in this case?

6    A.  I reviewed a number of BOP policy statements.  I was

7    familiar with them to begin with, but I often re-review those if

8    there's a question related to those particular issues.  In

9    addition, I reviewed a letter from Dr. Araujo, a letter from

10   Dr. Sabater, a letter from Dr. Trent, and a report by Dr. Tarlow

11   and a report by Dr. Romanoff.

12   Q.  What did you learn from reviewing Mr. Mo's medical records?

13   A.  I learned that he had -- he had undergone surgery for a

14   tumor that subsequently was determined that it was not just a

15   tumor, it was synovial sarcoma, and he, after the correct

16   diagnosis was made, received chemotherapy and radiation therapy

17   in preparation for a subsequent surgery that occurred and that

18   for the past year or so he's been without sign or symptoms of

19   recurrence of that cancer.

20   Q.  Did you learn about any other medical ailments that Mr. Mo

21   has?

22   A.  Yeah.  He has -- as a result of the chemotherapy, he

23   has -- either the chemo or radiation therapy, has lymphedema,

24   which is a swelling of the limbs or in the body.  He also has

25   some gum conditions that need some treatment as well, as well as

1  depression.  I think there was also an issue of depression.

2  Q.  What is the required follow-up for Mr. Mo's synovial

3  sarcoma?

4  A.  I think if I remember right -- and I can refer here, I

5  guess, but follow-up with the oncologist for three months for

6  the -- every three months for the first year, every four months

7  for the next two years, and every six months until 2020, and

8  annually after that.  And that involves imaging and some lab

9  work and review by an oncologist.

10  Q.  What is Mr. Mo required to do following his lymphedema

11  diagnosis?

12  A.  One of the standard treatments for that is compression, and

13  it's my understanding that he wears a compression garment that

14  provides for that and he has to wear that 24 hours.  Those have

15  to be changed out periodically.  They don't last forever.

16  Q.  Given what you have read, what challenges will the BOP face

17  in dealing with Mr. Mo's medical conditions?

18  A.  Yeah.  First challenge, I think, is that he's probably -- if

19  the Bureau follows its own policies, which it -- in fact, the

20  header on the Bureau's Web page is a claim that they're a leader

21  in corrections because of strict adherence to carefully crafted

22  policies, and if they do that in this case, they follow their

23  own policies, he's going to be placed in a facility that does

24  not have enhanced medical resources either in the institution or

25  in the community.  It's just a run-of-the-mill type of facility.

1 So that's going to be the first is he's going to be in a typical

2 type facility.

3          Second, the scope of care that he'll have access to

4 and his access to medical specialists is going to be more

5 limited than it is in the community, and that's just simply due

6 to the correctional overlay that happens with anybody in any

7 correctional system.  It just is reduced.  It's not as open as

8 it is in the community.

9          Third is chronic conditions like the lymphedema, for

10 example, are difficult to manage over the long term in a

11 correctional setting.  There are all sorts of events that can

12 happen in a prison, a correctional facility, that can interfere

13 with that, security features and those sorts of things.

14          And fourth, one of his physicians indicated that

15 chronic stress may lead to an earlier -- or to a recurrence of

16 his cancer or make treatment of a recurrence more difficult, and

17 there are some stressors that, in my experience, inmates, they

18 experience, they complain about or talk about, just by being

19 incarcerated.  It's just a part of incarceration.

20          And I think all those are going to be challenges that

21 he and the Bureau will deal with if he goes into custody.

22 Q.  How is Mr. Mo likely to be classified within the BOP, and

23 can you explain the different classification levels?

24 A.  Sure.  There are at least two ways the Bureau classifies

25 everybody coming into custody.  The first is security level.

1 And because he is a non-U.S. citizen, he's going to go to a low

2 security level facility, not a minimum security level facility.

3       The second -- in fact, he may not even go to a

4 Bureau-operated facility. He would likely end up at a different

5 kind of contract facility.

6       Secondly, the Bureau classifies inmates based on

7 medical needs so they assign them a care level. And their care

8 levels are rated I through IV, I being the lowest, and that's

9 for people who are generally healthy, basically healthy, and

10 don't have recurrent or regular need for clinical intervention.

11       Care Level II is for those who typically have a

12 chronic medical condition that's managed by medication but

13 stable, they don't need a lot of intervention.

14       Care Level III is for inmates who may have a chronic

15 condition that's not stabilized or that require more frequent

16 intervention by a clinician.

17       And Care Level IV is for those inmates who require

18 24-hour skilled nursing care or substantial assistance with

19 activities of daily living.

20       Mr. Mo, if the Bureau -- again, assuming it follows

21 its own policies and procedures, the Bureau uses an algorithm

22 and a set of charts and tables to assign an initial care level

23 for individuals, and that algorithm for cancer patients

24 indicates that if they have been cancer-free for a year, they've

25 been treated and are cancer-free for a year, then they're

1  qualified and classified for placement in the Care Level II

2  facility.  That's a general kind of run of the mill sort of most

3  of the Bureau facilities are classified as Care Level II.

4  Q.  Have you read Dr. Harvey, the Government expert's, letter

5  regarding care level placement for Mr. Mo?

6  A.  I have.

7  Q.  And he asserts that Mr. Mo would be placed in a Care Level

8  IV facility, correct?

9  A.  He does.

10  Q.  Do you agree with that?

11  A.  I do not.  Dr. Harvey is -- I know Dr. Harvey; he's an

12  excellent physician.  He's not involved in the designation

13  process.  That happens -- in the Bureau that happens in Grand

14  Prairie, Texas by a group of people that this is what they do

15  all day is initially designate inmates with medical issues.

16  They control the beds in the Care Level III and Care Level IV

17  facilities.

18          And those beds, in particularly the medical facilities

19  that Dr. Harvey references, the Care Level IV's, those are

20  really -- that's really valuable real estate.  There's a waiting

21  list for every one of the medical facilities.  There are only

22  five that handle male inmates.  There are six total.  And

23  there's a waiting list for every one of those to get inmates

24  into, and it's just not the practice of the Bureau to typically

25  send somebody who's been treated for cancer and then needs

1 monitoring to a medical facility.

2           The Bureau has a very large number of those people,

3 and there's just not room in the medical facilities for every

4 cancer survivor that requires monitoring.

5 Q.  And Level IV requires daily care, as I understand it; is

6 that right?

7 A.  Correct.  It has -- the Level IV facilities have inpatient

8 and outpatient units or areas, but they're primarily for people

9 who need skilled nursing care 24 hours.  They have to have

10 access to skilled nurses or they're so impaired they have to

11 have a great deal of assistance with activities of daily living

12 like showering, toileting, eating, bathing, you know, that sort

13 of thing.

14 Q.  Dr. Harvey mentions primary care provider teams in his

15 letter.  Can you explain what those are?

16 A.  Sure.  Years ago the Bureau of Prisons tried to offer

17 everything to everybody everywhere all the time, and that got

18 horrifically expensive, so we changed the way we delivered

19 health care and created these primary care provider teams.

20           The concept is that there's a physician that's kind of

21 the head of the -- each team, and the team then consists of

22 ancillary providers, mid-level providers, typically either a

23 physician assistant or a nurse practitioner or, in the case of

24 the Bureau, an unlicensed medical graduate that is allowed to

25 work as a mid-level provider.

1          An inmate is assigned to a particular team, so most of

2    his care is provided by those mid-level providers, overseen by

3    the physician.

4    Q.  So in all likelihood inmates don't see an M.D., they see a

5    nurse practitioner or an unlicensed medical provider?

6    A.  Generally, for most care, they see a mid-level provider.

7    They do see a physician within two weeks of arrival at an

8    institution for a history and physical, and that's always done

9    by a physician, but general care, particularly for chronic care

10   clinics or for sick call or for any of those sorts of things,

11   that's generally provided by one of the mid-level providers.

12   Q.  How available is specialty care within the BOP?

13   A.  The Bureau has remarkable access to medical specialty care.

14   They have contracts with the Mayo Clinic and with Brigham and

15   Women's Hospital in Boston.  They've got some remarkable

16   resources.  They're isolated.  They're located in particular

17   areas.  They're not universally available, and they have some

18   pretty clear policies that govern what kind of access inmates

19   get to those resources.

20   Q.  So along those lines, what is a utilization review

21   committee?

22   A.  It's -- every institution is required to have one, and it's

23   a committee that meets any time an intervention outside that

24   particular facility or its staff -- any time an intervention is

25   recommended or requested by a provider, by a clinician, it goes

1  in front of the utilization review committee which makes a

2  determination as to whether that intervention falls within the

3  scope of care that the Bureau provides or not.  And if it

4  doesn't, if it's outside the scope of care, then it's denied at

5  that point.  That intervention is denied.

6  Q.  Does the utilization review committee make the final call on

7  whether a specialist is allowed to be seen?

8  A.  No.  That then goes to, in most cases, the regional office,

9  and a decision is made there as to whether it really does fall

10  into the scope of care and whether an outside trip is necessary

11  and those sort of things.

12  Q.  What effect has regional office review had on the number of

13  specialists seen by inmates?

14  A.  It's reduced the number of ten trips -- the number of times

15  an inmate goes out into the community for medical reasons by

16  about 10 percent.

17  Q.  Is Mr. Mo's ability to see a synovial sarcoma specialist

18  guaranteed or even likely within the BOP?

19  A.  Again, if the Bureau follows its policies, what's most

20  likely to happen is he's going to be placed in a Care Level II

21  facility.  In very high probability it's going to be a contract

22  Care Level II facility in a pretty remote area so there's --

23  it's unlikely there would be a synovial sarcoma specialist in

24  those areas.

25  Q.  Why is specialist care limited within the BOP?

1  A.  It's very expensive.  It's very expensive.  Again, the

2  Bureau provides what they consider medically necessary care, but

3  not -- they don't provide all medically appropriate care that

4  you or I may get in the community or Mr. Mo.  It's a resource

5  issue, and so they have to make sure they have sufficient

6  resources to provide medically necessary care for everybody, so

7  it's limited.

8  Q.  Are the recommendations of specialists always followed by

9  the BOP?

10  A.  No.  The policy is really clear on this, and the practice is

11  as well, that the recommendations of any specialist are

12  considered recommendations, not mandates, and they're evaluated

13  by the -- typically the clinical director of the institution or

14  one of the clinicians at the institution to ensure that whatever

15  recommendation -- and that includes medications or follow-up

16  tests or anything like that, to make sure those do fall within

17  the scope of care that the Bureau is going to provide.

18  Q.  Is the BOP obligated to follow the three-month monitoring

19  protocol recommended by Dr. Araujo and Dr. Trent?

20  A.  They're not obligated to.  They will make their own

21  determination in terms of what is medically necessary, and

22  that's -- that's what they'll follow.

23  Q.  If Mr. Mo were able to get the three-month scans by a

24  synovial sarcoma specialist, who within the BOP would read those

25  scans, in all likelihood?

1    A.  Well, the Bureau does not have a synovial sarcoma specialist

2    on staff.  If -- if he's in a typical facility, the physician

3    that he's seeing -- as I understand it, what he needs is an MRI,

4    full MRI, and some lab work.  The initial look at that MRI is

5    going to be done by the institution physician.

6    Q.  And are those physicians typically family practice or

7    internists?

8    A.  They're generally internal medicine or family practice.

9    There are some few that have other specialties.  There are some

10   psychiatrists at some of the psychiatric referral centers, but

11   most of them, the Bureau physicians, are internal medicine and

12   family practice.

13   Q.  What would happen if Mr. Mo's cancer reoccurred within the

14   BOP?

15   A.  He would probably -- in all probability, he would be

16   referred for transfer to the Federal Medical Center at Butner.

17   That's where the oncology center is for the Bureau of Prisons.

18   They have capability of providing some in-house care there.

19   Q.  And are there synovial sarcoma specialists at Butner?

20   A.  No.  There's a medical oncologist and a radiation oncologist

21   on site.  They're contracted, but they're on site, but they are

22   not synovial sarcoma specialists.

23   Q.  Is compassionate release a real possibility for Mr. Mo if

24   his cancer reoccurs?

25   A.  Compassionate release is an interesting topic for the Bureau

1  of Prisons.  Actually, the Department of Justice has been, since

2  before I retired, applying pressure to the Bureau to move

3  through more recommendations for compassionate release, and the

4  Bureau is very hesitant, very reluctant to do that.  The statute

5  is there, it's available, but it's -- it's just not used very

6  frequently in the Bureau.

7  Q.  If Mr. Mo's cancer reoccurred, would he be eligible for

8  medical trials?

9  A.  No.  Typically -- and there are a number of reasons for

10  that.  Number one, the investigation protocols for medical

11  trials or those sort of things are typically geographically

12  specific.  They're run by a particular research facility.  I

13  know there are a couple that do the -- a lot of them in cancer

14  research, but they're usually geographically specific.

15          And there's a long, not very pretty history of inmates

16  being used for medical research, and for that reason most

17  correctional agencies, certainly the Bureau, is really reluctant

18  to allow inmates to participate in any kind of non-FDA-

19  sanctioned and approved and already cleared sort of protocol.

20  Q.  Switching gears to the lymphedema, will Mr. Mo be allowed to

21  wear his compression garment within the BOP?

22  A.  That's going to depend on the facility, and there's no

23  guarantee that he's going to because there are some security

24  issues with that kind of a garment.  Inmates have to be -- that

25  could be used for movement of contraband.  Inmates are

1   periodically strip-searched.  There's just no assurance, no

2   absolute assurance, that that's going to be allowed 24 hours.

3   Q.  Your report states that Mr. Mo will likely be enrolled in a

4   chronic care clinic.  What is a chronic care clinic?

5   A.  That's a phrase the Bureau of Prisons uses for -- a

6   computerized scheduling device is really what it is.  It's not a

7   building, it's not a clinic building, and it's not a collection

8   of specialists that come in on Thursday to see this kind of

9   inmate.  It's just a scheduling device to get a particular

10  inmate in front of a clinician for a particular reason on a

11  regular basis.

12          The current policy is that anybody enrolled in a

13  chronic care clinic has got to be in front of a clinician at

14  least once a year but more often as medically indicated by and

15  decided by the clinician.

16  Q.  And what type of clinician do inmates see at chronic care

17  clinics?

18  A.  Almost always a mid-level provider.  They run those, the

19  chronic care clinics.

20  Q.  Does the intended monitoring always happen within the

21  chronic care clinics?

22  A.  No.  Number one -- and there are a lot of reasons for that.

23  There are reasons why an inmate may not make that appointment

24  that's been scheduled six months in advance.  He may be out of

25  the institution for some reason, he may have moved to a

1   different housing area and not get the word that he's to be at

2   the hospital or the health services unit at that particular date

3   and time.  He may be locked up in administrative detention.

4   There's lots of reasons an inmate may miss one of those

5   scheduled appointments.

6          But also there have been problems historically, even

7   when inmates do make those appointments, of the monitoring that

8   needs to happen taking place.  There was a report in 2008 by the

9   Inspector General of the Department of Justice that pointed out

10  that in about 18 -- I think it was 18 percent of the time

11  inmates enrolled in chronic care clinics did not get the

12  monitoring that that chronic care clinic was supposed to

13  provide.

14  Q.  Will Mr. Mo have access to the level of mental health care

15  that he currently receives when he's within the BOP?

16  A.  The Bureau has -- the Bureau has mental health treatment

17  programs out there.  There are psychologists available at each

18  facility.  They're geared primarily toward keeping an inmate

19  functional in the general population so that if there's a crisis

20  or an issue that threatens an inmate's ability to function in

21  the general population, then certainly they're seen and they're

22  treated and psychotropic medications are available.

23         But long-term individual therapy like I understand he

24  receives now is just not -- not likely to happen, certainly not

25  in the contract facility, and not even in a BOP-managed

1    facility.

2    Q.  I want to switch gears again.  And you hinted at this

3    earlier, but where do you think Mr. Mo would be placed, assuming

4    he's a green card holder and assuming he's deportable, if he

5    gets more than, say, eight months within the BOP, more than

6    eight months' term of imprisonment?

7    A.   Yeah.  And I apologize, I wasn't aware until just very

8    recently that he was -- he is not a U.S. citizen.  That brings

9    in a whole nother, excuse me, set of issues with designation.

10          If he goes -- if he's determined to be Care Level II,

11   which I think he will be, then the Bureau has in place a program

12   they call an institution hearing program.  It's designed to try

13   to get individuals who are non-U.S. citizens to get their

14   deportation status decided before completion of their sentence.

15          And in that program, if they're within 48 to 60 months

16   of release, they're typically moved to one of the facilities

17   that offers on-site hearings by immigration officials.  There

18   are about five of those sites that are actually operated by the

19   Bureau of Prisons.  All the rest are contract facilities and

20   they're operated by private correctional companies.

21          So to answer your question a little bit more directly,

22   if things go as they normally would with a designation of

23   Mr. Mo's type, the algorithm would be applied, he'd be

24   classified as Care Level II.  He'd be noted as a non-U.S.

25   citizen.  If his sentence is less than 60 months, he would be

1  designated to one of these institution hearing sites -- and,

2  again, most of those are contract facilities, not operated by

3  the Bureau of Prisons -- and he would go there for service of

4  his sentence and processing through immigration hearings.

5  Q.  And where are these privately owned facilities located?

6  A.  Most of them are in Texas.  They're scattered all through

7  the southern tier.  There's one in California that actually was

8  built by the Bureau of Prisons but is operated by a private

9  contractor, but most of them are across the southern tier, and,

10  frankly, most of them are in Texas.

11  Q.  Safe to say they're in pretty rural areas?

12  A.  They're in very rural areas.  Big Spring is one of the

13  largest ones.  There's one in New Mexico that's pretty remote.

14  But, yeah, they're in pretty remote areas for the most part.

15  Q.  Is the medical care received by inmates better within the

16  BOP or within these privately owned facilities?

17  A.  Well, the BOP is not trying to make a profit so they -- they

18  have pretty specific policies in terms of what level care is

19  going to be provided and what their staffing complement looks

20  like and those sorts of things.

21       The privately contracted prisons are not bound by BOP

22  medical policies.  There's a statement of work that says that

23  they have to meet certain standards, but it's not -- it's not

24  the BOP policy applied to that specific facility.

25  Q.  What standards are the privately owned placement facilities

1  held to?

2  A.  Each of them has their own -- each -- there are two primary

3  private providers, and they both have their own policies for

4  staffing and provision of medical care.  There's a statement of

5  work that actually governs the minimum that has to be provided,

6  and that talks -- that's issued by the Bureau for the

7  contractor, and that talks about you have to have at least this

8  kind of staffing there, you have to have sick call at least

9  three out of five -- out of seven days or it has some minimal

10  standards, but that's about it.

11  Q.  Does Mr. Mo's chance of seeing a synovial sarcoma specialist

12  increase or decrease if he's placed in a contract facility?

13  A.  Oh, I think it definitely decreases for a number of reasons.

14  One is cost.  The other is location.  I just think it's -- it

15  would be very unlikely for him to see a synovial sarcoma

16  specialist in a contract facility.

17  Q.  To summarize your testimony, do you believe that Mr. Mo's

18  health concerns will be adequately addressed if he's

19  incarcerated?

20  A.  I -- I -- again, if the Bureau follows its own policies, I

21  think he will -- he will get a basic level of care; that is, he

22  will be monitored for recurrence of his cancer.  I don't think

23  it will be at the level recommended by his oncologist.  I think

24  it would be at a different level.

25  Q.  And if he's placed in a contract facility?

1  A.  I think it would be even less, less reliable or dependable

2  at that point.

3         MS. LOGAN:  Thank you.

4         THE COURT:  Mr. Griess.

5         MR. GRIESS:  Thank you, Your Honor.

6                     CROSS-EXAMINATION

7  BY MR. GRIESS:

8  Q.  Dr. Wise, what is synovial sarcoma?

9  A.  It's Mr. Wise.  I'm not a physician.

10 Q.  I'm sorry.  I apologize.

11 A.  As far as I understand it -- again, I'm not a physician, so

12 this is a layman's interpretation -- it's a soft tissue cancer,

13 a type of soft tissue cancer, that's, according to his

14 oncologist, Mr. Mo's is very aggressive or was very aggressive.

15 Q.  So your interpretation of the medical requirements is based

16 entirely on your review of Mr. Mo's doctors, correct?

17 A.  Absolutely.

18 Q.  You have not been employed within the BOP since 2002; is

19 that accurate?

20 A.  That's correct.

21 Q.  So you talked about some of the things that you do to keep

22 up to date or current with how Bureau of Prisons conducts

23 itself.  One of those things was to follow current policies and

24 rules; is that accurate?

25 A.  Yes, sir.

1   Q.   How often have those changed over the years?

2   A.   They do change periodically.  It's -- some policies change

3   more frequently than others.  For example, the national

4   formulary comes out about once a year.  They do change.

5   Q.   And the national formulary, that's actually something that

6   you were personally involved in creating, correct?

7   A.   Yes, sir.

8   Q.   And what's the purpose of that?

9   A.   Yeah.  The original purpose, and it's still, I assume, the

10  purpose, was to, number one, ensure that a wide variety of

11  medications most frequently needed for treatment of inmates in

12  the Bureau is available and known to the clinicians; and,

13  secondly, to restrict some of the medications that are either

14  cost-prohibitive when there are other alternatives available or

15  that are -- for some reason need a higher level of review before

16  they're considered.

17  Q.   In your opinion, is that body and that process designed with

18  the patient's health in mind or with cost savings in mind?

19  A.   I was -- actually, both.  It was -- and we implemented that,

20  actually, when I was the assistant director for health services,

21  and the -- I will tell you the initial thrust on that was we had

22  physicians prescribing some really exotic medications.

23          For example, there was one very expensive one, there

24  was then, for toenail fungus.  Not a medical necessity to treat

25  an inmate for toenail fungus, but we had physicians prescribing

1  that stuff and costing a lot of dollars.  So the formulary

2  required at least that somebody else review that before that

3  kind of medication was prescribed.

4  Q.  So it's designed not to prevent patients from receiving the

5  treatment they need, but to make sure that there aren't abuses

6  or -- intentional or otherwise, occurring within the system; is

7  that accurate?

8  A.  Yeah.  In fact, yes.  In fact, we built in and is still

9  there, there's a provision for non-formulary prescriptions.  If

10  a physician is of the opinion that an inmate particularly needs

11  medication that's not on that formulary, he can absolutely make

12  a request for a non-formulary -- authorization for a

13  non-formulary prescription.  That will be reviewed.  That's

14  reviewed in most institutions at the regional level and either

15  approved or denied there.  At the higher care level

16  institutions, it's reviewed in the central office and either

17  approved or denied there.

18  Q.  So there are mechanisms whereby someone could receive

19  different types of medications that weren't on the formulary

20  list that the doctor felt it was -- within the BOP felt it was

21  medically necessary?

22  A.  Yeah.  In fact, there are even examples in the formulary in

23  a policy that prescribe how to make the requests for a

24  non-formulary prescription; do this, do this, do this, make sure

25  you've tried this, this, and this, and when you've done all

1  that, then make your request and we'll consider it.  So, yeah,

2  there is a provision there for that kind of exception.

3  Q.  Thank you.  You talked about also reviewing testimony before

4  courts and regulatory bodies.  Is that something you regularly

5  do?

6  A.  I do fairly frequently.  I do get copies often of either

7  declarations, letters, or testimony from BOP people who have

8  testified.

9  Q.  Okay.  Now, you talked about -- in fact, you referenced one

10 of those, an Inspector General's report from 2008, in which you

11 indicated that apparently the conclusion of the report was --

12 not apparently, the conclusion of the report was that 18 percent

13 did not get the monitoring required; is that accurate?

14 A.  That was one of their findings, yeah.  I don't know that

15 that was the overall conclusion of the report.  Actually, it was

16 based -- it was focused on costs and cost containment.

17 Q.  Has there been an additional report, more current than eight

18 years ago, that addressed that same issue?

19 A.  Not that issue.  There was a follow-up report, a review

20 done, I think two years later, that looked at one of the issues

21 that was reported in that 2008 document, and that was

22 credentialing, and the 2000 -- I think it's 2010 report from the

23 Inspector General was a follow-up on the credentialing issue,

24 and it found that they had resolved most of their credentialing

25 concerns, but yet there were still some issues there with

1  credentialing.

2  Q.  In your experience with BOP, is part of the purpose of those

3  reports to help improve medical services within the Bureau of

4  Prisons?

5  A.  You're talking about the IG reports?

6  Q.  Yes.

7  A.  They -- yeah.  That's -- that's a report done by the

8  Department of Justice, and, of course, the Bureau is part of the

9  Department of Justice, so it's an effort on the department's

10  part, that's the way we always looked at it when I was there, an

11  effort on the department's part to ensure that we're doing what

12  we're supposed to be doing and, if we're veering off the track,

13  get us back on.

14  Q.  So let's talk a little bit about the care level assessment.

15  Were you ever personally a part of that care level assessment

16  team or the process?

17  A.  Yeah.  I kind of helped, actually, design that when I was

18  with the Bureau.  We did the first -- first round of

19  classified -- number one, developing the guidelines for

20  classifying inmates medically and then actually applying it.

21  Q.  Are you familiar with changes that have occurred in that

22  over the years?

23  A.  Yes.  And they have.

24  Q.  Okay.  How so?

25  A.  To begin with, we started with a list of -- a list of

1  conditions, basically, and said this goes to that level, this

2  goes to that level.  And they've evolved.  That list changed

3  several times, and then it's evolved into an algorithm now, a

4  flow chart, that asks a series of questions and directs toward

5  different care levels.

6           And then with that is an associated set of charts and

7  tables that specifies minimum care level for a particular

8  diagnosis and, even within those diagnoses, particular

9  progression of that disease.  So that, for example, diabetes at

10  one level gets one care level classification, at another level a

11  different; it's not just all diabetes.  So it has evolved and

12  it's become refined, and but it is different from when it

13  started.

14  Q.  Is that process designed to be a flexible one, taking into

15  account a number of characteristics of the defendant's or a

16  particular incarcerated individual's profile, or is it more

17  rigid?

18  A.  It's pretty -- it's pretty clear.  It was designed

19  originally for non-clinicians to use and still is designed for a

20  non-clinician.  And the reason for that is the Bureau makes

21  their initial designation decisions based on what's in the

22  Presentence Investigation Report.  Those are written by

23  non-clinicians.  They may have clinical information in there.

24           They take that clinical information that's listed in

25  the presentence report and apply that to this algorithm that's a

1  series of yes-no questions; is the inmate over or under 70 years

2  of age?  Is he able to satisfy all the activities of daily

3  living or does he require substantial assistance?  Does he have

4  one of the diagnoses in the associated charts?  They're pretty

5  cut-and-dried yes-or-no questions that are fairly

6  straightforward.

7  Q.  And do you have access to the current algorithm?

8  A.  Yes, sir.

9  Q.  And it's your assessment that based upon the information

10  that Mr. Mo would provide, which both you and Dr. Harvey have

11  looked at, that he would be Level II, not Level IV?

12  A.  Yeah.  The associated charts are pretty clear that if he's

13  been treated for cancer and it's been less than a year since

14  there's no sign of cancer, he's got to go to a Care Level III

15  facility.  If it's been over a year with no sign of cancer, he

16  goes to Care Level II facility.  That's, again, that kind of

17  within a diagnosis sort of distinction that the algorithm makes.

18  Q.  And that singular factor right there that you just described

19  will put him in a Care Level II absolutely?

20  A.  Well, if they follow their algorithm, yes, sir.

21  Q.  Are there reasons why they wouldn't follow their own

22  algorithm?

23  A.  They'd be extraordinarily unusual.  It's pretty rare.  I

24  mean, it's always possible.  Let me -- it is possible that they

25  would go outside their own policies.  These are policies, not

1 laws, so they write their policies, and they can -- just like

2 with the formulary, they can except their policies, but it's

3 pretty rare, especially on an initial classification, to do

4 that.

5 Q. You say it's pretty rare. What do you base that upon?

6 A. My experience with inmates that, number one, when I was with

7 the Bureau of Prisons and then, number two, with those that I've

8 worked since then.

9 Q. Okay. So in fairness, it's been since 2002 since you worked

10 with the Bureau of Prisons, correct?

11 A. Yes. Yes.

12 Q. And how many inmates have you worked with since then that

13 you personally know their characteristics -- or their

14 classification, excuse me, whereby you would feel confident to

15 say it's rare that they would deviate from that?

16 A. Yeah. I typically am working with three to four inmates all

17 the time, so it's -- it's hard to put a number there, but it's

18 not -- I mean, I'm typically involved with three or four

19 potential inmates, guys that -- like Mr. Mo that are preparing

20 to go into custody at a time.

21 Q. But that's before they're classified, correct?

22 A. Yes. Yes. It's before they are in custody.

23 Q. So how many do you work with after the classification where

24 you could say, "Wow, they didn't follow their policies here"?

25 A. Some but not a lot.

1  Q.  Okay.  So you really don't have a large basis of knowledge

2  with regard to the likelihood that they're going to follow their

3  policies or the likelihood of other things impacting currently

4  the final designation?

5          Is that too confusing?

6  A.  Is there a question there?  I'm sorry.

7  Q.  I'll rephrase that.  I'll try to make it a question.

8  A.  Okay.

9  Q.  You said on several occasions that it was rare that they

10 don't follow -- at least as I interpreted it, it was rare that

11 they wouldn't follow or a particular individual would be

12 classified in a way inconsistent with the policies.  Is that

13 accurate?

14 A.  Yes.

15 Q.  And so I'm trying to understand how you would know that

16 currently, since 2002.

17 A.  Yeah.  Again, I typically am working with people

18 presentence, but once they're sentenced, I'm generally aware of

19 where they're sent, where they're designated.  In fact, I often

20 do a follow-up teleconference with them to help prepare them

21 going into custody, and it's based on that.  Is that a large

22 number?  It's not huge.  But, again, I typically am working with

23 three to four people at a time.

24 Q.  Now, location of designation doesn't necessarily dictate

25 care level, correct?

1  A.  Yes.  The institutions are classified by care level as well

2  as the inmates.  So every institution is assigned a Care Level

3  I, II, III, or IV.

4  Q.  So, for instance, if someone was classified -- or

5  designated, I should say, to the Butner facility, the FMC --

6  correct?

7  A.  There are several Butner facilities, but the one we've been

8  talking about is the medical facility, a federal medical

9  facility.

10 Q.  Is it your testimony that the only way you'd be sent to FMC

11 Butner is if you were Care Level IV?

12 A.  Correct.  That's a Care Level IV facility, and they send

13 their Care Level IV inmates.  Care Level II inmates don't go to

14 FMC Butner.

15 Q.  What about Care Level III?

16 A.  They go to Care Level III facilities.

17 Q.  Is that in Butner?

18 A.  Butner has some, but the medical facility is not one.  The

19 other facilities are considered -- at Butner are considered Care

20 Level IIIs, as are Terre Haute, Terminal Island in California,

21 the camp at the Federal Medical Center Devens.  There are a

22 few -- and one more.  Oh, the facility in Fort Worth.

23 Q.  Now, the FMC at Butner, there is relationship -- is there a

24 reason why FMC Butner is at that particular location?

25 A.  Well, there are two -- let me back up.  All the medical

1 facilities are located near major teaching medical resources,

2 and in Butner, it's near Chapel Hill and Raleigh-Durham, so it

3 has access both to Wake Med and Duke.

4 Q.  And it specifically is affiliated with Duke University --

5 A.  Yes.

6 Q.  -- is that your understanding?

7 A.  Well, it's affiliated with both of them.  Duke is -- because

8 of pricing considerations, Duke's almost their backup.  Their

9 run-of-the-mill stuff tends to go to Wake Med, and their more

10 difficult stuff goes to Duke.

11 Q.  So there's actually a variety of resources they have at

12 Butner that they wouldn't have at other locations?

13 A.  Correct.  All the medical facilities typically have a

14 variety of good resources.

15 Q.  Just so I'm clear, the conclusions that you arrived at in

16 your report, those were based upon the idea that Mr. Mo would go

17 to a Level II facility or be classified as Level II, correct?

18 A.  Correct.

19 Q.  All right.  If he were classified as a Level III or a Level

20 IV, he would have much greater medical attention and the

21 challenges, I presume, would be less, correct?

22 A.  He would -- yeah.  He would certainly have -- he would be

23 placed in an institution where there are greater medical

24 resources both internally and in the community.

25 Q.  Particularly with regard to one of the problems being travel

1  to a medical facility to receive treatment, those concerns would

2  be very much alleviated if he were at Butner?

3  A.  I'm not sure what you're asking about travel to a facility.

4  Q.  Oh, sure.  Let me clarify.

5  A.  All the -- all the medical specialty care that an inmate

6  receives outside an institution is done generally -- pretty much

7  in that local community.  They won't take an inmate from Florida

8  and move him to Cleveland for treatment and then back to

9  Florida.  They don't do that.  It's got to be within that

10  community.

11  Q.  Clearly.  But if an individual were classified -- or

12  designated, I should say, to Butner, whether III or IV, he would

13  have much alleviated concerns.  The concerns with regard to

14  travel to, let's say, outside treatment or outside specialists

15  at Duke would be alleviated, correct?

16  A.  Yeah.  If he were -- yeah.  If he were at Butner, either a

17  Level III or Level IV, the resources in the community would be

18  available to the staff at that institution, as at Rochester he

19  would have access to the Mayo Clinic or at Devens to Brigham and

20  Women's or University of Massachusetts.

21  Q.  At least as it pertains to oncology or cancer, Butner is the

22  Bureau of Prisons' primary facility, correct?

23  A.  It is.  That is their oncology center, absolutely.

24  Q.  Let's talk a little bit about the compression garment.  You

25  indicated that there would be no guarantee he would have that

1  particular garment.  Why is that?

2  A.  There may be security issues in terms of wearing that

3  throughout the institution.  And certainly if he's in a secure

4  facility, it's going to have to be removed for pat searches and

5  shake-downs and things like that.

6  Q.  Will the Bureau of Prisons provide something to address the

7  problem if a doctor prescribes it or a medical technician

8  indicates it's necessary?

9  A.  Yeah.  If it's determined to be medically necessary,

10 they'll -- they'll -- they will address it some way.  It may

11 just not be a full-body compression suit 24 hours.  They will

12 address it if it's medically necessary.

13 Q.  Okay.  I want to ask you just briefly about the immigration

14 situation you talked about, and I want to make sure I understand

15 your testimony.  Are you saying that an individual's immigration

16 classification would override the medical needs of that inmate?

17 A.  No, I didn't say that.

18 Q.  Okay.

19 A.  I did not say that.  If he's Care Level II, then all of the

20 contract facilities that the Bureau uses are classified as Care

21 Level II.  If, if the Bureau overrides that and classifies it as

22 Care Level III or Care Level IV, then that would rule out the

23 contract facilities.  He would then have to be placed in a

24 Bureau facility.

25 Q.  Thank you.  You talked a little bit about waiting lists,

1  correct?

2  A.  At the medical referral centers?

3  Q.  Right.

4  A.  Yeah.

5  Q.  And so that's the area -- explain to me what that means.

6  What's a medical referral center?

7  A.  There are five Care Level IV facilities.  They're called

8  medical referral centers or Federal Medical Centers.

9  Q.  Okay.

10  A.  There are five of them available for men, one for women, and

11  there are waiting lists at all of those for beds in those

12  facilities, inmates either coming into custody or that are in

13  custody and need to be transferred there for some reason or

14  another.

15  Q.  And is Butner, FMC Butner, one such type facility?

16  A.  Yes.

17  Q.  Okay.  How are you aware of the waiting lists?

18  A.  Talked to Bureau staff.  And that -- that is not a new or

19  resolved problem ever.  There's always a waiting list every

20  time.  That just doesn't go away.

21  Q.  Are the waiting lists published or do you have public access

22  to those actual lists?

23  A.  No.  No.  They're certainly not published.

24  Q.  Do you have any idea of how long a wait there is?

25  A.  The answer I always get when I talk with Bureau staff is if

1  it's an emergency, we can get them in there today; if it's not,

2  they prioritize it based on who's out there waiting.

3  Q.  Okay.  But you don't have any indication of how long,

4  whether that's a week, a month, a year?

5  A.  And they would -- they tell me that -- and this is the way

6  we did it when I was with the Bureau, actually, that that wait

7  may change for a particular individual based on priority today

8  and tomorrow.  He could be bumped back or moved up depending on

9  who else is on the list.

10 Q.  But as far as the length of time, you don't know how long

11 that is?

12 A.  No.

13 Q.  And these conversations you have, they're just conversations

14 with regard to -- what type staff are you talking to?

15 A.  It ranges from the assistant director, my replacement, the

16 assistant director of health services, to my most recent

17 discussion was an exchange of e-mails with the executive

18 assistant at the Brooklyn facility.

19 Q.  Okay.  Now, with regard to Dr. Harvey, you're not saying

20 that Dr. Harvey wouldn't have knowledge of the policies, the

21 placement policies, of the Bureau of Prisons, are you?

22 A.  No.  He's not involved in the designation process itself,

23 but I wouldn't -- wouldn't presume to say that Dr. Harvey

24 doesn't -- is not familiar with those policies.  He's a very

25 capable physician and administrator.

1      MR. GRIESS:  That's all the questions I have, Your

2  Honor.

3      THE COURT:  Ms. Logan.

4      MS. LOGAN:  Just a couple, Your Honor, please.

5                  REDIRECT EXAMINATION

6  BY MS. LOGAN:

7  Q.  Mr. Wise, you were talking with Mr. Griess about the

8  classification of inmates you've worked with since you retired

9  in 2002.  After classification, you can just look your inmates

10 up that you've worked with on the BOP Web site, right?

11 A.  Yes, you can.

12 Q.  Find out where they were initially classified or initially

13 designated to, and you know where they went?

14 A.  Yeah.  In most cases, I -- in most cases, I know that before

15 they actually go into custody, but you can -- you're right, you

16 can always find them on the designator, the locater, inmate

17 locater.

18 Q.  And just like the chances of seeing a synovial sarcoma

19 specialist is lower in the BOP and lower still in the private

20 placement setting, the chances of seeing any sarcoma specialist

21 or any medical oncologist at all is lower, right?

22 A.  Not -- not necessarily.  Even those remotely located

23 facilities typically have access to a medical oncologist, but

24 not a subspecialist.

25 Q.  There would be a medical oncologist in the rural Texas

1  areas?

2  A.   Probably in Big Spring, and that's the biggest concentration

3  of those.  There may be some areas where they don't.  There

4  could be.  I -- I don't know the location of all the oncologists

5  and whether every facility has access to one, but generally the

6  Bureau facilities would have access to an oncologist.  I'm not

7  certain about all the contract facilities.

8           MS. LOGAN:  Okay.  Thank you.

9           MR. GRIESS:  Nothing further.

10           THE COURT:  I have a couple questions.

11           As a private citizen, I own my medical records, I can

12  send them to anybody I want for a second opinion.  Do inmates

13  own their medical records?  In other words, if the MRI was done,

14  if the lab work was done for Mr. Mo and he wanted to send it to

15  his specialist in Texas or wherever he wants to send it, his

16  synovial sarcoma specialist, could he do that?

17           THE WITNESS:  Yeah.  There's a process.

18           Let me get over here so the recorder can hear me.

19           THE COURT:  Sure.

20           THE WITNESS:  There's a process where an inmate may

21  request his medical records and send those to whomever he

22  chooses.

23           THE COURT:  Okay.  And with respect to inmates, do

24  they have the option for paying out of pocket for certain

25  services?  In other words, if Mr. Mo wanted to have an MRI and

1  BOP deemed it unnecessary, could he pay for that and have it

2  done?

3          THE WITNESS:  No.

4          THE COURT:  Okay.

5          THE WITNESS:  That's not an option.  Nor, generally,

6  can he be examined by his own physician.

7          THE COURT:  Okay.  Any follow-up questions for that,

8  Mr. Griess?

9          MR. GRIESS:  No, Your Honor.

10         THE COURT:  Ms. Logan?

11         MS. LOGAN:  No, Your Honor.

12         THE COURT:  Thank you.  You may step down.

13         THE WITNESS:  Thank you.

14                              (Witness excused.)

15         THE COURT:  Ms. Logan, do you have any additional

16  witnesses you'd like to present?

17         MS. LOGAN:  We have a physician, Dr. Araujo, who is

18  available by phone at 1:30 this afternoon.  If we could break

19  until then, unless Mr. Griess has evidence that he would like to

20  put on before then.

21         MR. GRIESS:  Not at this point, Your Honor.

22         THE COURT:  And do you still anticipate a telephone

23  witness as well?

24         MR. GRIESS:  We're trying to make that determination.

25  I think this will inform that, so I can let the Court know at

1  1:30.

2      THE COURT:  Okay.  Why don't we go ahead and take a

3  break.  We'll return at 1:30.  We'll see everybody back then.

4  Thank you.

5      (Recess at 11:30 a.m. until 1:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION (1:30 p.m.)

2          (In open court with the defendant present.)

3          THE COURT:  Thank you.  You can be seated.

4          And I understand we already have the doctor on the

5     phone.

6          Anything we need to talk about before you begin your

7     examination of her?

8          MR. WEINHARDT:  No, Your Honor.

9          THE COURT:  Go ahead.

10          MR. WEINHARDT:  Doctor, we need to swear you in as a

11     witness.

12          DEJKA ARAUJO, DEFENDANT'S WITNESS VIA TELEPHONE, SWORN

13          THE DEPUTY CLERK:  Thank you.

14                    DIRECT EXAMINATION

15     BY MR. WEINHARDT:

16     Q.  State your name for us, please.

17     A.  Dejka Araujo.

18     Q.  Thank you.  We already have the spelling of your name so we

19     won't make you go through that.  And we know that you're seeing

20     patients today, and so we'll try to be as efficient with this

21     discussion as we can.

22          Doctor, could you describe for us the general

23     phenomenon of cancer and then describe how sarcoma is different

24     within that and then how synovial sarcoma is different within

25     sarcoma?

1  A.  Yes.  So when most people think of cancers they think of

2  carcinomas such as lung cancer, breast cancer, colon cancer, and

3  all of those are carcinomas.  My particular area of specialty is

4  sarcoma, and this is a rare group of tumors.  They can arise

5  either in the soft tissue or bones.  Mr. Mo has a soft tissue

6  sarcoma, and of the soft tissue sarcomas, there are over 50

7  different subtypes.

8       And so each year in the United States there are

9  somewhere between 10,000 and 15,000 soft tissue sarcomas

10 diagnosed.  You can compare that to carcinomas, such as lung

11 cancer, where there are over 200,000 cases.  One of the

12 difficult things about sarcomas is that the soft tissue

13 sarcomas, there are over 50 different subtypes, so each subtype,

14 there are not that many cases diagnosed each year in the United

15 States.

16      My particular area of expertise is synovial sarcoma.

17 Most of my new patients and consults have synovial sarcoma.  In

18 the United States, there are fewer than a thousand cases of

19 synovial sarcoma diagnosed each year in the United States so the

20 sort of average medical oncologist out in the community

21 frequently will have never seen a synovial sarcoma and usually

22 just a handful of sarcomas in general.

23      The difference between a sarcoma and a carcinoma is

24 the cell of origin.  Sarcomas originate from a mesenchymal

25 cell --

1    THE COURT:  Sorry.  Doctor, can you repeat that

2  statement for us?  The difference between a sarcoma and a

3  carcinoma is cell origin.  Can you repeat what you said right

4  after that?

5    THE WITNESS:  Oh, yes.  So carcinomas tend to respond

6  better to chemotherapy.  Sarcomas are more resistant to

7  chemotherapy.

8    THE COURT:  Thank you.

9  BY MR. WEINHARDT:

10  Q.  And does the MD Anderson Center have a particular

11  specialization in treating sarcomas?

12  A.  Yes.  We have the largest sarcoma center in the world.

13  Q.  And you told us that you have a particular expertise in

14  synovial sarcoma.

15  A.  I do.

16  Q.  How many cases of that are you treating in a year?

17  A.  So almost all of my new patients and consults are synovial

18  sarcomas.  It is not uncommon that I will see, you know, one,

19  two, or three new cases each week, and so I currently have

20  hundreds of patients with synovial sarcoma under my care.

21  Q.  How many other physicians in the United States have the

22  emphasis and experience on synovial sarcoma that you have?

23  A.  From the standpoint of patient care, to my knowledge, I'm

24  the only one who has a focus of seeing patients with synovial

25  sarcoma.  There are many other good sarcoma centers, but they

1  have a more general interest.

2  Q.  All right.  Now, currently Mr. Mo has most directly been

3  monitored by a Dr. Trent in Miami.  Tell us how you know him and

4  what his qualifications are.

5  A.  Sure.  So Dr. Trent previously was a colleague of mine here

6  at MD Anderson Cancer Center.  We had offices next door to each

7  other.  He decided to move to the University of Miami and

8  improve their sarcoma center.  And so he is a very reputable,

9  good sarcoma medical oncologist.  He is not a specialist, per

10 se, in synovial sarcoma but I think is very capable of treating

11 such a patient.

12 Q.  We have the letter that you wrote dated May 2nd of 2016.  In

13 that letter you stated a 50 percent likelihood of recurrence for

14 Mr. Mo.  A little bit of time has passed since then, and he's

15 past the one-year anniversary date from the end of his treatment

16 last year.  About where would you put the likelihood of

17 recurrence right now?

18 A.  So as time goes on from the end of treatment, which for

19 Mr. Mo was July 22nd, 2015, the likelihood of recurrence goes

20 down, but it still remains quite high, so I would say, you know,

21 his chance of recurrence is maybe down to 45 percent.

22 Q.  All right.  And is the nearer term the more risky time for

23 recurrence as opposed to years farther into the future?

24 A.  It is.  The first two years are when we see the highest

25 chance of recurrence, and in our center our standard is to

1 monitor patients every three months for the first two years.

2 Q. And in your letter, in paragraph 5, you list that monitoring

3 plan for Mr. Mo. In your opinion, is a monitoring regimen of

4 that frequency and with those components medically necessary for

5 Mr. Mo?

6 A. Yes.

7 Q. If that plan were not followed, either because there were

8 longer gaps than what you have prescribed between the monitoring

9 visits or if all of the components, imaging and lab work, were

10 not done, is there a risk of recurrence or metastasis that would

11 be caught too late for effective treatment?

12 A. So if it's caught later on, the chances of getting Mr. Mo

13 back to a no evidence of disease status decreases. The earlier

14 we catch a recurrence or a metastatic disease and the smaller

15 the volume of disease, the better the chance we have of

16 corrective therapy.

17 Q. And with regard to the work that a doctor does in reviewing

18 the imaging and the lab work that goes into those now quarterly

19 monitoring encounters, is it fair to say that not all physicians

20 are created equal in terms of their ability to correctly

21 interpret that work?

22 A. Correct. At a bare minimum, I think a patient such as

23 Mr. Mo should have -- should be followed by a medical

24 oncologist, ideally a sarcoma medical oncologist.

25 Q. Because, as you've said before, many medical oncologists

1  have only seen a handful of sarcomas ever?

2  A.  Correct.  It's not that they're bad physicians, they just

3  don't have the experience.

4  Q.  And --

5  A.  And they won't look for the nuances that are necessary.

6  Q.  And that was going to be my next question.  Are there

7  nuances in the imaging and in the lab work that someone trained

8  in sarcoma could see that someone, even a medical oncologist,

9  could miss that could mean the difference between prescribing

10  further treatment and not doing so?

11  A.  For me, you know, sort of standard of care, a patient such

12  as Mr. Mo, the bare minimum, he needs to be followed by a

13  medical oncologist; however, our recommendation in our center

14  and sort of the NCCN guidelines are that patients with sarcomas

15  are followed in large academic centers where there's experience

16  in sarcomas because otherwise things can be missed.

17  Q.  Now, is it possible that in, for example, an institutional

18  setting like the prison setting in the federal system that some

19  other physician could look at this case and believe that some

20  less rigorous schedule of monitoring is appropriate, less

21  frequency or something of that sort?

22  A.  I think there's a high chance of that happening because I

23  see even with medical oncologists they will space out the visits

24  more than I think, at least in our center, we would recommend.

25  Q.  Have there been situations where people have been monitored

1  outside of your center and something came to your attention that

2  caused you to recommend that the patient come right back to MD

3  Anderson?

4  A.  Yes.

5  Q.  And is that --

6  A.  Generally, my patients, I continue to follow them for life.

7  Q.  One final question.  There's been testimony from other

8  witnesses suggesting that a possible place, if he were

9  incarcerated, that Mr. Mo would wind up is in Butner, North

10 Carolina, and that the Federal Medical Center there has access

11 to the staffs at Wake Forest and Duke medical schools.

12        What can you tell us -- or what do you know about

13 their capabilities with regard to sarcoma?

14 A.  With regards to sarcomas, I have worked with them before.  I

15 can't say that they have good -- from a standpoint of following

16 sarcoma patients, they are better general medical oncologists.

17 They do not have sarcoma centers, so I have some hesitation.

18        MR. WEINHARDT:  All right.  No further questions, Your

19 Honor.

20        THE COURT:  Mr. Griess.

21        MR. GRIESS:  Thank you, Your Honor.

22                  CROSS-EXAMINATION

23 BY MR. GRIESS:

24 Q.  Doctor, they do, at the university of Duke and at Wake

25 Forest University, have medical oncologists on staff, though; is

1  that correct?

2  A.  Yes, they do.

3  Q.  And those doctors are competent to consider test results and

4  blood work in order to determine whether or not there's been a

5  recurrence of the cancer; is that true?

6  A.  Yes.

7  Q.  You talked about the strict regimen he's on as far as the

8  timing of the blood work that you're recommending.  What type of

9  variance becomes problematic from that timing?

10 A.  So because Mr. Mo received high doses of chemotherapy, he

11 needs to be monitored in case he develops a secondary leukemia,

12 and so for that reason we recommend, you know, close monitoring

13 of blood work.

14 Q.  And I understand that.  But the schedule, as I understand

15 it, is on a, you know, every three months, every two months, you

16 know, on that basis.  Is there any sort of acceptable variance

17 in that?  Does it have to be three months on the date, and at

18 what point do you expect that to be problematic?

19 A.  Oh, no.  I mean, if it's every -- you know, it doesn't have

20 to be three months to the day, not at all.  But in our center

21 and many other sarcoma centers, we generally look at the date a

22 patient has no evidence of disease.  We monitor them, you know,

23 approximately every three months for two years, every four

24 months for two years, every six months for one year, and then

25 yearly for the rest of their life.

1  Q.  So if there's a little bit of lag time between those visits,

2  as long as it's not a complete abandonment, it's not necessarily

3  fatal to the treatment plan or to the --

4  A.  Correct.  Correct.

5          MR. GRIESS:  That's all the questions I have, Your

6  Honor.

7          MR. WEINHARDT:  I don't have any further questions,

8  Your Honor.

9          THE COURT:  I have a few questions.  When was Mr. Mo's

10 last MRI scan and blood work?

11         THE WITNESS:  If you're asking me, Your Honor, I don't

12 know because I think Dr. Trent ordered his last scan.

13         THE COURT:  Okay.  If Mr. Mo makes it to the 24 mark

14 with no evidence of a reoccurrence of this sarcoma, what are his

15 odds at that point?

16         THE WITNESS:  So they keep going down, and it's a

17 little hard to say an exact number just because we've seen

18 recurrences as far out as 15 years, but it goes down enough that

19 we spread the visits out to every four months for years three

20 and four.

21         THE COURT:  Okay.  So you don't have a number on what

22 that looks like?

23         THE WITNESS:  Unfortunately, we don't have a number.

24         THE COURT:  Okay.  And regular carcinomas have certain

25 genetic and environmental triggers.  Is that true with sarcomas

1 as well?

2          THE WITNESS:  So for synovial sarcoma, we have not

3 found anything that we think causes it.  There is a

4 translocation that almost all synovial sarcomas have, but we

5 have not found an environmental cause or a genetic cause of

6 synovial sarcoma.

7          THE COURT:  Now, in this case Mr. Mo had symptoms of

8 this illness for better than a decade before the surgery

9 happened.  What kinds of symptoms, if any, would he have if

10 there was a reoccurrence that would be caught prior to a blood

11 test or an MRI?

12          THE WITNESS:  Sure.  So with a synovial sarcoma, apart

13 from maybe a decreased hemoglobin, probably not much is going to

14 show up in the lab.  Mr. Mo's tumor was in the left groin area,

15 so the two areas that I am most concerned about are the tumor

16 could show up would be what we call a local occurrence.  He's

17 definitely at risk for that because at the time the tumor was

18 resected, there was spillage of tumor.  So either in the left

19 groin area or in the lungs are going to be the most common

20 areas, and that's why I recommend the CAT scan of the abdomen

21 and pelvis, which would detect a local recurrence, and a chest

22 X-ray, which would detect a spread of the tumor to the lungs.

23          THE COURT:  Okay.  And those are regular tests,

24 correct?  They're read by experts, but they are a regular CAT

25 scan?

1          THE WITNESS:  Correct.  Yes.

2          THE COURT:  And same with the blood work?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Any follow-up questions,

5   Mr. Griess?

6          MR. GRIESS:  No, Your Honor.

7          THE COURT:  Mr. Weinhardt?

8          MR. WEINHARDT:  No, Your Honor.  Thank you.

9          THE COURT:  Thank you so much, Dr. Araujo, for joining

10  us.  I know you have a very busy life, and we appreciate your

11  time.

12         THE WITNESS:  You're welcome.  Thank you, Your Honor.

13         THE COURT:  Thank you.

14                              (Witness excused.)

15         THE COURT:  Mr. Weinhardt, any additional evidence?

16         MR. WEINHARDT:  No additional evidence today, Your

17  Honor.  As we indicated, Dr. Romanoff will be available

18  tomorrow.  And we've also informed the Government of this.

19  After Dr. Romanoff, we'd like to present some brief telephonic

20  testimony from the other psychologist of whom the Court is

21  aware, but we don't really want to have that be public

22  testimony.

23         THE COURT:  Okay.  And that's along the same lines of

24  Dr. Romanoff's, the same area?

25         MR. WEINHARDT:  It is the same area, that's correct.

1       THE COURT:  All right.  Okay.  Mr. Griess, has the

2  Government decided whether or not it wishes to present any other

3  evidence?

4       MR. GRIESS:  We don't, Your Honor, at this point in

5  time.  Mr. Weinhardt advised us yesterday that they did not

6  require Dr. Harvey to be available.  He is available, and if

7  they've changed their mind or if the Court would desire to take

8  his testimony, we certainly can make him available this

9  afternoon.  Otherwise, we would just rely on -- I believe it's

10  Exhibit 60 that was submitted on Friday.

11       THE COURT:  Mr. Weinhardt, any objection?

12       MR. WEINHARDT:  I have no objection.  As Mr. Griess

13  said, we said yesterday that we do not require cross-examination

14  of him, and Exhibit 60 can come in for what it says.

15       I would say this, just regarding Dr. Tarlow.  We're

16  going to start with Dr. Romanoff at 1:30, hopefully get him

17  done -- I'm sorry -- 10:30.

18       Thank you, Kelli.

19       She was shaking her head at me.

20       THE COURT:  She's good at that.

21       MR. WEINHARDT:  Hopefully have him done at about noon.

22  Dr. Tarlow would be available at noon so we might go into the

23  lunch period to get that done.

24       THE COURT:  Okay.  And so Government Exhibit 60 will

25  be admitted.

1                    (Government Exhibit No. 60 was

2                         offered and received in evidence.)

3          THE COURT:  We'll go ahead, then, and expect to get

4    started again tomorrow morning at 10:30.  We'll run into the

5    lunch hour if we need to for Dr. Tarlow, and then we'll probably

6    take a brief break and come back and do arguments and other

7    things, then, after we take a lunch break.

8          Anything more to talk about, then, today?

9          MR. GRIESS:  No.  Thank you, Your Honor.

10         THE COURT:  Ms. Dietch, any questions from you?

11         THE PROBATION OFFICER:  No, Your Honor.

12         THE COURT:  Mr. Weinhardt?

13         MR. WEINHARDT:  Nothing further for us.

14         THE COURT:  Do you need a minute with Mr. Beck?

15         MR. WEINHARDT:  If I could have just a minute.

16         THE COURT:  Yes.  Go ahead.

17         MR. WEINHARDT:  No.  We're done for today, Your Honor.

18   Thanks.

19         THE COURT:  Okay.  We'll see everybody tomorrow

20   morning at 10:30.

21              (Recess at 1:49 p.m. until 10:30 a.m., Wednesday,

22   October 4, 2016.)

23

24

25

1        C E R T I F I C A T E

2           I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3    the State of Iowa and Federal Official Realtime Court Reporter

4    in and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11          Dated at Des Moines, Iowa, this 26th day of October,

12   2016.

13

14

15                        /s/ Kelli M. Mulcahy
                          Kelli M. Mulcahy, CSR, RMR, CRR
16                        Federal Official Court Reporter

17

18

19

20

21

22

23

24

25